UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MURPHY MEDICAL ASSOCIATES, LLC;    :    Docket No. 20 Civ. _____
DIAGNOSTIC AND MEDICAL SPECIALISTS  :
OF GREENWICH, LLC; NORTH STAMFORD   :
MEDICAL ASSOCIATES, LLC; COASTAL    :    **COMPLAINT**
CONNECTICUT MEDICAL GROUP, LLC; and :
STEVEN A.R. MURPHY, M.D.,           :    **JURY TRIAL DEMANDED**
                                    :
                  Plaintiffs,       :
                                    :
      vs.                           :
                                    :
CIGNA HEALTH AND LIFE INSURANCE     :
COMPANY and CONNECTICUT GENERAL     :
LIFE INSURANCE COMPANY,             :
                                    :
                  Defendants.       :
                                    :
                                    :
- - -- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

    Plaintiffs, Murphy Medical Associates LLC; Diagnostic and Medical Specialists of

Greenwich, LLC; North Stamford Medical Associates, LLC; Coastal Connecticut Medical

Group, LLC (collectively, "Murphy Practice"); and Steven A.R. Murphy, M.D. ("Dr.

Murphy"), by their attorneys, Garfunkel Wild, P.C., for their Complaint against the

Defendants, CIGNA Health and Life Insurance Company and Connecticut General Life

Insurance Company (collectively, Cigna), allege as follows:

## INTRODUCTION

    1.    That this lawsuit needs to be brought at all is a sad commentary on the

state of health care in 2020 America.  Put simply, at the start of the COVID-19

pandemic, the Murphy Practice – a cutting edge internal and preventative medical

practice based in southwestern Connecticut – was one of the first (if not the first) to

answer the call of towns and institutions throughout Fairfield and New Haven Counties,

Connecticut, and Westchester County, New York about the desperate need for timely COVID-19 testing.

2.    Accordingly, the Murphy Practice invested hundreds of thousands of dollars to transform its traditional medical practice to set up COVID-19 testing sites throughout southwestern Connecticut and the Hudson Valley. These sites – which were erected virtually overnight – were designed to provide efficient drive and/or walk-through COVID-19 testing to patients with symptoms or suspected exposure. These testing sites were unquestionably the first line of defense against the pandemic.

3.    The Murphy Practice also invested significant hours and resources researching peer-reviewed and other expert literature to determine the most effective and informative way to fulfill its COVID-19 testing mission. This research, combined with Dr. Murphy's more than a decade's worth of primary care and academic experiences, confirmed that merely performing a rapid COVID-19 polymerase chain reaction ("PCR") test is insufficient for treating potentially infected patients. Rather, to comply with the most up-to-date clinical guidance, and to provide complete and thorough patient care, testing for other potential viruses and bacteriological diseases had to simultaneously be performed. And, for patients who tested positive for COVID-19 – or who had COVID-19 antibodies in their system – blood testing had to be performed to determine the potentially life-threatening damage that the virus was doing or had done to the body's organs and systems.

4.    The Murphy Practice unquestionably fulfilled its mission. From March 1, 2020 through October 31, 2020, the Murphy Practice engaged in over 65,000 encounters with patients, and collectively tested and provided medical treatment and

care to over 28,000 of those patients. To date, the Murphy Practice has provided COVID-19 testing to approximately 3,000 uninsured patients.

5.      The Murphy Practice has received accolades for its public health efforts from federal and state elected representatives, local government officials, and the media. Indeed, the Murphy Practice's efforts in creating the first walk up and/or drive through testing sites in Connecticut played a significant part in the relative success that Connecticut enjoyed in combating the COVID-19 crisis.

6.      Sadly, however, Cigna has not honored its obligation to reimburse the Murphy Practice for this vitally needed public health service. This is tragic, because, while it is virtually impossible in this polarized political environment for our federal elected officials to agree on *anything*, they did agree on payment for COVID-19 testing and related services.

7.      Specifically, through the Families First Coronavirus Response Act and the CARES Act, Congress mandated that health plans and managed care companies, such as Cigna, must cover and reimburse providers for conducting COVID-19-related testing. This coverage must be provided "without cost sharing, when medically appropriate for the individual, as determined by the individual's attending healthcare provider in accordance with acceptable standards of current medical practice."[1]

8.      Thus, health plans and managed care companies must provide this coverage without requiring the patients themselves to pay anything for the testing, even for testing that is performed by out-of-network providers.

---

[1] *FAQS About Families First Coronavirus Response Act and Coronavirus Aid, Relief, and Economic Security Act Implementation Part 42*, CTR. FOR MEDICAID AND MEDICARE SERVICES (Apr. 11, 2020), https://www.cms.gov/files/document/FFCRA-Part-42-FAQs.pdf, at 5-6.

3

9.      Cigna, perhaps more concerned with ensuring that COVID-19 does not adversely impact its profit margins, has not honored its statutory obligation to reimburse the Murphy Practice for the COVID-19-related testing that it provided to Cigna's members and beneficiaries since March 2020. As of now, the amount outstanding owed to the Murphy Practice for this testing totals more than $4.6 million dollars. Cigna has denied reimbursement for COVID-19 testing-related services for over 4,400 members or beneficiaries.

