## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

-------------------------------------------------------------------- x

MURPHY MEDICAL ASSOCIATES, LLC;
DIAGNOSTIC AND MEDICAL SPECIALISTS OF
GREENWICH, LLC; NORTH STAMFORD MEDICAL
ASSOCIATES, LLC; COASTAL CONNECTICUT     3:20-cv-01675-JBA
MEDICAL GROUP, LLC; and STEVEN A.R. MURPHY,
MD,

                Plaintiffs,

V.

CIGNA HEALTH AND LIFE INSURANCE COMPANY     APRIL 16, 2021
and CONNECTICUT GENERAL LIFE INSURANCE
COMPANY,

                Defendants.

-------------------------------------------------------------------- X


## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT


Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103
Telephone: (860) 275-8200
Fax: (860) 275-8299

*Attorneys for Cigna Health And Life
Insurance Company and Connecticut
General Life Insurance Company*

*Of Counsel*:

*Theodore J. Tucci*

*Patrick W. Begos*

*Jean E. Tomasco*

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

I.    INTRODUCTION ................................................................................. 1

II.   SUMMARY OF CLAIMS AND GROUNDS FOR DISMISSAL................................. 3

III.  SUMMARY OF PLAINTIFFS' ALLEGATIONS ........................................... 5

IV.  LEGAL STANDARD ON A MOTION TO DISMISS .................................... 8

V.   ARGUMENT ..................................................................................... 9

     A.    Plaintiffs Fail to Plead Essential Facts for Out-of-Network Reimbursement........ 9

     B.    Plaintiffs Have No Cause of Action Under the CARES Act .............................. 11

          1.    The FFCRA and the CARES Act Have No Express Private Right of Action .................................................................................. 11

          2.    The FFCRA and the CARES Acts Have No Implied Private Right of Action .................................................................................. 13

          3.    The Amended Complaint Alleges No Facts Concerning Posted "Cash Prices" ............................................................................. 15

     C.    Plaintiffs Lack Standing Under ERISA and Fail to Plead a Plausible ERISA Claim .......................................................................................... 15

          1.    Plaintiffs Have No ERISA Standing................................................. 15

               a.    Plaintiffs Fail to Adequately Plead A Single Valid Assignment ................................................................. 16

               b.    Neither the FFCRA nor the CARES Act Confer Standing to Sue Under ERISA ............................................ 18

          2.    Plaintiffs Fail to Allege Sufficient Facts About Any Plan to Support a Claim ........................................................................ 20

          3.    The Second Count—Seeking Reformation of Unidentified ERISA Plans—Fails to State a Claim .............................................. 22

          4.    The Third Count—Seeking Benefits—Fails to State a Claim ................ 23

          5.    The Fourth Count—Seeking Equitable Relief—Fails to Plausibly State a Claim ...................................................................... 25

     D.    Plaintiffs' CUTPA/CUIPA Claim Fails as a Matter of Law.............................. 26

          1.    ERISA Preempts CUTPA and CUIPA ................................................. 26

          2.    Plaintiffs Have Not Pleaded Facts Establishing a CUTPA/CUIPA Claim.......................................................................... 27

     E.    Plaintiffs' Unjust Enrichment Claim Fails as a Matter of Law ......................... 28

          1.    ERISA Preempts the Unjust Enrichment Claim ..................................... 28

|       | 2. | Plaintiffs Have Not Pleaded Facts Establishing an Unjust Enrichment Claim | 29 |
| F.    |    | There is No "Federal Law" Claim for Reimbursement | 30 |
| G.    |    | Plaintiffs' Tortious Interference Claim Fails as a Matter of Law | 30 |
|       | 1. | ERISA Preempts the Tortious Interference Claim | 31 |
|       | 2. | Plaintiffs Have Not Pleaded Facts Establishing an Tortious Interference Claim | 31 |
| VI.   |    | CONCLUSION | 33 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abe v. N.Y. Univ.*,
   No. 14-CV-9323, 2016 WL 1275661 (S.D.N.Y. Mar. 30, 2016)...........................................24

*Alexander v. Sandoval*,
   532 U.S. 275 (2001).....................................................................................11, 13, 14

*Am. Video Duplicating, Inc. v. City Nat'l Bank*,
   No. 2:20-CV-04036, 2020 WL 6882735 (C.D. Cal. Nov. 20, 2020) ....................................14

*Apollo MD Bus. Servs., L.L.C. v. Amerigroup Corp. (Delaware)*,
   No. 1:16-cv-4814-RWS, 2017 WL 10185527 (N.D. Ga. Nov. 27, 2017)..............................19

*Appleton v. Bd. of Educ. of Town of Stonington*,
   254 Conn. 205 (2000) ..............................................................................................31, 32

*Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*,
   317 Conn. 602 (2015) .......................................................................................................27

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................................................8

*Autumn Court Operating Co., LLC v. Healthcare Ventures of Ohio*,
   No. 2:20-cv-4901, 2021 WL 325887 (S.D. Ohio Feb. 1, 2021) .............................................14

*Baras v. Baras*,
   No. FST-CV-186035174-S, 2019 WL 4668415 (Conn. Super. Ct. Aug. 22,
   2019) ..................................................................................................................................29

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................................8

*Biomed Pharm., Inc. v. Oxford Health Plans*,
   775 F. Supp. 2d 730 (S.D.N.Y. 2011)...............................................................17, 22, 26, 33

*Black & Decker Disability Plan v. Nord*,
   538 U.S. 822 (2003).........................................................................................................23

*Brownstone Inv. Grp., LLC. v. Levey*,
   468 F. Supp. 2d 654 (S.D.N.Y. 2007)..................................................................................10

*Chertkova v. Conn. Gen. Life Ins. Co.*,
   No. CV-980486346-S, 2002 WL 1902988 (Conn. Super. Ct. July 12, 2002).........................31

*Ciambrello v. Cty. of Nassau,*
   292 F.3d 307 (2d Cir. 2002) ................................................................................8

*Cole v. Aetna,*
   70 F. Supp. 2d 106 (D. Conn. 1999) .................................................................29

*Cole v. Travelers Ins. Co.,*
   208 F. Supp. 2d 248 (D. Conn. 2002) ...............................................................28

*Curtis v. Aetna Life Ins. Co.,*
   No. 3:19-CV-01579, 2021 WL 1056785 (D. Conn. Mar. 18, 2021) ...............8, 23

*Dekutowski-Cook v. Pavalock,*
   No. HHB-CV-054005970-S, 2006 WL 251167 (Conn. Super. Ct. Jan. 9,
   2006) ..................................................................................................................28

*DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.,*
   770 F. Supp. 2d 497 (E.D.N.Y. 2011) ...............................................................25

*Feldman v. Bhrags Home Care, Inc.,*
   No. 15CV5834RRMRML, 2017 WL 1274055 (E.D.N.Y. Mar. 10, 2017) ..........10

*Ferrari v. U.S. Equities Corp.,*
   No. 3:13-CV-00395, 2014 WL 5144736 (D. Conn. Oct. 14, 2014) ...................27

*Forest Ambulatory Surgical Assocs., L.P. v. United Healthcare Ins. Co.,*
   No. 10-CV-04911, 2011 WL 2748724 (N.D. Cal. July 13, 2011) ......................21

*Franchise Tax Bd. v. Constr. Laborers Vacation Trust for S. Cal.,*
   463 U.S. 1 (1983) ...............................................................................................15

*Frommert v. Conkright,*
   433 F.3d 254 (2d Cir. 2006) ..............................................................................26

*Gerosa v. Savasta & Co., Inc.,*
   329 F.3d 317 (2d Cir. 2003) ..............................................................................26

*Gianetti v. Blue Cross & Blue Shield of Connecticut, Inc.,*
   No. 3:07-CV-01561, 2008 WL 1994895 (D. Conn. May 6, 2008), *aff'd,* 351 F.
   App'x 520 (2d Cir. 2009) ...................................................................................27

*Giordano v. Thomson,*
   564 F.3d 163 (2d Cir. 2009) ..............................................................................23

*Glynn v. Bankers Life & Cas. Co.,*
   297 F. Supp. 2d 424 (D. Conn. 2003) ...............................................................27

*Gonzaga Univ. v. Doe*,
   536 U.S. 273 (2002)...........................................................................................................13

*Healthcare Ventures of Ohio, LLC v. HVO Operations Windup LLC*,
   No. 20-CV-04991, 2020 WL 6688994 (S.D. Ohio Nov. 13, 2020) ...................................13, 14

*Heimeshoff v. Hartford Life & Acc. Ins. Co.*,
   571 U.S. 99 (2013)...........................................................................................................23

*Johnson v. JPMorgan Chase Bank, N.A.*,
   488 F. Supp. 3d 144 (S.D.N.Y. 2020)...............................................................................12

*Juan Antonio Sanchez, PC v. Bank of S. Texas*,
   No. 7:20-CV-00139, 2020 WL 6060868 (S.D. Tex. Oct. 14, 2020) ...................................15

*Keller v. Beckenstein*,
   117 Conn. App. 550 (2009), *cert. denied*, 294 Conn. 913 (2009) ..........................................27

*Kennedy v. Empire Blue Cross & Blue Shield*,
   989 F.2d 588 (2d Cir. 1993)...............................................................................................24

*Kittay v. Kornstein*,
   230 F. 3d 531 (2d Cir. 2000)...............................................................................................8

*Law Offices of Frank N. Peluso, P.C. v. Cotrone*,
   No. FST-CV-06-5000599-S, 2009 WL 3416247 (Conn. Super. Ct. Sept. 23,
   2009) ...............................................................................................................................32

*Lopez v. Jet Blue Airways*,
   662 F.3d 593 (2d Cir. 2011)...............................................................................................13

*In re Managed Care Litig.*,
   No. 00-1334, 2009 WL 742678 (S.D. Fla. Mar. 20, 2009).......................................................20

*Markowitz v. Villa*,
   No. CV-166060963-S, 2017 WL 960769 (Conn. Super. Ct. Jan. 26, 2017) ..........................29

*Martin v. American Equity Ins. Co.*,
   185 F. Supp. 2d 162 (D. Conn. 2002) ...................................................................................28

*Mastafa v. Chevron Corp.*,
   770 F.3d 170 (2d Cir. 2014)...................................................................................8, 24, 27

*Matava v. CTPPS, LLC*,
   No. 3:20-CV-01709, 2020 WL 6784263 (D. Conn. Nov. 18, 2020)................................12, 14

*MC1 Healthcare, Inc. v. United Health Group, Inc.*,
   No. 3:17-CV-01909, 2019 WL 2015949 (D. Conn. May 7, 2019) ......................16, 17, 20, 21

