UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MURPHY MEDICAL ASSOCIATES, LLC; DIAGNOSTIC AND MEDICAL SPECIALISTS OF GREENWICH, LLC; NORTH STAMFORD MEDICAL ASSOCIATES, LLC; COASTAL CONNECTICUT MEDICAL GROUP, LLC; and STEVEN A.R. MURPHY, M.D., *Plaintiffs*, *v.* CIGNA HEALTH AND LIFE INSURANCE COMPANY and CONNECTICUT GENERAL LIFE INSURANCE COMPANY, *Defendants*. | Civil No. 3:20cv1675(JBA) March 11, 2022 |

**ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS**

Murphy Medical Associates, LLC; Diagnostic and Medical Specialists of Greenwich, LLC; North Stamford Medical Associates, LLC; Coastal Connecticut Medical Group, LLC; and Steven A.R. Murphy (collectively the "Murphy Practice") bring this action against Cigna Health and Life Insurance Company and Connecticut General Life Insurance Company (collectively "Cigna"), alleging violations of the Families First Coronavirus Response Act ("FFCRA") and Coronavirus Aid, Relief and Economic Security Act ("CARES Act"), the Employee Retirement Income Security Act of 1974 ("ERISA"), the Connecticut Unfair Insurance Practices Act ("CUIPA") through the Connecticut Unfair Trade Practices Act ("CUTPA") ("CUTPA/CUIPA"), and asserting unjust enrichment, quantum meruit, and tortious interference. (Am. Compl. [Doc. # 29].) Defendants move to dismiss the Amended Complaint in its entirety. (Defs.' Mem. in Supp. of Mot. to Dismiss Pl.'s Am. Compl. ("Defs.' Mem.") [Doc. # 30-1] at 33.) For the reasons that follow, the Courts GRANTS Cigna's motion

with respect to Counts One, Two, Four, Five, Six, and Seven, and DENIES Cigna's motion with respect to Counts Three and Eight.

## I.     Facts Alleged

The Amended Complaint alleges that the Murphy Practice responded to the "the desperate need for timely COVID-19 testing," by operating COVID-19 testing sites throughout southern Connecticut and parts of New York. (Am. Compl. ¶¶ 14, 23.) It concluded that symptomatic patients or those exposed to COVID-19 "need[ed] to be tested for COVID-19 as well as other respiratory viruses and infections." (*Id.* ¶ 26.) At first, Plaintiff would "split[] the samples," sending half of the sample to its own lab to test for "non-COVID respiratory viruses" and the other half to an outside lab to test for COVID-19. (*Id.* ¶ 30.) Later, Plaintiff purchased an advanced BioFire Film Array System with COVID-19 testing capability, which "is not capable of running a test limited to the detection of COVID-19," (*id.* ¶¶ 33, 34), and used this machine for "patients who were symptomatic or otherwise had a need for expedited results," (*id.* ¶¶ 32, 36). Other patients' tests were sent to an outside lab, and tested only for COVID-19. (*Id.* ¶ 36.) Plaintiff also provided antibody blood testing to those with reason to believe they had recovered from COVID-19. (*Id.* ¶ 37.)

If a patient tested positive for COVID-19 or had COVID-19 antibodies present in their system, the Murphy Practice would conduct "medically necessary comprehensive blood testing . . . to determine the potentially life-threatening damage that the virus was doing or had done to the body's organs and systems." (*Id.* ¶ 38.) Plaintiff also provided "telemedicine preventative medicine counseling and education," (*id.* ¶ 39), "telemedicine visits with the patients to check on their conditions and determine whether further medical intervention was needed," (*id.* ¶ 40), and "telemedicine visit[s] . . . to review the results and next steps with a clinician," (*id.* ¶ 41).

Plaintiff alleges that "Cigna has not honored its obligation to reimburse the Murphy Practice for this vitally needed public health service," but instead "has made and continues

to make voluminous frivolous and bad faith medical records and audit requests." (*Id.* ¶¶ 59-60.) Although Plaintiff acknowledges that Cigna made "a few payments," it alleges that Cigna "denied reimbursement for COVID-19 testing and testing-related services for over 4,000 Cigna members or beneficiaries." (*Id.* ¶ 64.) The Murphy Practice states that Cigna has "reflexively denied thousands of claims" and denied claims before it could reasonably respond to requests for records. (*Id.* ¶¶ 68, 119.) Plaintiff characterizes Cigna's denial letters as "gibberish."[1] (*Id.* ¶ 94.)

Further, Plaintiff alleges that Cigna "made defamatory and malicious statements about the Murphy Practice and Dr. Murphy to its patients and others." (*Id.* ¶ 95.) When patients inquired about the status of the Murphy Practice's reimbursement, "Cigna falsely informed them that the Murphy Practice is a fraudulent enterprise and it, together with Dr. Murphy are committing fraud in connection with its COVID-19-related testing services." (*Id.* ¶ 96.) According to Plaintiff, Cigna is also "sending patients false and misleading explanation of benefits" and informing patients that they are "personally responsible for paying the Murphy Practice." (*Id.* ¶ 97.) Because of Cigna's statements, testing site sponsors, cities, towns, and facilities have "br[oken] their agreements or end[ed]their relationships" with Plaintiff. (*Id.* ¶¶ 98-99.)

## II.   Legal Standard

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must determine whether the plaintiff has stated a legally cognizable claim by allegations that, if true, would plausibly show that the plaintiff is entitled to relief, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007), by assuming all factual allegations in the complaint as true and

---

[1] One series of denial letters read that "[t]he attachment/other documentation that was received was incomplete or deficient. The necessary information is still needed to process the claim. At least one Remark Code must be provided (may be comprised of either the NCPDP Reject Reason Code, or Remittance Advice Remark Code that is not an ALERT)." (*Id.* ¶ 91.) Another claim was denied because there was no "patient medical record for this service," while Cigna never requested the patient's record. (*Id.* ¶ 90.)

drawing all reasonable inferences in the plaintiff's favor. *See Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015). However, this principle does not extend to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). Because "only a complaint that states a plausible claim for relief survives a motion to dismiss," *Iqbal*, 556 U.S. at 679, a complaint must contain "factual amplification . . . to render a claim plausible*." Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)). A complaint that only "offers 'labels and conclusions'" or "naked assertions devoid of further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557).

