UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MURPHY MEDICAL ASSOCIATES, LLC;        :    Docket No. 20 – cv – 1675 (JBA)
DIAGNOSTIC AND MEDICAL SPECIALISTS    :
OF GREENWICH, LLC; NORTH STAMFORD    :
MEDICAL ASSOCIATES, LLC; COASTAL    :    **THIRD AMENDED COMPLAINT**
CONNECTICUT MEDICAL GROUP, LLC; and  :
STEVEN A.R. MURPHY, M.D.,             :    **JURY TRIAL DEMANDED**
                                       :
                    Plaintiffs,        :
                                       :
        vs.                            :
                                       :
CIGNA HEALTH AND LIFE INSURANCE       :
COMPANY and CONNECTICUT GENERAL       :
LIFE INSURANCE COMPANY,               :
                                       :
                    Defendants.        :
                                       :
                                       :
                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

        Plaintiffs, Murphy Medical Associates LLC; Diagnostic and Medical Specialists of

Greenwich, LLC; North Stamford Medical Associates, LLC; (collectively, "Murphy

Practice"); and Steven A.R. Murphy, M.D. ("Dr. Murphy"), by their attorneys, Harris Beach,

PLLC, for their Third Amended Complaint against the Defendants, CIGNA Health and Life

Insurance Company and Connecticut General Life Insurance Company (collectively,

Cigna), allege as follows:

                                **INTRODUCTION**

        1.      This case is brought because CIGNA, a Fortune 500 health insurance

company, is blatantly defying federal law by unjustifiably refusing to provide healthcare

coverage for public health measures – COVID-19 testing and related services - that

federal law requires CIGNA to cover.  Since the onset of the COVID-19 pandemic Plaintiff

the Murphy Practice has provided CIGNA members and beneficiaries with thousands of

COVID-19 diagnostic tests, as well as related medically necessary testing and services. Congress has twice specifically passed statutes requiring all insurers, including CIGNA, to cover such tests and services, regardless of whether they are provided by in-network or out-of-network providers. Such coverage must be complete: copayments, deductibles, coinsurance and limits on coverage are not permitted.

2.      Nevertheless, CIGNA has only reimbursed the Murphy Practice a fraction of the cost of the services provided to CIGNA beneficiaries. Instead, CIGNA has issued improper requests for medical records in every case, and, even after records have been provided, CIGNA has continued to refuse to pay for the services. At last count, CIGNA owed the Murphy Practice over $6 million.

3.      By this Action, the Murphy Practice seeks to hold CIGNA accountable for its illegal practices.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this dispute under 28 U.S.C. § 1331 because the Murphy Practice and Dr. Murphy assert federal claims against Cigna under the Families First Coronavirus Response Act, the CARES Act, and ERISA.

5.      This Court also has supplemental jurisdiction over the Murphy Practice's and Dr. Murphy's state law claims against Cigna because these claims are so related to the Murphy Practice's and Dr. Murphy's federal claims that the state law claims form a part of the same case or controversy. This Court accordingly has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a).

6.      This Court has personal jurisdiction over Cigna because Cigna carries on one or more businesses or business ventures in this judicial district; there is the requisite

2

nexus between the businesses and this action; and Cigna engages in substantial, and not isolated, activity within this judicial district.

7.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial portion of the events giving rise to this action arose in this District.

## PARTIES

8.      At all times relevant to this matter, Plaintiff Murphy Medical Associates LLC is a limited liability company organized under Connecticut law. Its principal place of business is located at 30 Buxton Farms Road, Suite 220, Stamford, Connecticut 06605.

9.      At all times relevant to this matter, Plaintiff Diagnostic and Medical Specialists of Greenwich, LLC is a limited liability company organized under Connecticut law. Its principal place of business is located at 30 Buxton Farms Road, Suite 220, Stamford, Connecticut 06605.

10.     At all times relevant to this matter, Plaintiff North Stamford Medical Associates, LLC is a limited liability company organized under Connecticut law. Its principal place of business is located at 30 Buxton Farms Road, Suite 220, Stamford, Connecticut 06605.

11.     At all times relevant to this matter, Plaintiff Steven A.R. Murphy, M.D. is a physician licensed to practice medicine in Connecticut and New York. His principal place of practice is located at 30 Buxton Farms Road, Suite 220, Stamford, Connecticut 06605.

12.     Upon information and belief, at all times relevant to this matter, Defendant Cigna Health and Life Insurance Company is a corporation organized under Connecticut law. Its principal place of business is located at 900 Cottage Grove Road, Bloomfield, Connecticut 06152.

13.    Upon information and belief, at all times relevant to this matter, Defendant Connecticut General Life Insurance Company is a corporation organized under Connecticut Law. Its principal place of business is located at 900 Cottage Grove Road, Bloomfield, Connecticut 06152.

## RELEVANT FACTS

14.    At the start of the COVID-19 pandemic, the Murphy Practice – a cutting edge internal and preventative medical practice based in southwestern Connecticut – was one of the first (if not the first) to answer the call of towns and institutions throughout Fairfield and New Haven Counties, Connecticut, and Westchester County, New York about the desperate need for timely COVID-19 testing.

15.    Formed by Dr. Murphy over a decade ago, the mission of the Murphy Practice is to provide high-quality preventive and general health services, as well as acute primary care, to men, women, and adolescents. Dr. Murphy, a board-certified internist, is the principal of the Murphy Practice.

16.    The Murphy Practice accomplishes its mission by offering an array of preventive medical services, including diagnostic laboratory testing and imaging such as ultrasounds and echocardiograms.

17.    Patients of the Murphy Practice can also receive care and consultations concerning a myriad of other services, including allergy testing, testosterone therapy, chronic disease management, gynecology, immigration physicals, medical marijuana, vitamin therapy, vein evaluation, urgent care and weight loss.

18.    Dr. Murphy completed his internship in medical genetics and pediatrics at Mount Sinai Hospital in New York. He subsequently served as the chief resident in internal

4

medicine at Greenwich Hospital-Yale New Haven Health in Greenwich, Connecticut. Prior to entering private practice, Dr. Murphy also served as a clinical fellow in medical genetics at Yale Medical School in New Haven, Connecticut.

