```
                 UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT


_____)
                              )
MURPHY MEDICAL ASSOCIATES,    )
LLC, ET AL,                   ) No. 3:20-cv-01675-JBA
                              )
            Plaintiffs,        ) February 23, 2023
                              )
v.                            ) 10:57 a.m.
                              )
CIGNA HEALTH AND LIFE         ) 141 Church Street
INSURANCE COMPANY, ET AL,     ) New Haven, Connecticut
                              )
            Defendants.        )
_____)




                      ORAL ARGUMENT




B E F O R E:

        THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
```

                    Official Court Reporter:
                    Corinne T. Thomas, RPR
                    (203) 809-0848

A P P E A R A N C E S:

For the Plaintiffs:

    HARRIS BEACH PLLC
        333 Earle Ovington Boulevard
        Suite 901
        Uniondale, NY 11553
        (516) 880-8378
        E-mail:  Rbreitenbach@harrisbeach.com
    BY:  ROY BREITENBACH, ESQ.


For the Defendants:

    ROBINSON & COLE LLP, Stamford
        1055 Washington Boulevard, 9th Floor
        Stamford, CT 06901-2249
        203-462-7500
        E-mail:  Pbegos@rc.com
    BY:  PATRICK WALTER BEGOS, ESQ

(Call to Order, 10:57 a.m.)

THE COURT:  Good morning, counsel.  Please be seated.  We're here in the matter of *Murphy Medical Associates v. Cigna*, 20-cv-1675.

May I have appearances of counsel starting with plaintiff?

MR. BEGOS:  Roy Breitenbach, Harris Beach PLLC, for the plaintiffs.  Good morning.

THE COURT:  Good morning.

And for the defendants?

MR. BEGOS:  Good morning, Your Honor, Patrick Begos from Robinson & Cole.

THE COURT:  Good morning.

All right.  I'd like to start out our argument today on the issue of general business practice.  What I will do is as we conclude the substantive issues or some of them today, we'll move to the motion for sanctions at which time you can update me on what has transpired with respect to the claims that are being dismissed.  Okay?  It may be that some response requires you to bring that up, but that's -- and that's fine.

I'd like to understand basically -- I'd like counsel to tell me if they agree that if there isn't a general business practice, that the 8616 analysis

in part will be -- won't matter.  So why don't I get from you the understanding of what general business practice should mean in this instance recognizing that the Courts, including the Connecticut Supreme Court, has not offered guidance, substantive guidance, on how many acts of misconduct must be proved to demonstrate a general practice, with whom those general practices are alleged to have been applied, et cetera.

So why don't I start with the plaintiff. Please help me understand in terms of how the cases that have addressed business practice create a context for us here.

MR. BREITENBACH:  Your Honor, it's our position that with regard to the claims under the CUTPA and CUIPA, that the cases from the Supreme Court and the lower courts here in Connecticut have held that it really is a determination --

THE COURT:  You may take your mask off while you argue.

MR. BREITENBACH:  Thank you.  It really is a determination that has to be done on a case-by-case basis.

THE COURT:  Okay.  So let's do it on a case-by-case basis here.

MR. BREITENBACH: So I think in this particular situation, it's our position given the sheer volume of claims that were involved and the totality of Cigna's lack of response to those claims both in a timely fashion and with any substantive response, that that is enough to raise at the -- you know, we think meets our pleading requirements under *Iqbal* and *Twombly* to make it plausible that there was a general business practice and to go forward with discovery on that issue.

THE COURT: So what is the purpose of including in the CUIPA statute the requirement of a general business practice? Specifically, here we have one plaintiff and one defendant and a multiplicity of arguments or claims by the plaintiff against the one defendant. Tell me your view of what is the purpose of the general business practice to include this scenario -- this one-on-one scenario.

MR. BREITENBACH: Right. So I think it's clear, Your Honor, that it is to be conduct that's directed at the public. A private business dispute -- a typical garden variety private business dispute between two parties is generally not, I would say, you know, a breach of contract dispute between two parties over interpretation of a contract or

whatever typically would not rise to the level of a CUTPA or CUIPA claim.

However, this is not -- while we acknowledge that in one sense this is a dispute between two parties because it's a dispute between the Murphy entities, okay, and Cigna, there are many, many members of the public that are implicated by this, right, all people, the availability of testing and whether they may or may not have to be pay as a result. So this is far beyond the ordinary business dispute that affects two people.

The purpose of CUTPA and CUIPA in many respects is to address some type of business practice that is negatively affecting the public and we think that given the -- you know, this is -- in a series of claims involving a series of Cigna plans involving a lot of patients, we see a commonality of practice and we think that at least at the pleading level under *Iqbal* and *Twombly*, this renders it plausible that there was a general business practice.

We believe that went we pursue this and, you know, if the motion to dismiss were to be denied and these claims remain as we go into discovery on these claims, we will see that we were not the only entity to have had this issue based upon press statements,

things like that, and the sheer number of these cases that have been pending throughout the country.

There are, as I think Your Honor is aware based upon Your Honor's prior decision in this case which has been cited in cases throughout the country, a significant number of cases against Cigna regarding this issue and we are also aware of complaints and claims actually brought by patients against Cigna regarding some of these issues.

So I think that given the pattern here, even though it only involves a provider -- providers that under, you know, related providers, so in one way you could see it as a single entity, we think that it's enough given the sheer volume to at least make it plausible to get over the pleading level.  I think --

THE COURT:  May I stop you There.  When you talk about the pleading level, I do not recall from your amended complaint that you have referred to any other complaints against Cigna or claims against Cigna tracking the type of complaints that Murphy Medical has against Cigna.  Am I accurate and why is that not a pleading deficit?

MR. BREITENBACH:  Well, I think, Your Honor, it is accurate that we did not cite other cases.  Number two, I think under the Second Circuit case

law, Your Honor could take judicial notice of the pending cases. So I don't think it's necessarily a pleading deficiency. And number three, I think that this complaint standing on its own based upon the number of claims in this case establishes, we think, the plausibility issue, right, that make it plausible that this is a general conduct -- you know, that it's a general business practice that affects more than just the individuals.

THE COURT: Okay. Let me move to Mr. Begos for a response on this and then we'll take up other issues.

MR. BEGOS: Thank you, Your Honor. I do think this is an issue worth addressing at the outset. We addressed in our moving brief the statement of the law such as it is regarding the pleading requirements. It's clear that there is a requirement to actually plead facts that support a plausible conclusion that there's a general business practice.

I'm not aware of certainly not a Connecticut Appellate Court case that specifically says this is enough, this is not enough. There's a little bit of a -- the Court knows it when it sees it sort of sufficiency and plausibility.

THE COURT:  Does that suggest that given this quite open issue, that we should wait for the summary judgment stage to know exactly what we're talking about here?

MR. Begos:  I don't think so, Your Honor. The case law is clear that there needs to be facts alleged in the complaint to establish a general business practice.  I think it's clear that with respect to a single provider who is asserting claims against a single insurance company, that does not rise to the level of a general business practice.

Dr. Murphy is essentially saying -- this kind of gets back to who's appropriate party under CUIPA a little bit, but generally, a CUIPA claim is brought by an individual insured against an insurance company and it's crystal clear that an individual insured cannot say my claim was improperly denied or there wasn't a reasonable settlement or the investigation was not reasonable and plead a CUIPA claim based on that.

And there's ample case law we've cited in our moving brief that says typically the way insureds satisfy the pleading standard is by alleging that there are other lawsuits out there, usually lawsuits that have been -- where the insurance company has

been found liable that are similar enough to the conduct that's being alleged in the pending case to give rise to a plausible conclusion that there's a general business practice.  All this is on pages 19, 20 and 21 of our opening brief.

