UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MURPHY MEDICAL ASSOCIATES, LLC ET AL., <br><br> *Plaintiffs*, <br><br> v. <br><br> CIGNA HEALTH AND LIFE INS. CO. ET AL. <br><br> *Defendants*. | Civil No.3:20cv1675 (JBA) <br><br><br> May 12, 2023 |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' PARTIAL MOTION TO DISMISS**

**I.   Background**

The Court assumes familiarity with the factual background of the case. (*See* Order Granting in Part Defs.' Mot. to Dismiss [Doc. # 48].) The procedural history is as follows. Plaintiffs brought this action alleging violations of the Families First Coronavirus Response Act ("FFCRA") and Coronavirus Aid, Relief and Economic Security Act ("CARES Act"), the Employee Retirement Income Security Act of 1974 ("ERISA"), the Connecticut Unfair Trade Practices Act ("CUTPA"), as well as unjust enrichment, quantum meruit and tortious interference claims related to both ERISA and non-ERISA plans. (Am. Compl. [Doc. # 29]).

Previously, Defendants moved to dismiss all claims with prejudice. (Defs.' Mot. to Dismiss. Am. Compl. [Doc # 30] at 1.) Relevant here, they argued that Plaintiffs' CUTPA (Count Five) and unjust enrichment (Count Six) claims were preempted by ERISA. (*Id.* at 26-29.) Plaintiffs' opposition broadly argued that ERISA preemption did not apply to the state law claims as a whole, stating that distinguishing between ERISA and non-ERISA plans was "irrelevant." (Pls.' Opp'n [Doc. # 31] at 31-35.) The Court partially granted the motion to dismiss, including dismissing Counts Five and Six with prejudice on ERISA preemption grounds. (Order Granting Mot. to Dismiss [Doc. # 48] at 18-23.)

Plaintiffs moved under Rule 59(e) for reconsideration of the Court's dismissal and for leave to file a Second Amended Complaint (Pls.' Mem. [Doc. # 50-1] at 1) which was granted. (Order Granting Mot. to Reconsider [Doc. # 71].) Following a pre-filing conference, Plaintiffs filed the operative Third Amended Complaint (TAC. [Doc. # 92]) which Defendants now move to dismiss with prejudice as to Counts Two (CUTPA) and Three (Unjust Enrichment), on the grounds that they fail to state a viable claim upon which relief can be granted. (Defs.' Partial Mot. to Dismiss [Doc. # 93].) At oral argument Plaintiffs withdrew Count Three, and so only Count Two is at issue.

## II.     Legal Standard

The Court has previously set out the standards for deciding a motion to dismiss pursuant to Rule 12(b)(6). (Order Granting in Part Defs.' Mot. to Dismiss [Doc. # 48] at 3-4.)

## III.    Discussion

Under CUTPA, Conn. Gen. Stat. § 42-110b(a), "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." To assist courts in determining whether a practice violates CUTPA, the Connecticut Supreme Court has identified several relevant factors, only one of which needs to be satisfied:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise . . . ; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [or] (3) whether it causes substantial injury to consumers.

*Harris v. Bradley Mem'l Hosp. & Health Ctr., Inc.*, 296 Conn. 315, 350-51 (2010). "A practice may violate CUTPA without meeting all three criteria—i.e. a practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Laura Laaman Assoc., LLC v. Davis*, No. 3:16-cv-00594 (MPS), 2017 WL 5711393, at *9 (D. Conn. Nov. 27, 2017).

Defendants argue that "[a] claim under CUTPA must be pled with particularity," *see Keller v. Beckenstein*, 117 Conn. App. 550, 569 n.7 (2009), *cert. denied*, 294 Conn. 913 (2009); *Ferrari v. U.S. Equities Corp.*, No. 3:13-cv-00395, 2014 WL 5144736 at *3 (D. Conn. Oct. 14, 2014) (same), which Plaintiffs rebut with Connecticut Supreme Court precedent that there is no "special requirement of pleading particularity connected with a CUTPA claim, over and above any other claim." *Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 644 (2002).

Plaintiffs assert a number of claims arising under CUTPA based on the Connecticut Unfair Insurance Practices Act ("CUIPA"), as well as claims based on alleged violations of other statutes. Plaintiffs maintain this Count applies to non-ERISA plans and thus is not preempted. (TAC, ¶ 127).