10.      Cigna has instead engaged the Murphy Practice in a paperwork war of attrition. Specifically, Cigna has made and continues to make voluminous medical records and audit requests in a clear effort to overwhelm the Murphy Practice and to delay its payment obligations indefinitely.

11.      Indeed, Cigna's requests would require the Murphy Practice to provide it with hundreds of thousands of pages of documents, and cause the entire practice, and the COVID-19 testing operation that is so vital to the ongoing public health emergency, to grind to a halt.

12.      Cigna has even engaged in the practice of denying claim appeals *before* the Murphy Practice has responded with requested records or reasonably could respond to those claim appeals.

13.      Moreover, even if the Families First Coronavirus Response Act and CARES Act do not obligate Cigna to reimburse the Murphy Practice for the medically necessary COVID-19-related testing that it performed – which they most certainly do – Cigna would still be obligated to reimburse the Murphy Practice for the COVID-19-related testing. This is because the Affordable Care Act requires group health plans and

4

managed care companies – such as Cigna – that provide or cover benefits with respect to services in an emergency department of a hospital, to cover all emergency services without the need for prior authorization, without regard to the provider's status as an out-of-network provider, and in a manner that ensures that the patient's cost-sharing requirement is the same requirement that would apply if such services were provided in-network.[2] COVID-19-related testing unquestionably constitutes emergency services and must be reimbursed by Cigna under these provisions.

14.    Additionally, Cigna's blatant refusal to reimburse the Murphy Practice not only directly violates the Families First Coronavirus Response Act, the CARES Act, and the Affordable Care Act, it also, to the extent that its plans are covered by ERISA, violates various ERISA provisions.

15.    Finally, adding insult to injury, Cigna has – in a cynical attempt to divert attention away from its wrongful conduct – made defamatory and malicious statements about the Murphy Practice and Dr. Murphy to its patients and others. As we explain below, Cigna's conduct violates Connecticut law and has damaged the Murphy Practice and Dr. Murphy.

16.    For all these reasons, the Murphy Practice and Dr. Murphy are entitled to compensatory damages and the declaratory and other relief requested herein.

## **JURISDICTION AND VENUE**

17.    This Court has jurisdiction over this dispute under 28 U.S.C. § 1331 because the Murphy Practice and Dr. Murphy assert federal claims against Cigna under the Families First Coronavirus Relief Act, the CARES Act, the Affordable Care Act and ERISA.

---

[2] 42 U.S.C. § 300gg-19a(b)(1).

5858941v.5

18.     This Court also has supplemental jurisdiction over the Murphy Practice's and Dr. Murphy's state law claims against Cigna because these claims are so related to the Murphy Practice's and Dr. Murphy's federal claims that the state law claims form a part of the same case or controversy. This Court accordingly has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a).

19.     This Court has personal jurisdiction over Cigna because Cigna carries on one or more businesses or business ventures in this judicial district; there is the requisite nexus between the businesses and this action; and Cigna engages in substantial, and not isolated, activity within this judicial district.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial portion of the events giving rise to this action arose in this District.

## PARTIES

21.     At all times relevant to this matter, Plaintiff Murphy Medical Associates LLC is a limited liability company organized under Connecticut law. Its principal place of business is located at One East Putnam Avenue, Greenwich, Connecticut 06830.

22.     At all times relevant to this matter, Plaintiff Diagnostic and Medical Specialists of Greenwich, LLC is a limited liability company organized under Connecticut law. Its principal place of business is located at One East Putnam Avenue, Greenwich, Connecticut 06830.

23.     At all times relevant to this matter, Plaintiff North Stamford Medical Associates, LLC is a limited liability company organized under Connecticut law. Its principal place of business is located at 30 Buxton Farms Road, Suite 220, Stamford, Connecticut 06605.

24.     At all times relevant to this matter, Plaintiff Coastal Connecticut Medical Group, LLC is a limited liability company organized under Connecticut law. Its principal place of business is located at 2900 Man Street, Suite 1F, Stratford, Connecticut 06614.

25.     At all times relevant to this matter, Plaintiff Steven A.R. Murphy, M.D. is a physician licensed to practice medicine in Connecticut, New York and Colorado. His principal place of practice is located at One East Putnam Avenue, Greenwich, Connecticut 06830

26.     Upon information and belief, at all times relevant to this matter, Defendant Cigna Health and Life Insurance Company is a corporation organized under Connecticut law. Its principal place of business is located at 900 Cottage Grove Road, Bloomfield, Connecticut 06152.

27.     Upon information and belief, at all times relevant to this matter, Defendant Connecticut General Life Insurance Company is a corporation organized under Connecticut Law. Its principal place of business is located at 900 Cottage Grove Road, Bloomfield, Connecticut 06152.

## **FACTUAL BACKGROUND**

28.     Formed by Dr. Murphy over a decade ago, the mission of the Murphy Practice is to provide high-quality preventive and general health services, as well as acute primary care, to men, women, and adolescents. Dr. Murphy, a board-certified internist, is the principal of the Murphy Practice.