*McCullough Orthopaedic Surgical Servs., PLLC v. Aetna, Inc.*,
    857 F.3d 141 (2d Cir. 2017)................................................................18

*Merrick v. UnitedHealth Grp., Inc.*,
    175 F. Supp. 3d 110 (S.D.N.Y. 2016)..............................................18, 20

*Mescall v. U.S. Dep't of Justice*,
    No. 2:20-CV-13364, 2021 WL 199277 (E.D. Mich. Jan. 19, 2021) ......................14

*Michael E. Jones M.D., P.C. v. UnitedHealth Grp., Inc.*,
    No. 19-CV-7972, 2020 WL 4895675 (S.D.N.Y. Aug. 19, 2020)..........................21

*Michel v. Bridgeport Hosp.*,
    No. FST-11-6015195-S, 2011 WL 1176885 (Conn. Super. Ct. March 7, 2011) ...................32

*Mills v. Bluecross Blueshield of Tenn., Inc.*,
    No. 3:15-CV-552, 2017 WL 78488 (E.D. Ten. Jan. 9, 2017)...................................14

*Montefiore Med. Ctr. v. Teamsters Local 272*,
    642 F.3d 321 (2d Cir. 2011)..............................................................16

*N.R. v. Raytheon Co.*,
    No. 20-10153-RGS, 2020 WL 3065415 (D. Mass. June 9, 2020)..........................19

*Neurological Surgery, P.C. v. Aetna Health Inc.*,
    No. 2:19-CVx-4817, 2021 WL 26097 (E.D.N.Y. Jan. 4, 2021) ............9, 10, 16, 17, 18, 27, 31

*New York State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*,
    798 F.3d 125 (2d Cir. 2015)..............................................................21

*Paese v. Hartford Life & Acc. Ins. Co.*,
    449 F.3d 435 (2d Cir. 2006)..............................................................23

*Papasan v. Allain*,
    478 U.S. 265 (1986)......................................................................8

*Paskiewicz v. Brower*,
    No. 2:20-CV-02238, 2020 WL 7074605 (E.D. Cal. Dec. 3, 2020) ........................13

*Pettengill v. Fireman's Fund Ins. Co.*,
    No. 3:13-CV-154, 2013 WL 4054635 (D. Conn. Aug. 12, 2013)..........................28

*Physicians Multispecialty Grp. v. Health Care Plan of Horton Homes, Inc.*,
    371 F.3d 1291 (11th Cir. 2004) ..........................................................18

*Pilot Life Ins. Co. v. Dedeaux*,
    481 U.S. 41 (1987)......................................................................19

*Prof'l Orthopaedic Assocs., PA v. 1199 SEIU Nat'l Benefit Fund*,
   697 F. App'x 39 (2d Cir. 2017) ....................................................................16

*Prof'l Staff Cong./CUNY v. Rodriguez*,
   478 F. Supp. 3d 509 (S.D.N.Y. 2020).........................................................12

*Profiles, Inc. v. Bank of Am. Corp.*,
   453 F. Supp. 3d 742 (D. Md. 2020).......................................................13, 14

*Progressive Spine & Orthopaedics, LLC v. Empire Blue Cross Blue Shield*,
   No. 16-CV-01649, 2017 WL 751851 (D.N.J. Feb. 27, 2017) ...............17, 18

*Rep. of Iraq v. ABB AG*,
   768 F.3d 145 (2d Cir. 2014)................................................................11, 13

*Robert S. Weiss & Assoc., Inc. v. Wiederlight*,
   208 Conn. 525 (1988) ...................................................................................31

*Rojas v. Cigna Health & Life Ins. Co.*,
   793 F.3d 253 (2d Cir. 2015).......................................................2, 16, 17, 19, 20, 22

*Sanctuary Surgical Ctr., Inc. v. UnitedHealthcare, Inc.*,
   No. 10-81589-CV, 2011 WL 6935289 (S.D. Fla. Dec. 30, 2011).............20

*Shehan v. U.S. Dep't of Justice*,
   No. 1:20-CV-00500, 2020 WL 7711635 (S.D. Ohio Dec. 29, 2020)......14

*Simon v. Gen. Elec. Co.*,
   263 F.3d 176 (2d Cir. 2001) (per curiam)................................................15, 16

*Smith v. United Healthcare Ins. Co.*,
   No. 18-CV-06336-HSG, 2019 WL 3238918 ...........................................19

*Steven L. Steward & Assocs., P.A. v. Truist Bank*,
   No. 6:20-CV-1083, 2020 WL 5939150 (M.D. Fla. Oct. 6, 2020) ...........13

*Stewart v. Nat'l Educ. Ass'n*,
   404 F. Supp. 2d 122 (D.D.C. 2005), *aff'd*, 471 F.3d 169 (D.C. Cir. 2006)............23

*Sullivan v. Allstate Ins. Co.*,
   No. CV-054008548, 2006 WL 1000236 (Conn. Super. Ct. Mar. 28, 2006) ..........28

*US Airways, Inc. v. McCutchen*,
   569 U.S. 88 (2013)......................................................................................23

*Varity Corp. v. Howe*,
   516 U.S. 489 (1996).....................................................................................26

*Vertex, Inc. v. Waterbury*,
    278 Conn. 557 (2006) ...................................................................................29

*Wegmann v. Young Adult Inst., Inc.*,
    No. 15-CV- 3815, 2016 WL 827780 (S.D.N.Y. Mar. 2, 2016) ...............................25

*Wisniewski v. Rodale, Inc.*,
    510 F.3d 294 (3d Cir. 2007).............................................................................14

**Statutes**

29 U.S.C. § 1132(a)(1)(B)  (ERISA § 502(a)(1)(B) ..............................3, 15, 16, 19, 23, 24, 25, 26

29 U.S.C. § 1132(a)(3)  (ERISA § 502(a)(3).........................................................3, 15, 19, 25, 26

29 U.S.C. § 1132(g)  (ERISA § 502(g).............................................................................33

29 U.S.C. § 1133  (ERISA § 503) .....................................................................................24

29 U.S.C. § 1185d  (ERISA § 711)....................................................................................19

Coronavirus Aid, Relief, and Economic Security Act (CARES Act) Act,  Pub. L.
    No. 116-136, 134 Stat. 281 (March 27, 2020) ...................................11, 12, 13, 14, 15, 18, 30

Conn. Gen. Stat. § 38a-816 (CUIPA) ...........................................................................3, 27

Conn. Gen. Stat. § 42-110b(a) (CUTPA) .................................................................3, 26, 27, 29

ERISA ........................................................................................................... *passim*

Families First Coronavirus Response Act ("FFCRA"), Public Law 116-127, 134
    Stat. 178  (March 18, 2020)
    ………………………………………………………...…………3, 4, 7, 8, 11, 12, 13, 15, 18, 22, 30

**Other Authorities**

29 C.F.R. § 2560.503-1...............................................................................................31

Federal Rule of Civil Procedure 12(b)(6) ..............................................................1, 8, 11

Federal Rules of Civil Procedure Rule 8 .................................................................8, 27

http://coronatestct.com...........................................................................................1, 7

https://hipaa.jotform.com/MurphyMA/Register .......................................................11

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html .....................7

INSIDE EDITION, Nov. 12, 2020, https://www.insideedition.com/family-says-nearly-7000-covid-19-test-bill-includes-480-charge-for-phone-call-telling-them-results ................................................................................................................1

Thomas Breen, *Covid-Test Doc's Woes Mount UNH Bails*, New Haven Independent, Nov. 16, 2020, https://www.newhavenindependent.org/index.php/archives/entry/murphy_update/ ................................................................................................................1

Jean M. Connors & Jerrold H. Levy, *COVID-19 and Its Implications for Thrombosis and Anticoagulation* ..............................................................................6

Bangshun He, et al., Tumor Biomarkers Predict Clinical Outcome of COVID-19 Patients ........................................................................................................6

Sarah Kliff, *These Towns Trusted a Doctor to Set Up Covid Testing Set Up Covid Testing. Sample Patient Fee: $1,944*, N.Y. TIMES, Nov. 10, 2020 (updated Nov. 12, 2020) ...............................................................................................1

Thirumalaisamy P. Velavan & Christian G. Meyer, *Mild Versus Severe COVID-19: Laboratory Markers* ...................................................................................6

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants, Cigna Health and Life Insurance Company and Connecticut General Life Insurance Company (collectively, "Cigna"), move to dismiss the Amended Complaint in its entirety, and with prejudice (Doc. No. 29; hereinafter "AC"). As this Memorandum demonstrates, the Amended Complaint fails to allege the factual and legal basis necessary for viable claims against Cigna.

## I.      INTRODUCTION

Distilled to its essence, the Amended Complaint conveys the story of an opportunistic medical provider who followed the old adage of never letting a crisis go to waste. Plaintiffs portray themselves as "answer[ing] the call of towns and institutions . . . about the desperate need for timely COVID-19 testing." (AC, ¶ 14). In reality, the Amended Complaint details an elaborate business enterprise to exploit a national health emergency for profit.

Plaintiffs' own public communications demonstrate a practice of gross over-charging for testing services, demanding that insurers pay $1,500 for Plaintiffs' in-house test, while at the same time acknowledging that a SARS-CoV-2 test costs only "$200 to $600" at the outside lab Plaintiff also used. See http://coronatestct.com. Plaintiffs' price gouging has attracted widespread press coverage and numerous complaints by the people they tested,[1] as well as the interest of the Connecticut Attorney General's Office, which stated in November 2020: "we have received complaints and have an active, ongoing investigation[.]"[2] Beyond COVID-19 price gouging,

---

[1] *See, e.g.,* Sarah Kliff, *These Towns Trusted a Doctor to Set Up Covid Testing. Sample Patient Fee: $1,944*, N.Y. TIMES, Nov. 10, 2020 (updated Nov. 12, 2020), https://www.nytimes.com/2020/11/10/upshot/covid-testing-doctor-fees.html; *see also* Inside Edition Staff, *Family Says Nearly $7,000 COVID-19 Test Bill Includes $480 Charge for Phone Call Telling Them Results*, INSIDE EDITION, Nov. 12, 2020, https://www.insideedition.com/family-says-nearly-7000-covid-19-test-bill-includes-480-charge-for-phone-call-telling-them-results.

[2] Breen, Thomas, *Covid-Test Doc's Woes Mount; UNH Bails*, New Haven Independent, Nov. 16, 2020, https://www.newhavenindependent.org/index.php/archives/entry/murphy_update/.