## III.   Discussion[2]

### A.  Count One: Violation of FFCRA and CARES Act

Plaintiff alleges that Cigna violated the FFCRA and the CARES Act, (collectively the "Coronavirus Legislation"), by failing to reimburse it for the services "specifically covered" by the Coronavirus Legislation. (Am. Compl. ¶ 110.) It maintains that "a private right of action can readily be inferred from the language and context" of these Acts. (Pl.'s Opp'n at 17.) To the contrary, Cigna asserts the Coronavirus Legislation cannot confer a private right of action when it does not afford providers with a right to reimbursement and delegates enforcement authority to federal agencies. (Defs.' Mem. 11-14.)

---

[2] Cigna asserts generally that because the Amended Complaint fails to provide the name of "any individual who was tested; the benefit plan covering each; the specific tests and/or treatments Plaintiff[] provided to each; what Plaintiff[] billed for these services; and what decision Cigna made on each claim," it fails to "plausibly allege a single claim for failure to pay for covered health service." (Defs.' Mem. at 10.) However, because Cigna has received and processed the individual claims involved in this litigation, it does not lack notice of the underlying claims. *See* Fed. R. Civ. P. 8(a).

By way of background, Congress passed the FFCRA and the CARES Act, requiring group health insurance plans to cover the costs of SARS-CoV-2 tests at no cost to a patient. The FFCRA states, in relevant part:

> SEC. 6001. COVERAGE OF TESTING FOR COVID–19.
>
> (a) IN GENERAL. —A group health plan and a health insurance issuer offering group or individual health insurance coverage . . . *shall provide coverage, and shall not impose any cost sharing (including deductibles, copayments, and coinsurance) requirements or prior authorization or other medical management requirements*, for the following items and services furnished during any portion of the emergency period . . . beginning on or after the date of the enactment of this Act:
>
> (1) In vitro diagnostic products . . . *for the detection of SARS–CoV–2 or the diagnosis of the virus that causes COVID–19 that are approved, cleared, or authorized* . . . and the administration of such in vitro diagnostic products. . . .
>
> (2) Items and services furnished to an individual during health care provider office visits (which term in this paragraph includes in-person visits and telehealth visits), urgent care center visits, and emergency room visits that result in an order for or administration of an in vitro diagnostic product described in paragraph (1), but only to the extent such items and services relate to the furnishing or administration of such product or to the evaluation of such individual for purposes of determining the need of such individual for such product.
>
> (b) ENFORCEMENT.—The provisions of subsection (a) shall be applied by the Secretary of Health and Human Services, Secretary of Labor, and Secretary of the Treasury to group health plans and health insurance issuers offering group or individual health insurance coverage as if included in the provisions of part A of title XXVII of the Public Health Service Act, part 7 of the Employee Retirement Income Security Act of 1974, and subchapter B of chapter 100 of the Internal Revenue Code of 1986, as applicable.
>
> (c) IMPLEMENTATION.—The Secretary of Health and Human Services, Secretary of Labor, and Secretary of the Treasury may implement the provisions of this section through sub-regulatory guidance, program instruction or otherwise.

(emphasis added).

The CARES Act provides:

> SEC. 3201. COVERAGE OF DIAGNOSTIC TESTING FOR COVID-19

Paragraph (1) of section 6001(a) of division F of the Families First Coronavirus Response Act (Public Law 116–127) is amended to read as follows:

"(1) An in vitro diagnostic test defined in section 809.3 of title 21, Code of Federal Regulations[3] (or successor regulations) for the detection of SARS–CoV–2 or the diagnosis of the virus that causes COVID–19, and the administration of such a test, that—

"(A) is approved, cleared, or authorized under section 510(k), 513, 515, or 564 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360(k), 360c, 360e, 360bbb–3);

"(B) the developer has requested, or intends to request, emergency use authorization under section 564 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360bbb–3), unless and until the emergency use authorization request under such section 564 has been denied or the developer of such test does not submit a request under such section within a reasonable timeframe;

"(C) is developed in and authorized by a State that has notified the Secretary of Health and Human Services of its intention to review tests intended to diagnose COVID–19; or

"(D) other test that the Secretary determines appropriate in guidance."

SEC. 3202. PRICING OF DIAGNOSTIC TESTING.

(a) REIMBURSEMENT RATES.—A group health plan or a health insurance issuer providing coverage of items and services described in section 6001(a) of division F of the Families First Coronavirus Response Act (Public Law 116–127) with respect to an enrollee *shall reimburse the provider* of the diagnostic testing *as follows*:

(1) If the health plan or issuer has a negotiated rate with such provider in effect before the public health emergency declared under section 319 of the Public Health Service Act (42 U.S.C. 247d), such negotiated rate shall apply throughout the period of such declaration.

(2) If the health plan or issuer does not have a negotiated rate with such provider, such plan or issuer *shall reimburse the provider in an amount that*

---

[3] This regulation defines in vitro diagnostic products as "those reagents, instruments, and systems intended for use in the diagnosis of disease or other conditions, including a determination of the state of health, in order to cure, mitigate, treat, or prevent disease or its sequelae." 21 C.F.R. § 809.3.

*equals the cash price for such service as listed by the provider on a public internet website***,** or such plan or issuer may negotiate a rate with such provider for less than such cash price.

(b) REQUIREMENT TO PUBLICIZE CASH PRICE FOR DIAGNOSTIC TESTING FOR COVID–19.—

(1) IN GENERAL.—During the emergency period declared under section 319 of the Public Health Service Act (42 U.S.C. 247d), each *provider of a diagnostic test for COVID–19 shall make public the cash price for such test on a public internet website of such provider.*

(2) CIVIL MONETARY PENALTIES.—The Secretary of Health and Human Services may impose a civil monetary penalty on any provider of a diagnostic test for COVID–19 that is not in compliance with paragraph (1) and has not completed a corrective action plan to comply with the requirements of such paragraph, in an amount not to exceed $300 per day that the violation is ongoing

(emphasis added).

"[P]rivate rights of action to enforce federal laws must be created by Congress." *Republic of Iraq v. ABB AG*, 768 F.3d 145, 170 (2d Cir. 2014) (quoting *Alexander v. Sandoval,* 532 U.S. 275, 286 (2001)). A private right of action is created either expressly "or, more rarely, by implication." *Id.* To determine if Congress intended to imply a private right of action, courts consider "the text and structure of the statute," *id.*, to "determine whether it displays an intent to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 288 n.7 ("[T]he interpretative inquiry begins with the text and structure of the statute and ends once it has become clear that Congress did not provide a cause of action." (citations omitted)). Further, to help "illuminate" the analysis of Congressional intent, *ABB AG*, 768 F.3d at 170, courts consider:

First, is the plaintiff one of the class for whose especial benefit the statute was enacted—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be

inappropriate to infer a cause of action based solely on federal law?

*Cort v. Ash,* 422 U.S. 66, 78 (1975). But without Congressional intent for a private right and remedy, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Sandoval*, 532 U.S. at 286-87.