19.    As a physician, Dr. Murphy specializes in general medical care, personalized medicine and genetics, weight loss medicine, adolescent care, and hereditary cancers. In addition, Dr. Murphy is an FAA Senior Aviation Medical Examiner, a United States Civil Surgeon, and an obesity medicine specialist.

20.    Dr. Murphy serves as an assistant professor of medicine, cell biology, and anatomy at New York Medical College in Valhalla, New York.

21.    Among its other services, the Murphy Practice operates a state-licensed physician office laboratory located at 30 Buxton Farms Road in Stamford, Connecticut. Dr. Murphy is the certified laboratory director for this laboratory under the federal Clinical Laboratory Improvement Amendments ("CLIA") and Connecticut law.

### The Murphy Practice's COVID-19 Response

22.    The Murphy Practice invested hundreds of thousands of dollars to transform its traditional medical practice to set up COVID-19 testing sites throughout southwestern Connecticut and the Hudson Valley. These sites – which were erected virtually overnight – were designed to provide efficient drive and/or walk-through COVID-19 testing to patients with symptoms or suspected exposure. These testing sites were unquestionably the first line of defense against the pandemic.

23.    Ultimately, the Murphy Practice operated drive and/or walk-through COVID-19 testing sites in Greenwich, Stamford, New Canaan, Darien, Fairfield, Bridgeport, New Haven, West Haven, Stratford, and Ridgefield, Connecticut, and Bedford, Brooklyn, and Pound Ridge, New York.

5

24.     In addition to creating the physical infrastructure for the sites, the Murphy Practice had to assemble the clinical and administrative staff needed to operate the sites and to perform the testing, including physicians, medical students, physician assistants, nurse practitioners, registered nurses, medical assistants, registrars, coordinators, and IT staff. It had to develop extensive protocols and procedures to ensure the sites were effectively and efficiently operating, and all safety, infection control, OSHA, and CDC guidance were observed.

25.     The Murphy Practice also invested significant hours and resources researching peer-reviewed and other expert literature to determine the most effective and informative way to fulfill its COVID-19 testing mission.

26.     Through this research, and based on personal experience, the Murphy Practice concluded that performing a COVID-19 test in a vacuum, without performing any other diagnostic testing, would fail to adhere to the requisite standard of care. Thus, patients who present with symptoms of COVID-19, or patients who have or potentially have exposure to COVID-19, need to be tested for COVID-19 as well as other respiratory viruses and infections that could possibly cause the same or similar symptoms as COVID-19, or could possibly co-exist with COVID-19. Information about other potential respiratory viruses or infections is vitally important to ensure that patients who present with symptoms or were possibly exposed to COVID-19 receive the most appropriate and effective treatment for a life-threatening condition.[1]

---

[1] *See, e.g.*, Bangshun He et al., *Tumor Biomarkers Predict Clinical Outcome of COVID-19 Patients*, 81 J. OF INFECTION 452 (2020).

27.    Medical Studies have also concluded that a statistically significant percentage of patients (20% in one study) who tested positive for COVID-19 also tested positive for one or more respiratory pathogens.[2]

28.    In particular, FAQs regarding the federal COVID-19 testing law that have been prepared jointly by the Departments of Labor, Health and Human Services (HHS), and the Treasury (collectively, "FAQs"), state that "the CDC strongly encourages clinicians to test for other causes of respiratory illnesses."[3]

29.    As a result, when testing for COVID-19 among symptomatic patients the Murphy Practice also tested for other respiratory pathogens.

30.    Initially, this was accomplished by splitting the samples taken from patients and sending one sample to a lab with the capability to test for COVID-19, and one sample to the Murphy Practice lab, which was able to test for non-COVID respiratory viruses, but did not yet have the capacity to test for COVID-19.  The Murphy Practice utilized a BioFire Film Array Panel test for its COVID-related respiratory virus testing.

31.    These Panels are front-line tests to help clinicians quickly and accurately diagnose numerous respiratory infections, which present with nearly indistinguishable

---

[2] Of the 116 specimens positive for SARS-CoV-2, 24 (20.7%) were positive for 1 or more additional pathogens, compared with 294 of the 1101 specimens (26.7%) negative for SARS-CoV-2 (Table 1) (difference, 6.0% [95% CI, –2.3% to 14.3%]). "Rates of Co-infection Between SARS-CoV-2 and Other Respiratory Pathogens,"  JAMA. 2020;323(20):2085-2086. doi:10.1001/jama.2020.6266, Available at https://jamanetwork.com/journals/jama/fullarticle/2764787

[3]  "FAQS ABOUT FAMILIES FIRST CORONAVIRUS RESPONSE ACT AND CORONAVIRUS AID, RELIEF, AND ECONOMIC SECURITY ACT IMPLEMENTATION PART 42," dated April 11, 2020, available at https://www.cms.gov/files/document/FFCRA-Part-42-FAQs.pdf at Q.5.

symptoms and contribute to a significant healthcare burden. These multiplex PCR respiratory panels utilize a syndromic approach to target a broad grouping of probable respiratory pathogens.

32.     After months of working unsuccessfully to obtain the equipment necessary to directly provide COVID-19 testing, in May of 2020 an advanced BioFire Film Array System, with COVID-19 testing capability, was approved by the FDA for COVID-19 testing.[4]  The Murphy Practice was able to purchase the new BioFire machine.

33.     According to the makers of BioFire, "[t]he inclusion of SARS-CoV-2 in the BIOFIRE® RP2.1 panel allows healthcare providers to quickly identify patients with common respiratory pathogens, as well as those with COVID-19, using one simple test. The BIOFIRE® RP2.1 panel takes approximately 45 minutes and tests nasopharyngeal swab samples in transport media."[5]

34.     The new BioFire machines are not capable of running a test limited to the detection of COVID-19.  They are only capable of running an enhanced 21 channel PCR BioFire test that detects COVID-19, as well as other common respiratory virus and bacterial infections.

35.     The BioFire machine was an extraordinary advance, and it enabled the Murphy Practice to test far more efficiently.  BioFire is capable of producing COVID-19 test results on the same day a sample was taken, as opposed to commercial labs in

---

[4] https://docs.biofiredx.com/wp-content/uploads/PRESS-RELEASE-BIOFIRE%C2%AE-Respiratory-Panel-2.1-RP2.1-with-SARS-CoV-2.pdf

[5] Id.