Here, where we have Dr. Murphy who is saying I'm an appropriate party under CUIPA to assert a claim, I think that -- he can't then say also but I have 10,000 claims that I've filed against Cigna and each of those claims, you know, counts towards a general business practice.  I think the reasonable position if Dr. Murphy is an appropriate party under CUIPA at all is to say he's got one claim.  I mean, all of his complaints against Cigna sort of arise from the same thing, Cigna kept asking for records and I didn't have records, I couldn't give them records and they denied my claim because I couldn't produce records.

So it's all really the same conduct, and as Your Honor pointed out, there's no allegation in the complaint that Cigna has done this with respect to anybody else.  I'm not aware of widespread lawsuits against Cigna, not that I would necessarily know every suit brought against Cigna by a provider around the country or by a claimant, but I'm certainly not

aware of widespread suits.  There's certainly widespread suits by Dr. Murphy against various different providers in this state.

THE COURT:  So if those were cited in the amended complaint, even though they're brought by the same provider, Murphy Medical, but incorporating a group of new insured whose -- for whom the plaintiff rendered service, would that give you at least a, let's call it, prima fascia general business practice?

MR. BEGOS:  No, Your Honor, because the other suits that Dr. Murphy has brought are against other insurance companies, not against Cigna.  So he has sued -- I think there's eight pending claims in the District of Connecticut.

THE COURT:  I thought you were saying that he has other claims against Cigna involving other patients whose -- for whom the services that he rendered weren't reimbursed.

MR. BEGOS:  No, Your Honor.

THE COURT:  Okay.  Got it.

MR. BEGOS:  I misspoke if I gave that impression.  I'm not aware -- Dr. Murphy, to my knowledge, has not sued Cigna regarding COVID testing in any suit other than the one that's pending before

Your Honor.

THE COURT:  So I asked Mr. Breitenbach what is the purpose behind the requirement under CUIPA of general business practice.  What was the legislature trying to get at there that would help us in conjunction with the Connecticut Supreme Court's helpful reference to the dictionary definition?  What was the purpose of general business practice?

MR. BEGOS:  So I think, Your Honor, the best source I have for that is the *State v. Acordia* case, and that actually refers back quite extensively to the *Mead* decision by the Connecticut Supreme Court, and what *Acordia* -- it goes into great detail about what the state legislature was intending to do with CUIPA and one of the things it was intending to do was essentially to completely occupy the Connecticut field of what it means to have an unfair insurance practice.

The Court went through a lot of discussion of the fact that CUIPA had been updated over the years, it has very, very specific references as to what's an unfair insurance practice and what isn't.  So it's clear from the Supreme Court case that the Connecticut legislature wanted to entirely occupy this field.  And *Acordia* quotes from *Mead*, this is on

page 310 Connecticut at page 35, the Court said quote:  As we previously noted here in *Mead*, this Court stated that, quote, the definition of unacceptable insurer conduct in CUIPA reflects the legislative determination that isolated instances of unfair insurance settlement practices are not so violative of the public policy of this state as to warrant statutory intervention.  Under CUTPA, as under CUIPA, a litigant is bound by this legislative determination.

And so then it said:  Thus, this Court strongly suggested that the legislative determinations as to unfair insurance practices embodied in CUIPA are the exclusive and comprehensive source of public policy in this area.

So what that is saying to me is -- as Mr. Breitenbach admitted, we're not talking about, you know, an isolated instance of a person having a problem with their insurance company over a claim, but the practice has to be widespread enough within a particular insurance company so as to impact public policy, just be against public policy.

And I would note that there's another part of CUIPA that I think bears on this.  The legislature gave the insurance commissioner the ability to decide

that there were some practices that weren't specifically criminalized in CUIPA but that nonetheless were violative of public policy after conducting administrative hearings regarding that. So, you know, to the extent there's some -- you know, the insurance commissioner has some ability, I think, to speak to what's a general business practice.

So I can't say to Your Honor that there is clear law that says here's exactly what the standard is. There certainly is a standard for pleading. It has to be pleaded in the complaint. There has to be facts pleaded in the complaint to support it. I don't know exactly where the line gets drawn, but I think it's clear that in this case the plaintiffs aren't close to the line.

THE COURT: Let me figure out with you where the line is. What if Murphy Medical had a unique procedure or technique for patients that was not otherwise available and it -- they performed that on many, many patients and sought reimbursement and didn't get it and got the runaround and everything that they allege, would that not arguably implicate a public policy?

MR. BEGOS: I don't believe so, Your Honor. First of all, if it's a procedure that only one

doctor in the state is performing, it's hard to say that there's a public policy.

THE COURT:  Even though it may be a -- the only procedure available to save lives or prevent serious illness?

MR. BEGOS:  I think that's a coverage dispute there.  There's a question as to whether a particular plan, whether it's an ERISA plan or -- actually, it would be a non-ERISA plan since we're talking about CUIPA, there's a question whether a particular plan covers a particular medical procedure or whether it's experimental or investigational.  Those kinds of cases come into the courts all the time and sometimes they're brought by the patients who say there's this particular procedure that I want and you should cover it; sometimes they're brought by providers who say I perform this procedure, I have an assignment from a patient.  That doesn't give rise to a CUIPA claim, I think, in a situation where it's an individual doctor who is saying I'm doing this procedure, you're not covering it.

If it were multiple doctors with multiple lawsuits against a particular insurance company that says we're all doing this, you're not covering it, you may get closer to being able to plead the general

business practice, but I just think that to the extent there's a bright line -- to the extent there's a bright line, it prevents a single plaintiff, a single provider or insured from asserting the way you insurance company have treated me is a general business practice.

THE COURT:  Okay.  I think what you have done is moved us into this question about whether there can be standalone CUTPA claims if there is no CUIPA claim.  So I'd like to hear from both of you on that.

MR. BEGOS:  Certainly.

THE COURT:  Because that gets into another aspect of this that is not dominated by this general business practice.

MR. BEGOS:  May I say something before we turn to that?  May I address one other issue that I think is relatively straightforward in this regard, with regard to CUIPA, that I think should be less controversial and more able to resolve a large part of the claim?

THE COURT:  Yes.

MR. BEGOS:  We make the argument that with respect to self-funded non-ERISA plans, there's no business of insurance, there's no CUIPA claim.

THE COURT:  All right.  I'm happy to take

that up, but don't forget, I want to get back to the other because I'm puzzled by some of your argument that self-funded plans that Cigna administers is not the business of insurance.

MR. BEGOS:  Correct.  Connecticut --

THE COURT:  Wouldn't that cut out a huge amount of coverage of these statutes since the majority of large employers are self-insured and do rely on insurance companies to administer those claims?

MR. BEGOS:  Yes.  And I think one of the reasons -- one of the many reasons that large employers do that is so that they're not -- their plans are not subject to all of the regulations that govern insurance.

THE COURT:  They do it because it's cheaper.

MR. BEGOS:  Well, they do it because it's cheaper as well, yes.  But the Connecticut statute is very clear in defining what insurance is and insurance has to involve a transfer and pooling of risk.

THE COURT:  So you say that employers using self-funded plans do it to avoid the regulation of CUIPA and CUTPA?

MR. BEGOS:  No.  I think, Your Honor, you're

right, that they do it because it's cheaper because, you know, they do an analysis and they say we don't need to pay Cigna or Aetna or United Health to pay these claims out of their own funds and charge presumably, you know, a percentage on top of that, we can just have them administer our claims and we have enough resources to pay those claims ourselves.

I do think that -- I understand Your Honor's policy argument there, you know, but I think that the inescapable conclusion from the way CUIPA is drafted to be limited to the business of insurance and the way the Connecticut statute defines insurance, that the inescapable conclusion is when there is a plan that doesn't involve insurance, that it's not covered by CUIPA.

THE COURT:  Well, it's a form of insurance; it's a self-insurance, right?