### A. CUIPA/CUTPA Claims

Plaintiffs allege that Cigna engaged in unfair claims settlement practices and failed to timely pay insurance claims in violation of CUIPA, Conn. Gen. Stat. §§ 38a-816(6) [1], on which the CUTPA claim is based. (TAC, ¶¶ 122-167) (the "CUIPA/CUTPA" claims.) *See Pettengill v. Fireman's Funds Ins., Co.*, No. 3:13cv154 (WWE), 2013 WL 4054635 (D. Conn. Aug. 12, 2013); *Nazami v. Patrons Mut. Ins. Co.*, 280 Conn. 619, 625 (2006); *Traylor v. Awwa*, 88 F. Supp. 3d 102, 108 (D. Conn. 2015). However, "if a plaintiff brings a claim pursuant to CUIPA alleging an unfair insurance practice, and the plaintiff further claims that the CUIPA violation constituted a CUTPA violation, the failure of the CUIPA claim is fatal to the CUTPA claim." *State v. Acordia, Inc.*, 310 Conn. 1, 31(2013).

### 1. Have Plaintiffs Alleged Cigna's Actions Constitute a General Business Practice?

---

[1] The Amended Complaint does allege a violation of one CUIPA provision outside of Section 816(6)—a claim under Section 816(15). However, Plaintiffs abandoned this claim in their briefing and subsequently withdrew the claim at oral argument.

As a threshold matter, to prevail on a CUIPA claim under Section 816(6), a plaintiff must present "enough facts to permit [] the reasonable inference that the unfair insurance practice occurred with enough frequency for it to be deemed a general business practice." *Kim v. State Farm Fire & Cas. Co.*, No. 3:15-cv-00879(VLB), 2015 WL 6675532, at *5 (D. Conn. Oct. 30, 2015); *see also Lees v. Middlesex Ins. Co.*, 229 Conn. 842, 850 (1994); *Nationwide Mut. Fire Ins. Co. v. Hermann*, No. CV126009631S, 2014 WL 4817899, at *4 (Conn. Super. Ct. Aug. 25, 2014) (collecting cases).

"The alleged mishandling of various elements of the same claim does not reach the level of a general business practice." *L.A. Limousine Inc. v. Liberty Mut. Ins. Co.*, 509 F. Supp. 2d 176, 182 (D. Conn. 2007) (citing *Starview Ventures v. Acadia Ins.,* No. cv-065003463S, 2006 WL 3069664 at *3 (Conn. Super. Ct. Oct. 17, 2006). Allegations sufficient to establish a general business practice are "[t]ypically" accomplished "by citing to other cases brought [by other insureds] against the defendant or its affiliates." *Connecticut Mun. Elec. Energy Coop. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 3:19-cv-839 (JCH), 2020 WL 6888272, at *3 (D. Conn. Jan. 17, 2020)* (citing *Mazzarella v. Amica Mut. Ins. Co.*, 774 F. App'x 14, 18 (2d Cir. 2019)).

> Factors relevant to a court's determination of whether a practice is a 'general business practice' include: the degree of similarity between the alleged unfair practices in other instances and the practice allegedly harming the plaintiff; the degree of similarity between the insurance policy held by the plaintiff and the policies held by other alleged victims of the defendant's practices; the degree of similarity between claims made under the plaintiff's policy and those made by other alleged victims under their respective policies; and the degree to which the defendant is related to other entities engaging in similar practices.

*Hartford Roman Cath. Diocesan Corp. v. Interstate Fire & Cas. Co.*, 199 F. Supp. 3d 559, 602–03 (D. Conn. 2016), *aff'd*, 905 F.3d 84 (2d Cir. 2018). While "general business practice" is not precisely defined in Connecticut law, "the Connecticut Supreme Court has advised that a court 'may look to the common understanding of the words as expressed in a dictionary.'. Doing so, the Connecticut Supreme Court observed that '[g]eneral' is defined as 'prevalent,

usual [or] widespread'; and 'practice' means '[p]erformance or application habitually engaged in . . . [or] repeated or customary action.'" *Hartford Roman Cath. Diocesan Corp.*, 905 F.3d 84 at 96 (quoting *Lees v. Middlesex Ins. Co.*, 229 Conn. 842 at 849).

Defendants argue that Plaintiffs fail to allege facts demonstrating that Cigna has engaged in the same allegedly improper activity with other providers. Plaintiffs do not respond to this argument except to argue that to demonstrate a general business practice, a plaintiff "must demonstrate that the proscribed conduct occurred with sufficient frequency to indicate a general business practice as opposed to an isolated, improper handling of a single insurance claim." (Pls.' Opp'n at 15.)