29.     The Murphy Practice accomplishes its mission by offering an array of preventive medical services, including diagnostic laboratory testing and imaging such as ultrasounds and echocardiograms.

5858941v.5

30.    Patients of the Murphy Practice can also receive care and consultations concerning a myriad of other services, including allergy testing, testosterone therapy, chronic disease management, gynecology, immigration physicals, medical marijuana, vitamin therapy, vein evaluation, urgent care and weight loss.

31.    Dr. Murphy completed his internship in medical genetics and pediatrics at Mount Sinai Hospital in New York. He subsequently served as the chief resident in internal medicine at Greenwich Hospital-Yale New Haven Health in Greenwich, Connecticut. Prior to entering private practice, Dr. Murphy also served as a clinical fellow in medical genetics at Yale Medical School in New Haven, Connecticut.

32.    As a physician, Dr. Murphy specializes in general medical care, personalized medicine and genetics, weight loss medicine, adolescent care, and hereditary cancers. In addition, Dr. Murphy is an FAA Senior Aviation Medical Examiner, a United States Civil Surgeon, and an obesity medicine specialist.

33.    Dr. Murphy serves as an assistant professor of medicine, cell biology, and anatomy at New York Medical College in Valhalla, New York.

34.    Among its other services, the Murphy Practice operates a state-licensed physician office laboratory located at 30 Buxton Farms Road in Stamford, Connecticut. Dr. Murphy is the certified laboratory director for this laboratory under the federal Clinical Laboratory Improvement Amendments ("CLIA") and Connecticut law.

35.    For several years, the Murphy Practice's laboratory has run BioFire® FilmArray® Respiratory Panels.

36.    These Panels are front-line tests to help clinicians quickly and accurately diagnose numerous respiratory infections, which present with nearly indistinguishable

symptoms and contribute to a significant healthcare burden. These multiplex PCR respiratory panels utilize a syndromic approach to target a broad grouping of probable respiratory pathogens, all in one sample-to-answer test.

37.     Effective May 1, 2020, the FDA granted emergency use authorization under 21 U.S.C. § 360bbb-3(b)(1) for the BioFire equipment and panels to test for COVID-19.  Thereafter, the Murphy Practice modified its BioFire equipment to also test for COVID-19.

38.     Beginning in January 2020, well before COVID-19 became an American public health crisis, the Murphy Practice undertook extensive clinical research – using peer-reviewed and other authoritative sources – to study, understand and determine the best way to test for and treat COVID-19.

39.     Through this research, and based on personal experience, the Murphy Practice concluded that performing a COVID-19 test in a vacuum, without performing any other diagnostic testing, would fail to adhere to the requisite standard of care. Thus, patients who present with symptoms of COVID-19, or patients who have or potentially have exposure to COVID-19, need to be tested for COVID-19 as well as other respiratory viruses and infections that could possibly cause the same or similar symptoms as COVID-19, or could possibly co-exist with COVID-19. Information about other potential respiratory viruses or infections is vitally important to ensure that patients who present with symptoms or were possibly exposed to COVID-19 receive the most appropriate and effective treatment for a life-threatening condition.[3]

---

[3] *See, e.g.*, Bangshun He et al., *Tumor Biomarkers Predict Clinical Outcome of COVID-19 Patients*, 81 J. OF INFECTION 452 (2020).

5858941v.5

40.    Additionally, patients who seek COVID-19 testing because of symptoms or exposure need to have a thorough medical history and basic examination taken at the same time the test is performed. A baseline assessment of the patient's current medical status is absolutely required to ensure that the patient receives the most appropriate and effective treatment. Patients also need preventative medicine counseling regarding the taking of universal precautions and other vitally necessary actions or things to avoid. All of this was particularly important during the early days of the pandemic when patients had little personal direct access to primary care physicians because of pandemic closures.

41.    Also, patients who test positive for COVID-19 – or who have tested positive for COVID-19 antibodies -- need to have comprehensive blood testing performed to determine the potentially life-threatening damage that the virus is doing or has done to the body's organs and systems. This blood testing includes checking for certain protein levels, vitamin levels, hormone levels, and other indicia that will provide key insights into the operation of various vital organs and systems.[4]

42.    As a result, the Murphy Practice, based on its careful review of the most updated peer-reviewed studies and other authoritative information, developed a comprehensive approach to COVID-19 testing and treatment containing all of these elements.

---

[4] *See, e.g.*, Thirumalaisamy P. Velavan & Christian G. Meyer, *Mild Versus Severe COVID-19: Laboratory Markers*, 90 INT'L J. OF INFECTIOUS DISEASE 304 (2020); Jean M. Connors & Jerrold H. Levy, *COVID-19 and Its Implications for Thrombosis and Anticoagulation*, 135 BLOOD 2033 (2020); David O. Meltzer et al., *Association of Vitamin D Status and other Clinical Characteristics with COVID-19 Test Results*, 3 JAMA NETWORK OPEN E2019722 (2020); Brody H. Foy, Jonathan C.T. Carlson & Erik Reinersten, *Association of Red Blood Cell Distribution Width with Mortality Risk in Hospitalized Adults with SARS-CoV-2 Infection*, 3 JAMA NETWORK OPEN E2022058 (2020).