1

Plaintiffs also charged insurers for tests, consultations, and other services that either were unnecessary or were never provided.

Faced with Plaintiffs' blatant overbilling and improper billing, Cigna took the entirely reasonable step of requesting that Plaintiffs provide records to document that they performed the services for which they billed. (AC, ¶¶ 2, 60, 61). Plaintiffs were unable or unwilling to do so, which led Cigna to, *inter alia*, demand repayment of amounts previously paid. (AC, ¶ 64, n. 12).

Plaintiffs seek to indict Cigna for requesting documentation to support their claims for plan benefits, even in the face of substantial reasons to question the veracity and validity of those claims. Such requests for information are necessary and appropriate. *See, e.g., Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 255 (2d Cir. 2015) ("Cigna regularly investigates its in-network physicians regarding reimbursement claims that may be inconsistent with Cigna's coverage regarding medical necessity."). In fact, Cigna owes fiduciary duties to the plans it administers – many of which are self-funded by the employers who hire Cigna to provide administrative services – to ensure that it authorizes payment only of legitimate claims for covered services.

Plaintiffs complain that the "burden" of furnishing proof to confirm and support the need for and performance of the services they billed for would cause their "testing operation … to grind to a halt." (AC, ¶¶ 60-61). Purported inconvenience to Plaintiffs' business enterprise is hardly justification to preclude Cigna from confirming that millions of dollars in fees were legitimate and billed properly. In fact, Plaintiffs bragged of "transform[ing]" their "traditional medical practice overnight" by assembling "the clinical and administrative staff needed to operate the [testing] sites[.]" (AC ¶¶ 22, 24). Presumably such efforts included staff necessary to support billing functions.

Finally, this lawsuit has nothing whatever to do with protecting the interest of Cigna members in obtaining SARS-CoV-2 testing. As Plaintiffs admit, "the Murphy Practice has not and will not bill a Cigna member … for any of these services." (AC, ¶ 100). Thus, this dispute is simply about the financial interests of an out-of-network provider.

As the discussion below demonstrates, the Amended Complaint is long on rhetoric but woefully short on required facts. In particular, the Amended Complaint does not identify a single one of the "over 4,000" Cigna members it allegedly tested, and for whom it seeks payment.[3] Neither is there any legal support for Plaintiffs' contention that they have a direct right to sue health plans and plan administrators for bills for SARS-CoV-2 testing services. The FFCRA, the CARES Act, and abundant caselaw addressing express and implied causes of action, plainly lead to the conclusion that Congress did not provide a private right of action.

## II.      SUMMARY OF CLAIMS AND GROUNDS FOR DISMISSAL

The eight count Amended Complaint asserts: (1) a private right of action under the Families First Coronavirus Response Act, Public Law 116-127 ("FFCRA"), and Section 3202(a) of the Coronavirus Aid, Relief, and Economic Security Act ("CARES") Act; (2) equitable reformation of unidentified ERISA plans; (3) ERISA benefits claims for unidentified beneficiaries unsupported by assignments of ERISA rights, 29 U.S.C. § 1132(a)(1)(B); (4) a claim for equitable relief under 29 U.S.C. § 1132(a)(3), to remedy alleged violations of ERISA procedures on unidentified claims for unidentified beneficiaries; (5) a claim under the Connecticut Unfair Trade Practices Act ("CUTPA"), C.G.S. § 42-110b *et seq*., for violation of the Connecticut Unfair Insurance Practices Act ("CUIPA"), C.G.S. § 38a-816; (6) a claim for unjust enrichment; (7) a claim for

---

[3] On April 9, 2021 (a week before this motion was due and over five months after they commenced this action), Plaintiffs disclosed purported details on services provided to approximately 2,600 individuals – far short of the 4,000 that are supposedly at issue in this case. Plaintiffs have asserted that these are all outstanding claims to date, thus the Amended Complaint substantially over-states the number of Cigna members Plaintiffs allegedly tested.

reimbursement mandated by unspecified "federal law"; and (8) a claim for tortious interference with contractual relationships. The Amended Complaint must be dismissed in its entirety for the following reasons:

*First*, the Amended Complaint fails to plead essential facts necessary to recover reimbursement from Cigna. Plaintiffs want payment of "more than $6 million" for COVID-19-related health services provided to "over 4,000 members or beneficiaries" of Cigna plans (an average charge of $1,500 per person). (AC, ¶ 64).[4] But the Amended Complaint does not identify a *single individual* Plaintiffs tested for whom Cigna did not pay. Plaintiffs cannot require Cigna to guess which of the hundreds of thousands of claims it has received and administered since the pandemic began are at issue in this action. The law requires out-of-network providers like Plaintiffs to plead facts identifying patients and plans at issue, services provided, and the amounts billed and owed.

*Second*, Plaintiffs have no private right of action – either express or implied – under FFCRA or the CARES Act.

*Third*, Plaintiffs cannot recover under ERISA. The Amended Complaint alleges, in conclusory fashion, that Plaintiffs received assignments from some Cigna members, but fails to identify any specific assignment, the plan under which rights were assigned, or valid assignment language. Nor is there a valid claim that the FFCRA or CARES Act grants Plaintiffs ERISA standing or requires equitable reformation of unidentified ERISA plans. Further, the Amended Complaint fails to state an ERISA claim for benefits or for equitable relief.

---

[4] The number of alleged Cigna members has decreased from "over 4,400" to "over 4,000," while the amount Plaintiffs seek to recover increased from $4.6 million to "more than $6 million." *Compare*, Complaint, ¶ 9 *with* AC, ¶ 64.

*Fourth*, ERISA preempts Plaintiffs' common-law claims for reimbursement of employee benefits. Further, Plaintiffs have not pleaded facts establishing plausible claims for CUTPA/CUIPA, unjust enrichment, or tortious interference. Nor can Plaintiffs rely on a conclusory allegation that "federal law requires Cigna to pay" Plaintiffs for the benefits they allegedly provided to Cigna, when Cigna's obligations are governed by ERISA and the unidentified plans covering the individuals Plaintiffs tested.

### III.   SUMMARY OF PLAINTIFFS' ALLEGATIONS [5]

Plaintiffs, Murphy Medical Associates, LLC, Diagnostic and Medical Specialists of Greenwich, LLC, North Stamford Medical Associates, LLC, and Coastal Connecticut Medical Group, LLC (collectively, the "Murphy Practice"), seek payment for services related to SARS-CoV-2 testing provided to over 4,000 unidentified individuals participating in Cigna-administered health plans.[6] Plaintiffs set up drive- and/or walk-through SARS-CoV-2 testing operations in various towns in Southwest Connecticut and New York (often under contract with municipalities or other entities such as colleges). (AC, ¶¶ 22-23). At the head of the Murphy Practice is Plaintiff, Dr. Steven A.R. Murphy. (*Id.*, ¶ 15). The sites provided SARS-CoV-2 testing to individuals with symptoms or suspected exposure. (*Id.*, ¶ 22).

At the start of this testing enterprise, the Murphy Practice's own lab could not perform SARS-CoV-2 tests. Accordingly, test samples were split, with one part going to an outside commercial laboratory for the SARS-CoV-2 test, and the other part tested by the Murphy Practice lab for non-

---

[5] Cigna denies Plaintiffs' material allegations and causes of action alleged under federal and state law. Solely for purposes of this motion to dismiss, this section of the Memorandum summarizes their factual and legal allegations.

[6] The Amended Complaint blurs the distinction between COVID-19 (the disease) and SARS-CoV-2 (the virus). Accordingly, it improperly conflates the protocol for testing asymptomatic people for SARS-CoV-2 with the treatment protocol for COVID-19. The distinction is crucial, and Cigna notes the difference throughout this Memorandum, because the gravamen of the Amended Complaint concerns an alleged failure to comply with federal law concerning testing for SARS-CoV-2, not treatment for the effects of COVID-19.

SARS-CoV-2 respiratory viruses through a "BioFire" test. (*Id.*, ¶ 30). There is no allegation that the Murphy Practice waited to receive a positive SARS-CoV-2 test result before running its own tests for other potential respiratory infections, or that it ran such additional tests only for individuals who presented with symptoms of a respiratory infection.[7]

In May 2020, the Murphy Practice purchased a "new BioFire machine" that had been granted FDA emergency use authorization in May 2020 for purposes of performing SARS-CoV-2 testing. (*Id.*, ¶ 32). Plaintiffs allege that "the new BioFire machines are not capable of running a test limited to the detection of [SARS-CoV-2]." (*Id.*, ¶ 34). Thereafter, Plaintiffs allege that they used their new machine to test for non-SARS-CoV-2 respiratory infections for any individuals seeking SARS-CoV-2 tests "who were symptomatic or otherwise had a need for expedited results." (*Id.*, ¶ 36). "For others, the samples were sent to an outside lab that did the [SARS-CoV-2] testing." (*Id.*). The Amended Complaint does not allege which, or even how many, of the 4,000-plus individuals at issue were "symptomatic," which ones simply had "a need for expedited results," and which ones had their samples sent to an outside lab.[8] Plaintiffs do not allege that (or why) the medical necessity of a test for non-SARS-CoV-2 respiratory infections turns on whether the test subject wants expedited results on a SARS-CoV-2 test.[9]

---

[7] Plaintiffs allege that "information about other potential respiratory viruses or infections" is important for people "who present with symptoms or were possibly exposed to [SARS-CoV-2]." (AC, ¶ 26 n.1). But the sources they cite there and elsewhere in the Amended Complaint do not address SARS-CoV-2 testing in asymptomatic people; rather, they consider evaluation and treatment of patients already diagnosed with, and/or hospitalized for, active COVID-19. *See, e.g.*, Bangshun He, *et al.*, *Tumor Biomarkers Predict Clinical Outcome of COVID-19 Patients*, 81 J. of Infection 452 (2020) (predicting mortality for patients with moderate, severe or critical COVID-19); Thirumalaisamy P. Velavan & Christian G. Meyer, *Mild Versus Severe COVID-19: Laboratory Markers*, 90 INT'L J. OF INFECTIOUS DISEASE 304 (2020) (hospitalized patients); Jean M. Connors & Jerrold H. Levy, *COVID-19 and Its Implications for Thrombosis and Anticoagulation*, 135 BLOOD 2033 (2020) (hospitalized patients).

[8] Plaintiffs seek to suggest that an individualized medical evaluation was provided before any test was ordered, alleging that they have "test order form[s], signed by a physician[.]" (AC, ¶ 67). But those forms, some of which Plaintiffs have now produced in discovery, have the identical physician's signature, suggesting that someone signed a "master" test order form that was then copied and distributed to multiple test sites.