Plaintiff emphasizes the mandatory payment language of § 3202 of the CARES Act, arguing that Congress intended to afford "out-of-network providers who furnish COVID testing" with a private right to reimbursement. (Pl.'s Opp'n at 18-19.) With such a right, Plaintiff asserts that "[i]t is only logical to assume that if the group is denied the right granted to it by Congress, they will have a remedy." (*Id.*) However, this "assumption" does not suffice to show such Congressional intent. *Sandoval*, 532 U.S. at 286 ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."); *see Universities Rsch. Ass'n, Inc.*, 450 U.S. at 771 ("But the fact that an enactment is designed to benefit a particular class does not end the inquiry; instead, it must also be asked whether the language of the statute indicates that Congress intended that it be enforced through private litigation."). Plaintiff has not identified anything in the text or structure of the CARES Act which suggests that Congress intended to afford them with a privately enforceable remedy.

Despite the absence of textual or structural support, Plaintiff posits that Congress's silence was merely a product of its rush to create legislation in the midst of the pandemic and the lack of specificity in the Coronavirus Legislation does not amount to Congress' desire to forego a private right of action "given the emergency Congress faced, the need for immediate decisive action, and the overall complexity of the entire statutory scheme." (Pl.'s Opp'n at 19.) This argument, however, ignores the principle that "[i]f Congress has manifested no intent to provide a private right of action, [the Court] cannot create one." *Lindsay v. Ass'n of Pro. Flight Attendants*, 581 F.3d 47, 52 (2d Cir. 2009).

Finally, Plaintiff contends that it is left remediless without a private right of action, relying upon the reasoning in *Diagnostic Affiliates of Ne. Hous., LLC v. United Healthcare Servs. Inc.*, No. 2:21-cv-131, 2022 WL 214101 (S.D. Tex. Jan. 18, 2022).[4] It asserts that the enforcement provision in the FFCRA is inapplicable and that the CARES Act only permits the Secretary of Health and Human Services to impose a fine on providers who do not make public their cash price for COVID-19 testing. (Tr. [Doc. # 47] at 10:3-13:1.) As such, it argues that the legislation is "worthless" if there is not an implied right of action for medical providers. (*Id.* at 20:6.) While this argument may provide a good policy reason to create a private right of action, it does not provide an indication that Congress intended to create such a right.[5] *See Sandoval*, 532 U.S. at 286-87.

Mindful that the Supreme Court "has increasingly discouraged the recognition of implied rights of actions without a clear indication of congressional intent," *Duplan v. City of*

---

[4] The court in *Diagnostic Affiliates* found a private right of action within § 3202 of the CARES Act. 2022 WL 214101, at *9. It concluded that the enforcement provisions within the FFCRA and CARES Act "do not address the manner in which a COVID-19 testing provider can obtain its reimbursements (which are no less mandatory)." *Id.* *8. The first enforcement provision, found in § 6001 of the FFCRA, authorizes the Secretary of Health and Human Services, Secretary of Labor, and Secretary of the Treasury to enforce its requirement that insurers cover the cost of COVID-19 tests, which the *Diagnostic Affiliates* court concluded was "designed for the purpose of ensuring coverage for insureds" and not necessarily providers. *Id.* The second enforcement provision, located in § 3202 of the CARES Act, permits the Secretary of Health and Human Services to impose a fine on providers. The district court thus concluded that "the administrative enforcement scheme cannot be said to evidence an intent to deny a private right of action." *Id.*

[5] Further, it is not clear that Plaintiff is left remediless. The parties' briefing on the issue of whether the enforcement provisions cover Plaintiff's claim does not address the statement in the Departments of Labor, Health and Human Services, and Treasury's joint set of Frequently Asked Questions that the Departments would "enforce the applicable provisions of the FFCRA (and the related provisions of the CARES Act), in conjunction with states, where applicable." *See* Department of Labor, the Department of Health and Human Services, and the Department of the Treasury, FAQs About Families First Coronavirus Response Act and Coronavirus Aid, Relief, And Economic Security Act Implementation Part 43 (June 23, 2020). Further, while Plaintiff asserts that it will be left without a remedy because state law and ERISA will not compensate its clams, it has nonetheless asserted claims under both.

*N.Y.*, 888 F.3d 612, 621 (2d Cir. 2018), the Court concludes that neither § 6001 of the FFCRA nor § 3202 of the CARES Act contains a private right of action. Accordingly, Count One will be dismissed with prejudice for failure to state a claim upon which relief may be granted.[6]

### B.  Counts Two: Reformation of ERISA Plans

Plaintiff alleges that "some of the plans at issue do not provide the coverage of COVID-19 related testing and services required by the FFCRA and the CARES Act," (Am. Compl. ¶¶ 114, 116), and asks the Court to "equitably reform any of Cigna's ERISA plans that do not comply with the FFCRA and the CARES Act at issue to require that they mirror the language of the FFCRA and the CARES Act." (*Id.* ¶ 123). Cigna maintains that Plaintiff does not have standing to seek equitable reformation of Cigna plans, the Amended Complaint does not identify the plans in need of reformation, and the Coronavirus Legislation does not allow "providers to force wholesale reformation of ERISA benefit plans." (Defs.' Mem. at 22.)

Section 502(a)(1)(B) of ERISA empowers only a "participant or beneficiary" to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1). Healthcare providers are not "beneficiaries" of an ERISA plan. *Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 259 (2d Cir. 2015). However, the Second Circuit has recognized a "narrow exception to the ERISA standing requirements," allowing healthcare providers "to whom a beneficiary has assigned his claim in exchange for health care" to bring certain claims under ERISA. *Simon v. General Elec. Co.*, 263 F.3d 176, 178 (2d Cir. 2001); *see*

---

[6] The Murphy Practice states that if the Court "is inclined to dismiss [the] action, or any claim or cause of action therein, then [it] respectfully requests leave to amend its Amended Complaint to cure any pleading deficiencies." (Pl.'s Opp'n at 40.) While leave to replead is left to the discretion of the district court, *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991), "where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice." *Id.* Plaintiff does not propose additional factual allegations demonstrating that the FFCRA and CARES Act incorporate a private right of action.

*I.V. Servs. of Am., Inc. v. Trustees of Am. Consulting Eng'rs Council Ins. Tr. Fund,* 136 F.3d 114, 117 n.2 (2d Cir. 1998). "Not all ERISA assignments convey the same rights. For example, an assignment may give the assignee the right to bring only a claim for benefits, but not a claim for breach of fiduciary duty." *Rojas*, 793 F.3d at 258.