8

Connecticut, where results could take a week to 10 days.  For symptomatic patients, the time difference was potentially life-saving.

36.    Once the Murphy Practice had COVID-19 testing capacity through the BioFire machines, patients who were symptomatic or otherwise had a need for expedited results had their samples run through BioFire, which often provided them with results in one day or less.  For others, the samples were sent to an outside lab that did the COVID-19 testing.

37.    The Murphy Practice also provided COVID-19 antibody blood testing in its lab for patients who knew or had reason to believe that they had recovered from COVID-19.

38.    And, for patients who tested positive for COVID-19 – or who had COVID-19 antibodies in their system – additional blood testing was necessary to determine the potentially life-threatening damage that the virus was doing or had done to the body's organs and systems.  As a result, in addition to the antibody testing specifically covered by the FFCRA and the CARES Act, these patients also received medically necessary comprehensive blood testing performed to determine the potentially life-threatening damage that the virus was doing or had done to the body's organs and systems. This blood testing includes checking for certain protein levels, vitamin levels, hormone levels, and other indicia that will provide key insights into the operation of various vital organs and systems.[6]

---

[6] *See, e.g.*, Thirumalaisamy P. Velavan & Christian G. Meyer, *Mild Versus Severe COVID-19: Laboratory Markers*, 90 INT'L J. OF INFECTIOUS DISEASE 304 (2020); Jean M. Connors & Jerrold H. Levy, *COVID-19 and Its Implications for Thrombosis and Anticoagulation*, 135 BLOOD 2033 (2020); David O. Meltzer et al., *Association of Vitamin D Status and other Clinical Characteristics with COVID-19 Test Results*, 3 JAMA

39.     Along with the testing services described above, the Murphy Practice's clinical personnel provided telemedicine preventative medicine counseling and education to the patients, including how to observe universal precautions and proper nutrition during the pandemic, and other important issues, as specifically recommended by the Centers for Disease Control.[7]

40.     Also, during the time period between the day the sample was taken and the results were available, the Murphy Practice's clinical personnel conducted telemedicine visits with the patients to check on their conditions and determine whether further medical intervention was needed. The frequency and duration of these visits was dependent on each patient's unique condition, with an emphasis and priority on following up with symptomatic patients suspected of being infected with the virus.

41.     Finally, when the results of the tests were available, the results were posted on the patient's individual registration portal. For positive tests a telemedicine visit was scheduled with the patient to review the results and next steps with a clinician.  The patient was advised to schedule an appointment to receive a comprehensive blood panel test. The purpose of this blood test, as discussed above, is to determine the potentially life-

---

NETWORK OPEN E2019722 (2020); Brody H. Foy, Jonathan C.T. Carlson & Erik Reinersten, *Association of Red Blood Cell Distribution Width with Mortality Risk in Hospitalized Adults with SARS-CoV-2 Infection*, 3 JAMA NETWORK OPEN E2022058 (2020).

[7] "All persons being tested, regardless of results, should receive counseling on the continuation of risk reduction behaviors that help prevent the transmission of SARS-CoV-2 (e.g., wearing masks, physical distancing, avoiding crowds and poorly ventilated spaces)."  Overview of Testing for SARS-CoV-2 (COVID-19), available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-overview.html

threatening damage that the virus was doing or had done to the body's organs and systems.

42.     The Murphy Practice unquestionably fulfilled its mission to provide ready access to COVID testing and related services to residents of southeastern Connecticut. From March 1, 2020 through December 31, 2020, the Murphy Practice engaged in over 75,000 encounters with patients, and collectively tested and provided medical treatment and care to over 35,000 of those patients. To date, the Murphy Practice has provided COVID-19 testing to approximately 3,000 uninsured patients, without cost to the patients.

43.     The Murphy Practice has received accolades for its public health efforts from federal and state elected representatives, local government officials, and the media. Indeed, the Murphy Practice's efforts in creating the first walk up and/or drive through testing sites in Connecticut played a significant part in the relative success that Connecticut enjoyed in combating the COVID-19 crisis.

### The Requirement That Health Plans Cover COVID-19 Testing and Related Services

44.     In March of 2020 Congress, in recognition of the public health emergency and the desperate need to address it by making COVID-19 testing readily available to anyone who needed it, enacted two statues that addressed the issue of payment for testing:  the Families First Coronavirus Response Act ("FFCRA") and the CARES Act.

45.     Specifically, through the FFCRA Congress mandated that health plans and managed care companies, such as Cigna, must cover and reimburse providers for conducting COVID-19 testing, COVID antibody testing, and related testing and services.

46.     Moreover, in recognition of the emergency conditions, Congress went much further than merely requiring insurers to cover testing.  To make sure that no patient would

be deterred from getting a COVID-19 test due to a concern for the cost, Congress required coverage for COVID-19 testing and related services to be provided without cost sharing, deductibles, copayments or coinsurance, or other medical management requirements.

47.    In essence, Congress sought to ensure that any patient with health insurance could get a COVID-19 test without any out-of-pocket costs, and without having to get permission from their insurer.

48.    Further, Congress addressed the possibility that a patient would have access to a COVID-19 test that was provided by practice that was not in the patient's insurance network.

49.    All healthcare providers are either "in-network" or "out-of-network" with respect to a particular insurance carrier. "In-network" or "participating" providers describes those who contract with a health insurer to accept discounted negotiated rates as payment in full for covered services.  The members typically can obtain services from an "in-network" provider at little or no cost to the member.

50.    "Out-of-network" or "non-participating" providers are those that do not have contracts with an insurance carrier to accept discounted rates and instead set their own fees for services.

51.    Guidance from the Departments of Labor, Health and Human Services and the Treasury has clarified that the FFCRA and the CARES Act apply to COVID-19 testing, antibody testing, and related services rendered by both "in-network" and "out-of-network" providers." [8]

---

[8] FAQs dated April 11, 2020, at Q.7 and Q.4, available at https://www.cms.gov/files/document/FFCRA-Part-42-FAQs.pdf

52.    However, insurers typically seek to dissuade their members from using "out of network" providers, as a cost saving measure.  Some healthcare plans provide no "out of network" benefits at all, meaning that any services obtained from an "out of network provider" must be paid for by the patient.  Alternatively, many plans will pay only a percentage of "out of network" charges, leaving the patient responsible for the remainder.