MR. BEGOS:  Well, I think insurance -- self-insurance is a misnomer there.  It's not -- there's no transfer of risk.  The employer is not transferring risk of payment to a company that's pooling that risk with other risks, and that's directly from the statute that governs -- that defines what insurance is which is included in the same chapter of the statutes where CUIPA is.

So --- and I didn't mean to divert Your Honor too much from the question that Your Honor wanted to ask.

THE COURT:  The issue -- and I want to hear from Mr. Breitenbach on that -- about this concept that self-funded plans do not invoke regulation of the business of insurance.

MR. BEGOS:  And there's -- I can add Your Honor, it's consistent with the way ERISA handles this.  ERISA has what's called a savings clause which says that ERISA doesn't preempt laws regulating insurance.

THE COURT:  But that's how we got here in the first place, right?

MR. BEGOS:  Correct.  Then there's also what's commonly referred to as the Deemer Clause which says that plans that don't involve insurance -- benefit plans that don't involve insurance are not deemed to be insurance.  So ERISA recognizes that there are self-funded plans that don't involve insurance even though to the outside they may look very similar to an insured plan.

Would you like me to turn to the -- I did forget the specific question.

THE COURT:  So what I wanted to know is the

one that you are quite vociferous about and that is whether there can be a stand-alone claim under CUTPA where there is no CUIPA claim?  And while I am not going to ask you to engage in criticism of names, you may demonstrate why the reasoning there is not appropriate.

MR. BEGOS:  Sure.  Thank you.  So *NEMS* cites to -- we're back to *Acordia* for this process and *NEMS* actually cited to victim in *Acordia*, but there's actually a conclusion and a holding in *Acordia* that addresses this issue.  This is at the very end of the decision.  It's on page 37 and 38.  *Acordia* writes, quote:  Accordingly, we conclude that a common law breach of fiduciary duty arising in the insurance context that does not violate CUIPA or some other statute regulating the insurance industry cannot provide the basis for a valid CUIPA claim.

THE COURT:  So we get to the clause or some other statute regulating a specific type of insurance-related conduct, right?

MR. BEGOS:  Correct.

THE COURT:  And we need to address the CARES Act, the surprise billing law and the --

MR. BEGOS:  FFCRA.

THE COURT:  -- FFCRA.

MR. BEGOS:  So when you read *Acordia*, as I mentioned earlier, *Acordia* says that it's clear that the Connecticut state legislature intended to completely occupy the law regarding what unfair insurance practices were and actually cites the legislative history that says we don't want the federal government to do it, we want to do it ourselves.

I think there's two reasons why the FFCRA and the CARES Act do not satisfy this sort of exception in *Acordia* regulating the insurance industry.  First of all, neither one of them are statutes regulating the insurance industry.  They are statutes dealing with the social, economic, medical and various other aspects of the COVID pandemic.  Yes, there are sections in these large statutes that do have some impact on the insurance industry, but I don't think that they could be called statutes regulating the insurance industry.

Secondly, I think that a fair reading of *Acordia* is that when it referred to statutes regulating the insurance industry, it was referring to state statutes regulating the insurance industry. There's no discussion of federal statutes that might impact the insurance industry being considered claims

that can be asserted against an insurance company under CUTPA without constituting a violation of CUIPA.

THE COURT:  So when *Acordia* says, or arguably some other statute regulating a specific type of insurance-related conduct, why does that limit it to just state legislation as opposed to federal and state?

MR. BEGOS:  I think you wouldn't draw that conclusion just from that clause, Your Honor.  But when you look at the entirety of the case, including the Supreme Court's lengthy discussion of why and how CUIPA was enacted, how it was updated over the years, what the overriding intention of the Connecticut legislature was, I think it's clear.  And granted, *Acordia* didn't have to address this because they were talking about a common law issue, not a statutory issue outside of CUIPA.  But I think when it made that reference to some other statute, it was clearly thinking of some other Connecticut statute, not a federal statute --

THE COURT:  So you think from the language of *Acordia* if the federal government has enacted a statute that said with respect to insurance coverage for COVID vaccinations, et cetera, the following

applies, that that, which clearly would regulate the business of insurance, would not be actionable under CUTPA?

MR. BEGOS:  Unless there's a CUIPA violation. So for example --

THE COURT:  So what did *Acordia* mean then when it says or other statute?

MR. BEGOS:  Well, it's a little -- they weren't addressing statute in *Acordia*.  They were addressing a breach of fiduciary duty claim.  So it was a common law issue, but I would say, Your Honor, in this instance when we look at a federal statute, let's say, you know, if there's a decision by this Court or some other Court that, you know, the CARES Act clearly imposed obligations on insurance companies to pay this claim and not that claim, to pay these claims, if an insurance company engages in conduct that's prohibited by CUIPA with respect to COVID claims with sufficient regularity to be a general business practice, for example, you know, is not paying -- not settling claims fairly for patients and so forth but if it's engaging in conduct that's violative of federal law and does so in a way that violates one of the specific prohibited acts in CUIPA, then very well that could be the basis of a

CUIPA violation.

But I don't think that a plaintiff can say you have -- you are violating a federal statute that has some impact on insurance companies and I can assert a CUTPA claim against you without alleging or establishing that the misconduct violates CUIPA.

THE COURT:  So let me ask you this in summary:  Are you saying that all non-ERISA plans are not insured plans, are not the business of insurance, and that all out-of-network providers don't have any CUTPA or CUIPA claims available?

MR. BEGOS:  I am not saying that all of the non-ERISA plans are noninsured plans.  The plaintiff hasn't alleged which are self-funded and which are insured.  I think we've all recognized plaintiff and defendant, including Your Honor, that the reality of today's world is a majority of plans, health plans that are established by large employers, are self-funded, and the likelihood is the majority of non-ERISA plans are large employers because they're going to be states, perhaps the State of Connecticut. They're going to be municipalities, public school unions, church plans, you know, large religious hospitals and schools and the like.  And so I think the reality is that a large number of the non-ERISA

plans that exist in this case are self-funded.

I am also saying I do think that the law provides that an out-of-network provider, like the plaintiff, is not a party that can assert a CUIPA claim, that -- and I recognize that that's, you know, an issue of some debate and the *NEMS* case held differently, NEMS Or Neams, I'm not sure how that's pronounced. We've addressed that in our reply brief. I can certainly talk about that further.

THE COURT: Only if you want to expand beyond what you've said in your reply brief.

MR. BEGOS: No, Your Honor.

THE COURT: Okay. Let me get Mr. Breitenbach's view on the issue of stand-alone claims as well as self-funded plans not being the issue, not being the business of insurance.

MR. BREITENBACH: With regards, Your Honor -- I'll go first to the business of insurance issue. You know, I think there's a variety of ways that Cigna offers plans and engages with the market and it's not either insured or self-funded as a black and white, you know, yes, no. There's a continuum.

Certainly, I think there would be no debate that to the extent there was a non-ERISA fully insured plan, okay, that it was a church plan or was

a governmental plan that was fully insured, then that would be -- constitute the business of a non-ERISA -- a non-ERISA plan constituting the business of insurance and it would certainly be subject to CUIPA and all other --

THE COURT:  When you say fully insured, you mean that the risk of the loss there is somebody other than the employer?

MR. BREITENBACH:  Yeah.  It would be -- I think in insurance parlance, fully insured would mean the risk would be some Cigna entity.

THE COURT:  But not the self-insured plan which just gets administered?

MR. BREITENBACH:  Exactly.  And then on the other end of the continuum, you have a situation in which you would have in a non-ERISA context a self-insured plan in which there was no insurance involved in which all -- you know, the risk is completely born by the plan, there's no spreading of risk, and it's a simple -- a simple, you know, claims come in, they get paid.