This issue comes down to whether sheer frequency of denial of Plaintiffs' *claims* is sufficient even without allegation that the practice goes beyond denial of claims from just one *provider*, the Plaintiffs. In *Hartford Roman Cath. Diocesan*, the Second Circuit found insufficient evidence of a general business practice even where plaintiffs "submitted 57 claims as a representative sample of [defendant's] response to [diocesan] sexual abuse claims across the country," where "9-11 percent of the 57 claims reflected misconduct." 905 F.3d at 96. The Second Circuit noted that there were "more than 1700 sexual abuse settlements nationwide" and so defendant's conduct in this limited sample of 57 claims was insufficient to demonstrate a general business practice. *Id.* Here, Plaintiffs fail to allege that Defendants have violated CUIPA in their processing of claims submitted by any other providers. This Court's Memorandum of Decision in *Hartford* looked to factors including "the degree of similarity between claims made under the plaintiff's policy *and those made by other alleged victims under their respective policies*" in determining whether there was a general business practice. *Hartford Roman Cath. Diocesan*, 199 F. Supp. 3d at 602 (emphasis added). This factor presumes the existence of "other alleged victims" when evaluating whether a general business practice exists. Because Plaintiffs fail to plausibly plead the existence of

other alleged victims of Cigna's insurance practices, Plaintiffs' CUTPA claims based in CUIPA must be dismissed.

### B. Can Plaintiffs Plead a Standalone CUTPA Cause of Action Not Specifically Proscribed by CUIPA?

Defendants claim that Plaintiffs may not proceed on their non-CUIPA based CUTPA claims, which are based only on violations of the CARES Act, the FFCRA, and the Connecticut Surprise Billing Law. (Defs.' Mem. at 11.)[2] Plaintiffs argue this is permitted because they are alleging a violation of a "statute regulating a specific type of insurance related conduct," *NEMS PLLC v. Harvard Pilgrim Health Care of Connecticut Inc.*, 615 F. Supp. 3d 125, 138 (D. Conn. 2022); (*see* Pls.' Opp'n at 7).

The Connecticut Supreme Court has held that "[b]ecause CUIPA provides the exclusive and comprehensive source of public policy with respect to general insurance practices . . . unless an insurance related practice violates CUIPA *or, arguably, some other statute regulating a specific type of insurance related conduct*, it cannot be found to violate any public policy, and, therefore, it cannot be found to violate CUTPA." *State v. Acordia, Inc.*, 310 Conn. 1, 37 (2013) (emphasis added). In *NEMS*, District Judge Nagala concluded that some standalone CUTPA claims outside of CUIPA could be maintained "where there is an alleged violation of a statute regulating a specific type of insurance related conduct." 615 F. Supp. 3d at 138. Some Connecticut state courts have come to a contrary conclusion.[3]

---

[2] Plaintiffs also reference in paragraph 96 of the TAC that Cigna "made defamatory and malicious statements about the Murphy Practice and Dr. Murphy to its patients and others," which they incorporate into the CUTPA count. *See* TAC ¶ 139 ("Cigna's actions, including its refusal to comply with the FFCRA, the CARES Act and Connecticut Law, as well as those actions described above at paragraphs 83 through 90, and 92 through 99, constitute unfair claims settlement practices in violation of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-816."). Plaintiffs never explain how such defamatory conduct is proscribed by CUTPA.

[3] *See* 12 Robert Langer et al., *Conn. Prac., Unfair Trade Practices* § 3:13 (collecting cases holding that CUTPA insurance claims must generally arise through CUIPA) (last updated December 2022); *see also Chicago Title Insurance Company v. LaPuma*, 2016 WL 5339456, at

*NEMS* found guidance in *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 317 Conn. 602 (2015), where the Connecticut Supreme Court held that "'although § 38a-790-8 reasonably may be characterized as regulating insurance related conduct insofar as it prescribes a standard of conduct for appraisers who estimate the cost to insurers of auto body repairs,' that provision did not regulate the conduct at issue because the labor rate an auto body shop would be paid was the subject of negotiation between the insurer and the shop, and did not run afoul of the ethical duties of appraisers set forth in the statute." *NEMS*, 615 F. Supp. 3d at 138 (quoting *Arties*, 317 Conn. at 625.) *NEMS* concluded that the "implication of the Connecticut Supreme Court's language in *Artie's* is that, had the statute regulated the conduct at issue, the Connecticut Supreme Court would have allowed the CUTPA claim to proceed under *Acordia*'s holding that a statute regulating a specific type of insurance related conduct could give rise to a CUTPA claim, even if the conduct does not also violate CUIPA." *Id.* While a close issue, the Court agrees with the analysis in *NEMS* because the Connecticut Supreme Court in *Acordia* expressly left open the possibility that CUTPA could provide relief based on the violation of "some other statute regulating a specific type of insurance related conduct." *Acordia*, 310 Conn. at 37. As such, Plaintiffs may bring certain standalone CUTPA claims based on alleged violations of statutes regulating a specific type of insurance related conduct.