43.     Ultimately, the Murphy Practice operated drive and/or walk-through COVID-19 testing sites in Greenwich, Stamford, New Canaan, Darien, Fairfield, Bridgeport, New Haven, West Haven, Stratford, and Ridgefield, Connecticut, and Bedford, Brooklyn, and Pound Ridge, New York.

44.     These sites – which were erected virtually overnight – were designed to provide efficient drive and/or walk-in COVID-19 testing to patients with symptoms and/or suspected exposure. They were unquestionably the first line of defense against the pandemic.

45.     In addition to creating the physical infrastructure for the sites, the Murphy Practice had to assemble the clinical and administrative staff needed to operate the sites and to perform the testing, including physicians, medical students, physician assistants, nurse practitioners, registered nurses, medical assistants, registrars, coordinators, and IT staff. It also had to develop extensive protocols and procedures to ensure the sites were effectively and efficiently operating, and all safety, infection control, OSHA, and CDC guidance were observed.

46.     The process for all patients – including patients who were Cigna health plan members or beneficiaries – was essentially the same.

47.     First, upon arriving at the testing site, patients were interviewed and assessed as to whether they met the requirements for COVID-19 testing. As part of this assessment, a detailed medical history and examination was taken, and all required registration and demographic information was obtained. As discussed above, the purpose of the medical history and examination was to understand the presence and

5858941v.5

severity of the patients' symptoms, as well as potential co-morbidities and complications.

48.     <u>Second</u>, if the patient met the criteria for COVID-19 testing, a sample was carefully taken using the required precautions by appropriately trained clinical personnel.

49.     Prior to the date in or about May 2020 when the BioFire respiratory panel received FDA emergency use authorization for COVID-19 testing, the samples taken from patients were split. A portion of the sample was sent to an outside, commercial laboratory to run the COVID-19 test, and, if the patient was symptomatic or had potential co-morbidities, the rest of the sample was taken to the Murphy Practice's laboratory to run a 19-channel PCR test on the BioFire machine for common respiratory virus and bacterial infections.  Prior to May 2020, the Murphy Practice was unable to perform COVID-19 PCR tests on its BioFire or other equipment.

50.     Starting in or around May 2020 – after the FDA granted emergency use authorization to perform COVID-19 testing using the BioFire® FilmArray® Respiratory Panels –samples of patients who were either symptomatic or who had potential co-morbidities were taken to the Murphy Practice's physician operated laboratory to run a 21-channel PCR test that included testing for COVID-19 as well as other common respiratory virus and bacterial infections.

51.     <u>Third</u>, the Murphy Practice's clinical personnel provided preventative medicine counseling and education to the patients, including how to observe universal precautions and proper nutrition during the pandemic, and other important issues.

52.    Fourth, during the time period between the day the sample was taken and the results were available, the Murphy Practice's clinical personnel conducted telemedicine visits with the patients to check on their conditions and determine whether further medical intervention was needed. The frequency and duration of these visits was dependent on each patient's unique condition, with an emphasis and priority on following up with patients suspected of being infected with the virus.

53.    Fifth, when the results of the tests were available, the results were posted on the patient's individual registration portal. For positive tests, a telemedicine visit was scheduled with the patient to review the results and next steps with a clinician. The patient was advised to schedule an appointment to receive a comprehensive blood panel test. The purpose of this blood test, as discussed above, is to determine the potentially life-threatening damage that the virus is doing or has done to the body's organs and systems.

54.    All totaled, from the start of the pandemic through October 31, 2020, the Murphy Practice provided these COVID-19-related testing services to over 28,000 patients, over 4,400 of whom were members or beneficiaries of Cigna health plans.

55.    Based on the provisions of the Families First Coronavirus Response Act, the CARES Act, and the Affordable Care Act discussed above, the Murphy Practice had every expectation that Cigna would honor its obligations and reimburse the practice for these COVID-19-related testing services provided to its members or beneficiaries. Indeed, other carriers similarly situated to Cigna honored their obligations to the Murphy Practice.

13

56.     Unfortunately, however, days, weeks, and, ultimately, months passed after the services were provided, and the Murphy Practice received only a token amount of reimbursement for the medically necessary services that it provided to Cigna's members or beneficiaries.

57.     What the Murphy Practice, however, did receive from Cigna were literally reams of paper requesting medical records and other supporting documents for the services that the Murphy Practice provided Cigna's members and beneficiaries.

58.     Under ordinary circumstances, the Murphy Practice would simply comply with the requests by providing the records. However, the sheer volume of these requests made this impossible, particularly given the stress of having to comply with these requests while still providing the pandemic-required COVID-19 tests in an efficient and effective manner. This is also undoubtedly what Cigna had anticipated all along.

59.     The Murphy Practice has provided Cigna what it could, requiring its administrative staff to work into nights and weekends. However, it became clear to the Murphy Practice that Cigna was using the records requests – and "audits" that it was allegedly performing – to simply delay and avoid its payment obligations. Cigna took the position, for example, that it would make *no* reimbursement to the Murphy Practice until *all* records were provided and reviewed, a process that would take months or even years.