[9] Plaintiffs, who were not in Cigna's network of providers (AC, ¶ 73), billed Cigna for the tests they allegedly performed on Cigna members. And they seek to charge dearly for the additional respiratory tests for individuals who

Plaintiffs allege that they also provided SARS-CoV-2 antibody blood testing for individuals who knew or had reason to believe they had recovered from COVID-19. (*Id.*, ¶ 37). Plaintiffs claim that, for individuals who tested positive for SARS-CoV-2 or its antibodies, it was "necessary" to conduct additional blood testing— "in addition to the antibody testing specifically covered by the FFCRA and the CARES Act"—to provide insight into the operation of various unspecified vital organs and systems. (*Id.*, ¶ 38).

The Amended Complaint further alleges that the Murphy Practice's "clinical personnel" provided "telemedicine preventative medicine counseling and education" to those who went to their sites for SARS-CoV-2 testing, including counseling and education about "how to observe universal precautions," "proper nutrition during the pandemic," and, vaguely, "other important issues." (*Id.*, ¶ 39).[10] The Murphy Practice also allegedly had "clinical personnel" conduct telemedicine visits "between the day the sample was taken and the results were available" with individuals who had visited a site (apparently even those who were asymptomatic), purportedly to "check on their conditions and determine whether further medical intervention was needed." (*Id.*, ¶ 40). When the results of the tests were available, the results allegedly were posted on the person's "individual registration portal." (*Id.*, ¶ 41). When an individual's test came back positive, the Murphy Practice scheduled a telemedicine visit to discuss the test results, during which the Practice advised the individual to "schedule an appointment [with the Practice] to receive a comprehensive blood panel test" purportedly "to determine the potentially life-threatening damage that the virus

---

wanted expedited results. Their current web page, http://coronatestct.com. tells prospective test subjects that they "will bill your insurance" $200 to $600 for SARS-CoV-2 tests sent to an outside lab, and "will bill your insurance $1,500" for using the BioFire machine.

[10] As Plaintiffs acknowledge (AC, ¶ 37 n.7), the CDC's recommended precautions to minimize the risk of contracting COVID-19 are basic, such as social distancing, frequent hand-washing, and wearing masks. https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html. It is unclear why it would be necessary to have "clinical personnel" convey such information to everyone tested.

was doing or had done to the body's organs and symptoms." (*Id.*). Plaintiffs billed Cigna for these communications as health services.

## IV.   LEGAL STANDARD ON A MOTION TO DISMISS

Rule 8 of the Federal Rules of Civil Procedure requires a plaintiff to "disclose sufficient information to permit the defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery." *Kittay v. Kornstein*, 230 F. 3d 531, 541 (2d Cir. 2000) (quotation marks omitted). Rule 12(b)(6) requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility exists when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

"[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice[.]" *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014) (quotation marks omitted). Nor are courts "bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. A complaint does not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 557). Accordingly, "complaints containing only conclusory, vague, or general allegations . . . are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambrello v. Cty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (quotation marks omitted).

For claims seeking recovery of ERISA plan benefits, it is insufficient to nakedly assert that the plan "covers" the desired benefit. *Curtis v. Aetna Life Ins. Co.*, No. 3:19-CV-01579, 2021 WL 1056785 at *13 (D. Conn. Mar. 18, 2021) ("[A]llegation that the benefit … is an eligible health

service cannot survive Aetna's motion to dismiss for the simple reason that such an allegation is not a factual allegation. Rather, it is a legal conclusion couched as a factual allegation.").

## V.     ARGUMENT

### A.    Plaintiffs Fail to Plead Essential Facts for Out-of-Network Reimbursement

Plaintiffs are out-of-network providers who seek $6 million for SARS-CoV-2 "testing-related services" allegedly provided to over 4,000 individuals covered under Cigna-administered benefit plans. But the Amended Complaint fails to identify the following key information: any covered individual who was tested; the benefit plan covering each; the specific tests and/or treatments Plaintiffs provided to each; what Plaintiffs billed for the services; and what decision Cigna made on each claim.

There is no question that such conclusory pleading is inadequate. In *Neurological Surgery, P.C. v. Aetna Health Inc.*, No. 2:19-CVx-4817, 2021 WL 26097 (E.D.N.Y. Jan. 4, 2021), the law firm representing Plaintiffs in the present action brought suit on behalf of an out-of-network medical provider who alleged a failure to pay "for 200 medical claims for services performed on Aetna health plan members[.]" *Id.* at *1. Unlike the Amended Complaint here, the complaint in that action provided an "abundance of details" for each patient and claim:

> The Complaint sets out the details of each claim in the following pattern: (i) the Aetna member's initials; (ii) the date of service; (iii) whether the services were emergency or elective, (iv) the nature of the services (i.e., the diagnosis and procedure, generally); (v) the date on which the member assigned to Plaintiff all rights to receive reimbursement from Aetna for the services provided; (vi) the date on which Plaintiff first billed Aetna, and the amount of the bill; (vii) the dates on which Plaintiff "communicated" with Aetna, if any; (viii) whether or not Aetna reimbursed Plaintiff, and the amount of reimbursement, if any; (ix) "the reimbursement methodology that Aetna should have applied in accordance with the terms of the applicable plan"; and (x) the dates and outcome of "additional, written appeals" to Aetna seeking further reimbursement, if any.

*Id.* at *2.

Those details allowed Aetna to bring a motion to dismiss in which it provided to the court the plan documents for the 145 ERISA plans implicated by the Neurological Surgery claims. *Id.* at *4. In an extensive analysis, the court dismissed a number of claims for various reasons, including finding that the plaintiff lacked standing to assert ERISA claims for numerous patients.

Even though Neurological Surgery provided abundant detail about specific claims, it was impermissibly vague in certain respects. For instance, the court noted that "Plaintiff cannot satisfy its pleading burden by simply arguing 'it administratively appealed each of the 200 claims at issue with Aetna.'" *Id.* at * 18. And it remarked that "[t]his is not the first time Plaintiff and Plaintiff counsel engaged in this exact 'artful pleading.'" *Id.*

Plaintiffs served a purported "damages analysis" on April 9, 2021, which Plaintiffs cannot rely on to provide any the essential facts omitted from the Amended Complaint. *Brownstone Inv. Grp., LLC. v. Levey*, 468 F. Supp. 2d 654, 660 (S.D.N.Y. 2007) ("a complaint cannot be modified by a party's affidavit or by papers filed in response to a dispositive motion to dismiss"); *Feldman v. Bhrags Home Care, Inc.*, No. 15CV5834RRMRML, 2017 WL 1274055, at *3 (E.D.N.Y. Mar. 10, 2017) (same).

Even if this disclosure could be deemed part of the complaint, it is too little, too late. The purported damages analysis was due by February 26, 2021 (Doc. 21, § IV.E.h), but Plaintiffs delayed serving it until April 9, 2021 – one week before the filing deadline for this motion. There are numerous deficiencies and other problems with this document as well:

- Though Plaintiffs allege that the litigation involves claims for treatment of "over 4,000" people, the "damages analysis" includes information on only about 2,600 people.

- There is nothing in the "damages analysis" indicating that any of the people listed are Cigna members, or, indeed, any information by which they could be located in Cigna's systems

if they were members. Thus, there are no Cigna member numbers, group numbers, dates of birth, social security numbers, or addresses.[11]

- The "damages analysis" purports to include claims for tests conducted months after the Complaint and the Amended Complaint were filed.

Plaintiffs' Amended Complaint, which provides not a single fact about any of the "over 4,000" claims at issue, fails to plausibly allege a single claim for failure to pay for covered health services.

## B.    Plaintiffs Have No Cause of Action Under the CARES Act

Plaintiffs allege that "for the most part," Cigna has paid them nothing for services provided to Cigna members even though "most, if not all" such services are "specifically covered by the FFCRA and the CARES Act." (AC, ¶ 110). Plaintiffs state that the CARES Act obligates Cigna, in the absence of a negotiated rate for "COVID-19 testing related services," to pay the provider's cash price, but that Cigna "has failed and refused to provide anything remotely close to the Murphy Practice's cash price[.]" (*Id.*, ¶¶ 108-09). The First Count invokes Section 6001 of the FFCRA, as subsequently amended by Sections 3201(a) and 3202(a) of the CARES Act. As shown below, Plaintiffs have no private right of recovery under these statutes.

### 1.   *The FFCRA and the CARES Act Have No Express Private Right of Action*

Plaintiffs have no express private cause of action under the FFCRA or the CARES Act. *See Rep. of Iraq v. ABB AG*, 768 F.3d 145, 171 (2d Cir. 2014) (affirming dismissal under Rule 12(b)(6) due to absence of private right of action in federal statute.). "[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). The Amended Complaint fails to identify language creating a private enforcement right

---

[11] To be sure, this is all standard information gathered by medical providers when treating an individual. Moreover, Plaintiffs' online registration portal requires individuals to provide this information, and more, when registering for a test. https://hipaa.jotform.com/MurphyMA/Register.

under either statute for medical providers providing health services because, quite simply, none

exists. Section 6001(a) of the FFCRA states, in pertinent part:

> A group health plan and a health insurance issuer . . . shall provide coverage, and shall
> not impose any cost sharing (including deductibles, copayments, and coinsurance)
> requirements or prior authorization or other medical management requirements for the
> following items and services furnished during any portion of the emergency period . .
> . (1) In vitro diagnostic products . . . for the detection or diagnosis of SARS-CoV-2
> or the diagnosis of the virus that causes COVID-19[;] … (2) [Certain] Items and
> services furnished to an individual … that result in an order for or administration of
> an in vitro diagnostic product described in paragraph (1)[.]

Section 6001(b) of the FFCRA provides that various federal agencies are charged with

implementing and applying section 6001(a). There is no express private right for healthcare

providers.