Plaintiff alleges that "a significant number of claims the Murphy Practice has submitted to Cigna relate to patients enrolled in ERISA plans." (Am. Compl. ¶ 72.) It pleads that "[m]any of the Cigna members who received testing services at the Murphy Practice locations executed assignments of benefits forms," which stated that the patient "assign[s] to [Diagnostic and Medical Specialists of Greenwich, LLC and North Stamford Medical Associates], for application onto your bill for services, all of your rights and claims for the medical benefits to which you or your dependents are entitled, under any federal or state healthcare plan (including, but not limited to, Medicare or Medicaid), insurance policy, any managed care arrangement or other similar third-party payor arrangement . . . ." (*Id.* ¶ 78.) Other patients registered for testing electronically and "were advised and agreed that federal law requires their insurer to cover the entire cost of testing and related services, that the Murphy Practice would bill their insurer, and that the Murphy Practice would not, under any circumstances, seek payment from the patient." (*Id.* ¶ 79.) Alternatively, Plaintiff contends that Congress "effectively assigned the right to payment for the covered COVID-19 testing to any out-of-network provider who renders the services" pursuant to the CARES Act. (Pl.'s Opp'n at 29; Am. Compl. ¶¶ 80-81.)

However, these assignments do not give Plaintiff standing to equitably reform its patients' ERISA plans. Patients who executed an assignment of benefits form limited their assignment to the "rights and claims" for "medical benefits." (Am. Compl. ¶ 78.) Plaintiff's patients cannot be said to have assigned the right to reform their health plans where they limited their assignment to claims for medical benefits. *See Rojas*, 793 F.3d at 258. This conclusion rings true for the patients who agreed that "federal law requires their insurer to

cover the entire cost of testing and related services." (Am. Compl. ¶ 79.) Further, even if Congress created "effective[] assign[ments]" through its CARES Act, such assignments would be limited to "the right to payment for the covered COVID-19 testing" services, which Plaintiff itself acknowledges. (*See* Pl.'s Opp'n at 29.) Without standing to reform its patients' ERISA plans, Plaintiff's second count is dismissed with prejudice.[7]

### C. Count Three: ERISA Benefits

Plaintiff alleges that Cigna's "failure to pay the Murphy Practice in full for the covered healthcare services rendered to the Members constitutes a breach of the Plans, either as written or as equitably reformed pursuant to the Second Cause of Action, and Cigna's failure was erroneous, arbitrary and capricious and was without reason, was unsupported by substantial evidence and was erroneous as a matter of law." (Am. Compl. ¶ 136.) It asserts that Cigna has "reflexively denied thousands of claims for the exact same clearly reimbursable services, without providing any legitimate justification," and contends that it has exhausted the administrative remedies, that exhaustion is futile, or that exhaustion should be excused because of "Cigna's utter disregard for ERISA deadlines and procedures." (*Id.* ¶¶ 137-38.) Cigna moves to dismiss this count for lack of standing, failure to allege sufficient facts to support a claim, and improper pleading of administrative exhaustion. (Defs.' Mem. at 23-25.)

#### 1. Standing

Cigna argues that the Court should dismiss Count Three because the Amended Complaint "fails to identify a single member who executed an assignment or what the assignment said." (Defs.' Mem. at 16.) At oral argument, Cigna acknowledged that the Amended Complaint quotes the language of Plaintiff's standard assignment of benefit form but nonetheless maintained that the pleading was insufficient because it leaves to

---

[7] Leave to replead would be futile because Plaintiff's assignments would still not confer standing on Plaintiff to bring equitable reformation claims under ERISA.

speculation who executed these assignments. (Tr. at 31:1-6.) Cigna further asserts that the Court cannot consider whether *valid* assignments were executed because the applicable ERISA plans may contain anti-assignment provisions. (Defs.' Mem. at 17-18.) Plaintiff again points to the language from their standard assignment form and alternatively argues that Congress has given it standing to sue under ERISA through the CARES Act. (Pl.'s Opp'n at 26.)

Pleadings that quote the "standard form language" of an assignment have been deemed sufficient to withstand a motion to dismiss. *See Premier Health Ctr., P.C. v. UnitedHealth Group*, No. 11-cv-425, 2012 WL 1135608, at *7 (D.N.J. Apr. 4, 2012). Plaintiff pleads the language of its assignment of benefits form in Paragraph 78 of the Amended Complaint. (Patient "assign[s] to [Diagnostic and Medical Specialists of Greenwich, LLC; North Stamford Medical Associates], for application onto your bill for services, all of your rights and claims for the medical benefits to which you or your dependents are entitled.") This is sufficient to establish Plaintiff's standing at this stage of the litigation. Even though Plaintiff has not identified the names of the individuals who executed assignments nor identified the plans by which they are governed, these are areas for discovery. *Premier Health Ctr., P.C.*, 2012 WL 1135608, at *7. Cigna's argument about anti-assignment provisions is properly considered at the summary judgment stage and wholesale dismissal on this ground is unfounded.[8]

### 2. Sufficient Factual Allegations

Cigna seeks dismissal of ERISA-based Count Three because Plaintiff does not identify "the assignor-beneficiaries whose claims they are asserting or the plans under which such benefits are allegedly conferred." (Defs.' Mem. at 20.) The Murphy Practice responds that

---

[8] Because Plaintiff has sufficiently pled standing through patient assignments in Paragraph 78, at this stage, the Court will not reach the issue of whether patients executed proper assignments through their electronic agreements with Plaintiff based on "federal law [that] requires their insurer to cover the entire cost of testing and related services," (Am. Compl. ¶ 79), or whether § 3202 of the CARES Act confers standing on providers.

"regardless of what plan is involved or what its provisions are, the reimbursement obligation is identical, and it arises from federal law [under the FFCRA and CARES Act], not the plan language." (Pl.'s Opp'n at 29.)

A participant or beneficiary may bring an ERISA claim to seek recovery of benefits under his or her ERISA plan. 29 U.S.C. § 1132(a). Claims where a plaintiff has neither identified the plan at issue nor the plan language violated have been dismissed. *See, e.g.*, *N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 798 F.3d 125, 135 (2d Cir. 2015) (affirming the dismissal of ERISA claims where the plaintiff failed to allege, *inter alia*, "her patients' plans or the terms of their plans"). Here, however, the reimbursement obligation derives from the Coronavirus Legislation, which effectively modified the terms of ERISA plans to provide SARS-CoV-2 tests at no cost to a patient. Thus, the relevant plans could not have precluded Cigna's obligation to reimburse COVID- 19 diagnostic testing in accordance with federal law. Under the circumstances of this case, Plaintiff's failure to plead the specific plan language or identify the individual assignor-beneficiaries does not warrant dismissal.