53.    The FFCRA and the CARES Act addressed how insurers were required to reimburse both "in network" and out of "network providers."  In a section titled "ACCESS TO HEALTH CARE FOR COVID-19 PATIENTS," the CARES Act added a requirement that health plans covered by the FFCRA "**shall reimburse the provider of the diagnostic testing as follows . . .**" for covered tests and services.  The Act then set forth alternative methods to calculate the actual payment amounts health plans were required to pay providers for testing and related services.  Importantly, the Act addressed payment for services provided by "out of network" providers as well as "in network" providers.

54.    If the patient's plan already had a negotiated rate with the provider, *i.e.*, the provider was "in-network," the plan had to pay that negotiated rate.

55.    Congress also addressed the potential problem of a patient who obtains a COVID test from an "out-of-network" provider.  Such a patient would ordinarily face the prospect of having to pay the full price to the provider, seek reimbursement from their insurer, and risk receiving no reimbursement, or at best partial reimbursement.

56.    However, the Act also addressed the payment requirements for providers who did not have a negotiated rate, *i.e.,* "out-of-network providers."  Insurers are required to pay "out of network" providers their full cash price for the test, unless the insurer is able to negotiate a lower rate with the provider.

13

57.     Guidance has also confirmed that, in addition to reimbursing providers for the COVID tests, insurers must reimburse providers for other related items and services furnished during a visit that results in an order for a COVID-19 or COVID-19 antibody test.

58.     More recently, the CDC has specifically expressed its approval of tests that, like the BioFire Array, screen patients for influenza variants, along with COVID-19.[9]

## CIGNA's FAILURE TO FOLLOW THE LAW

59.     Sadly, however, Cigna has not honored its obligation to reimburse the Murphy Practice for this vitally needed public health service. This is tragic, because, while it is virtually impossible in this polarized political environment for our federal elected officials to agree on *anything*, they did agree on payment for COVID-19 testing and related services.

60.      Cigna has instead engaged the Murphy Practice in a paperwork war of attrition.  Specifically, Cigna has made and continues to make voluminous frivolous and bad faith medical records and audit requests in response to every claim submitted by the Murphy Practice, in a clear effort to overwhelm the practice and to delay or avoid its payment obligations indefinitely.

61.     Indeed, Cigna's requests would require the Murphy Practice to provide hundreds of thousands of pages of documents, and cause the entire practice, and the COVID-19 testing operation that is so vital to the ongoing public health emergency, to grind to a halt.

---

[9] "Why the CDC Flu SC2 Multiplex Assay Is Important:  Serves as a single test to diagnose infection caused by one of three viruses: SARS-CoV-2, influenza A, and influenza B," available at https://www.cdc.gov/coronavirus/2019-ncov/lab/multiplex.html .

62.    More importantly, Cigna's practices are specifically prohibited.  According to FAQs released on February 26, 2021, "The FFCRA prohibits plans and issuers from imposing medical management, including specific medical screening criteria, on coverage of COVID-19 diagnostic testing."[10]

63.    Rather,

> "When an individual seeks and receives a COVID-19 diagnostic test from a licensed or authorized health care provider, or when a licensed or authorized health care provider refers an individual for a COVID-19 diagnostic test, plans and issuers generally must assume that the receipt of the test reflects an 'individualized clinical assessment' and the test should be covered without cost sharing, prior authorization, or other medical management requirements."[11]

64.    Cigna has simply ignored this direction. Although a few payments have been made, as of now, the amount owed to the Murphy Practice for this testing totals more than $6 million dollars.[12] Cigna has denied reimbursement for COVID-19 testing and testing-related services for over 4,000 Cigna members or beneficiaries.

65.    Notably, the Murphy Practice often initially submitted a claim for reimbursement only for the BioFire Covid-19 test array, even if many of the medically necessary ancillary services described above were also provided.  Those tests and services were billed separately.

66.    In these situations, despite the CARES Act guidance discussed above advising that "plans and issuers generally must assume that the receipt of the test reflects

---

[10] https://www.cms.gov/files/document/faqs-part-44.pdf at page 2.

[11] *Id.*

[12] Cigna recently issued a "retrospective review letter," demanding repayment of the amounts previously paid.

15

an 'individualized clinical assessment' and the test should be covered without cost sharing, prior authorization, or other medical management requirements," CIGNA either requested medical records or denied the claim.

67.     Despite the impropriety of the record requests, the Murphy Practice responded, providing Cigna with the test order form, signed by a physician, and the test results.  These documents demonstrated conclusively that "an individual [sought] and receive[d] a COVID-19 diagnostic test from a licensed or authorized health care provider." As the above guidance makes clear, Cigna "generally must assume that the receipt of the test reflects an 'individualized clinical assessment' and the test should be covered without cost sharing, prior authorization, or other medical management requirements."

68.     But even after receiving the records Cigna did not reimburse the practice. Rather, Cigna simply sent another request for medical records of denied the claim.  Cigna has even engaged in the practice of denying testing claims *before* the Murphy Practice has responded with requested records or reasonably could respond to those claim appeals.

69.     Cigna has also routinely, and without justification, refused to pay for the other, related testing and services the FFCRA and the CARES act require them to cover, including, for example, the patient's visit to a Murphy Practice location, the consultation regarding testing, the taking of samples, the related testing ordered during that visit, and the telemedicine follow-ups.

## ERISA PLANS

70.   On information and belief, some, but not all, of the patients the Murphy Practice treated were enrolled in Cigna health plans that were governed by the Employee Retirement Income Security Act ("ERISA").

71.   Even if the Families First Coronavirus Response Act and CARES Act did not, on their own, obligate Cigna to reimburse the Murphy Practice for the medically necessary COVID-19-related testing that it performed – which they most certainly do – Cigna would still be obligated to reimburse the Murphy Practice for the COVID-19-related testing and services rendered to patients enrolled in plans covered by ERISA. This is because the FFCRA and CARES Acts are to be treated, for enforcement purposes, as if they were included in ERISA.

72.   Further, the FFCRA and the CARES Act broadly apply to all health care plans, including ERISA plans, meaning that ERISA plans are required to cover COVID-19 testing and related services as provided in the FFCRA and the CARES Act.