The reality is, though, Your Honor, many of these self-funded plans, as Cigna as we quoted their annual report, do have some partial insurance aspects to them.  You know, they have stop-loss protections

where, you know, the employer says, well, I'll self-fund but if a claim -- you know, an individual claim gets over a certain threshold or all my claims in the year get over a certain threshold, there's some type of insurance that kicks in, which is oftentimes, you know, protection for smaller entities that may want to self-insure but can't deal with a catastrophic issue.  So there's a continuum there.

So there are many-self funded plans that do to some extent engage in the business of insurance or at least look to Cigna to provide that level of insurance.  And, of course, to the extent that that is part of the involved, then Cigna would be subject to CUIPA.  The plan would be subject to CUIPA in that context.

So, you know, for purposes of the motion to dismiss, we think we have established it is plausible that as -- that Cigna had fully insured plans in a non-ERISA context, they never denied that, you know, given what they've said on their public websites, and that's enough at least that would stand on the pleading stage.

We think that in discovery, we would be able to show that a number of their non-ERISA plans have at least a partial insurance aspect rendering it

subject to CUIPA.

You know, to put the burden on us at this stage, you know, we think is slightly disingenuous because all we see from a provider standpoint is an insurance card.  And while, you know, in 2022 and 2023 with amendments to the Affordable Care Act and other things that are going on, those cards are getting more detailed and provide more information to a provider.  Certainly, the insurance cards that were presented in the context of the drive-through testing at the beginning back in 2021, it's often difficult to tell the precise -- impossible in many cases to ascertain the precise nature of the Cigna plan involved.

THE COURT:  Can you address the issue of non-CUIPA/CUTPA claims and why they are viable and the magic language of or some other statute?

MR. BREITENBACH:  Yeah.  So --

THE COURT:  And *NEMS*.

MR. BREITENBACH:  So the way we see it is we see *NEMS* and we see the *Acordia* decision and other insurance-related statutes as saying that while the bulk of CUTPA claims in the insurance realm are going to rely on the provisions of CUIPA, the law has recognized that that doesn't necessarily define the

boundaries of what can potentially be an unfair trade practice.

THE COURT:  When you say the law has recognized, what law are you talking about?

MR. BREITENBACH:  What I'm talking about, Your Honor, is the decision in *Acordia* and *NEMS*, in other words, what the case law has recognized that the potential for a violation of CUTPA is not just limited to the -- is just not limited to violations of CUIPA, there can be some other insurance regulation or law.

THE COURT:  And what specifically are you claiming here that is a stand-alone claim not covered by CUIPA?

MR. BREITENBACH:  I would argue that violation of the CARES Act, violation of the Families First Coronavirus Relief Act and violation of the Connecticut Surprise Bill Law.

THE COURT:  Okay.  Can I stop you there.  If you are arguing CARES Act as giving rise to a claim, isn't it correct that the CARES Act requires publication of posting of cash prices for the services, I think this is both CARES and FFCRA, and there is no allegation in your complaint that you ever posted the cash prices -- cash, yeah, prices?

MR. BREITENBACH:  Well, the way we read the CARES Act is that we can -- first of all, in order for a violation of the CARES Act not to be properly pled in the context of CUTPA, it would have to be that under -- in our view, under no circumstances if you don't post a cash price can you -- can you recover under the CARES Act.

THE COURT:  And what circumstance are you alleging gets you out of that requirement which you don't plead that you met?

MR. BREITENBACH:  Because, Your Honor, we would say that even if we did not post a cash price, CARES does not prevent a recovery.  It just says that we violated a provision of the CARES Act and might be subject to administrative penalty.  When we review the CARES Act, we see that there is discussion about what occurs if a cash price was not posted, and in circumstances in which a CARES price was not posted, there are -- there is discussions about things such as looking at the state law and things like that.  So we don't believe the failure to post a cash price.

In any event, as we have uncovered, Your Honor, recently in a series of correspondence with Mr. Begos as late as yesterday, we have established and defined when the cash price was posted on the

website and we would be in a position to amend the complaint to add that. The allegation is -- we have through the use of various Internet archiving sources, including archiving sources maintained by the Library of Congress and some commercial sources that take snapshots of websites over time, we have been able to establish that the cash price was posted for the first time in the first two weeks of November 2020. So we would be prepared to amend the complaint to add that. We provided the backup to Mr. Begos.

But we don't believe that you can't recover under the CARES Act if you don't post the cash price. We would have to establish what a reasonable price was for those tests and my client may be subject to some type of penalty for failing to post a cash price, but we don't believe that we would be barred from recovering under the CARES Act.

THE COURT: Let's move similarly to the Surprise Bill Act which relates to emergency services.

MR. BREITENBACH: Correct.

THE COURT: And if the services -- how the services of testing offered by Murphy Medical to Cigna's insureds constituted emergency services

within the meaning of the Surprise Bill Act.

MR. BREITENBACH:  Right.  And I think there's a certain novel nature to our argument, Your Honor, but given the circumstances if we look back to when the pandemic was occurring at the times and severity of it and the precise need for testing, we believe that there is an argument to be made that it constitutes -- you know, that the testing, given the circumstances and the dire nature of what was occurring at the time, it constitutes emergency medical services.

The one thing I would point out, although Mr. Begos' brief suggests this, there is no requirement under the Connecticut statute that the emergency medical services have to be provided in an emergency department of a hospital.  There is a suggestion in the reply brief that that is the case, and if Your Honor looks closely at Cigna's moving brief, what they're saying is there is a requirement under the Social Security Act that hospitals have to provide emergency medical services, but there's nothing in the state act that confines emergency medical services to just hospital emergency departments.

THE COURT:  So if this is diagnostic testing,

why isn't that emergency service?

MR. BREITENBACH:  Because I think -- I think that in certain circumstances diagnostic testing can be emergency services.  If Your Honor goes and looks at the typical situation of somebody who comes into a hospital after having sustained a car accident, okay, and one of the things that they say in the car accident is I hit my head, well, most hospitals' emergency departments in that circumstance is going to -- are going to say we're going to send you for the diagnostic test of a CT examination, a head CT or head MRI to rule out that you don't have a brain bleed and that's part of the emergency medical treatment because we have to rule out whether or not you have that potentially life-threatening condition.

THE COURT:  But does that put the cart before the horse where nobody has said, ah, your symptoms may be COVID, you got to go get tested?

MR. BREITENBACH:  Well, I think that Your Honor also has to put in the context of the time period, right.  Most of these tests are -- were in -- what we know now as what's symptomatic, what's not symptomatic, what's diagnostic is different than what was occurring at the time.  People were not sure what the symptoms were of COVID, how severe it was.  And I

think given those circumstances that many if not all of the tests could be -- arguably could be considered emergency medical services.

THE COURT:  So given your scenario, what do you call this, the dark days or something?

MR. BREITENBACH:  Right.

THE COURT:  What your testing is doing is determining whether emergency services are needed, is it not?

MR. BREITENBACH:  Well, it's defining whether there is an emergency condition there much like in my head CT examination, we're determining whether there is a severe life-threatening condition that exists.

THE COURT:  But in the example you gave, it was at the ER that sent -- being presented with the patient with potential head injuries gets sent for further diagnosis.

MR. BREITENBACH:  Right.

THE COURT:  This has patients who have never been looked at by a doctor.

MR. BREITENBACH:  But who may be saying I was exposed.

THE COURT:  Right.  No.  I understand that.

MR. BREITENBACH:  I was exposed, I have the sniffles, I have whatever they are.  And given that

circumstance, I think that, you know, there is a -- there is an argument to be made that it constitutes an emergency medical condition.

THE COURT:  Okay.  Let me jump ahead to some specifics under CUIPA.  CUIPA 816(15), failure to pay claims on time, is this a claim that you continue to pursue?  It does not appear to have been addressed in your briefing.

MR. BREITENBACH:  We did not address it in our papers and we will withdraw it at the time -- at this time.

THE COURT:  Okay.  And then with respect to Section N, failing to promptly provide a reasonable explanation, how does Murphy Medical have standing on this claim which relates to the insurance policy and plaintiffs as providers were nonparties?