### 1. Standalone CUTPA Claims Asserted

#### a) The CARES Act and FFCRA

To address the impact of the COVID-19 pandemic, Congress passed the FFCRA and the CARES Act, requiring health insurance issuers to cover the costs of SARS-CoV-2

---

*5 (Conn. Super. Ct. Aug. 23, 2016) (interpreting the *Acordia* phrase "some other statute regulating a specific type of insurance related conduct" as providing the basis for a CUTPA claim only "when the legislature *explicitly* provides that the statute's violation constitutes an unfair or deceptive insurance practice[.]")

diagnostic tests at no cost to a patient and thus regulate insurance-related conduct. The FFCRA states that:

> SEC. 6001. COVERAGE OF TESTING FOR COVID–19.
>
> (a) IN GENERAL. —A group health plan and a health insurance issuer offering group or individual health insurance coverage . . . shall provide coverage, and shall not impose any cost sharing (including deductibles, copayments, and coinsurance) requirements or prior authorization or other medical management requirements, for the following items and services furnished during any portion of the emergency period . . . beginning on or after the date of the enactment of this Act:
>
> (1) In vitro diagnostic products . . . for the detection of SARS–CoV–2 or the diagnosis of the virus that causes COVID–19 that are approved, cleared, or authorized . . . and the administration of such in vitro diagnostic products. . . .
>
> (b) ENFORCEMENT.—The provisions of subsection (a) shall be applied by the Secretary of Health and Human Services, Secretary of Labor, and Secretary of the Treasury to group health plans and health insurance issuers offering group or individual health insurance coverage as if included in the provisions of part A of title XXVII of the Public Health Service Act, part 7 of the Employee Retirement Income Security Act of 1974, and subchapter B of chapter 100 of the Internal Revenue Code of 1986, as applicable.
>
> (c) IMPLEMENTATION.—The Secretary of Health and Human Services, Secretary of Labor, and Secretary of the Treasury may implement the provisions of this section through sub-regulatory guidance, program instruction or otherwise.

The CARES Act provides:

> SEC. 3201. COVERAGE OF DIAGNOSTIC TESTING FOR COVID-19
>
> Paragraph (1) of section 6001(a) of division F of the Families First Coronavirus Response Act (Public Law 116–127) is amended to read as follows:
>
> "(1) An in vitro diagnostic test defined in section 809.3 of title 21, Code of Federal Regulations (or successor regulations) for the detection of SARS–CoV–2 or the diagnosis of the virus that causes COVID–19, and the administration of such a test, that—
>
> "(A) is approved, cleared, or authorized under section 510(k), 513, 515, or 564 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360(k), 360c, 360e, 360bbb–3);

"(B) the developer has requested, or intends to request, emergency use authorization under section 564 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360bbb– 3), unless and until the emergency use authorization request under such section 564 has been denied or the developer of such test does not submit a request under such section within a reasonable timeframe;

"(C) is developed in and authorized by a State that has notified the Secretary of Health and Human Services of its intention to review tests intended to diagnose COVID–19; or

"(D) other test that the Secretary determines appropriate in guidance.".

SEC. 3202. PRICING OF DIAGNOSTIC TESTING.

(a) REIMBURSEMENT RATES.—A group health plan or a health insurance issuer providing coverage of items and services described in section 6001(a) of division F of the Families First Coronavirus Response Act (Public Law 116–127) with respect to an enrollee shall reimburse the provider of the diagnostic testing as follows:

(1) If the health plan or issuer has a negotiated rate with such provider in effect before the public health emergency declared under section 319 of the Public Health Service Act (42 U.S.C. 247d), such negotiated rate shall apply throughout the period of such declaration.

(2) If the health plan or issuer does not have a negotiated rate with such provider, such plan or issuer shall reimburse the provider in an amount that equals the cash price for such service as listed by the provider on a public internet website, or such plan or issuer may negotiate a rate with such provider for less than such cash price.

(b) REQUIREMENT TO PUBLICIZE CASH PRICE FOR DIAGNOSTIC TESTING FOR COVID–19.—

(1) IN GENERAL.—During the emergency period declared under section 319 of the Public Health Service Act (42 U.S.C. 247d), each provider of a diagnostic test for COVID–19 shall make public the cash price for such test on a public internet website of such provider.