60.     Also, despite the fact that months have elapsed since the Murphy Practice first began providing a sampling of the requested records to Cigna, the Murphy Practice has failed to receive any information from Cigna about the status of the review or when it will be paid anything.

14

61.     Astonishingly, in some cases, Cigna has issued denials of claims before any records were received from the Murphy Practice.

62.     Cigna's actions have greatly damaged the Murphy Practice and Dr. Murphy. As discussed above, to honor its commitments to operate the testing sites, the Murphy practice and Dr. Murphy invested hundreds of thousands of dollars to establish the sites. It is also paying hundreds of thousands of dollars in compensation to the staff operating the sites, and paying hundreds of thousands of dollars for needed medical and testing supplies to perform the tests.

63.     Yet, despite all of these efforts to provide much needed care to the community during this public health crisis, the Murphy Practice has received no reimbursement from Cigna at a time when insurance companies are reporting record profits.

64.     Indeed, for the second-quarter of 2020 – the very height of the pandemic in Connecticut – Cigna reported adjusted net income of $2.2 billion, compared to $1.6 billion year before. Cigna's total revenues for the second-quarter of 2020 were $39.2 billion.[5]

65.     Further, the Murphy Practice has learned from patients, testing site sponsors, and others that, when patients and others ask Cigna about the status of reimbursement to the Murphy Practice, Cigna falsely informed them that the Murphy Practice is a fraudulent enterprise and it, together with Dr. Murphy are committing fraud in connection with its COVID-19-related testing services.

---

[5] *See* Jack O'Brien, *Cigna's Net Income Grew to $1.8B During Q2, Despite Pandemic Challenges*, HEALTHLEADERS (Jul. 30, 2020), https://www.healthleadersmedia.com/finance/cignas-net-income-grew-18b-during-q2-despite-pandemic-challenges.

66.     Even more damaging, Cigna is also telling patients – again falsely – that they are personally responsible for paying the Murphy Practice for the charges it so far has refused to pay.  This is part of a pattern and practice by Cigna of sending patients false and misleading explanation of benefits. Indeed, Cigna is being sued in a RICO lawsuit in New Jersey for this very same practice.[6]

67.     All these statements are designed to create a false and negative impression about Dr. Murphy and the Murphy Practice among their patients and the community in general, to cause testing site sponsors to break their agreements or end their relationships with the Murphy Practice.

68.     Unfortunately, Cigna's efforts have already borne fruit as several cities, towns, and facilities have ended their relationships with the Murphy Practice and Dr. Murphy as a direct result of Cigna's malicious efforts.

69.     Despite not receiving any reimbursement from Cigna, the Murphy Practice has not and will not bill a Cigna member or beneficiary (or any patient for that matter) for any of these services.

70.     Despite not receiving any reimbursement from Cigna, the Murphy Practice will continue running all of its existing testing sites and will establish new testing sites to care for all patients, including Cigna members and beneficiaries, during this public health crisis.

---

[6] *Advanced Gynecology & Laparoscopy of N. Jersey. v. Cigna Health & Life Ins.*, Case No. 2:19-cv-22234 (D.N.J. filed Dec. 31, 2019).

## AS AND FOR A FIRST CAUSE OF ACTION

71.     The Murphy Practice and Dr. Murphy repeat, reiterate, and re-allege each and every allegation contained above as if more fully set forth herein.

72.     Cigna offers group health plans and is a health insurance issuer offering group or individual health insurance coverage, as those terms are defined under section 6001 of the Families First Coronavirus Response Act.

73.     The COVID-19-related testing services that the Murphy Practice provided to Cigna's health plan members and beneficiaries constitute (a) *In vitro* diagnostic products for the detection of COVID-19 or the diagnosis of the virus that causes COVID–19 that are approved, cleared, or authorized under Federal Food, Drug, and Cosmetic Act, and the administration of such *in vitro* diagnostic products; or (b) items and services furnished to individuals during health care provider office visits (including in-person visits and telemedicine visits) that result in an order for or administration of an *in vitro* diagnostic product for the detection of COVID-19, as provided by section 6001 of the Families First Coronavirus Response Act..

74.     The Murphy Practice did not have a negotiated rate with Cigna for the provision of these services.

75.     Under section 3202(a) of the CARES Act, if a health plan such as Cigna's does not have a negotiated rate with a provider such as the Murphy Practice for providing COVID-19 testing related services, the health plan is obligated to pay the provider its cash price for providing those services.

76.     Cigna, despite numerous and persistent demands and requests, has failed and refused to provide anything remotely close to the Murphy Practice's cash price for providing the COVID-19 testing related services.

77.     By reason of the foregoing, the Murphy Practice and Dr. Murphy have been injured.

78.     Based on the above, the Murphy Practice and Dr. Murphy are entitled to judgment against Cigna in an amount to be determined at the trial of this matter, which amount is no less than $4,680,326, plus interest thereon, together with the costs and disbursements of this action, including reasonable attorneys' fees.