Section 3202 of the CARES Act likewise contains no express private right of action for

healthcare providers. Section 3202(a) addresses pricing for the services required under the

FFCRA, and requires plans to pay either "the cash price for such services as listed by the provider

on a public internet website" or a rate negotiated with the provider before or after the service in

question was provided. The only enforcement of that provision, found in section 3202(b), provides

that the Secretary of Health and Human Services may impose a civil monetary penalty on any

***provider*** who fails to post the cash price for SARS-CoV-2 testing on its public website.

Multiple courts considering various CARES Act provisions have dismissed private

enforcement attempts. *See, e.g., Matava v. CTPPS, LLC*, No. 3:20-CV-01709, 2020 WL 6784263

at *1 (D. Conn. Nov. 18, 2020) (CARES Act does not expressly provide a private right of action

to enforce its provisions); *Johnson v. JPMorgan Chase Bank*, *N.A.*, 488 F. Supp. 3d 144, 157

(S.D.N.Y. 2020) (CARES Act does not contain an express cause of action to enforce the Payroll

Protection Program loan program); *Prof'l Staff Cong./CUNY v. Rodriguez*, 478 F. Supp. 3d 509,

517 (S.D.N.Y. 2020) (§ 18006 of the CARES Act, concerning the Educational Stabilization Fund, did not contain an express cause of action).[12]

### 2. The FFCRA and the CARES Acts Have No Implied Private Right of Action

Congress "rarely" creates private rights of action by implication. *Rep. of Iraq*, 768 F.3d at 171. "[U]nless Congress speak[s] with a clear voice, and manifests an unambiguous intent to confer individual rights," a court may not infer a private right of action. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002) (quotation marks omitted). If Congress is silent or ambiguous, courts may not find a cause of action "no matter how desirable that might be as a policy matter." *Sandoval*, 532 U.S. at 286–87. "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* at 286. There must be "a clear manifestation of congressional intent to create" that private remedy. *Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011).

"For a statute to create private rights, its text must be phrased in terms of the persons benefitted." *Gonzaga Univ.*, 536 U.S. at 274; *see also Sandoval*, 532 U.S. at 289 ("Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons."). Sections 6001(a) of FFCRA and 3202 of the CARES Act focus on the regulated entities – both the requirement for group health plans and health insurance issuers to pay for specified services, and the requirement for providers to post

---

[12] *See also Profiles, Inc. v. Bank of Am. Corp.*, 453 F. Supp. 3d 742, 748 (D. Md. 2020) (stating that "the CARES Act does not expressly provide a private right of action"); *Steven L. Steward & Assocs., P.A. v. Truist Bank*, No. 6:20-CV-1083, 2020 WL 5939150 at *3 (M.D. Fla. Oct. 6, 2020) (same, citing *Profiles*); *Paskiewicz v. Brower*, No. 2:20-CV-02238, 2020 WL 7074605 (E.D. Cal. Dec. 3, 2020) (finding no private right of action under CARES Act in case involving withheld pandemic unemployment compensation); *Healthcare Ventures of Ohio, LLC v. HVO Operations Windup LLC*, No. 20-CV-04991, 2020 WL 6688994 at *9 (S.D. Ohio Nov. 13, 2020) (noting "the absence of a private cause of action under the CARES Act").

cash prices for the general public. There is no statutory language focused on protecting providers' private rights.

Equally important is the express delegation of enforcement authority to various federal agencies. "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290. Both the FFCRA and the CARES Act delegate enforcement of the SARS-CoV-2 diagnostic testing provisions exclusively to the federal government, not private parties. Because Congress has specifically provided for agency enforcement, there is "a strong presumption against implied private rights of action that must be overcome." *Wisniewski v. Rodale, Inc.,* 510 F.3d 294, 305 (3d Cir. 2007). *See also Mills v. Bluecross Blueshield of Tenn., Inc*., No. 3:15-CV-552, 2017 WL 78488 at * 6 (E.D. Ten. Jan. 9, 2017) (court found no implied right of action under the Affordable Care Act because "enforcement of these requirements [is left] to the states and the Secretary of Health and Human Services, not individuals[.]").

Finally, there is an abundance of case law rejecting attempts to privately enforce the CARES Act. *See Am. Video Duplicating, Inc. v. City Nat'l Bank*, No. 2:20-CV-04036, 2020 WL 6882735 at *5 (C.D. Cal. Nov. 20, 2020) ("Unsurprisingly, every court to address whether the CARES Act created an implied private right of action has held that it does not.").[13]

---

[13] *See also Autumn Court Operating Co., LLC v. Healthcare Ventures of Ohio*, No. 2:20-cv-4901, 2021 WL 325887, at *6 (S.D. Ohio Feb. 1, 2021) ("The text of the CARES Act indicates no intent on the part of Congress to create such a private right of action; it included no clear and unambiguous rights-creating language. Absent congressional intent to create a private remedy, this Court may not imply one."); *HVO Operations Windup LLC,* 2020 WL 6688994 at *9 (there is no "welcome mat" to federal jurisdiction "given the absence of a private cause of action under the CARES Act"); *Profiles, Inc.*, 453 F. Supp. 3d at 751 (the court was "not persuaded that the language of the CARES Act evidences the requisite congressional intent to create a private right of action," noting that "an expansive approach to implied rights of action cannot be squared with the doctrine of the separation of powers" (quotation marks omitted)); *Mescall v. U.S. Dep't of Justice*, No. 2:20-CV-13364, 2021 WL 199277 at *2 (E.D. Mich. Jan. 19, 2021) ( "The CARES Act does not create a private cause of action."); *Matava*, 2020 WL 6784263 at *1 (after finding the CARES Act does not expressly provide a private right of action, the court concluded that the complaint did not set forth "sufficient (or any) analysis as to why . . . the [c]ourt should find an implied private right of action"); *Shehan v. U.S. Dep't of Justice,* No. 1:20-CV-00500, 2020 WL 7711635 at *11 (S.D. Ohio Dec. 29, 2020) ("Court concludes that the

Because the Murphy Practice cannot enforce the CARES Act or the FFCRA, the First Court of the Amended Complaint must be dismissed.

### 3.   The Amended Complaint Alleges No Facts Concerning Posted "Cash Prices"

Even if Plaintiffs had a private right of action under the FFCRA and/or the CARES Act, they have not alleged that *they* complied with the requirement that they post the cash prices that they seek to force Cigna to pay. As noted above, the CARES Act obligates Plaintiffs to post cash prices publicly, and imposes a "civil monetary penalty on any provider" who does not comply. CARES Act, § 3202(b). Plaintiffs cannot plausibly assert claims to collect payment based on "cash prices," where they have not alleged that they maintained accurate and up-to-date public disclosures throughout the time period at issue.

### C.   Plaintiffs Lack Standing Under ERISA and Fail to Plead a Plausible ERISA Claim

Plaintiffs have alleged scattershot ERISA claims for plan reformation, wrongful denial of benefits, and catch-all equitable relief, none of which can survive dismissal.

### 1.   Plaintiffs Have No ERISA Standing

ERISA does not bestow civil enforcement rights on healthcare providers such as the Murphy Practice, nor does the FFCRA or the CARES Act.  Section 502(a) of ERISA, 29 U.S.C. § 1132(a), expressly identifies who is eligible to seek ERISA's various civil remedies, and only the parties so identified can sue for relief. *Franchise Tax Bd. v. Constr. Laborers Vacation Trust for S. Cal*., 463 U.S. 1, 27 (1983); *Simon v. Gen. Elec. Co.,* 263 F.3d 176, 178 (2d Cir. 2001) (per curiam). Thus, a Section 1132(a)(1)(B) benefits claim can be brought ***only*** by a "participant or beneficiary" of an ERISA plan, and a Section 1132(a)(3) claim can be brought ***only*** by "a participant, beneficiary, or

---

CARES Act creates no implied private right of action"); *Juan Antonio Sanchez, PC v. Bank of S. Texas*, No. 7:20-CV-00139, 2020 WL 6060868 (S.D. Tex. Oct. 14, 2020) (same).

fiduciary[.]" Healthcare providers have no standing to bring a claim under either section 1132(a)(1)(B) or 1132(a)(3) merely because they provided medical services to participants or beneficiaries. *Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 258 (2d Cir. 2015) (healthcare providers are not ERISA beneficiaries).

### a.   Plaintiffs Fail to Adequately Plead A Single Valid Assignment

Courts have recognized a "narrow exception" extending standing to "healthcare providers to whom a beneficiary has assigned his claim in exchange for health care." *MC1 Healthcare, Inc. v. United Health Group, Inc*., No. 3:17-CV-01909, 2019 WL 2015949 at *3 (D. Conn. May 7, 2019) (quoting *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 329 (2d Cir. 2011)); *see also Simon*, 263 F.3d at 178. To benefit from this exception, "the assignee must show that there is a valid assignment that comports with the terms of the benefits plan." *Prof'l Orthopaedic Assocs., PA v. 1199 SEIU Nat'l Benefit Fund,* 697 F. App'x 39, 40 (2d Cir. 2017); *MC1 Healthcare,* 2019 WL 2015949 at *3; *see also Neurological Surgery*, 2021 WL 26097 at *6 ("[w]ithout a valid assignment of this right to reimbursement . . . Plaintiff has no standing to bring a claim for benefits") (internal reference omitted).

The Amended Complaint implicitly recognizes this rule, because it alleges that "[m]any of the Cigna members who received testing services … executed assignments of benefits forms." (AC, ¶ 78). However, the Amended Complaint fails to identify a single member who executed an assignment or what the assignment said. Moreover, Plaintiffs essentially admit that not all members executed assignments, because the Amended Complaint refers to "[o]ther patients [who] registered electronically," without alleging that the electronic registration included any assignment. (AC, ¶ 79). The lack of plausible allegations to show ERISA standing requires dismissal of the Third, Fourth and Fifth Counts.

A provider must plead facts sufficient to determine which patients purportedly assigned their ERISA rights, and what specific rights they assigned. As one court explained:

> When proving standing, a plaintiff must plausibly plead underlying facts demonstrating a valid assignment of benefits. To do so, a plaintiff may include in its complaint the particular language of the assignment or include the assignment of benefit document itself. But a conclusory statement merely alleging that a provider was assigned plan benefits from its patients does not plausibly demonstrate standing.

*Progressive Spine & Orthopaedics, LLC v. Empire Blue Cross Blue Shield*, No. 16-CV-01649, 2017 WL 751851 at *5 (D.N.J. Feb. 27, 2017) (citations and quotation marks omitted); *see also MC1 Healthcare,* 2019 WL 2015949 at *4-5 (in deciding a motion to dismiss, court relied on language of assignment forms in determining the validity and scope of a purported assignment of ERISA claims); *Neurological Surgery,* 2021 WL 26097 at *7-10 (examining the language of 9 different anti-assignment provisions in 86 ERISA plans and concluding that, by virtue of the provisions, the out-of-network plaintiff provider was deprived of standing to pursue all but one claim).