### 3. Administrative Exhaustion

Finally, Cigna argues that Plaintiff's conclusory pleading of administrative exhaustion warrants dismissal. (Defs.' Mem. at 24.) Plaintiff counters that the exhaustion of remedies is an affirmative defense and need not be pleaded, but alternatively asks the Court to find that "(1) exhaustion is excused; and/or (2) the pursuit of those remedies would have been futile." (Pl.'s Opp'n at 30-31.)

While ERISA does not contain an administrative exhaustion requirement, "the federal courts—including this Circuit—have recognized a 'firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases.'" *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006) (quoting *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993)). A plaintiff is only required to pursue "those administrative appeals provided for in the relevant plan or policy." *Kennedy*, 989 F.2d at 594. While the

14

failure to exhaust administrative remedies is an affirmative defense and does not deprive a court of subject matter jurisdiction, *Paese*, 449 F.3d at 446, courts have nevertheless dismissed claims where plaintiffs fail to plead, or baldly plead, that they have exhausted their administrative remedies, *see Kesselman v. The Rawlings Co.*, 668 F. Supp. 2d 604, 608-09 (S.D.N.Y. 2009) (collecting cases and concluding that the allegation that "all conditions precedent including the exhaustion of administrative remedies to maintaining this action have been performed or have occurred or are futile" was insufficient to withstand a motion to dismiss).

A plaintiff can overcome the administrative exhaustion requirement through a "clear and positive showing that seeking review by [the defendant] would be futile.'" *Kesselman*, 668 F. Supp. 2d at 609 (quoting *Jones v. UNUM Life Ins. Co. of Am.,* 223 F.3d 130, 140 (2d Cir. 2000)). The purpose of the exhaustion requirement is to "help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned." *Kennedy*, 989 F.2d at 594 (quoting *Amato v. Bernard,* 618 F.2d 559, 567 (9th Cir. 1980)). Where a plaintiff's participation in a formal administrative process is futile, the purposes are "no longer served," and "a court will release the claimant from the requirement." *Id.*

It is unclear what form of administrative exhaustion is at issue because the parties have not detailed the relevant plans' exhaustion requirements. While Plaintiff's plain assertion that it "exhausted available administrative remedies" (Am. Compl. ¶ 120) is unlikely to be sufficient to withstand a motion to dismiss without more, *see Kesselman,* 668 F. Supp. 2d at 608-09,[9] Plaintiff pleads that Cigna "reflexively denied thousands of claims for

---

[9] There is divided authority on whether Plaintiff is required to plead administrative exhaustion. At least two courts have concluded that a plaintiff need not plead administrative exhaustion to state a claim for benefits under ERISA. *See Rozek v. N.Y. Blood Ctr.*, 925 F. Supp. 2d 315, 343 (E.D.N.Y. 2013) ("[A] plaintiff is not required to plead exhaustion of

the exact same clearly reimbursable services" without "legitimate justification," (Am. Compl.

¶ 119) and provides the language of denials that they assert are unjustified, (*id.* ¶¶ 91-91).

It is at least plausible that where Plaintiff encountered such massive, repeated, and

automatic denials, it would be futile for it to administratively exhaust each individual claim

with any expectation of successful result. *See Diagnostic Affiliates of Ne. Hou., LLC*, 2022 WL

214101, at *11 (concluding that plaintiff had demonstrated futility to withstand a motion to

dismiss where almost all but a "very small fraction of the hundreds of claims" were denied).

Dismissal of Count Three for failure to exhaust fails, and because Plaintiff's Amended

Complaint contains allegations sufficient to support an ERISA claim for benefits, Cigna's

motion is denied in respect to Count Three.

### D.  Count Four: Equitable Relief for Full and Fair Review

Murphy Medical charges Cigna with failing to provide a "full and fair review" of their

claims by:

> (a) refusing to provide the specific reason or reasons for the denial or
> underpayment of claims; (b) refusing to provide the specific plan provisions
> relied upon to support its denials or underpayments; (c) refusing to provide
> the specific rule, guideline or protocol relied upon in making the decisions to
> deny or underpay claims; (d) refusing to describe any additional material or
> information necessary to perfect a claim, such as the appropriate
> diagnosis/treatment codes; (e) refusing to notify the relevant parties that they
> are entitled to have, free of charge, all documents, records and other
> information relevant to the claims for benefits; (f) refusing to provide a
> statement describing any voluntary appeals procedure available, or a
> description of all required information to be given in connection with that
> procedure; (g) refusing to provide the Murphy Practice with the documents
> and information relevant to Cigna's denial of the claims; and (h) refusing to
> timely issue required notifications that the claims have been denied or

---

administrative remedies."); *White v. Univ. of Rochester, Strong Mem'l Hosp.*, No. 12-cv-6288, 2012 WL 3598210, at *3 (W.D.N.Y. Aug. 20, 2012) ("[A] plaintiff is not required to plead the absence of an affirmative defense."). Nevertheless, other courts have continued to dismiss ERISA claims where the plaintiff "fails to plausibly allege exhaustion of remedies." *Neurological Surgery, P.C. v. Aetna Health Inc.*, 511 F. Supp. 3d 267, 296 (E.D.N.Y. 2021) (collecting cases). Here, because Plaintiff plausibly alleges that the exhaustion of administrative remedies would be futile, it is excused.

underpaid.

(*Id.* ¶ 146.) Plaintiff requests "relief under 29 U.S.C. § 1132(a)(3), including declaratory and injunctive relief, to remedy Cigna's failures to provide a full and fair review, to disclose information relevant to appeals, and to comply with applicable claim procedure regulations." (*Id.* ¶ 151.) ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) allows a civil action to be brought by

> a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan.

Cigna argues that Plaintiff lacks standing and does not provide factual amplification to their charge. (Defs.' Mem. at 25.) Further, Cigna asserts that Count Three and Four are duplicative. (*Id.*)

As discussed above, Plaintiff has received assignments for only "rights and claims" to "medical benefits," (Am. Compl. ¶ 78), thus limiting Plaintiff's standing. *See supra* pp. 11-12. Accordingly, Plaintiff lacks standing to request declaratory or injunctive relief under ERISA § 502(a)(3), and thus, Count Four must be dismissed.