73.   On information and belief, many of the ERISA plans that Cigna administers and patients of the Murphy Practice were enrolled in provide benefits for medically necessary healthcare services plan beneficiaries obtain from "out of network" providers.

74.   On information and belief, Cigna's blanket denials of the Murphy Practice's claims for COVID-19 testing, and unjustifiable records requests, violate the provisions of these ERISA plans and/or wrongfully deny benefits due under ERISA.

75.   To the extent that any of CIGNA's ERISA plans do provide COVID-19 testing benefits as required by the FFCRA and the CARES Act, CIGNA has wrongfully

failed to pay the Murphy Practice as required by the plans, and the FFCRA and the CARES Act, in violation of ERISA.

76.    To the extent that any of Cigna's ERISA plans have not followed the requirements of the FFCRA and CARES Act, and do not provide full coverage of COVID-19 testing services, they are in violation of the FFCRA, the CARES Act and ERISA.

77.    The proper remedy for this violation is to interpret all ERISA plans as being consistent with the mandates of the FFCRA and the CARES Act – that is, to interpret these ERISA plans as providing the coverage of Covid-19 testing and related services that they are required to provide under the FFCRA and the CARES Act as incorporated into ERISA.

### ERISA ASSIGNMENTS OF BENEFITS

78.    The Murphy Practice is "out-of-network" or non-participating with Cigna.

79.    Many of the Cigna members who received testing services at the Murphy Practice locations executed assignments of benefits forms.  The assignment documents stated that each patient "assign to DMSOG/NSMA[13], for application onto your bill for services, all of your rights and claims for the medical benefits to which you or your dependents are entitled, under any federal or state healthcare plan (including, but not limited to, Medicare or Medicaid), insurance policy, any managed care arrangement or other similar third-party payor arrangement . . ."

80.    Other patients registered electronically, and in the electronic forms that they completed they were advised and agreed that federal law requires their insurer to cover the entire cost of testing and related services, that the Murphy Practice would bill their

---

[13] Diagnostic and Medical Specialists of Greenwich, LLC; North Stamford Medical Associates.

insurer, and that the Murphy Practice would not, under any circumstances, seek payment from the patient.

81.     Moreover, the FFCRA and the CARES Act, by directing all plans, including ERISA plans, not just to cover COVID-19 testing and related services, but <u>to pay providers certain amounts for COVID-19 testing</u> and related services provided to covered persons, have obviated the need for a provider to obtain a specific assignment of ERISA benefits from an ERISA beneficiary to be entitled to seek reimbursement from the plan for such testing and related services, or to be entitled to bring an action under ERISA for reimbursement or injunctive relief.

82.     In effect, the FFCRA and the CARES Act have given providers of COVID-19 testing and related services standing to sue ERISA plans for violations of ERISA, including violations of the FFCRA and the CARES Act, regardless of whether there has been an assignment of benefits.  Indeed, the "benefit" the Murphy Practice is suing for is the provider reimbursement required by the FFCRA and the CARES Act.  The FFCRA and the CARES Act do not merely require healthcare plans to "cover" COVID-19 testing, they require the plans to pay amounts directly to providers, because the Congressional intent was to prevent patients from facing any possible out of pocket liability.

<strong><u>CIGNA'S ERISA PROCEDURAL VIOLATIONS</u></strong>

83.     Cigna has repeatedly and persistently failed to comply with ERISA requirements in processing the claims submitted by the Murphy practice.

84.     ERISA requires that a determination of, and payment of, benefits be made within 30 days of the submission of the claim or bill.  Cigna has rarely, if ever complied

19

with this rule, often issuing benefit determinations well over 30 days past submission of the claim, sometimes several months later.

85.     ERISA provides for an extension of up to 15 days, if the Plan requires additional information, and if the Plan notifies the claimant before the expiration of the initial 30-day period.  These prerequisites for obtaining an extension were rarely, if ever complied with by Cigna.

86.     For denied claims pursuant to 29 U.S.C. § 1133, an ERISA plan must (a) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant; and (b) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim. 29 U.S.C. § 1133(1) and (2). [14]

87.     A recent set of denials from Cigna read: "The attachment/other documentation that was received was incomplete or deficient. The necessary information is still needed to process the claim. At least one Remark Code must be provided (may be comprised of either the NCPDP Reject Reason Code, or Remittance Advice Remark Code that is not an ALERT)."

88.     One recent denial of a claim where Cigna had never requested records gave as the reasons for denial "Missing patient medical record for this service," and "the supporting documentation does not match the information sent on the claim."

---

[14] 29 C.F.R. § 2650.503–1(g)(1).

89. Cigna has also violated 28 U.S.C 1133 and its related regulations by (a) refusing to describe any additional material or information necessary to perfect a claim, such as the appropriate diagnosis/treatment codes; (b) refusing to notify the relevant parties that they are entitled to have, free of charge, all documents, records and other information relevant to the claims for benefits; (c) refusing to provide a statement describing any voluntary appeals procedure available, or a description of all required information to be given in connection with that procedure; (e) refusing to provide the Murphy Practice with the documents and information relevant to Cigna's denial of the claims; and (f) refusing to timely issue required notifications that the claims have been denied or underpaid.

90. Cigna's widespread non-compliance with ERISA regulations, and use of incomprehensible gibberish in its benefit denials has made participation in a fair administrative review process impossible.

## **NON-ERISA PLANS**

91. On information and belief, some, but not all, of the patients the Murphy Practice treated were enrolled in Cigna health plans that were not governed by ERISA. This is because, on information and belief, some of the health plans were sponsored by state or municipal governmental entities that are exempt from ERISA, and some of the plans do not involve employee benefit funds.

92. In these situations Cigna's persistent refusal to provide coverage for Covid-19 testing and related services not only violated the FFCRA and the CARES Act, but also gave rise to common law and statutory rights of recovery, including the Murphy Practice's right to recover under the theories of unjust enrichment, and under Connecticut statutes prohibiting unfair claims settlement practices, including of the Connecticut Unfair

21

Insurance Practices Act, Conn. Gen. Stat. § 38a-816, and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110g.

93.    All totaled, from the start of the pandemic through December 31, 2020, the Murphy Practice provided these COVID-19-related testing services to over 35,000 patients, over 5,000 of whom were members or beneficiaries of Cigna health plans.