MR. BREITENBACH:  Well, Your Honor, I think in this circumstance, first of all, we did take assignments of those policies.  You know, there's arguments that there are assignments.  And second of all, you know, I think that the denial of the claim directly impacts Murphy Medical given the circumstances and Murphy Medical who provided the services is entitled to know the basis by which the services are not paid.

THE COURT:  So you're limiting N to the claims in which you can show assignments?

MR. BREITENBACH:  Yes.  I think that -- we'll talk about that later.

THE COURT:  Yeah, we will.

MR. BREITENBACH:  In most of the remaining claims, we can show assignments.

THE COURT:  So under L, which is the delaying of investigation for payment of claims by requiring an insured or claimant or the physician to either submit a preliminary claim report and then formal proof of loss forms, I'd like you to clarify for me what it is you're claiming, because the allegations are that Cigna's requesting unnecessary documentation but the facts don't tell me whether that unnecessary documentation is the same as the information in the documents that have already been given.

MR. BREITENBACH:  Yeah.  So we think that what has occurred here, Your Honor, is that Cigna repeatedly asked our client for the same type of medical information both with respect to the same claims and across the board with regard to all claims.  So in other words, we received repeated requests on the same claims for medical records even after they were provided.

THE COURT:  When you say the same, repeated requests on the same claims for medical records after the medical records had already been provided?

MR. BREITENBACH:  Yes.

THE COURT:  So this claim is limited to we already gave you the medical records, why are you asking for them again?

MR. BREITENBACH:  We already gave you the information, you're now asking us for the information again.

THE COURT:  So this is duplicate requests --

MR. BREITENBACH:  Duplicate requests.

THE COURT:  -- for medical records and --

MR. BREITENBACH:  And other information.  It wasn't just, I think, limited to medical records, you know, testing strips, things like that.  I guess testing strips would be considered medical records, so yes.

THE COURT:  Okay.  So under H, which is attempting to settle a claim for less than the amount which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made a part of an application, I don't see any allegations in the complaint setting out that any such advertising

materials existed or that Cigna attempted to settle. Help me understand whether you are pursuing H, whether you are limiting H.

MR. BREITENBACH:  We are not pursuing H, Your Honor.

THE COURT:  So H will be withdrawn, okay.

Now, is there anything you want to add on the issue on the challenge to standing?  The defendant says that parties -- providers who aren't parties to the insurance contracts don't have standings -- standing.  You say under the reasoning of *NEMS*, so long as there are provisions in CUIPA that don't specifically reference an insurance contract, you have standing.

MR. BREITENBACH:  Yes.  And I think we rely on the reasoning in *NEMS*.  We think that's the right way to interpret the statute and the situation here.

THE COURT:  Now, under F, which is not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear, are you pursuing this?

MR. BREITENBACH:  Yes.

THE COURT:  And my question is:  If your argument is with relation to the independent statutes

of CARES Act, FFCRA and Surprise Billing Act, is there anything clear about those statutes at this time that could possibly support -- plausibly support a claim that they were reasonably clear?

MR. BREITENBACH:  I think that we can take each of these individual statutes and raise technical arguments and issues regarding it, but I think that if we were to take a step back from that and take the situation in which we establish to Cigna through submission of documents and other means that Cigna insured presented to our office, our testing site, were provided with a COVID test.  We have the testing strips.  We provided information to confirm that the tests were taken.  Okay.  We gave them the situation in which the tests were taken.

We think it was reasonably clear under the totality of circumstances that Cigna has an obligation to pay at the very least a reasonable price for those tests.  And we think that while we can -- we can point or we can argue over whether there's a private right of action in the CARES Act, what the impact of our failing to post the price is, whether or not what we did constitutes emergency services, the intendment of those acts, and particularly the CARES Act and the Families First

Coronavirus Relief Act, was to say that COVID tests have to be reimbursed without application of medical management criteria, and, in fact, directed insurance policies to be amended and things like that.

So given that circumstance, and if even if we were to say that CARES Act never existed and the Families First Coronavirus Relief Act ever existed, we think it's reasonably clear to an insurance provider such as Cigna that when you have a -- you know, worldwide pandemic that's causing whatever the rate of death is and a member goes to a testing site and says I have symptoms or I was exposed, for whatever reason, and says I need a test to determine whether or not I have this disease and that test was provided, their liability to pay for it is reasonably clear under those circumstances.

THE COURT:  So defendant has moved under 12(b)(6).  You claim you plausibly set out these things.

MR. BREITENBACH:  Yes.

THE COURT:  Is plausibly setting things out the same thing as reasonably clear?

MR. BREITENBACH:  I think that given the -- well, we can split hairs about that, but I think that in this circumstance, we have given enough

information to plausibly allege that liability will be reasonably clear, that it nudges it over the line to say that we'll be able to establish through all the totality of circumstances that what Cigna had in its possession at the time was enough information from a variety of all the sources to render its payment obligation reasonably clear.

THE COURT:  Are there any other CUIPA claims that you are withdrawing?

MR. BREITENBACH:  No.

THE COURT:  Let me -- before I get back to Mr. Begos and before we move on, let me just see here.  Wait a minute.

So you are precisely alleging that Cigna violated CARES and FFCRA how?

MR. BREITENBACH:  It's supposed to reimburse without conducting medical management and it did not -- I mean, you know, and I would argue if we didn't -- certainly for the time period after we posted the cash price was supposed to reimburse us the cash price, didn't do that, and really has imposed -- as is obvious by a lot of the correspondence that's gone back and forth, has imposed medical management criteria on us asking us to prove certain things in order to get paid which we

think is a violation of the statutes.

And certainly for the period of time before the cash price was posted, we think that those statutes, once they became effective at least, required payment of these tests at a reasonable amount, and there are a wholesale number of these tests and the related services that weren't paid at all or were paid at such a low rate that we would argue that they were below the reasonable price for those services or reasonable reimbursement rate for those services.

Our view of what the CARES Act has done in connection with the issue -- and the Families First Act has done in connection with the reimbursement of these claims is that once, you know, it's established that the claim -- that the test was actually conducted, they've got to pay for it.  They can't question -- they can't question was the test appropriate, you know, what was done, but, you know, they have to pay for the test.  There's no medical management requirements and there is a -- we believe a documented history of medical management requirements that were imposed on us.

THE COURT:  And medical management, you mean requesting medical records and all that stuff?

MR. BREITENBACH:  Determining -- yes.  To the extent of determining medical necessity and appropriateness which we think in this circumstance is incorrect because of the CARES Act.  The intent of the CARES Act was to wipe that out, it's to say that, you know, it's more important to get the test done, paid for, than to fight over, you know, fine points of appropriateness.

THE COURT:  Okay.  Let me question -- Mr. Begos, I'm just going to ask you to hold all your thoughts in a queue.

Unjust enrichment --

MR. BREITENBACH:  Yes.

THE COURT:  -- I don't understand how Cigna is claimed to have been enriched by its actions and particularly in the context of case law that says insurance companies aren't unjustly enriched.  I guess I ask first, are you pursuing that claim?

MR. BREITENBACH:  In this circumstance, we'll withdraw that claim.

THE COURT:  Okay.  Okay.  Let me hear briefly from Mr. Begos and then I want to move to the sanctions part because I think we've touched on the major points in the briefing.

MR. BEGOS:  Thank you, Your Honor.  There's a

couple of points that I wanted to respond to from Mr. Breitenbach's presentation.  One is I think it's worth noting that most of what he said about the support that he claims for the CUTPA and/or CUIPA cause of action are nowhere in the complaint.  So the allegation that Cigna repeatedly asked for the same medical records even after plaintiffs provided it, there's no allegation, specific allegation of any claims where Cigna did that as just one example.

THE COURT:  Well, do you want to give me the rest?