(2) CIVIL MONETARY PENALTIES.—The Secretary of Health and Human Services may impose a civil monetary penalty on any provider of a diagnostic test for COVID–19 that is not in compliance with paragraph (1) and has not completed a corrective action plan to comply with the requirements of such paragraph, in an amount not to exceed $300 per day that the violation is ongoing

Defendants argue that Plaintiffs' CUTPA-based claims under the CARES Act and FFCRA are defective because the Amended Complaint fails to allege Murphy posted a cash price for its diagnostic testing. (Defs.' Mem. at 3.) While Section 3202(b) of the CARES Act specifically contemplates certain penalties for failure to post a cash price, it does not relieve an insurer's obligations, and dismissal is not warranted on this basis.

Defendants also argue that the FFCRA and CARES Act cannot be said to be regulating a "*specific type* of insurance related conduct" (emphasis added) because both statutes address a large variety of policy issues. (Defs.' Reply [Doc. # 104] at 8.) But Cigna provides no support for the notion that a statute is not regulating a "specific type" of insurance-related conduct merely because it regulates other conduct as well. Here, the statutes regulate the specific conduct at issue in this case: reimbursement for Covid-19 testing services. As such, Plaintiffs have sufficiently pled a CUTPA cause of actions based on Cigna's alleged violations of the CARES Act and FFCRA.

### b) Connecticut Surprise Billing Law

Plaintiffs also bring a CUTPA claim under Connecticut's Surprise Billing Law. *NEMS* concluded that Connecticut's Surprise Billing Law provided a permissible basis for a standalone CUTPA claim. *See NEMS*, 615 F. Supp. 3d at 142. Cigna argues that Plaintiffs have failed to allege facts supporting their allegation that Cigna was required to reimburse claims under the Connecticut Surprise Billing Law because, as Plaintiffs acknowledge, the law does not apply to asymptomatic patients, and Plaintiffs fail to delineate which Cigna members claimed to be experiencing symptoms when they sought testing. (Defs.' Opp'n at 15.) Moreover, Defendants dispute that being symptomatic before taking a Covid test constitutes the sort of "emergency condition" to which the Surprise Billing Law applies. (Defs.' Opp'n at 15.)

The Surprise Billing Law applies to patients with an "emergency condition," Conn. Gen. Stat. § 38a-477aa(a)(1), which is defined to have "the same meaning as 'emergency

medical condition', as provided in section 38a-591a."[4] Defendants argue that an emergency condition is one whose symptoms warrant going to an emergency department, and that "[i]t is simply not plausible to conclude that a person who was experiencing an emergency medical condition would visit a drive-up Covid testing site rather than go to a hospital emergency department. (Defs. Memo at 16.) Defendants point to the definition of Emergency Services under the statute that states "a medical screening examination as required under Section 1867 of the Social Security Act, as amended from time to time, that is within the capability of a hospital emergency department, including ancillary services routinely available to such department to evaluate such condition, and such further medical examinations and treatment required under said Section 1867 to stabilize such individual that are within the capability of the hospital staff and facilities." C.G.S. § 38a-477aa(a)(2).

Given the initially unknown characteristics of a Covid-19 infection which rapidly transformed non-acute symptoms into potential life-threatening Covid-19 emergencies, this determination requires factual determinations about what symptoms existed for patients in question, and what symptoms constituted medical emergencies. At this motion to dismiss stage, where the Court must construe all well-pled allegations in favor of the Plaintiffs, Plaintiffs have sufficiently pled their claim that the Connecticut Surprise Billing Law was violated.

## IV. Conclusion

For the foregoing reasons, Defendants' Partial Motion to Dismiss Counts Two and Three of Plaintiffs' Third Amended Complaint [Doc. # 93] is GRANTED in Part and Denied in

---

[4] Conn. Gen. Stat. § 38a-591a(14) defines "emergency medical condition" as "a medical condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that a prudent layperson with an average knowledge of health and medicine, acting reasonably, would have believed that the absence of immediate medical attention would result in serious impairment to bodily functions or serious dysfunction of a bodily organ or part, or would place the person's health or, with respect to a pregnant woman, the health of the woman or her unborn child, in serious jeopardy."

Part. Count Two, insofar as it alleges CUTPA claims under the CARES Act, the FFCRA, and the Connecticut Surprise Billing Law, shall proceed. All remaining claims alleged under Counts Two and Three are DISMISSED.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 12th day of May, 2023