## AS AND FOR A SECOND CAUSE OF ACTION

79.     The Murphy Practice and Dr. Murphy repeat, reiterate, and re-allege each and every allegation contained above, as if more fully set forth at length herein.

80.     The Patient Protection and Affordable Care Act added section 2719A to the Public Health Services Act, 42 U.S.C. § 300gg-19a.

81.      Section 2719A requires any group health plan, or health insurer that provides or covers benefits with respect to services in an emergency department of a hospital, to cover any emergency services, including, emergency services outside of the emergency department, without the need for prior authorization, without regard to the provider's status as an out-of-network provider, and in a manner that ensures that the patient's cost-sharing requirement is the same requirement that would apply if such services were provided in-network. 42 U.S.C. § 300gg-19a. These requirements are expressly incorporated into group health plans covered by ERISA. 29 U.S.C. § 1185d(a).

82.     Cigna's health plans at issue in this lawsuit are health plans that are subject to the provisions of 42 U.S.C. § 300gg-19a or 29 U.S.C. § 1185d(a).

18

83.     The COVID-19-related testing services provided by the Murphy Practice that are at issue in this lawsuit meet the definition of  emergency services under 42 U.S.C. § 300gg-19a.

84.     Accordingly, Cigna was obligated to cover these COVID-19-related testing services under 42 U.S.C. § 300gg-19a and 29 U.S.C. § 1185d(a).

85.      Regulations provided pursuant to these sections require that, to satisfy their coverage obligations for emergency services, health plans must reimburse out-of-network providers at the greater of (a) the amount negotiated with in-network providers for the emergency service, accounting for in-network co-payment and co-insurance obligations; (b) the amount for the emergency service calculated suing the same method the plan generally uses to determine payments for out-of-network services (such as usual, customary, or reasonable charges), but substituting in-network cost-sharing provisions for out-of-network cost-sharing provisions; or (c) the amount that would be paid under Medicare for the emergency service, accounting for in-network co-payment and co-insurance obligations. 29 C.F.R. § 590.715-719A(b)(3)(i)(A)-(C).

86.     Cigna, despite numerous and persistent demands and requests, has failed and refused to provide to the Murphy Practice anything remotely close to the reimbursement required by 29 C.F.R. § 590.715-719A(b)(3)(i)(A)-(C).

87.     By reason of the foregoing, the Murphy Practice and Dr. Murphy have been injured.

88.     Based on the above, the Murphy Practice and Dr. Murphy are entitled to judgment against Cigna in an amount to be determined at the trial of this matter, which

19

amount is no less than $4,680,326, plus interest thereon, together with the costs and disbursements of this action, including reasonable attorneys' fees.

## AS AND FOR A THIRD CAUSE OF ACTION

89.     The Murphy Practice and Dr. Murphy repeat, reiterate, and re-allege each and every allegation contained above, as if more fully set forth at length herein.

90.     The Murphy Practice and Dr. Murphy have standing to pursue claims under ERISA as the assignee and authorized representative of its patients who are members or beneficiaries of Cigna's ERISA health plans.

91.     As the assignee of its patients, the Murphy Practice and Dr. Murphy are entitled to payment under Cigna's ERISA health plans for the medical services provided to the patients by the Murphy Practice and Dr. Murphy.

92.     Upon information and belief, the Cigna ERISA health plans do not prohibit patients from assigning their rights to benefits under the plans to the Murphy Practice and Dr. Murphy, including the right of direct payment of benefits under the plans to the Murphy Practice and Dr. Murphy.

93.     Moreover, even if some of the Cigna ERISA health plans prohibited the assignment of benefits to the Murphy Practice and Dr. Murphy, Cigna waived any purported anti-assignment provisions, ratified the assignment of benefits to the Murphy Practice and Dr. Murphy, and waived or is estopped from using any purported anti-assignment provisions against the Murphy Practice and Dr. Murphy due to Cigna's course of dealing with and statements to the Murphy Practice and Dr. Murphy as out-of-network providers.

94.     All of Cigna's ERISA health plans require payments of emergent and elective medical expenses incurred by its members and beneficiaries up to the rate of

the Murphy Practice's full incurred charges (less in-network patient responsibility amounts) for emergency/urgent care and (less out-of-network patient responsibility amounts) for elective care.

95.     The Murphy Practice's incurred charges represent its usual and customary rates for the treatment provided to Cigna's members or beneficiaries.

96.     Cigna breached the terms of its ERISA health plans by refusing to make out-of-network payments for charges covered by the plans, in violation of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

97.     These breaches include, among other things, (a) refusing to reimburse the Murphy Practice for the medically necessarily services it provided to Cigna's members or beneficiaries, as required by the Families First Coronavirus Response Act, the CARES Act, or the Affordable Care Act;  (b) refusing to reimburse the Murphy Practice for the medically necessary services that it provided to Cigna's members or beneficiaries, as required by 29 C.F.R. § 590.715-719A(b)(3)(i)(A)-(C); or (c) otherwise refusing to reimburse Murphy Practice the legally required amounts due under the plans for the medically necessary services provided by the Murphy Practice and Dr. Murphy to Cigna's members or beneficiaries.