Pleading facts regarding the particular assignments is critical to establishing standing, because "[n]ot all ERISA assignments convey the same rights," and a patient-assignor may not have assigned all potential claims to a provider. *Rojas*, 793 F.3d at 258 (assignment of patients' rights to payment conferred "*only* the right to pursue the participants' claims for payment, not other categories of ERISA claims"); *Biomed Pharm., Inc. v. Oxford Health Plans,* 775 F. Supp. 2d 730, 736 (S.D.N.Y. 2011) (dismissing claims for injunctive and/or declaratory relief to redress ERISA violations where plan participant's assignment to provider limited right to sue only to actions to recover money damages).

Pleading facts regarding the particular individuals who assigned claims and the terms of the assignments is also important to allow the defendant, and the court, to ascertain whether the ERISA plan at issue allows the claimed assignment. Thus, where an ERISA plan contains a provision

precluding participants or beneficiaries from assigning their rights, a purported assignment of those rights is invalid. *McCullough Orthopaedic Surgical Servs., PLLC v. Aetna, Inc.*, 857 F.3d 141, 147 (2d Cir. 2017) (plan's anti-assignment provision rendered provider's "acceptance of an assignment … ineffective—a legal nullity"); *Merrick v. UnitedHealth Grp., Inc.,* 175 F. Supp. 3d 110, 120 (S.D.N.Y. 2016) (patients' assignments to providers were "void pursuant to the unambiguous language" of the plan); *Neurological Surgery*, 2021 WL 26097 at *7 (same, collecting cases); *see generally Physicians Multispecialty Grp. v. Health Care Plan of Horton Homes, Inc.,* 371 F.3d 1291, 1295 (11th Cir. 2004) (court was "persuaded by the reasoning of the majority of federal courts that have concluded that an assignment is ineffectual if the plan contains an unambiguous anti-assignment provision").

None of this analysis regarding the existence, scope, and validity of any assignments is possible on Plaintiffs' threadbare allegations. Their conclusory assertions that they are assignees and authorized representatives of an unspecified number of unidentified Cigna plan members are insufficient and do not plausibly demonstrate their authority to assert ERISA claims in the shoes of those members. *See Progressive Spine & Orthopaedics*, 2017 WL 751851 at * 5 (conclusory statement merely alleging that a provider was assigned plan benefits from its patients does not plausibly demonstrate standing).

### b. Neither the FFCRA nor the CARES Act Confer Standing to Sue Under ERISA

The Amended Complaint attempts an end-run of the ERISA standing requirement by asserting the baseless legal argument that the FFCRA and the CARES Act offers ERISA standing to providers without the need for assignments. (AC, ¶ 81: "In effect, the FFCRA and the CARES Act have given providers of COVID-19 testing and related services standing to sue ERISA plans for violations of ERISA … regardless of whether there has been an assignment of benefits.").

Plaintiffs cannot bootstrap standing under ERISA through unrelated statutes, let alone statutes that do not give them a private right of action in the first place. This argument for an "indirect implied right of action" should be rejected for the reasons discussed in Point V.B.  Further, courts have denied such claims in similar cases, finding plaintiffs cannot gain standing under ERISA by alleging that the provisions of another statute are either expressly or impliedly incorporated into an ERISA plan.[14]  Indeed, given the precision of ERISA's right-of-action provisions and the strictness of the Supreme Court's interpretation of them, it is just too far-fetched to suggest that the FFCRA or the CARES Act have extended ERISA without ever saying so. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987) (Section 1132 sets forth "a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans. The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA plan participants and beneficiaries were free to obtain remedies … that Congress rejected in ERISA.").

The Second Circuit has removed any hint of doubt, rejecting a virtually identical theory, positing that a plan provision allowing or requiring a health plan to make direct payments to a health care provider bestowed beneficiary status on a provider and entitled the provider to assert an ERISA claim. In *Rojas*, the court held that "Congress did not intend to include doctors in the

---

[14] *See, e.g., N.R. v. Raytheon Co.,* No. 20-10153-RGS, 2020 WL 3065415, at * 7-8 (D. Mass. June 9, 2020) (holding that Mental Health Parity Act was not impliedly incorporated into the terms of an ERISA plan and plaintiff therefore could not bring an ERISA claim based on an alleged violation of the Parity Act); *Smith v. United Healthcare Ins. Co.*, No. 18-CV-06336-HSG, 2019 WL 3238918, at *6-7 (N.D. Cal. July 18, 2019 (rejecting plaintiff's argument that she had a private right of action under the Affordable Care Act ("ACA") through ERISA § 502(a)(1)(B) because the ACA was allegedly "incorporated" into ERISA under 29 U.S.C. § 1185d; the court noted it was an improper attempt at an end-run around the ACA's statutory limitations); *Apollo MD Bus. Servs., L.L.C. v. Amerigroup Corp. (Delaware),* No. 1:16-cv-4814-RWS, 2017 WL 10185527 at * 11 (N.D. Ga. Nov. 27, 2017) (rejecting claim under the ACA because the ACA does not provide a private right of action and plaintiff did not have standing to bring the claim under ERISA § 502(a)(3)).

category of 'beneficiaries.' Benefits to which a beneficiary is entitled are bargained-for goods, such as 'medical, surgical, or hospital care,' … rather than a right to payment for medical services rendered." *Id.* at 257 (citation omitted). Allowing direct payment to a provider for medical services does not change that status: "The 'benefit' the plan provides belongs to Rojas's patients; Rojas's claim to payment for covered services is a function of how Cigna reimburses healthcare providers under the Benefit Plan. That right to payment does not a beneficiary make." *Id.* at 257-58; *see also MC1 Healthcare*, 2019 WL 2015949 at *3 ("The 'right to payment' for covered services, however, 'does not a beneficiary make.'" (quoting *Rojas*)); *Merrick*, 175 F. Supp. 3d at 116 (same).

### 2. *Plaintiffs Fail to Allege Sufficient Facts About Any Plan to Support a Claim*

Even if the Amended Complaint had alleged facts sufficient to establish standing, it nonetheless fails to allege the necessary facts to establish a plausible right to recovery under ERISA. This is because Plaintiffs fail to identity—at all—the assignor-beneficiaries whose claims they are asserting or the plans under which such benefits are allegedly conferred.

This is fatal to their ERISA claims. As *MC1 Health Care* stated:

> The mere fact that [a provider] is an assignee of numerous claims under benefit plans covered by ERISA does not give [the provider] the unfettered ability to challenge [the insurer's] benefits payments or billing practices, wholly untethered from the patients in whose shoes [the provider] purports to stand and the plans which convey the rights [the provider] seeks to enforce.

*Id.*, 2019 WL 2015949 at *6; *see also Sanctuary Surgical Ctr., Inc. v. UnitedHealthcare, Inc.*, No. 10-81589-CV, 2011 WL 6935289 at *3 (S.D. Fla. Dec. 30, 2011) (in order to survive a motion to dismiss, a plaintiff must identify "the specific plans at issue with respect to each of the patients"); *In re Managed Care Litig.*, No. 00-1334, 2009 WL 742678 at *3 (S.D. Fla. Mar. 20, 2009) ("[F]ailure to identify the controlling ERISA plans makes the [c]omplaint unclear and ambiguous.").

In addition to identifying the specific plans at issue, Plaintiffs must allege what plan language required payment of the benefits they seek. Failure to do so warrants dismissal. *New York State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 798 F.3d 125, 135 (2d Cir. 2015) ("the amended complaint … fails to identify her patients' plans or the terms of their plans, and fails to allege facts making it plausible that United reduced or denied benefits for medically necessary services 'without any basis' under the terms of those plans. Faced with such inadequate pleading, the District Court did not err in dismissing Dr. Menolascino's claims."); *Michael E. Jones M.D., P.C. v. UnitedHealth Grp., Inc.*, No. 19-CV-7972, 2020 WL 4895675 at *3 (S.D.N.Y. Aug. 19, 2020) ("there are no well-pleaded allegations as to any plan terms that Defendants may have violated"); *Forest Ambulatory Surgical Assocs., L.P. v. United Healthcare Ins. Co.,* No. 10-CV-04911, 2011 WL 2748724 at *5 (N.D. Cal. July 13, 2011) (dismissing ERISA claims where complaint did not make "reference to the terms of the controlling plans").

Plaintiffs do not identify a single ERISA plan, let alone a specific plan term, that confers the benefits in question. Permitting Plaintiff's ERISA claims "to proceed as drafted—without any specificity or clarity as to the beneficiaries, claims, or plans at issue—would…be unfair." *MC1 Health Care*, 2019 WL 2015949 at *6. In the present case, the Amended Complaint includes even less information than the one found deficient in *MC1 Health Care.* Like the insurer in that case, Cigna does not have fair notice of the claims and cannot defend them in a meaningful or orderly manner without knowing whose rights Plaintiffs purport to assert or the plans under which those rights allegedly derive. *Id.* at *7. The Amended Complaint's naked assertions, devoid of factual enhancement, do not meet even the minimal standards of pleading a viable claim.

### 3. The Second Count—Seeking Reformation of Unidentified ERISA Plans—Fails to State a Claim

The Second Count asks the Court to "equitably reform any of Cigna's ERISA plans that do not comply with the FFCRA and the CARES Act at issue to require that they mirror the language of the FFCRA and the CARES Act." (AC, ¶ 123). Plaintiffs are not entitled to such relief as a matter of law.

*First*, even assuming Plaintiffs had ERISA standing, the Amended Complaint alleges, at most, that "Cigna's Members have assigned their *right to receive benefits*[.]" (AC ¶ 134) (emphasis added). The "right to receive benefits" payable under the terms of a plan does not confer standing to seek to equitably reform plan terms. *Rojas*, 793 F.3d at 258 ("Not all ERISA assignments convey the same rights. For example, an assignment may give the assignee the right to bring only a claim for benefits, but not a claim for breach of fiduciary duty."); *Biomed Pharm.*, 775 F. Supp. 2d at 736 (dismissing ERISA claims for equitable relief where plan participant assigned only right to seek damages).

*Second*, this claim illustrates the absurdity of proceeding on a complaint that leaves the Court and Cigna in the dark. Plaintiffs do not identify a single plan that does not conform to the language that they contend is required; they do not identify any adverse claim determination that was based on non-conforming language in any such plan; and they do not allege how the language of any plan should be reformed. Compounding this issue is the likely fact that some of the unidentified plans that Plaintiffs seek to reform are self-funded ERISA plans established by non-party employers who retained Cigna solely to administer claims. Plaintiffs have no legitimate basis to reform plans established by non-party employers.