Moreover, it appears that Plaintiff's claims are adequately addressed under ERISA § 502(a)(1)(B). "[W]here Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief," *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996), and if the equitable relief a plaintiff seeks "falls comfortably within the scope of § 502(a)(1)(B), which allows a plan participant 'to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan,'" then there is no need to "allow equitable relief under § 502(a)(3)." *Frommert v. Conkright*, 433 F.3d 254, 270 (2d Cir. 2006); *see Biomed Pharmaceuticals, Inc. v. Oxford Health Plans (N.Y.), Inc.*, 775 F. Supp. 2d 730, 738 (S.D.N.Y. 2011) (dismissing claims under ERISA § 502(a)(3) where the "gravamen" of the challenged claims was that the insurer "failed to follow proper procedures in denying the

Patient's claim for benefits, which resulted in an improper denial of benefits owed to the Patient under the terms of the Plan").

The Murphy Practice does not identify any declaratory and injunctive relief "to remedy Cigna's failures to provide a full and fair review, to disclose information relevant to appeals, and to comply with applicable claim procedure regulations" which could not be adequately remedied under Count Three. (*See* Am. Compl. ¶ 151.) Because Plaintiff is provided with adequate relief in Count Three under § 502(a)(1)(B) related to its claim of improperly denied benefits, Count Four will be dismissed.

### E.   Count Five: CUTPA/CUIPA

In Count Five, the Murphy Practice alleges that Cigna was "obligated to promptly reimburse the Murphy Practice and Dr. Murphy for those services in accordance with law and the terms of its plans, and in accordance with federal and state law" and has "failed and refused to do so." (Am. Compl. ¶¶ 155-56.) It characterizes Cigna's actions as "immoral, unethical, oppressive, and unscrupulous" and violative of several provisions of CUIPA. (*Id.* ¶¶ 157, 166, 176.) Cigna asserts that the claim is preempted by ERISA and fails to state a claim on which relief could be granted. Plaintiff acknowledged at oral argument that some of its CUTPA/CUIPA claims may be preempted, (*see* Tr. at 49:1-2), but argues that as to its patients' claims for which it does not have valid assignments, it will lack standing to pursue an ERISA remedy and should be allowed to bring a CUTPA/CUIPA action for these claims. (*Id.* at 52:15-24.)

"Congress enacted ERISA to 'protect . . . the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans and to 'provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (quoting 29 U.S.C. § 1001(b)). ERISA preempts state law "to ensure that all covered benefit plans will be governed by unified federal law," *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101,

113 (2d Cir. 2008), and contains two types of preemption: "complete preemption" and "express preemption." *Chau v. Hartford Life Ins. Co.*, 167 F. Supp. 3d 564, 570 (S.D.N.Y. 2016). The doctrine of "complete preemption" is implied from § 502(a) of ERISA and is "really a jurisdictional rather than a preemption doctrine," *Montefiore Med. Ctr. v. Teamsters Loc. 272*, 642 F.3d 321, 327-28 (2d Cir. 2011) (quoting *Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Tr. Fund*, 538 F. 3d 594, 596 (7th Cir. 2008)), allowing a "state cause of action brought in state court to be recast 'as a federal claim for relief, making [its] removal [by the defendant] proper on the basis of federal question jurisdiction.'" *Chau*, 167 F. Supp. 3d at 570 (quoting *Vaden v. Discover Bank*, 556 U.S. 49, 61 (2009)). Express preemption, on the other hand, derives from ERISA § 514(a), preempting any state law claim that "relate[s] to any employee benefit plan." ERISA § 514(a), 29 U.S.C. § 1144(a).

Plaintiff relies on *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004) to argue that because it lacks ERISA standing for some of its claims, its causes of action are not preempted by ERISA. (Pl.'s Opp'n at 33.) Not quite. *Davila* arose in the context of complete preemption, *Davila*, 542 U.S. at 204, and here, Plaintiff's claim was brought in federal court under supplemental jurisdiction. Thus, the doctrine of complete preemption is not pertinent, and Plaintiff's argument falls short. The Court must instead consider whether Plaintiff's claims would "relate to any employee benefit plan" no matter who has standing to bring the claim and are "expressly preempted." *Epic Reference Labs v. Cigna,* No. 3:19-cv-1326(SRU), 2021 WL 4502836, at *4 (D. Conn. Sept. 30, 2021) (argument that plaintiff's claim was not preempted because it lacked ERISA standing "misse[d] the mark" because it addressed the complete preemption doctrine which was inapplicable where the court had subject matter jurisdiction).

ERISA's express preemption of "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan," ERISA § 514(a), 29 U.S.C. § 1144(a), is "deliberately expansive." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45-46 (1987); *see also*

*Aesthetic & Reconstructive Breast Cntr., LLC v. United HealthCare Group, Inc.*, 367 F. Supp. 3d 1, 7 (D. Conn. 2019) ("As now understood, § 514 preempts two types of state laws: those that have a "reference to" ERISA plans, and as relevant here, those that have an impermissible "connection with" ERISA plans."). Because the text is "so expansive" that it "afford[s] no meaningful limitation on the scope of ERISA preemption," courts look towards the "structure and objectives of the statute as a means of determining the scope of preemption." *Stevenson v. Bank of N.Y. Co.*, 609 F.3d 56, 59 (2d Cir. 2010). State laws that "tend to control or supersede central ERISA functions" are normally expressly preempted, *id.* (quoting *Gerosa v. Savasta & Co.*, 329 F.3d 317, 324 (2d Cir. 2003)), including state statutory claims which "provide an alternative cause of action to employees to collect benefits protected by ERISA, refer specifically to ERISA plans and apply solely to them, or interfere with the calculation of benefits owed to an employee." *Paneccasio*, 532 F.3d at 114 (quoting *Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 146 (2d Cir. 1989)) (A CUTPA claim premised on the termination of an ERISA benefit plan that resulted in the denial of benefits under the plan was preempted); *see also Woods v. Unum Life Ins. Co. of Am.*, No. 3:09CV809 SRU, 2011 WL 166205, at *3 (D. Conn. Jan. 19, 2011) (finding CUTPA and CUIPA claims preempted by ERISA where plaintiff alleged that his insurer "wrongly denied his application for long-term disability coverage").