94.    Based on the provisions of the FFCRA and the CARES Act, and ERISA, as discussed above, the Murphy Practice had every expectation that Cigna would honor its obligations and reimburse the practice for these COVID-19-related testing services provided to its members or beneficiaries. Indeed, other carriers similarly situated to Cigna honored their obligations to the Murphy Practice.

95.    It is hard to imagine a clearer violation of ERISA and the FFCRA and the CARES Act, as well as common law duties and Connecticut statutes prohibiting unfair claims settlement practices, than an insurer who has been provided with proof that one of their beneficiaries was determined by a physician to be in medical need of a COVID-19 test, and provided with proof that the test was performed, yet refuses to pay anything.

96.    Finally, adding insult to injury, Cigna has – in a cynical attempt to divert attention away from its wrongful conduct – made defamatory and malicious statements about the Murphy Practice and Dr. Murphy to its patients and others. Cigna's conduct violates Connecticut law and has damaged the Murphy Practice and Dr. Murphy.

97.    Further, the Murphy Practice has learned from patients, testing site sponsors, and others that, when patients and others ask Cigna about the status of reimbursement to the Murphy Practice, Cigna falsely informed them that the Murphy

Practice is a fraudulent enterprise and it, together with Dr. Murphy are committing fraud in connection with its COVID-19-related testing services.

98.    Even more damaging, Cigna is also telling patients – again falsely – that they are personally responsible for paying the Murphy Practice for the charges Cigna has so far refused to pay.  Cigna made these statements in notices of denial and/or explanations of benefits that were sent to its members.  This is part of a pattern and practice by Cigna of sending patients false and misleading explanation of benefits.

99.    All these statements were designed to create a false and negative impression about Dr. Murphy and the Murphy Practice among their patients and the community in general, to cause testing site sponsors to break their agreements or end their relationships with the Murphy Practice.

100.    Unfortunately, Cigna's efforts have already borne fruit as several cities, towns, and facilities have ended their relationships with the Murphy Practice and Dr. Murphy as a direct result of Cigna's malicious efforts.

101.    Despite not receiving appropriate reimbursement from Cigna, the Murphy Practice has not and will not bill a Cigna member or beneficiary (or any patient for that matter) for any of these services.

102.    Despite not receiving anywhere near the required reimbursement from Cigna, the Murphy Practice will continue running all of its existing testing sites and will establish new testing sites to care for all patients, including Cigna members and beneficiaries, during this public health crisis.

103.    For all these reasons, the Murphy Practice and Dr. Murphy are entitled to compensatory damages and the declaratory and other relief requested herein.

23

## AS AND FOR A FIRST CAUSE OF ACTION

104.   The Murphy Practice and Dr. Murphy repeat, reiterate, and re-allege each and every allegation contained above, as if more fully set forth at length herein.

105.   Many of the Cigna plans at issue are benefit plans established pursuant to or governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq.

106.   The ERISA plans require Cigna to pay the cost of medically necessary covered healthcare services provided to Cigna's Members and Beneficiaries.

107.   Some of the ERISA plans provide coverage for COVID-19 related testing and services.

108.   The FFCRA and the CARES Act, as incorporated into ERISA, require the plans and Cigna to cover COVID-19 related testing and services, and to reimburse providers for COVID-19 related testing and services.

109.   The Murphy Practice provided medically necessary covered healthcare services, COVID-19 related testing and services, to Cigna's Members and Beneficiaries.

110.   The Murphy Practice properly billed the Cigna for covered COVID-19 related testing and related healthcare services provided to Cigna's Members.

111.   The Murphy Practice was entitled to be reimbursed in full for providing COVID-19 related testing and related covered healthcare services to Cigna's Members.

112.   Cigna improperly and without justification failed to pay the Murphy Practice, or failed to pay the Murphy Practice in full, for the COVID-19 related testing and related covered healthcare services rendered to Cigna's Members.

24

113.    29 U.S.C. § 1132 provides that a beneficiary of an ERISA Plan may bring a civil action to recover benefits due under the plan, to enforce rights under the plan and to clarify rights and future benefits under the plan.

114.    Cigna's Members have assigned their right to receive benefits under the Plan to the Murphy Practice, either explicitly, by implication or by operation of law pursuant to the FFCRA and the CARES Act.

115.    The Murphy Practice has standing to bring this action regardless of the assignments, because the FFCRA and the CARES Act, by specifically directing insurers to pay providers particular amount for particular services, has given providers, including the Murphy Practice, standing to sue ERISA plans for violations of the acts.

116.    The Defendants' failure to pay the Murphy Practice in full for the covered healthcare services rendered to the Members constitutes a breach of the Plans, either as written or as equitably reformed to comply with the FFCRA and the CARES Act, and Cigna's failure was erroneous, arbitrary and capricious and was without reason, was unsupported by substantial evidence and was erroneous as a matter of law.

117.    Because Cigna has reflexively denied thousands of claims for the exact same clearly reimbursable services, without providing any legitimate justification, appeal of these decisions would be futile.

118.    The Murphy Practice has exhausted available administrative remedies, or exhaustion of administrative remedies would be futile given the above, and, alternatively, Cigna's utter disregard for ERISA deadlines and procedures excuses any failure to exhaust administrative remedies.

119.    The Murphy Practice is entitled to payment, pursuant to the FFCRA and the CARES Act as incorporated into ERISA for the medically necessary COVID-19 related testing and services provided to Cigna members and beneficiaries.

120.    The Murphy Practice is also entitled to reasonable attorneys' fees, pursuant to 29 U.S.C. § 1132 (g)(1).

## AS AND FOR A SECOND CAUSE OF ACTION

121.    The Murphy Practice and Dr. Murphy repeat, reiterate, and re-allege each and every allegation contained above, as if more fully set forth at length herein.

122.    Cigna is a health insurer authorized to do business in Connecticut.

123.    Cigna either issues health plans directly or asserts total control over the claims adjudication process for plans Cigna fully administers, and is in the business of insurance pursuant to Conn. Gen. Stat. § 38a-816.

124.    This is because, on information and belief, some of the health plans are fully insured by Cigna.

125.    As discussed above, the Murphy Practice and Dr. Murphy have submitted numerous claims for medically necessary COVID-19-related testing services to Cigna's members and beneficiaries.