MR. BEGOS:  Well, one example of what he said -- I didn't write down everything he said that I think was unsupported by the complaint, but I have a note here that the -- when you look at the allegations in the third amended complaint compared to the justification for those allegations.  So, for example, another one that I call to mind is Mr. Breitenbach said, well, there are some self-funded plans that may have some other aspects of insurance to them, stop-loss policy, for example, and we don't need to debate today whether that converts a self-funded plan into an insured plan, but there's no allegation here that there's any non-ERISA self-funded plans that have some stop-loss coverage

associated with them.

In fact, there's really no allegation of what claims -- what non-ERISA claims relate to -- which claims are under non-ERISA plans which certainly can be determined with reasonable confidence if it's a -- you know, the State of Connecticut or the City of New Haven, it's pretty clear that it's a non-ERISA plan. There's no allegations of what plans are non-ERISA plans. So that's one aspect, but just in general, the allegations in the complaint are conclusory and not specific with respect to the CUTPA and the CUIPA claims.

With respect to -- I would also point that with respect to the notion that liability should have been clear to Cigna supporting one of the CUIPA claims, Mr. Breitenbach -- they've acknowledged that they had to post cash prices and that they didn't. Mr. Breitenbach says, well, even if we didn't post cashes, we think that the CARES Act says that Cigna should have had to pay some reasonable amount for a test.

The CARES Act doesn't say that. It doesn't say what happens or what's required if a provider who doesn't post a cash price demands payment from an insurance company. They say, well, it's still

reasonably clear, we think we're going to be able to establish that this is what Cigna should have done, but we're talking here about a statute that addresses unfair insurance practices.

It's not will this Court or will some Court in the future establish exactly what a company like Cigna should have done when presented with a claim like the plaintiff claims here but was it reasonably clear at the time these claims were submitted.

Plaintiffs are frequently referring to the depths and the dark days of the pandemic. Well, there were dark days in the pandemic in insurance companies too. So the notion that, you know, all of their ills should be forgiven but Cigna should have somehow had a magic crystal ball to figure out what the heck the CARES Act actually means when it's being applied to a specific claim for a test by a specific provider --

THE COURT: Let's fast forward to the November period when the posting apparently was made or is -- there's a basis for believing that the posting is made.

MR. BEGOS: Sure.

THE COURT: Does that take it out of your argument that without any posting and with the new

statute, it was not reasonably clear what Cigna was supposed to do?

MR. BEGOS:  I don't think it does, Your Honor.  Among other thing, it is clear that the CARES Act only covers diagnostic testing and it only speaks to COVID testing.  What plaintiffs were doing was not simply COVID testing.  They were taking somebody who came to them and asked for a COVID test and giving them a test for 22 respiratory pathogens.

Now, maybe the CARES Act covers that kind of multiplex testing when there's a COVID test included but the CARES Act doesn't say that and no Court has held that.

THE COURT:  But what if you -- does that mean the whole thing goes out of this complaint or are we just going to in time narrow it to just the COVID testing and not the other parts?

MR. BEGOS:  If we're talking about the CUIPA claim, yes, that means that it goes out of the complaint.  I don't see that plaintiff -- actually, sorry.  We're talking about a CUTPA complaint because we're talking about a direct CUTPA claim for a violation of the CARES Act and the Families First Coronavirus Act.

I don't see how with all the uncertainties

about what the statutes mean and how they apply to particular claims one can say that at the time Cigna was denying the claims from plaintiff that it denied, that its liability on those claims was reasonably clear.

I'll also just point out two other things in that regard, Your Honor. One, as I mentioned, the CARES Act is limited to diagnostic testing. We know from the discovery in this case that what plaintiff was doing was a lot of employment-related testing. There were people coming in for 40 or 50 tests over the course of a couple of months. The CARES Act doesn't cover that.

Secondly, Your Honor, as we pointed out in our reply brief, Your Honor can take judicial notice on this motion of things that have happened in this case. Plaintiff is on the cusp of withdrawing 10,000 of the itemized claims that it submitted Cigna should have paid at the outset of this case. The notion that Cigna should have nonetheless determined that its liability was clear, that plaintiff actually conducted the tests, performed the services that he said he performed when even plaintiff is now admitting that half or more of the services that he claimed he performed he can't prove that he

performed.

The notion that -- again, there may be a claim that gets covered that he performed and proves he performed and Cigna is required to pay for, but to say it's a violation of the Unfair Insurance Practices Act or that it's immoral, oppressive or against public policy and in violation of CUTPA for Cigna to have said hold on a second, we're seeing some pattern here, we want medical records to show that you actually have been doing the tests that you say you've been doing, I don't see how that claim has been plausibly pleaded.

THE COURT:  I'm wondering whether there's a -- you refer to the totality of the circumstances or somebody does and you're talking about seeing a trend.  I don't recall that Cigna paid some of the initial claims.

MR. BEGOS:  It did.  This is actually in our counterclaim, Your Honor, and we also have -- I don't have the document cite but in our -- I believe it was our original motion to compel, we had filed the special investigations unit report that gave rise to the counterclaim and Cigna has demanded -- has paid, I think it's about $450,000 to the plaintiffs that is the subject of the counterclaim.

And what happened was Cigna was paying these claims, Cigna has all sorts of processes to look at patterns in claims, and noticed that Dr. Murphy was billing for what they called high-level office visits.  It's evaluation management is what they're referred to in the coding context.  But he was billing for these, you know, high-level office visits at mobile testing sites which started Cigna looking into his claims.

Among the things that Cigna did was asked Dr. Murphy, and Mr. Breitenbach got involved in this, said let's do a sample, let's look at a sample of the claims that you've submitted, you give us the records that support those claims, and I forget whether it was 10 or 20 or 30 but there was some handful of records.  This was after Cigna reached out to patients and said, hey, did you have, you know, testing work done by Dr. Murphy, and a lot of patients said no, we didn't, or we didn't have the services that he's billing you for.

Cigna looked at the records that Dr. Murphy submitted and concluded, number one, that they were basically created after the fact, that -- and I'm making up dates here, but if the service was March of 2020, the medical record was dated by Dr. Murphy,

like, August of 2020 when they were submitted to Cigna.  So there was a lot of information.  Cigna was paying these claims --

THE COURT:  Okay.  I got it.  I got it.  I want to get to what was reasonably clear, maybe not the whole universe of what was reasonably clear, but wasn't the whole purpose of the CARES Act to get people tested as a way of controlling a pandemic that didn't yet have any vaccination?

MR. BEGOS:  I think that's certainly fair, Your Honor, and I think, although, you know, we're not at the stage in this litigation at all this evidence has come out yet, but the fact that, you know, untold hundreds of millions of COVID tests were done in this country and the lawsuits by providers are relatively few and far between, and to my knowledge, they seem to be by a small group of providers, I do think, Your Honor, that Cigna was paying these --

THE COURT:  Okay.  I just don't find that probative for the motion to dismiss.  What I'd like to understand is you say, well, the multiplex testing isn't -- it is not reasonably clear Cigna had to pay those, but for the -- for pleading purposes, if CARES Act was reasonably clear that if you gave a COVID

test, you got reimbursed for it without a lot of medical appropriateness and medical necessity determinations, and assume that that may just be a smaller subset of what seems to be encompassed by the allegations, why should we dismiss it and not just wait for later where things are very precise for summary judgment?

MR. BEGOS:  Because the plaintiff is not suing on an individual non-ERISA claim for which he has an assignment from a patient and says I gave this patient a test, you should have paid for it, you didn't pay for it, I want my money.  What the plaintiffs are claiming is Cigna engaged in unfair insurance practices or unfair trade practices with respect to how it filed these claims.