98.     As a result of, among other acts, Cigna's numerous procedural and substantive violations of ERISA and other federal statutes, any appeals are deemed exhausted or excused, and the Murphy Practice and Dr. Murphy are entitled to have this Court undertake a *de novo* review of the issues raised in this Complaint.

99.     Under 29 U.S.C. § 1132(a)(1)(B), the Murphy Practice and Dr. Murphy are entitled to recover unpaid/underpaid benefits from Cigna. The Murphy Practice and Dr.

Murphy are also entitled to declaratory and injunctive relief to enforce the terms of Cigna's ERISA health plans and to clarify their right to future benefits under such plans, as well as attorney's fees.

## AS AND FOR A FOURTH CAUSE OF ACTION

100.    The Murphy Practice and Dr. Murphy repeat, reiterate, and re-allege each and every allegation contained above, as if more fully set forth at length herein.

101.    As assignees and authorized representatives of its patients' claims, the Murphy Practice and Dr. Murphy are entitled to receive protection under ERISA, including (a) a "full and fair review" of all claims denied by Cigna; and (b) compliance by Cigna with applicable claims procedure requirements.

102.    Based on all of the foregoing, Cigna's actions and inactions relating to the claims at issue in this lawsuit are tantamount functionally to a denial of these claims.

103.    For denied claims pursuant to 29 U.S.C. § 1133, an ERISA plan must (a) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant; and (b) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim. 29 U.S.C. § 1133(1) and (2).

104.    ERISA regulations make clear that, in the case of post-service claims submitted pursuant to group health plans, the required notification that the claim has been denied must be issued within a reasonable period of time, but not later than 30 days after receipt of the claim, unless the member or beneficiary is notified that, due to

22

circumstances beyond the plan's control, the plan requires an additional 15 days to issue a required denial notification. 29 C.F.R. § 2560-503.1(f)(2)(iii)(B).

105.   Although Cigna is obligated to provide a "full and fair review" of denied and underpaid claims pursuant to 29 U.S.C. § 1133, Cigna has failed to do so by, among other things: (a) refusing to provide the specific reason or reasons for the denial or underpayment of claims; (b) refusing to provide the specific plan provisions relied upon to support its denials or underpayments; (c) refusing to provide the specific rule, guideline or protocol relied upon in making the decisions to deny or underpay claims; (d) refusing to describe any additional material or information necessary to perfect a claim, such as the appropriate diagnosis/treatment codes; (e) refusing to notify the relevant parties that they are entitled to have, free of charge, all documents, records and other information relevant to the claims for benefits; (f) refusing to provide a statement describing any voluntary appeals procedure available, or a description of all required information to be given in connection with that procedure; (g) refusing to provide the Murphy Practice with the documents and information relevant to Cigna's denial of the claims; and (h) refusing to timely issue required notifications that the claims have been denied or underpaid.

106.   By failing to comply with the ERISA claims procedure regulations, Cigna failed to provide a reasonable claims procedure.

107.   Because Cigna has failed to comply with the substantive and procedure requirements of ERISA, any administrative remedies are deemed exhausted pursuant to 29 C.F.R. § 2560.503-1(I) and 29 C.F.R. § 590.715-2719(b)(2)(ii)(F)(1).

108.    Exhaustion is also excused because it would be futile to pursue any administrative remedies, because Cigna does not acknowledge any legitimate basis for its denials and thus offers no meaningful administrative process for challenging its denials.

109.    The Murphy Practice and Dr. Murphy have been harmed by Cigna's failure to provide a full and fair review of appeals submitted and failure to comply with applicable claims procedure regulations under ERISA. 29 U.S.C. § 1133.

110.    The Murphy Practice and Dr. Murphy are entitled to relief under 29 U.S.C. § 1132(a)(3), including declaratory and injunctive relief, to remedy Cigna's failures to provide a full and fair review, to disclose information relevant to appeals, and to comply with applicable claim procedure regulations.

## AS AND FOR A FIFTH CAUSE OF ACTION

111.    The Murphy Practice and Dr. Murphy repeat, reiterate, and re-allege each and every allegation contained above, as if more fully set forth at length herein.

112.    Cigna is a health insurer authorized to do business in Connecticut.

113.    As discussed above, the Murphy Practice and Dr. Murphy have submitted numerous claims for medically necessary COVID-19-related testing services to Cigna's members and beneficiaries.

114.    As also addressed above, Cigna was obligated to promptly reimburse the Murphy Practice and Dr. Murphy for those services in accordance with law and the terms of its plans.

115.    Cigna, however, has failed and refused to do so.

116.    Cigna's actions constitute unfair claims settlement practices in violation of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-816.

24

5858941v.5

117.   Cigna's acts and omissions offend public policy as established by the Connecticut Unfair Insurance Practices Act.

118.   Cigna's acts are immoral, unethical, oppressive, and unscrupulous, with respect to their affects upon patients and providers.

119.   Cigna's acts are causing substantial injury to patients and providers.

120.   Cigna's acts are causing substantial injury to Dr. Murphy and the Murphy Practice.

121.   Cigna's acts have caused Dr. Murphy and the Murphy Practice to suffer an ascertainable loss of money and/or property.