*Third*, ERISA's core principles dispel the idea that the FFCRA or the CARES Act implicitly allows providers to force wholesale reformation of ERISA benefit plans. "[N]othing in ERISA …

mandate[s] what kind of benefits employers must provide if they choose to have … a plan." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003) (internal quotation marks omitted). "Rather, employers have large leeway to design … welfare plans as they see fit." *Id.* Once an employer establishes a particular plan with particular benefits, "ERISA's principal function [is] to protect contractually defined benefits." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 100 (2013) (internal quotation marks omitted). The written plan document "is at the center of ERISA." *Id.* at 101; *see also id*. at 100-01 ("The statutory scheme ... is built around reliance on the face of written plan documents." (quotation marks omitted)).

### 4. *The Third Count—Seeking Benefits—Fails to State a Claim*

The Third Count is a quintessential wrongful denial of benefits claim under 29 U.S.C. § 1132(a)(1)(B). The starting point for such a claim is the language of the plan at issue: "'[a] plaintiff who brings a claim for benefits under ERISA must identify a specific plan term that confers the benefit in question.'" *Curtis*, 2021 WL 1056785 at *9 (quoting *Stewart v. Nat'l Educ. Ass'n*, 404 F. Supp. 2d 122, 130 (D.D.C. 2005), *aff'd*, 471 F.3d 169 (D.C. Cir. 2006)); *see also Giordano v. Thomson*, 564 F.3d 163, 168 (2d Cir. 2009) (requiring plaintiff to show that he "was wrongfully denied [benefits] owed under the plan"). Plaintiffs have not alleged any language of any plan conferring the benefits they seek.

In addition, Plaintiffs have failed to allege facts showing that they have exhausted administrative remedies regarding each benefit claim at issue. Plaintiffs asserting an ERISA benefits claim are required to exhaust administrative remedies before filing suit. *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 105 (2013) ("A participant's cause of action under ERISA accordingly does not accrue until the plan issues a final denial."); *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006) ("the federal courts—including this Circuit—

have recognized a firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases" (quotation marks omitted)).

Completing an administrative appeal is a key component of exhausting administrative remedies. 29 U.S.C. § 1133 provides that a plan must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." The Second Circuit described the reasons for this requirement as follows:

> The primary purposes of the exhaustion requirement are to: (1) uphold Congress' desire that ERISA trustees be responsible for their actions, not the federal courts; (2) provide a sufficiently clear record of administrative action if litigation should ensue; and (3) assure that any judicial review of fiduciary action (or inaction) is made under the arbitrary and capricious standard, not de novo.

*Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993) (quotation marks omitted). In addition, "the requirement was intended to help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned." *Id.* (quotation marks omitted).

The Amended Complaint merely alleges the bare conclusion that Plaintiffs have exhausted all administrative remedies, or that it would be futile to do so. (AC, ¶ 138). That allegation is deficient on its face, especially in the context of alleging thousands of improper claim determinations. *Mastafa*, 770 F.3d at 177 ("threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss). Because the Amended Complaint is devoid of any factual allegations allowing the Court to infer that Plaintiffs exhausted administrative remedies regarding any claim, dismissal is warranted. *Abe v. N.Y. Univ.*, No. 14-CV-9323, 2016 WL 1275661 at *5 (S.D.N.Y. Mar. 30, 2016) ("courts routinely dismiss ERISA claims brought under Section 502(a)(1)(B) on a 12(b)(6) motion to dismiss where the plaintiff fails

to plausibly allege exhaustion of remedies"); *Wegmann v. Young Adult Inst., Inc.*, No. 15-CV-3815, 2016 WL 827780 at *5 (S.D.N.Y. Mar. 2, 2016) (granting dismissal where "the Court cannot say that Plaintiff has adequately pleaded exhaustion"); *DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 770 F. Supp. 2d 497, 538 (E.D.N.Y. 2011) ("because plaintiffs were required to plead exhaustion of administrative remedies … but have failed to do so, this claim must be dismissed[.]").

### 5. The Fourth Count—Seeking Equitable Relief—Fails to Plausibly State a Claim

The Fourth Count alleges that Cigna allegedly failed to comply with ERISA claim procedures in connection with unspecified claims for benefits under unspecified plans. Plaintiffs purport to stand in the shoes of the unnamed participants or beneficiaries, making a conclusory assertion that Cigna did not tell those participants or beneficiaries a specific reason why their claims were denied, advise them what additional information was needed to perfect their claim, and inform them that they had a right to obtain documents related to the claim, among other similar matters. (AC, ¶ 146). Plaintiffs therefore seek "declaratory and injunctive relief" to force Cigna "to comply with applicable claim procedure regulations." (*Id.*, ¶ 151).

This Count falls for several of the same reasons as the preceding ERISA Counts: Plaintiffs do not allege facts from which the Court can plausibly infer a violation of any regulation; and they do not allege the language of any assignment allowing them to maintain such a claim on behalf of a participant or beneficiary.  Further, the ERISA claim regulations concern notices to and rights of participants and beneficiaries, not providers, and Plaintiffs fail to allege any facts concerning denials of participant claims, let alone how Plaintiffs were privy to explanation of benefits notices that Cigna sent directly to its members.

Moreover, the Fourth Count, brought as an equitable claim under 29 U.S.C. § 1132(a)(3), fails as duplicative of the § 1132(a)(1)(B) benefits claim in the Third Count. Both counts seek the same

relief – payment of benefit claims under the ERISA plans; the equitable claim is merely a repackaging of the benefits claim using in equitable terms. Section 1132(a)(3) is a "catchall provision" that acts "as a safety net, offering appropriate equitable relief for injuries caused by violations that § [1132] does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996). *See also Gerosa v. Savasta & Co., Inc*., 329 F.3d 317, 321 (2d Cir. 2003) ("In determining the propriety of a remedy, we must look to the real nature of the relief sought, not its label.") (citation omitted); *Frommert v. Conkright*, 433 F.3d 254, 270 (2d Cir. 2006).

The *Biomed Pharmaceuticals* case*,* 775 F. Supp. 2d at 738, is on point. There, the court held that the provider's three § 1132(a)(3) claims – based on alleged lack of full and fair review, inadequate notice, and breach of fiduciary duties – were adequately redressed by money damages, thereby precluding such claims as duplicative of the provider's § 1132(a)(1)(B) claim for past due benefits. Noting that "the gravamen of the three challenged ERISA claims is that [the insurance company] failed to follow proper procedure in denying the Patient's claim for benefits, which resulted in an improper denial of benefits owed to the Patient under the terms of the Plan, adequate relief for these claims is plainly available under Section 502(a)(1)(B)." *Id.* The court therefore dismissed all of the § 1132(a)(3) claims. This Court should do the same.

### D.    Plaintiffs' CUTPA/CUIPA Claim Fails as a Matter of Law

#### 1.    *ERISA Preempts CUTPA and CUIPA*

Count Five seeks to obtain payment of ERISA benefits claims through the alternative enforcement mechanism of CUIPA, alleging that Cigna engaged in unfair claims settlement

practices, Conn. Gen. Stat. § 38a-816, which gives rise to a claim under CUTPA, Conn. Gen. Stat. § 42-110b(a).[15]

ERISA plainly occupies the benefits field and preempts alternative state law mechanisms to enforce benefit plans or to determine how ERISA benefits claims are administered. *See Gianetti v. Blue Cross & Blue Shield of Connecticut, Inc.*, No. 3:07-CV-01561, 2008 WL 1994895 (D. Conn. May 6, 2008), *aff'd*, 351 F. App'x 520, 523 (2d Cir. 2009) (ERISA preempts CUTPA claim arising out of the alleged denial of charges and the alleged lack of timely review of the denial of charges); *Glynn v. Bankers Life & Cas. Co.,* 297 F. Supp. 2d 424 (D. Conn. 2003) (ERISA preempts CUTPA/CUIPA claims where a plaintiff seeks to use CUTPA's civil enforcement provisions to enforce rights under an ERISA plan); *see generally Neurological Surgery,* 2021 WL 26097 at *14 (ERISA preempted provider's state law claims to remedy the insurer's alleged wrongful denials of benefits (collecting cases)).

### 2.   *Plaintiffs Have Not Pleaded Facts Establishing a CUTPA/CUIPA Claim*

Plaintiffs' CUTPA/CUIPA claim fails independently because it is nothing more than rote repetition of statutory elements. The allegations amount to nothing beyond "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," which are not entitled to an assumption of truth, and which do not meet Rule 8 pleading standards. *Mastafa*, 770 F.3d at 177.

It is well established that "[a] claim under CUTPA must be pleaded with particularity to allow evaluation of the legal theory upon which the claim is based." *Keller v. Beckenstein*, 117 Conn. App. 550, 569 n.7 (2009), *cert. denied*, 294 Conn. 913 (2009); *Ferrari v. U.S. Equities Corp.*, No.

---

[15] CUIPA "prohibits unfair business practices in the insurance industry[,]"but it "does not authorize a private right of action." *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 317 Conn. 602, 623 (2015). However, "individuals may bring an action under CUTPA for violations of CUIPA." *Id.*

3:13-CV-00395, 2014 WL 5144736 at *3 (D. Conn. Oct. 14, 2014) (same). In order to properly assert a CUTPA/CUIPA cause of action, a plaintiff must allege facts describing conduct that CUIPA proscribes. It is insufficient merely to recite statutory provisions—which is all Plaintiffs do in this case. *See Pettengill v. Fireman's Fund Ins. Co.*, No. 3:13-CV-154, 2013 WL 4054635 at *2 (D. Conn. Aug. 12, 2013) (striking CUTPA/CUIIPA claim where plaintiff's allegations recited the statutory provisions but alleged no specific conduct by defendant to support her claims); *Martin v. American Equity Ins. Co*., 185 F. Supp. 2d 162, 167 (D. Conn. 2002) (dismissing CUTPA/CUIIPA claim that failed to allege facts supporting claim of CUIPA violation).

Plaintiffs' allegations in Count Five merely parrot the statutory language of CUTPA/CUIIPA. (AC, ¶¶ 157-75), repeating the words of the statute that Cigna's acts are a uniform practice, constitute an unfair trade practice, and that Cigna engages in the unfair trade practices with such frequency as to indicate a general business practice. These are vague and conclusory allegations insufficient to withstand a motion to dismiss. *See Dekutowski-Cook v. Pavalock*, No. HHB-CV-054005970-S, 2006 WL 251167 (Conn. Super. Ct. Jan. 9, 2006) (a complaint reciting the "magic words" requires supporting facts to survive dismissal); *Sullivan v. Allstate Ins. Co*., No. CV-054008548, 2006 WL 1000236 at *2-3 (Conn. Super. Ct. Mar. 28, 2006) (striking CUTPA/CUIPA claim with conclusory allegations). Plaintiffs failed to plead any facts to support this cause of action.