Plaintiff alleges that Cigna "failed and refused" to reimburse it "in accordance with law and the terms of its plans, and in accordance with federal and state law." (Am. Compl. ¶¶ 152-56.) At oral argument, Plaintiff reinforced that its CUTPA/CUIPA claim addressed Cigna's "fail[ure] to do what an insurer is supposed to do, which is pay valid claims and negotiate claims." (Tr. 53:5-6.) While it charges Cigna with misconduct under CUIPA, Plaintiff's claim is centered around, and premised on, Cigna's denial of benefits under an ERISA plan, and is attempting to use CUTPA/CUIPA as an alternative enforcement

mechanism to "collect benefits protected by ERISA." *Paneccasio*, 532 F.3d at 114. As such, its claim is dismissed with prejudice as preempted by ERISA.[10]

### F.  Count Six: Unjust Enrichment

The Murphy Practice asserts in Count Six that Cigna was "obligated to pay" for the "medically necessary COVID-19 testing and related services to Cigna's members and beneficiaries" and Cigna "wrongfully and unjustifiably failed to pay for these services." (Am. Compl. ¶¶181-83.) It further alleges that Cigna "received funds to pay for these services" from "members, their employers, and/or sponsors of Cigna's health plans." (*Id.* ¶ 184.) Cigna maintains that Plaintiff's unjust enrichment claim is preempted because it seeks benefits that are payable under the terms of ERISA plans. (Defs.' Mem. at 28-29.) Plaintiff disagrees, arguing that the "unjust enrichment arises not from their failure to pay reimbursement as required by ERISA, but as required by FFCRA and the CARES Act." (Pl.'s Opp'n at 33.)

The Second Circuit has recognized that the interaction between express preemption under ERISA § 514 and the common law presents "a more nuanced question than a literal reading of the text [of § 514] would imply." *Aesthetic & Reconstructive Breast Cntr., LLC*, 367

---

[10] Plaintiff alleges that "a significant number of claims the Murphy Practice has submitted to Cigna relate to patients enrolled in ERISA plans" but notes that some of its patients may have "non-ERISA governed health care plans." (*See* Am. Compl. ¶ 82 ("To the extent that claims submitted to Cigna by the Murphy Practice relate to non-ERISA governed health care plans, on information and belief those plans provide coverage for out of network services. Even if the plans do not provide such coverage, they are obligated by the FFCRA and the CARES Act to cover COVID-19 testing and related procedures, and to pay providers for such services, even if furnishded [sic] by an 'out-of-network' provider."); *see also* Pl.'s Opp'n at 34 ("That some of the plans at issue may be ERISA plans is irrelevant.").) While Plaintiff alluded to non-ERISA plans at oral argument (Tr. 50:19-13), it did not press the viability of these claims in its brief in opposition nor during oral argument. In fact, at oral argument, counsel focused on its state law claims as a type of alternative remedy to any ERISA claim over which it lacked standing. (Tr. at 50:18-51:5.) The Court thus will not consider whether any potential claims brought under non-ERISA policies plausibly state a claim for relief under state law.

Further, because leave to replead would be futile, the Court dismisses the claim with prejudice.

F. Supp. 3d at 7 (citing *Paneccasio*, 532 F.3d at 114). As such, it elaborated on § 514 of ERISA, concluding that common law claims which "seek 'to rectify a wrongful denial of benefits promised under ERISA-regulated plans, and do not attempt to remedy any violation of a legal duty independent of ERISA'" are expressly preempted. *Panecasio*, 532 F.3d at 114 (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 214 (2004)).[11] How express preemption interacts with common law claims brought by third-party medical providers who do not have valid assignments of their patient's benefits, as here, remains open within the Second Circuit. *Aesthetic & Reconstructive Breast Cntr., LLC*, 367 F. Supp. 3d at 8. At least one court in this district has concluded that while "there is some room for a third-party medical provider to assert state law claims against an insurer when it has not been validly assigned its patient's benefits," the claim still must not seek to "rectify a wrongful denial of benefits" under an ERISA plan. *Id.* at 9

Plaintiff alleges that Cigna received funds from its members under their insurance plans, Cigna's members received COVID-19 tests from Plaintiff, and Cigna was obligated to pay for Plaintiff's services. (Am. Compl. ¶¶ 181-185.) This claim is premised upon Cigna's failure to pay for the services provided by ERISA plans and necessarily relates to the "denial of benefits promised under ERISA-regulated plans." *Panecasio*, 532 F.3d at 114. Further, while Plaintiff maintains that Cigna's reimbursement obligation is an "independent duty" arising from the Coronavirus Legislation, the Court has instead concluded that the Coronavirus Legislation "effectively modified" the terms of ERISA plans. *See supra* p. 14.

---

[11] This standard aligns with the "complete preemption" doctrine, *Chau*, 167 F. Supp. 3d at 571 n.3, which preempts claims where (1) the plaintiff is able to sue under ERISA, (2) the plaintiff's claim is a "colorable claim for ERISA benefits," and (3) there is no independent legal duty implicated. *Aesthetic & Reconstructive Breast Cntr., LLC*, 367 F. Supp. at 8 (citing *Montefiore Medical Center v. Teamsters Local 272*, 642 F.3d 321, 329-32 (2d Cir. 2011)).

Plaintiff's claim is thus encompassed and preempted by ERISA. Accordingly, its claim is dismissed with prejudice as preempted by ERISA.[12]

### G.  Count Seven: Quantum Meruit

Plaintiff alleges that Cigna "received a benefit when the Murphy Practice provided medically necessary COVID-19 testing and related services to its members," that "federal law requires Cigna to pay the Murphy Practice for this benefit," and that the Murphy Practice "relied on the requirements of federal law in providing these services." (Am. Compl. ¶¶ 190-92.) The Murphy Practice asserts that Count Seven is "a state law claim for quantum meruit reimbursement, relying on the FFCRA and CARES Acts to support the reasonableness of the Murphy Practice's expectation of payment." (Pl.'s Opp'n at 35.) Cigna moves to dismiss, arguing that Plaintiff has not alleged that it "provided a benefit to Cigna rather than to patients," and it alleges "no facts showing that Cigna knowingly accepted Plaintiff['s] services, or that Cigna promised Plaintiff[] it would pay." (Defs.' Reply at 9.)

"Quantum meruit is an equitable remedy to provide restitution to a plaintiff for the reasonable value of services provided to a defendant despite an unenforceable contract." *Lancaster v. Ecuadorian Inv. Corp.*, No. 3:19-cv-01581(JAM) 2020 WL 1863305, at *2 (D. Conn. Apr. 14, 2020). To plead a cognizable quantum meruit claim, a plaintiff "must allege facts to support the theory that the defendant, by knowingly accepting the services of the plaintiff and representing to her that she would be compensated in the future, impliedly promised to pay her for the services she rendered." *Burns v. Koellmer*, 11 Conn. App. 375, 383-84 (Conn. App. Ct. 1987).