126.    The Murphy Practice treated patients with ERISA plans and patients with non-ERISA plans.

127.    This claim concerns patients with non-ERISA plans that Cigna either insures benefits or asserts complete control over the claims adjudication process as a third-party administrator of the non-ERISA health plans.

26

128.   In cases where Cigna acts as a third-party administrator of non-ERISA plans, Cigna was the fiduciary that made final and binding decisions to deny claims submitted by the Murphy Practice in this action.

129.   As also addressed above, Cigna was obligated to promptly reimburse the Murphy Practice and Dr. Murphy for those services in accordance with law and the terms of its plans, and in accordance with federal and state law.

130.   As stated above, federal law mandated that Cigna reimburse the Murphy Practice for COVID-19 testing and related services.

131.   In addition, state law mandated that Cigna reimburse the Murphy Practice for COVID-19 testing and related services.[15]

132.   For symptomatic patients that appeared to the Murphy Practice for testing, Cigna was required to reimburse those claims pursuant to the Connecticut Surprise Billing Law.[16]

133.   In recognition of the nature and critical importance of these services, and to protect patients from surprise bills, the Connecticut General Assembly enacted a surprise billing law that creates a legal duty that compels Cigna to pay the Murphy Practice the amount specified by statute (for the care provided, the greatest of (i) the in network fee; (2) the usual, customary and reasonable rate as set forth in the Fair Health database; or (3) the Medicare rate).

---

[15] *See* https://portal.ct.gov/-/media/CID/1_Bulletins/Bulletin-IC-39.pdf (last accessed on December 20, 2022)

[16] Conn. Gen. Stat. § 477aa (the "Surprise Billing Law").

134.   For symptomatic members that presented to the Murphy Practice for testing, the COVID-19 testing services provided by the Murphy Practice meet the definition of emergency services.

135.   As stated above, as the operator of COVID-19 drive-through testing sites, the Murphy Practice was entitled to assume that there was a diagnostic reason for each test, and insurance plans and issuers must generally assume that the receipt of the test reflects an individualized clinical assessment.[17]

136.   Cigna, however, has failed and refused to do so.

137.   Moreover, even if federal and state law did not mandate that Cigna cover the cost of COVID-19 testing and related services on its members, which it undeniably did, Cigna entered into an agreement with Connecticut wherein it explicitly agreed to cover COVID-19 testing fees for its members.[18]

138.   Cigna, again, has failed and refused to honor its agreements.

139.   Cigna's actions, including its refusal to comply with the FFCRA, the CARES Act and Connecticut Law, as well as those actions described above at paragraphs 83 through 90, and 92 through 99, constitute unfair claims settlement practices in violation of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-816.

140.   Cigna's actions violate Conn. Gen. Stat. 38a-816(6)(D): "Refusing to pay claims without conducting a reasonable investigation based upon all available information"

---

[17] FAQs Part 44 (February 26, 2021).
[18] *See* https://www.nbcconnecticut.com/news/local/ct-insurers-agree-to-cover-costs-of-covid-19-testing/2236045/ (last accessed on December 20, 2022)

141.    Cigna's actions violate Conn. Gen. Stat. 38a-816(6)(F): "Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear" when it failed to settle or resolve the claims at issue in this litigation, despite the fact that its legal obligations are clear under federal and Connecticut law.

142.    Cigna's actions violate Conn. Gen. Stat. 38a-816(6)(H): "Attempting to settle claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application."

143.    Cigna's actions violate Conn. Gen. Stat. 38a-816(6)(L): "Delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information."

144.    Cigna's actions violate Conn. Gen. Stat. 38a-816(6)(N): "Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement."

145.    Cigna's actions violate the FFCRA, and the CARES Act, and related regulations and guidance.

146.    When denying the claims submitted by the Murphy Practice, Cigna issued false Explanations of Benefits (EOBs) to the patients stating that the patient, not Cigna, was obligated to pay for these services.

147.   Cigna knew, or alternatively should have known, that the content of the above false statements and misrepresentations were false and violative of federal and Connecticut law.

148.   The Murphy Practice relied on Cigna's representations that it would adhere to its agreement with Connecticut to comply with the FFCRA and CARES Act, and continues to suffer pecuniary harm and ascertainable loss as a result.

149.   Cigna's actions violate Conn. Gen. Stat.  38a-816(15).  Under this law, "failure by an insurer, or any other entity responsible for providing payment to a health care provider pursuant to an insurance policy, to pay…health claims, including, but not limited to, claims for payment or reimbursement to health care providers, within the time periods set forth….shall pay the claimant or health care provider the amount of such claim plus interest at the rate of fifteen per cent per annum, in addition to any other penalties which may be imposed."

150.   Cigna's acts and omissions offend public policy as it has been established by statutes, the common law, or otherwise and is within the penumbra of common law, statutory, and other established concepts of unfairness.

151.   Cigna's acts are immoral, unethical, oppressive, and unscrupulous, with respect to their affects upon patients and providers.

152.   Cigna's acts are causing substantial injury to patients and providers.

153.   Cigna's acts are causing substantial injury to Dr. Murphy and the Murphy Practice.

154.   Cigna's acts have caused Dr. Murphy and the Murphy Practice to suffer an ascertainable loss of money and/or property.

155.   Dr. Murphy and the Murphy Practice are entitled to compensation for the ascertainable loss they suffered as a result of Cigna's acts.

156.   Cigna's acts have been taken over a period of many months and are continuing.

157.   Cigna's acts have been performed with extraordinary frequency:  Cigna has wrongfully responded in the same or similar ways to thousands of claims submitted by the Murphy Practice.

158.    Cigna's acts represent a uniform practice of Cigna.

159.   Cigna's acts constitute an unfair trade practice.

160.   Cigna has engaged in the aforementioned unfair trade practices with such frequency as to indicate a general business practice.

161.   Cigna's acts are a violation of the Connecticut Unfair Trade Practices[19] independent of CUIPA because, among other reasons, Cigna is violating multiple federal and Connecticut laws and is directing the Murphy Practice to violate these laws by designating its liability as the patient's (its member's) liability and, in effect, directing the Murphy Practice to collect these funds from patients, which is impermissible.