They didn't have to proceed in that way but that's the way they've chosen to proceed, and under the circumstances, what they've alleged just does not rise to the level of plausibly alleging violations of CUIPA or a direct violation of CUTPA.  And I think that's the significant difference here, Your Honor. This is general business practice of unfair insurance claim processing or oppressive unscrupulous conduct in trade and they just haven't met that pleading standard under either analysis.

If I can add one thing in response -- request to -- regarding the direct CUTPA claim, Your Honor, I did want to call Your Honor's attention to -- this is again from *Acordia* and it relates to my point previously that when *Acordia* was talking about other statutes, it was talking about state statutes not including federal statutes.  There's a quote on page 26 -- 25 and 26 of *Acordia* that was looking at legislature history and said that the legislative history reveals not only, quote, that the legislator intended to set out specifically the types of actions that constitute unfair insurance practices in a highly detailed manner but also that the legislature viewed accomplishing that task as essential to the underlying purpose of CUIPA enabling the commissioner to better protect consumers.  The many subsequent amendments -- sorry.  The many subsequent amendments incorporating additional practices as violative of CUIPA demonstrate an ongoing legislative effort to keep the list of prohibited practices as current as possible and provide further evidence of the legislature's intent to provide in CUIPA a comprehensive list of unfair insurance practices.

So I think *Acordia* recognized there might be some statute, Connecticut statute other than CUIPA,

that would support a direct CUTPA claim in the insurance context, but I think the language in *Acordia* says that there should be a high bar before a Court determines that there's some statute outside of CUIPA that creates -- that can support a CUTPA claim in the insurance context.

And the last point on this, Your Honor, with respect to the surprise billing law which I didn't touch on under Your Honor's questioning, it's clear that the surprise billing law when it refers to emergency conditions is not referring to I have a sore throat, I have a headache, if it's not treated, it could develop into something that's life threatening, but it's relating to symptoms that cause a prudent to person to think if I don't get immediate medical treatment, I'm either going to die or have severe organ failure.  It's the kind of thing that makes people to go the emergency room.  It's not something that makes people go to a drive-up test and say I may have been exposed to COVID and I want to get a COVID test to determine whether I'm positive or not.

THE COURT:  Okay.  Let's move to the motion for sanctions.  I need to be updated with respect what has now been produced, withdrawn, stipulated to,

et cetera.

MR. BEGOS:  Sure.  If I may -- let me just find my notes on this, Your Honor, if I may.  Just give me a second.

So plaintiff has given us two spreadsheets in the last ten days.  Just to level set this, back in April 2021, they gave us a spreadsheet in response to the court-ordered damages disclosure that listed 12,970 itemized claims.  They gave us a spreadsheet last week identifying the claims that they say are still in the case, the claims that they say they've produced assignments for and they produced medical records for.  That was about 6,300 claims.  These haven't been filed because obviously there's a lot of patient names and whatnot in there.

Last night pursuant to Your Honor's order, they gave us a spreadsheet that had 10,620 itemized claims they're withdrawing, and I think Mr. Breitenbach is prepared to withdraw those claims today.  Because of the privacy issues, he wanted to speak to Your Honor about that and figures out how best to document that.

So one issue is the numbers don't really add up.  So we had just under 13,000 claims that were part of the lawsuit, they claim that 6,000 remain in

the lawsuit and that 10,000 are being withdrawn. So there's 3,000 claims that seem to not have been part of the lawsuit initially that, you know, either they're withdrawing or they say are still part of the lawsuit. So we need -- and we just got that list last night. I think we both -- both parties have work to do to be able to come up with a comprehensive list of what's before Your Honor in terms of what they have produced documents regarding.

I did prepare -- and Your Honor, I think this may aid the discussion of the motion for sanctions. I did prepare -- I called it a proposed order but it's sort of grand, but it's just a list of the things that we would ask the Court to order and I figured it would be easier to put it in writing so we could talk about it, if I may.

THE COURT: All right. You have that, Mr. Breitenbach?

MR. BREITENBACH: I don't.

MR. BEGOS: And whenever Your Honor is ready, I can run through these and sort of explain how they come up in our motion and why we're asking for this relief.

THE COURT: Have you had a chance to look at that, Mr. Breitenbach?

MR. BREITENBACH:  I have not, Your Honor. Being handed in court just now is the first time.

THE COURT:  I'm just wondering if you're reading it right now as I am.

MR. BREITENBACH:  I am.  I could identify certain issues and concerns with it now, but I would need to speak to my client in order to -- you know, if I may just raise one point with Your Honor, I think -- here's where I think is going to be the biggest item of contention between us, I think, or at least disagreement that I think we have to -- we have to address which is that the April 2021 spreadsheet was produced and that listed all the claims that were in existence as of that date and that's the 12,000 number that was there.

Then when my predecessor counsel in December or November, I don't know the exact date off the top of my head, in compliance with the various orders in connection with sanctions produced all of the records and all of the claim documents and spreadsheets and things like that, they produced all of the claims that they had outstanding through, I believe it was May -- the end of May of 2022.

So there is a delta of claims that were presented which is why -- one of the reasons why

there's a discrepancy between the number of claims we have pending and the number of claims withdrawn. Because we viewed that in December, we presented medical records and information not only on the claims that were on the April 21st -- the April 2021 spreadsheet that we're still maintaining but other claims for dates of service after April 2021.

THE COURT:  Is this colloquially what the defendant refers as your 86,000 document dump?

MR. BREITENBACH:  Yes, I think so, Your Honor.  So we -- and I think we gave at that point spreadsheets on those claims; I was told they were produced.  But that's where there is a discrepancy there.  We're going to have to deal with that.

THE COURT:  Okay.  Let me hear from Mr. Begos on why the various portions of this order are appropriate and I'm almost thinking that this might be premature.

MR. BEGOS:  Sure.  And I would say that all of this is addressed in our motion and in our reply papers.  As I was preparing for the argument today, I realized there's a lot of different things we're asking for and so I just wanted to put it down in one place.

Item No. 1 is -- I don't think there's going

to be a controversy over.  Those were the 10,000 itemized claims that Mr. Breitenbach told me last night they're withdrawing and presumably will be withdrawn today when Your Honor decides how we should document that on the court record while preserving patient confidentiality.

Then there is the 6,390 claims that's listed on the spreadsheet that we got last week and plaintiff has represented that by putting the claims on that spreadsheet, they've produced medical records for those claims and they've produced assignments for the patients.  We haven't had a chance to verify that, and in part -- I have to jump to Item 5 on my list.  They agreed to give us specification for each of those claims, here's the Bates' number where the medical records are, here's the Bate's number where the assignment is.

So we're asking the Court to simply order them to do what they said they're going to do so that we can then look at those 6,000 claims and say, okay, we agree you've produced medical records and assignments so they're at least part of the action. If there are -- and A, B and C under Item 2 address the situation where maybe they've produced some medical records but they haven't produced medical

records regarding all of the services for a particular patient, to simply sort of have an order we can say, you know, when the trial comes up, okay, well, one of these 6,000 claims -- or here's the list of among those 6,000 claims plaintiffs in fact didn't produce medical records, we don't want those to pop back into the case and let plaintiff produce documents in the future supporting claims.

So really, Item 2 is sort of freezing the evidence that they can use as the evidence that they've produced to date.  That's the intention of Item 2 and Item 3 as well.  I'm sorry.  I misspoke a little bit.  Item 2 is to dismiss claims that they say have been supported but in fact haven't been supported and we'll have to determine that as the case goes on and as we get more information from the plaintiff.

Item 3 is freezing the production as it currently stands or as it stood as of -- I picked the end of 2022, the document dump, the 86,000 page document dump ended up being a 100,000 page document dump.

And then Item 4, Item 4 relates to cash prices and I left the date blank in there.  In this document dump, plaintiffs did not produce anything

regarding cash prices.  Yesterday, as Mr. Breitenbach said, they gave me some documents from some Internet source that they say establishes that they posted cash prices in November of 2020.  I don't know if Your Honor thinks that's a timely production.  I'm not looking to debate now whether the third party information is admissible or anything like that.  But again, I don't want to -- you know, that blank date could either be today or it could be the end of 2022.