122.   Dr. Murphy and the Murphy Practice are entitled to compensation for the ascertainable loss they suffered as a result of Cigna's acts.

123.   Cigna's acts represent a uniform practice of Cigna.

124.   Cigna's acts constitute an unfair trade practice.

125.   Cigna has engaged in the aforementioned unfair trade practices with such frequency as to indicate a general business practice.

126.   Cigna's acts are a violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b.

127.   Cigna's acts are wanton and reckless given the harm they have caused and will continue to cause Dr. Murphy and the Murphy Practice, and Cigna knew or should have known of the wrongfulness of its acts and that such severe harm would have resulted from such acts.

128.   Cigna acted with reckless indifference to the rights of others, including Dr. Murphy and the Murphy Practice.

5858941v.5

129.    By reason of the foregoing, Dr. Murphy and the Murphy Practice are entitled to compensatory damages, punitive damages, and attorney's fees against Cigna pursuant to the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110g.

### AS AND FOR A SIXTH CAUSE OF ACTION

130.    The Murphy Practice and Dr. Murphy repeat, reiterate, and re-allege each and every allegation contained above, as if more fully set forth at length herein.

131.    A beneficial or contractual relationship exists between Dr. Murphy and the Murphy Practice and their patients who are Cigna members or subscribers.

132.    A beneficial or contractual relationship exists between Dr. Murphy and the Murphy Practice and the sponsors of their COVID-19 testing sites.

133.    At all times relevant to this action, Cigna has been well aware of these relationships.

134.    Cigna intended to, and did, interfere with these relationships by, among other things, making defamatory and malicious statements about Dr. Murphy and the Murphy Practice to their patients and others.

135.    These statements were tortious in that they were specifically designed to create a false and negative impression about Dr. Murphy and the Murphy Practice among their patients and the community in general and to cause testing site sponsors to break their agreements or end their relationships with Dr. Murphy and the Murphy Practice.

136.    As a direct result of Cigna's efforts, some municipalities and facilities have ended their relationship with the Murphy Practice and Dr. Murphy.

5858941v.5

137. By reason of the foregoing, the losses suffered by Dr. Murphy and the Murphy Practice were caused by Cigna's tortious conduct.

138. By reason of the foregoing, Dr. Murphy and the Murphy Practice are entitled to compensatory and punitive damages in an amount to be determined at trial.

**WHEREFORE**, the Plaintiffs, Murphy Medical Associates LLC; Diagnostic and Medical Specialists of Greenwich, LLC; North Stamford Medical Associates, LLC; Coastal Connecticut Medical Group, LLC; and Steven A.R. Murphy, M.D. (collectively, the "Murphy Practice") demand judgment against the Defendants, CIGNA Health and Life Insurance Company and Connecticut General Life Insurance Company, as follows:

(i) on the First Cause of Action, awarding the Murphy Practice and Dr. Murphy an amount of damages to be determined at the trial of this matter, which amount is no less than $4,680,326, plus interest thereon, and the costs and disbursements of this action, including reasonable attorneys' fees;

(ii) on the Second Cause of Action, awarding the Murphy Practice and Dr. Murphy an amount of damages to be determined at the trial of this matter, which amount is no less than $4,680,326, plus interest thereon, and the costs and disbursements of this action, including reasonable attorneys' fees;

(iii) on the Third Cause of Action, awarding the Murphy Practice and Dr. Murphy a recovery under 29 U.S.C. § 1132(a)(1)(B) of unpaid/underpaid benefits from Cigna, together with declaratory and injunctive relief to enforce the terms of Cigna's ERISA health plans and to clarify their right to future benefits under such plans, as well as attorney's fees;

5858941v.5

(iv)    on the Fourth Cause of Action, awarding the Murphy Practice and Dr. Murphy relief under 29 U.S.C. § 1132(a)(3), including declaratory and injunctive relief, to remedy Cigna's failures to provide a full and fair review, to disclose information relevant to appeals, and to comply with applicable claim procedure regulations;

(v)    on the Fifth Cause of Action, awarding the Murphy Practice and Dr. Murphy compensatory damages, punitive damages, and attorney's fees against Cigna pursuant to the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110g;

(vi)    on the Sixth Cause of Action, awarding the Murphy Practice and Dr. Murphy compensatory and punitive damages in an amount to be determined at trial; and.

(vii)    such other and further relief as this Court may deem just and proper.

Dated: Stamford, Connecticut
       November 6, 2020

GARFUNKEL WILD, P.C.
*Attorneys for Plaintiffs*

By:_____*/s/ Roy W. Breitenbach*_____
       Roy W. Breitenbach
       Barry B. Cepelewicz
       Michael J. Keane, Jr.
350 Bedford Street
Stamford, Connecticut 06901
(203) 316-0483

TO:   CIGNA HEALTH AND LIFE INSURANCE COMPANY
900 Cottage Grove Road
Bloomfield, Connecticut 06152

CONNECTICUT GENERAL LIFE INSURANCE COMPANY
900 Cottage Grove Road
Bloomfield, Connecticut 06152

5858941v.5