### E.   Plaintiffs' Unjust Enrichment Claim Fails as a Matter of Law

#### 1.   ERISA Preempts the Unjust Enrichment Claim

Plaintiffs' state-law unjust enrichment claim seeks benefits that are payable, if at all, under the terms of one or more ERISA plans. As such, ERISA plainly preempts the claim. *Cole v. Travelers Ins. Co.*, 208 F. Supp. 2d 248, 260 (D. Conn. 2002) (dismissing unjust enrichment claim, explaining, "[t]he alleged conduct underlying each of these causes of action concerns the

defendants' reimbursement of benefits for services Cole provided to patients covered by the defendants' employee benefits plans. … [T]hese causes of action are precisely of the type that Congress sought to preempt with ERISA."); *see also Cole v. Aetna*, 70 F. Supp. 2d 106, 112–13 (D. Conn. 1999) (dismissing breach of contract, unjust enrichment, fraud, CUTPA, and CUIPA claims in similar action).

### 2. *Plaintiffs Have Not Pleaded Facts Establishing an Unjust Enrichment Claim*

Employing a tactic commonly adopted by out-of-network providers, the Murphy Practice alleges that it provided "medically necessary COVID-19 testing and related services to Cigna's members and beneficiaries." (AC, ¶ 180). Even if true, Plaintiffs falsely equate a benefit that they provided to patients as ultimately flowing to Cigna.

The elements of an unjust enrichment claim are (1) that *the defendants* were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits *they received*, and (3) that the failure of payment was to the plaintiffs' detriment. *Vertex, Inc. v. Waterbury*, 278 Conn. 557, 573 (2006). Plaintiffs fail to allege any facts plausibly establishing that Cigna benefitted from any of the SARS-CoV-2 testing services they allegedly provided to unidentified Cigna members. In other words, *Plaintiffs* did not confer a benefit *on Cigna*. In *Baras v. Baras*, No. FST-CV-186035174-S, 2019 WL 4668415 (Conn. Super. Ct. Aug. 22, 2019), the court struck an unjust enrichment claim alleging that the defendant improperly received a bequest from the decedent that should have been given to the plaintiffs. The court found that the claim failed because, even if the defendant received something that the decedent might otherwise have given to plaintiffs, plaintiffs "have not alleged, nor can they allege, that they somehow conferred a benefit upon the defendant. Rather, plaintiffs allege in their complaint that [the defendant] purportedly benefitted herself[.] … These allegations … fail to state a claim for unjust enrichment against the defendant[.]" *Id.* at *13. *See also Markowitz v. Villa*, No. CV-166060963-S, 2017 WL 960769 at *5 (Conn. Super. Ct. Jan.

26, 2017) ("The doctrinal difficulties attendant to applying this cause of action to the present facts—where there is no relationship between the parties under which it can be said that the plaintiff somehow conferred a benefit upon the defendants—are acute. This is not an action where … it would be inequitable for the defendants to retain some benefit conferred by the plaintiff.).

Moreover, even if testing a Cigna member could be construed as conferring a benefit on Cigna, Plaintiffs have not alleged even a single SARS-CoV-2 test that they performed on a Cigna plan member, for which Cigna improperly retained the benefit.

### F.     There is No "Federal Law" Claim for Reimbursement

The Seventh Count appears to be a variation on the Sixth Count, in which Plaintiffs allege that their testing conferred a benefit on Cigna by testing unidentified members, and that "Federal law requires Cigna to pay the Murphy Practice for this benefit." (AC, ¶ 191). Plaintiffs do not specify the federal law on which they rely. To the extent this is simply a common-law unjust enrichment claim, ERISA preempts it, even if some unidentified federal law assists Plaintiffs in satisfying some parts of the elements of the claim. To the extent the unidentified federal law is the FFCRA and/or the CARES Act, Plaintiffs cannot use the side door of unjust enrichment to avoid the lack of a private right of action under those statutes.

### G.     Plaintiffs' Tortious Interference Claim Fails as a Matter of Law

The Eighth Count alleges that Cigna tortiously interfered with the "beneficial or contractual relationship[s]" between Plaintiffs and "their patients who are Cigna members" or with "the sponsors of their [SARS-CoV-2] testing sites." (AC, ¶¶ 195-96). Such tortious interference allegedly was accomplished by Cigna's "defamatory and malicious statements about Dr. Murphy and the Murphy Practice to their patients and others." (*Id.*, ¶ 198).

### 1.  ERISA Preempts the Tortious Interference Claim

Plaintiffs have not alleged facts about any statement by Cigna "about Dr. Murphy and the Murphy Practice" that it allegedly made outside the context of its obligation to administer claims for benefits under the health plans it administered. For example, Plaintiffs acknowledge that ERISA requires Cigna to provide various types of disclosures to participants or beneficiaries when denying a claim, including "the specific reasons for such denial, written in a manner calculated to be understood by the participant." (AC, ¶ 144). *See also*, 29 C.F.R. § 2560.503-1. To the extent Plaintiffs seek to create a common-law tort out of an ERISA-required communication about an ERISA benefit claim, ERISA preempts the claim. *Neurological Surgery*, 2021 WL 26097 at *14 ("Plaintiff's … tortious interference with contract cause[] of action [is] likewise 'related to' the plans and thus preempted by ERISA.").

### 2.  Plaintiffs Have Not Pleaded Facts Establishing an Tortious Interference Claim

Tortious interference with contractual or business relations requires proof of: "(1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct." *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 212-13 (2000) (citations omitted). "[N]ot every act that disturbs a contract or business expectancy is actionable." *Robert S. Weiss & Assoc., Inc. v. Wiederlight*, 208 Conn. 525, 535 (1988). Rather, "there must be evidence that the interference resulted from the defendant's commission of a tort." *Id.*

Plaintiffs charge Cigna with the tort of "making defamatory and malicious statements about [Plaintiffs] to their patients and others." (AC, ¶ 198). Connecticut law requires defamation to be pleaded with specificity, alleging the precise words used, to whom such statements were made, and when they were made. *See Chertkova v. Conn. Gen. Life Ins. Co.*, No. CV-980486346-S, 2002

WL 1902988 at *4 (Conn. Super. Ct. July 12, 2002) ("a complaint for defamation must, on its face, specifically identify what allegedly defamatory statements were made, by whom, and to whom") (internal citations omitted); *see also Law Offices of Frank N. Peluso, P.C. v. Cotrone*, No. FST-CV-06-5000599-S, 2009 WL 3416247 (Conn. Super. Ct. Sept. 23, 2009) (same).

Plaintiffs' conclusory and vague allegations do not come close to meeting the required level of specificity and are subject to dismissal. Plaintiffs make unsupported allegations that the Murphy Practice has learned from patients, testing site sponsors, and "others," that when the "patients and others" asked Cigna about the status of reimbursement to the Murphy Practice, Cigna allegedly falsely informed them that the Murphy Practice was a fraudulent enterprise and Plaintiffs were committing fraud in connection with their testing services. (AC, ¶ 96).[16]

Plaintiffs do not identify a single one of the patients, site sponsors, or mysterious "others" to whom the defamatory statements allegedly were made, nor do they provide any other details such as the date(s) of the alleged statements, and what was said. *See Michel v. Bridgeport Hosp*., No. FST-11-6015195-S, 2011 WL 1176885 (Conn. Super. Ct. March 7, 2011) (striking defamation claim where the complaint did not allege facts indicating what defamatory statements were made, when they were made, or to whom).

Further, the Amended Complaint has no factual content establishing causation. Alleging a tortious interference claim requires alleging facts to establish "a loss sustained by the plaintiff that was caused by the defendant's tortious conduct." *Appleton*, 254 Conn. at 212-13. Plaintiffs conclusorily assert—without any supporting factual allegations—that as a result of Cigna's alleged unspecified defamatory comments, several unidentified cities, towns, and facilities have ended

---

[16] Plaintiffs also allege that Cigna is falsely telling patients, in notices of denial and/or explanation of benefits, that they are personally responsible for paying the Murphy Practice for charges that Cigna has refused to pay. (AC, ¶¶ 97-98). They do not allege a single specific statement to that effect to a single Cigna member. Even if the allegation were true—which it is not—it is hard to see how such a statement defamed Plaintiffs.

their relationship with Plaintiffs. (AC, ¶¶ 99, 199). But it is difficult to understand how a defamatory statement allegedly made by Cigna to one or more of its members could cause a testing site sponsor to take action against Plaintiffs. It is equally plausible—perhaps even more so—that test site sponsors ended their relationships with Plaintiffs due to negative media reports about Plaintiffs' abusive practices. *See, e.g.*, note 1, *supra*.

Without factual allegations regarding which entities ended relations with Plaintiffs and why, it is impossible to plausibly conclude that the termination of any test site was proximately caused by anything Cigna allegedly said. Plaintiffs' conclusory and vague allegations do not come close to meeting the required level of specificity and fail to give Cigna fair notice. *See Biomed Pharm.*, 775 F. Supp. 2d at 738-39 (dismissing similar defamation claim brought by provider against insurer where the provider failed to allege specifics as to when, by whom, and to whom the allegedly defamatory statements were made, noting the provider failed to provide sufficient notice to allow the insurer to prepare a defense). The Eighth Count therefore should be dismissed.

## VI.   CONCLUSION

For all of the foregoing reasons, all of Plaintiffs' claims fail as a matter of law. Cigna therefore respectfully requests that the Court dismiss Plaintiffs' Amended Complaint, with prejudice and without leave to amend. Further, Cigna requests that the Court award Cigna its fees and costs under 29 U.S.C. § 1132(g).

THE DEFENDANTS,

CIGNA HEALTH AND LIFE INSURANCE
COMPANY and CONNECTICUT GENERAL
LIFE INSURANCE COMPANY

By: _/s/ Jean E. Tomasco_
      Theodore J. Tucci, (ct05249)
      Email: ttucci@rc.com
      Jean E. Tomasco, (ct09635)
      Email: jtomasco@rc.com
      Robinson & Cole LLP
      280 Trumbull Street
      Hartford, CT 06103
      Telephone: (860) 275-8200
      Fax: (860) 275-8299

      And

      Patrick W. Begos, (ct19090)
      Email: pbegos@rc.com
      Robinson & Cole LLP
      1055 Washington Boulevard
      Stamford, CT 06901
      Telephone: (203) 462-7500
      Fax: (203) 462-7599

      *Their Attorneys*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 16, 2021, a copy of the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

<u>*/s/ Jean E. Tomasco*</u>
Jean E. Tomasco