Plaintiff has not alleged facts that support recovery under this theory. Rather, the Amended Complaint asserts that Cigna's obligation to reimburse Plaintiff stems from federal law—not an acceptance of services under an implied promise—which negates the theory

---

[12] Because leave to replead would not remedy the claim's preemption, the Court dismisses the claim with prejudice.

that the parties had a quasi-contractual relationship. While Plaintiff relies on the principles of quantum meruit, it has not addressed its factual pleading burden to show the plausibility of this count. Count Seven is dismissed with prejudice for failure to state a claim upon which relief can be granted.[13]

### H. Count Eight: Tortious Interference

In Count Eight, the Murphy Practice alleges that a "beneficial or contractual relationship" exists between itself and the "sponsors of . . . their COVID-19 testing sites." (Am. Compl. ¶¶ 195-96.) Cigna, it asserts, interfered with these contractual relationships by making "defamatory and malicious statements about Dr. Murphy and the Murphy Practice" which caused it loss. (*Id.* ¶¶ 198-201.) These statements were made "in notices of denial and/or explanations of benefits that were sent to its members," (*Id.* ¶¶ 96-97), and were "designed to create a false and negative impression about Dr. Murphy and the Murphy Practice among their patients and the community in general" and "cause testing site sponsors to break their agreements or end their relationships with the Murphy Practice." (*Id.* ¶ 98.) Plaintiff also claims that "Cigna falsely informed [patients and others] that the Murphy Practice is a fraudulent enterprise and it, together with Dr. Murphy are committing fraud in connection with its COVID-19-related testing services." (*Id.* ¶ 96.) Cigna argues that this claim is preempted by ERISA and fails to state a claim upon which relief could be granted. (Defs.' Mem. at 30-32.)

#### 1. Preemption

Because the alleged "defamatory and malicious statements" occurred within "the context of its obligation to administer claims for benefits under the health plans it

---

[13] Because Plaintiff's claim is premised upon an obligation under federal law and not an implied promise, leave to amend would be futile and the Court denies Plaintiff's request to amend.

administered," Defendant maintains that Plaintiff's tortious interference claim is "related to" ERISA and expressly preempted. (Def's Mem. at 31.)

As discussed above, *supra* p. 22, state common law claims which "seek 'to rectify a wrongful denial of benefits promised under ERISA-regulated plans, and do not attempt to remedy any violation of a legal duty independent of ERISA'" are preempted. *Panecasio*, 532 F.3d at 114 (quoting *Davila*, 542 U.S. at 214). Plaintiff's tortious interference claim does not seek to rectify a denial of benefits. Rather, Plaintiff seeks to address the business losses it sustained from the "municipalities and facilities [that] have ended their relationship" with Plaintiff based upon Cigna's statements. (Am. Compl. ¶ 200.) Even though these statements may have been made in notices of denial or explanations of insurance benefits, and are broadly related to ERISA, the tortious interference claim does not attempt to "control or supersede central ERISA functions." *Stevenson*, 609 F.3d at 59. As such, Plaintiff's claim is not preempted by ERISA.

### 2. Failure to State a Claim

Cigna alternatively contends that because Plaintiff's tortious interference claim is predicated on defamatory statements, and defamation requires specificity in pleading, it fails. (Defs.' Mem. at 31 (citing *Chertkova v. Conn. Gen. Life Ins. Co.*, No. CV-980486346-S, 2002 WL 1902988, at *4 (Conn. Super. Ct. July 2002) ("[A] complaint for defamation must, on its face, specifically identify what allegedly defamatory statements were made, by whom, and to whom.")).) It also claims an insufficiency of facts establishing causation. (*Id.* at 32.) Plaintiff maintains that the defamation pleading standard is inapplicable and that the claim is properly pleaded. (Pl.'s Opp'n at 39-40.) The Court agrees.

"The essential elements of [tortious interference] include, of course, the existence of a contractual or beneficial relationship and that the defendant(s), knowing of that relationship, intentionally sought to interfere with it; and, as a result, the plaintiff claimed to have suffered actual loss." *Solomon v. Aberman,* 196 Conn. 359, 365 (1985) (internal

quotations and citations omitted). To successfully prosecute a claim of tortious interference, a plaintiff "must prove that the defendant's conduct was in fact tortious." *Daley v. Aetna Life & Casualty Co.*, 249 Conn. 766, 805-06 (1999). "This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously . . . ." *Id.* Malice requires a plaintiff to "allege[e] and prov[e] 'lack of justification' on the part of the actor." *Id.* (internal citations and quotations omitted).

While Plaintiff's Amended Complaint does not directly identify an individual speaker of the allegedly defamatory statements or state where and when the statements were made, it alleges that Cigna acted maliciously by making statements that were "specifically designed" to cause "testing site sponsors to break their agreements . . . with Dr. Murphy and the Murphy Practice." (Am. Compl. ¶ 200.) Such allegations, taken as true, plausibly demonstrate that Cigna acted improperly and without justification in order to sabotage Plaintiff's contracts. (*See id.*) Nothing more is required. *See Indiaweekly.com, LLC v. Nehaflix.com, Inc.*, 596 F. Supp. 2d 497, 505-06 (D. Conn. 2009) (concluding that a tortious interference claim based upon fraud was not subject to a heightened pleading requirement because the complainant alleged an "improper motive").

Cigna claims that Plaintiff baldly pleaded causation and "[i]t is equally plausible—perhaps even more so—that test site sponsors ended their relationships with Plaintiff[] due to negative media reports about Plaintiff[']s abusive practices." (Defs.' Mem. at 32-33.) For now, Plaintiff's allegation of Cigna's statements, which were designed to cause Plaintiff's sponsors to break their agreements and caused such a result, (*see* Am. Compl. ¶¶ 95-96, 197-201), is adequate "factual amplification" to render it plausible. *See Arista Records LLC*, 604 F.3d at 120. The Court will not dismiss the claim on this basis.

Because Plaintiff's claim for tortious interference is not preempted by ERISA and states a claim upon which relief may be granted, Cigna's motion is denied with respect to Count Eight.

**IV.     Conclusion**

For the foregoing reasons, Defendants' Motion to Dismiss [Doc. # 30] is GRANTED with respect to Counts One, Two, Four, Five, Six and Seven and DENIED with respect to Counts Three and Eight.[14]

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 11th day of March 2022

---

[14] Plaintiff "ask[s] the Court to disregard and strike the first two paragraphs of Cigna's memorandum" referencing matters outside of the Amended Complaint. (Pl.s' Opp'n at 5.) Under Federal Rule of Civil Procedure 12(f), a court may strike any redundant, immaterial, impertinent, or scandalous material from a pleading. A memorandum is not a pleading. *See* Fed. R. Civ. P. 7(a) (pleadings include complaint, answer, reply to counterclaim, answer to cross-claim, third-party complaint, third-party answer). However, as to Cigna's citations to news articles not referenced in Plaintiff's Amended Complaint, the Court disregards these sources.