162.   Indeed, Conn. Gen. Stat. Ann. § 20-7f(b) states that "[i]t shall be an unfair trade practice in violation of chapter 735a for any health care provider to request payment from an enrollee, other than a coinsurance, copayment, deductible or other out-of-pocket expense, for . . . (2) emergency services covered under a health care plan and rendered by an out-of-network health care provider, or (3) a surprise bill, as defined in section 38a-477aa."

---

[19] Conn. Gen. Stat. § 42-110b.

163.   Cigna's suggestion that the Murphy Practice seek payment from the patient is expressly prohibited by the Surprise Billing Law. In other words, any follow up phone call with the patient to collect unpaid emergency services fees or sending a statement to the patient violates CUTPA. In so doing, Cigna knowingly and illegally attempted to induce the Murphy Practice in legal jeopardy.

164.   As set forth herein, and including the foregoing, Cigna's conduct violates public policy.

165.   Cigna's acts are wanton and reckless given the harm they have caused and will continue to cause Dr. Murphy and the Murphy Practice, and Cigna knew or should have known of the wrongfulness of its acts and that such severe harm would have resulted from such acts.

166.   Cigna acted with reckless indifference to the rights of others, including Dr. Murphy, the Murphy Practice and Cigna's members that presented to the Murphy Practice for Covid-19 testing services.

167.    By reason of the foregoing, Dr. Murphy and the Murphy Practice are entitled to compensatory damages, interest, punitive damages, and attorney's fees against Cigna pursuant to the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110g.

### AS AND FOR A THIRD CAUSE OF ACTION

168.   The Murphy Practice and Dr. Murphy repeat, reiterate, and re-allege each and every allegation contained above, as if more fully set forth at length herein.

169.   The Murphy Practice provided medically necessary COVID-19 testing and related services to Cigna's members and beneficiaries.

170.   Cigna was legally obligated to pay for these services.

171. Cigna wrongfully and unjustifiably failed to pay for these services.

172. Cigna received funds to pay for these services by the collection of payment from members, their employers, and/or sponsors of Cigna's health plans.

173. A benefit was conferred on Cigna because the Murphy Practice handled all aspects of the referenced COVID-19 testing. Cigna was able to save time and money because it did not have to administer, process, or pay claims for COVID-19 tests that its members or the members of the plan it administers desperately needed.

174. In other words, Cigna received the benefit of a free ride.

175. Moreover, Cigna's compensation or future compensation for its administration services is as a matter of virtual certainty based on performance and money saved by denying the Murphy Practice's claims. Cigna benefitted or stands to benefit in terms of its relationship with and compensation from the non-ERISA plans it administers because by wrongfully denying or fractionally paying the COVID-19 testing costs, Cigna saved the self-funded plans money.

176. Cigna was therefore enriched by the amount of payment they wrongfully withheld from the Murphy Practice for these services.

177. This enrichment was at the Murphy Practice's expense.

178. The Murphy Practice treated patients with and without ERISA plans.

179. This claim concerns non-ERISA plans.

180. Given all the facts and circumstances principles of equity and applicable law require that Cigna return this unjust benefit to the Murphy Practice.

181. By reason of the foregoing the Murphy Practice is entitled to an amount to be determined at trial plus interest.

## AS AND FOR A FOURTH CAUSE OF ACTION

182.    A beneficial or contractual relationship exists between Dr. Murphy and the Murphy Practice and their patients who are Cigna members or subscribers.

183.    A beneficial or contractual relationship exists between Dr. Murphy and the Murphy Practice and the sponsors of their COVID-19 testing sites.

184.    At all times relevant to this action, Cigna has been well aware of these relationships.

185.    Cigna intended to, and did, interfere with these relationships by, among other things, making defamatory and malicious statements about Dr. Murphy and the Murphy Practice to their patients and others.

186.    These statements were tortious in that they were specifically designed to create a false and negative impression about Dr. Murphy and the Murphy Practice among their patients and the community in general and to cause testing site sponsors to break their agreements or end their relationships with Dr. Murphy and the Murphy Practice.

187.    As a direct result of Cigna's efforts, some municipalities and facilities have ended their relationship with the Murphy Practice and Dr. Murphy.

188.    By reason of the foregoing, the losses suffered by Dr. Murphy and the Murphy Practice were caused by Cigna's tortious conduct.

189.    By reason of the foregoing, Dr. Murphy and the Murphy Practice are entitled to compensatory and punitive damages in an amount to be determined at trial.

**WHEREFORE**, the Plaintiffs, Murphy Medical Associates LLC; Diagnostic and Medical Specialists of Greenwich, LLC; North Stamford Medical Associates, LLC; Coastal Connecticut Medical Group, LLC; and Steven A.R. Murphy, M.D. (collectively, the

34

"Murphy Practice") demand judgment against the Defendants, CIGNA Health and Life Insurance Company and Connecticut General Life Insurance Company, as follows:

(i)     on the First Cause of Action, awarding the Murphy Practice and Dr. Murphy compensatory damages and the costs and disbursements of this action, including reasonable attorneys' fees and interest;

(ii)    on the Second Cause of Action, awarding the Murphy Practice and Dr. Murphy compensatory damages, punitive damages, and attorney's fees against Cigna pursuant to the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110g;

(iii)   on the Third Cause of Action, awarding the Murphy Practice and Dr. Murphy compensatory damages in an amount to be determined at trial; and interest and attorney's fees;

(iv)    on the Fourth Cause of Action, damages in an amount to be determined at trial, and interest and attorney's fees; and

(v)     such other and further relief as this Court may deem just and proper.

Dated: December 21, 2022
    New Haven, Connecticut

HARRIS BEACH, PLLC
*Attorneys for Plaintiffs*

By: /s/ Roy W. Breitenbach
    Roy W. Breitenbach (Ct Juris No. 428695)
    RBreitenbach@HarrisBeach.com
    333 Earle Ovington Blvd., Suite 901
    Uniondale, New York 11553
    (516) 880-8378

    195 Church Street, #18
    New Haven, Connecticut 06510
    (203) 784-3159

35

TO:    CIGNA HEALTH AND LIFE INSURANCE COMPANY
       900 Cottage Grove Road
       Bloomfield, Connecticut 06152

       CONNECTICUT GENERAL LIFE INSURANCE COMPANY
       900 Cottage Grove Road
       Bloomfield, Connecticut 06152