What's not dealt with in this order is attorney's fees.  We do think that the Court should order attorney's fees.  Cigna has gone through great expense on this motion for sanctions after the motion to compel.  Plaintiff has acknowledged that he intentionally didn't comply with the order.  He said, well, I had other things that I needed to focus my attention on.  He never asked us for an extension of time.  His attorney agreed to the April 15, 2022, production date when we were here last with Your Honor.  They never asked for more time.  They never made a motion for more time.  I'm actually not aware of any other discovery obligations in other cases -- we're defending a number of his other cases --

THE COURT:  Okay.  Don't go there.  I'm not interested in that.  I want to know what, if

anything, can be accomplished on the sanctions motion given that you all have this review process underway that is going to get to the preclusion result that you seek as a sanction and if I were to -- and that is really what I think the defendant's most keen on is how much is in this case.

MR. BEGOS:  Correct.  So I think in terms of today, we can certainly deal with the 10,621 itemized claims if plaintiffs are prepared to withdraw it.

THE COURT:  Why don't I get to Mr. Breitenbach and ask if that is accurate, that those 10,621 itemized claims will be withdrawn?

MR. BREITENBACH:  Yes.  We are going to withdraw them.  The one issue that we have, Your Honor, and it's an issue I raised with Mr. Begos yesterday, included -- a subset of those claims that we are withdrawing are claims in which Dr. Murphy either in the last few months or is in the process of correcting.  In other words, as Dr. Murphy did his review, a lot of the evaluation and management code claims, the claims for, you know, the visit that went along with the testing, Dr. Murphy as he went through everything determined that the level of visit -- as Mr. Begos had indicated, there are levels of visits, of complexity.

Dr. Murphy determined the medical record does not support, let's say, a Level 3 but I still can bill a Level 1 because the patient was shown.  We withdrew the Level 3 and we're standing by that. We're in the process of submitting, as we can to Cigna in accordance with their processes, claims for the Level 1 visit, the lower visit, and -- you know, so those claims have to be -- so however that is reflected in the order, we don't want an order by saying we're withdrawing these claims with prejudice to inhibit our ability to pursue a potential corrected claim for the E&Ms.  So that's the one issue that we have there.

THE COURT:  Wait a second.  I don't understand.  10,211 claims you are withdrawing with prejudice?

MR. BREITENBACH:  I'm withdrawing them with prejudice.  But let's say, for example, these are claims described by name of patient, date of service and CPT code bills.  Okay.  So on January 1, 2022, Roy Breitenbach, CPT code 12345, right?  I'm withdrawing that claim.  Okay.  I may -- Dr. Murphy may be in the process of billing a new claim for Roy Breitenbach, January 1, 2020 {sic}, 12344, because we're saying that we're withdrawing the 45 claim

because it's unsupported but we may have the right under Cigna's rules to bill it as a corrected claim.

So there's a subset of claims that I don't want to by saying it's with prejudice, I don't -- and we've already identified on our spreadsheet to Mr. Begos what those corrected claims are.  So, you know, I don't want to prejudice that situation. That's my -- that has to be from our perspective incorporated into the withdrawal, but everything else, we are withdrawing.

THE COURT:  So we met the objective that the defendant has of taking out of this case the 10,000 --

MR. BREITENBACH:  Correct.

THE COURT:  -- 621 claims with prejudice and whether they see new life as another form of a claim, that's not part of this.  I think that's probably about as clear cut what we can do today, is it not, and leave you to your undertakings with respect to freezing the data as to claims submitted by December 31, 2022, without supporting medical records and without assignments, and that will require, I gather, a new compilation.

MR. BREITENBACH:  What I would like, Your Honor, is with regard to two, three, four and five, I

would consult with my client.  Five is no issue, we'll pick a date.  I'll ask my staff what's the date we can provide that and we'll provide five.  That's not an issue at all.

But for two, three and four, I'd like to consult with my client and provide a response to Mr. Begos regarding this and see if we can work out the issues in there because I think that the main issue is going to be, quite frankly, the handling of claims from -- that occurred from after April of 2021 but documents were produced for them in November and December of 2022.

THE COURT:  Okay.  I'm not going to go through the details of that.  Let me just say that your idea that what you submitted and are claiming all these CUIPA and CUTPA violations emanated from, if they are out, it's a little bit perplexing to me how they can come back in as a resubmitted corrected claim that isn't all part of the time line of what was alleged as the CUIPA/CUTPA practices.  Think about it.  All right.

And the last -- let me just tell you that my initial take, if you will, on the motion for sanctions is that the meet and confer requirements have been satisfied.  I'll detail that later when we

get to -- when we have a full ability to look at what you are agreeing to, what has been done, what has not been done, and correlating whatever may be the claim for attorney's fees to not just be the whole thing but comporting with the different sections of work.

Okay.  Can I do anything more today?  I really do have to stop.

MR. BEGOS:  Your Honor, the only thing I would ask is that we have some date to come back to the Court to update the Court.  So we have to look at the lists.  We have to figure --

THE COURT:  What do you think is an appropriate date?

MR. BEGOS:  It depends on how much time Mr. Breitenbach wants to give us Item 5 in my order, you know, the new spreadsheet with all the Bates numbers --

THE COURT:  Although it has looked at little bit futile for the Court to assign dates things are due which is part of a motion for sanctions, what should be the next final date for the conclusion of all of these moving parts?

MR. BREITENBACH:  Thirty days, Your Honor.

MR. BEGOS:  I would say if he takes 30 days to give us the new stipulation, I would like 30 days

for us to be able to review all the material and come back to Your Honor with our take on what's in and out of the case.

THE COURT:  All right.  Let me have then by April 24th, let's see, the defendant's -- what is it -- a revised motion for sanctions or supplemented?

MR. BEGOS:  I think, Your Honor, I would ask that we supplement with claims that we think should be dismissed and/or relief that we think we should be entitled to based on --

THE COURT:  All right.  Let's do that.  That gives you 30 days -- it gives the plaintiff 30 days.  It gives the defendant 30 days and should bring about the kind of finality that we really need on this case, yes?

MR. BEGOS:  Should we talk to Your Honor's clerk about filing the stipulation of withdrawal in a way that's protecting the privacy of all the 10,000 patients --

THE COURT:  You know what you have to protect.  So what you can do is you can file it as an original under seal filing a redacted version for the public.

MR. BREITENBACH:  I think what we can do is we can, it's going to take a day or two to accomplish

this, but I can have my word processing department can run a program that just deletes all but the first name and the patient's last name -- all but the first letter of the patient's last name.

THE COURT:  Yeah.  I was going to say.

MR. BREITENBACH:  But the publicly available we'll supply -- we'll file under seal the full one and then we can go on --

THE COURT:  Keep in mind that the Court is not -- it is not appropriate for the Court to do broad sealing.

MR. BREITENBACH:  I understand that.

THE COURT:  Narrow tailoring to protect the legitimate privacy interests that the patients have in their medical information, their personal identifying information, and other financial type information is what we're going to be looking for. Okay.  All right then.  Thank you very much, we stand in recess.

(Proceedings adjourned, 12:40 p.m.)


                    C E R T I F I C A T E


RE:   MURPHY MEDICAL ASSOCIATES, LLC v. CIGNA HEALTH
         AND LIFE INSURANCE COMPANY, ET AL
              No. 3:20-cv-01675-JBA

I hereby certify that the within and foregoing is a true and accurate transcript taken in the aforementioned matter to the best of my skill and ability.

/s/ Corinne T. Thomas

CORINNE T. THOMAS, RPR
Official Court Reporter
United States District Court
141 Church Street
New Haven, Connecticut 06510
(203) 809-0848