**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

------------------------------------------------------------------------ x

MURPHY MEDICAL ASSOCIATES, LLC; DIAGNOS-    :
TIC AND MEDICAL SPECIALISTS OF GREENWICH,   :
LLC; NORTH STAMFORD MEDICAL ASSOCIATES,     :
LLC; COASTAL CONNECTICUT MEDICAL GROUP,     :   3:20-cv-01675-VAB
LLC; and STEVEN A.R. MURPHY, MD,            :
                                            :
            Plaintiffs,                     :
v.                                          :   November 12, 2024
                                            :
CIGNA HEALTH AND LIFE INSURANCE COMPANY     :
and CONNECTICUT GENERAL LIFE INSURANCE      :
COMPANY,                                    :
                                            :
            Defendants.                     :

------------------------------------------------------------------------ x

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

Robinson & Cole LLP
1055 Washington Boulevard
Stamford, CT 06901
Tel: (203) 462-7500

*Attorneys for Defendants*

*Of Counsel*:

*Patrick W. Begos*
*Raymond J. Carta*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

I.      INTRODUCTION ................................................................................................... 1

II.     SUMMARY OF GROUNDS FOR SUMMARY JUDGMENT ...................................... 4

III.    RELEVANT PROCEDURAL HISTORY ..................................................................... 6

IV.     STATEMENT OF FACTS ........................................................................................ 9

        A.      Background Facts and Admissions ........................................................ 9

        B.      Cigna's SIU Investigation .................................................................... 10

        C.      Plaintiffs Have Been Precluded From Introducing Evidence For Most of
                Their Itemized Claims ........................................................................ 14

        D.      Plaintiffs Have Not Produced Evidence Essential to Their Claims ..................... 16

                1.      Many of Plaintiffs' "assignments" do not assign any ERISA rights. ...... 16
                2.      Plaintiffs have not exhausted administrative remedies. .......................... 17
                3.      Plaintiffs did not post a "cash price" as required by the CARES
                        Act. ............................................................................................... 18
                4.      Plaintiffs have no evidence that Cigna published any defamatory
                        statements .................................................................................... 20

V.      APPLICABLE LEGAL STANDARD ....................................................................... 22

VI.     LEGAL ARGUMENT ........................................................................................... 23

        A.      Plaintiffs Cannot Succeed on Their ERISA Benefits Claim .............................. 23

                1.      The Court should grant summary judgment dismissing the
                        Itemized Claims for which the Court has precluded Plaintiffs from
                        introducing evidence. .................................................................... 23
                2.      Numerous defects in or limitations of Plaintiffs' alleged
                        assignments prevent them from establishing ERISA standing. ............... 24
                3.      Plaintiffs did not exhaust administrative remedies for any Itemized
                        Claims. ......................................................................................... 27
                4.      Plaintiffs' own violation of the CARES Act precludes them from
                        compelling Cigna to pay a "cash price" allegedly required by the
                        CARES Act. ................................................................................... 29

        B.      Plaintiffs' Remaining CUTPA Claim Fails as a Matter of Law Under a
                2024 Connecticut Supreme Court Decision ........................................... 32

        C.      Plaintiffs Have No Admissible Evidence of Tortious Interference .................... 37

VII.    CONCLUSION ................................................................................................... 39

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Appleton v. Bd. of Educ. of Town of Stonington*,
254 Conn. 205 (2000) ...................................................................................................37

*Baena v. KPMG LLP*,
453 F.3d 1 (1st Cir. 2006) .............................................................................................31

*First Nat'l Bank of Ariz. V. Cities Serv. Co.*,
391 U.S. 253 (1968)..................................................................................4, 25, 30, 34

*Franchise Tax Bd. v. Constr. Laborers Vacation Trust for S. Cal.*,
463 U.S. 1 (1983)..........................................................................................................24

*Funk v. Gallivan*,
49 Conn. 124 (Conn. 1881)...........................................................................................31

*Gallardo By & Through Vassallo v. Marstiller*,
596 U.S. 420 (2022)......................................................................................................26

*Greenwald v. Van Handel*,
311 Conn. 370 (2014) ...............................................................................................31, 37

*Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*,
819 F.3d 42 (2d Cir. 2016).............................................................................................23

*Heimeshoff v. Hartford Life & Acc. Ins. Co.*,
571 U.S. 99 (2013)........................................................................................................27

*Jones v. UNUM Life Ins. Co. of Am.*,
223 F.3d 130 (2d Cir. 2000)...........................................................................................28

*Kennedy v. Empire Blue Cross & Blue Shield*,
989 F.2d 588 (2d Cir. 1993)......................................................................................27, 28

*MC1 Healthcare, Inc. v. United Health Group, Inc.*,
No. 17-cv-01909 (KAD), 2019 WL 2015949 (D. Conn. May 7, 2019) .................................24

*Muller v. First Unum Life Ins. Co.*,
341 F.3d 119 (2d Cir. 2003).............................................................................................23

*Murphy Med. Assocs., LLC v. 1199SEIU Nat'l Benefit Fund*,
No. 23-cv-6237 (DEH), 2024 WL 2978306 (S.D.N.Y. June 12, 2024) ..................................3

ii

*Murphy Med. Assocs., LLC v. Centene Corp.*,
  No. 22-cv-504 (VLB), 2023 WL 2384143 (D. Conn. Mar. 6, 2023 ...........................................3

*Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*,
  No. 20-cv-1675 (JBA), 2022 WL 10560321 (D. Conn. Oct. 18, 2022) ...................................7

*Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*,
  No. 20-cv-1675(JBA), 2022 WL 743088 (D. Conn. Mar. 11, 2022), *on
  reconsideration*, 2022 WL 10560321 (D. Conn. Oct. 18, 2022) .........................................6, 26

*Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*,
  No. 20-cv-1675 (JBA), 2023 WL 3434988 (D. Conn. May 12, 2023).........................7, 32, 33

*Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*,
  No. 20-cv-1675 (JBA), 2023 WL 5608444 (D. Conn. Aug. 30, 2023) .....................................8

*Murphy Med. Assocs., LLC v. EmblemHealth, Inc.*,
  No. 22-cv-59 (CSH), 2024 WL 4388305 (D. Conn. Oct. 3, 2024).............................................3

*Murphy Med. Assocs., LLC v. United Med. Res., Inc.*,
  No. 22-cv-00083 (MPS), 2024 WL 1072731 (D. Conn. Mar. 12, 2024) ..................................3

*Murphy Med. Assocs., LLC v. Yale Univ.*,
  No. 24-944, 2024 WL 4656321 (2d Cir. Nov. 4, 2024) .................................................3, 7, 24

*Murphy Medical Associates, LLC v. MagnaCare LLC*,
  No.: 22-cv-00326 (RNC) (D. Conn. Nov. 30, 2023) ................................................................3

*Navarro v. Town of Stratford*,
  No. 22-cv-01254 (VAB), 2024 WL 4008229 (D. Conn. Aug. 30, 2024)...............................23

*NEMS PLLC v. Harvard Pilgrim Health Care of Conn. Inc.*,
  615 F. Supp.3d 125 (D. Conn. 2022).......................................................................................8

*NEMS, PLLC v. Harvard Pilgrim Health Care of Connecticut, Inc.*,
  No. 20914, 2024 WL 3892879 (Conn. Aug. 21, 2024) ................................................... *passim*

*Paese v. Hartford Life & Acc. Ins. Co.*,
  449 F.3d 435 (2d Cir. 2006)...................................................................................................27

*Quigley v. Citigroup Supplemental Plan for Shearson Transfers*,
  No. 09-cv-8944 (PGG), 2011 WL 1213218 (S.D.N.Y. Mar. 29, 2011) .................................28

*Richard Mfg. Co. v. Richard*,
  513 F. Supp.3d 261 (D. Conn. 2021).......................................................................................28

*Robert S. Weiss & Assoc., Inc. v. Wiederlight*,
  208 Conn. 525 (1988) .............................................................................................................37

iii

*Rojas v. Cigna Health & Life Ins. Co.*,
  793 F.3d 253 (2d Cir. 2015)..................................................................24, 25

*Simon v. Gen. Elec. Co.*,
  263 F.3d 176 (2d Cir. 2001) ........................................................................24

*Solomon v. Gilmore*,
  248 Conn. 769 (1999) ..................................................................................31

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)......................................................................................26

*State v. Acordia, Inc.*,
  310 Conn. 1 (2013) .............................................................................8, 34, 35

*United States v. Corbin*,
  620 F. Supp.2d 400 (E.D.N.Y. 2009) ..........................................................32

*Zarringhalam v. United Food & Com. Workers Int'l Union Loc. 1500 Welfare
  Fund*,
  906 F. Supp.2d 140 (E.D.N.Y. 2012) ..........................................................27

**Statutes**

15 U.S.C.§ 1012...............................................................................................37

29 U.S.C. § 1133..............................................................................................27

Connecticut Unfair Insurance Practices Act of 1955................................ *passim*

Connecticut Unfair Trade Practices Act of 1973 ..............................................4

Coronavirus Aid, Relief, and Economic Security Act of 2020................... *passim*

Employee Retirement Income and Security Act of 1974 ........................... *passim*

**Rules and Regulations**

Fed. R. Civ. P. 37..............................................................................................8

Fed. R. Civ. P. 56............................................................................................38

Fed. R. Evid. 801 ............................................................................................38

Fed. R. Evid. 802 ............................................................................................38

45 C.F.R. § 182.20 (2020) ..............................................................................30

45 C.F.R. § 182.40 (2020) ..............................................................................30

85 Fed. Reg. 71152 (Nov. 6, 2020)........................................................................................30

**Other Authorities**

COVID-19 Health Insurance- and Health Care-Related Fraud, FinCEN Advisory
  (FIN-2021-A001) (Feb. 2, 2021); available at
  https://www.fincen.gov/sites/default/files/advisory/2021-02-02/COVID-
  19%20Health%20Care%20508%20Final.pdf ...................................................................2

FAQs About [FFCRA] and [CARES] Act Implementation Part 44 (February 26,
  2021), Q. 6, https://www.cms.gov/files/document/faqs-part-44.pdf .........................................2

Inside Edition Staff, *Family Says Nearly $7,000 COVID-19 Test Bill Includes
  $480 Charge for Phone Call Telling Them Results*, INSIDE EDITION, Nov. 12,
  2020, https://www.insideedition.com/family-says-nearly-7000-covid-19-test-
  bill-includes-480-charge-for-phone-call-telling-them-results ...................................................2

Meiselbach, Mark et al., *Charges of COVID-19 diagnostic testing and antibody
  testing across facility types and states*, J. Gen. Intern. Med., 1-4 (Sept. 15,
  2020), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7491868..........................1

'Profiteer'-Yale Lawsuit," (New Haven Independent), Mar. 29, 2023,
  https://www.newhavenindependent.org/article/murphy_yale_dismissal ..................................3

Sarah Kliff, *These Towns Trusted a Doctor to Set Up Covid Testing. Sample
  Patient Fee: $1,944*, N.Y. TIMES, Nov. 10, 2020 (updated Nov. 24, 2021),
  https://www.nytimes.com/2020/11/10/upshot/covid-testing-doctor-fees.html ...................2, 21

Thomas Breen, *"Profiteer" Set Up In City Amid Fraud Probe*, NEW HAVEN
  INDEPENDENT, June 18, 2021,
  https://www.newhavenindependent.org/article/1_patient_22_covid_tests_4676
  4_billed .................................................................................................................................2

Defendants, Cigna Health and Life Insurance Company, and Connecticut General Life Insurance Company (together, "Cigna"), move for summary judgment dismissing the Third Amended Complaint.

## I.      **INTRODUCTION**

Plaintiffs seek to recover millions of dollars for health services that they allegedly provided to Cigna members at Covid testing sites during the pandemic. Notably, Plaintiffs claim to be entitled to payment of up to $1,500 per test plus additional fees for alleged associated services, even though the average nationwide price for a Covid test at the height of the pandemic was less than $150.[1] Plaintiffs contend that they are entitled to these grossly excessive charges pursuant to pandemic-era legislation known as the CARES Act, but the undisputed evidence establishes that *Plaintiffs* were in violation of the CARES Act. To be sure, even if they had complied with the CARES Act, their contention that the Act enabled them to charge ten times the typical rate for a Covid test is fundamentally flawed.

Plaintiffs' business model of billing these grossly excessive charges for Covid tests formed the core of their plan to monetize the pandemic. Specifically, they operated multiple walk-in or drive-up testing sites, at which they would take swabs from people seeking a simple Covid test, and then run the swabs through a "multiplex" test for twenty-one respiratory pathogens (including Covid), claiming that such "multiplex" testing was medically necessary (even for asymptomatic people). But they did not tell their patients that they were doing this, and they did not even advise their patients if the test found one of the twenty other pathogens.

---

[1] Meiselbach, Mark et al., *Charges of COVID-19 diagnostic testing and antibody testing across facility types and states*, J. Gen. Intern. Med., 1-4 (Sept. 15, 2020), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7491868.

The U.S. Treasury Department identified this precise kind of bait and switch as one of the hallmarks of health care fraud: "Ordering or submitting claims for expensive tests or services that do not test for Covid, oftentimes in conjunction with Covid testing, such as medically unnecessary and expensive respiratory testing."[2]

Not satisfied with their excessive charges for the tests, Plaintiffs also billed up to $350 for an additional "office visit" each time a person came to a testing site. On top of that, Plaintiffs billed up to $130 for so-called "preventive medicine counseling" for these test seekers. When these and other charges are tallied, Plaintiffs often billed insurers up to $2,000 for a single Covid test. Plaintiffs thus fall into the small group of providers that the federal government has identified as "using the public health emergency as an opportunity to impose extraordinarily high charges."[3]

Plaintiffs' business model of exploiting the pandemic for profit generated significant negative press reports, including in *The New York Times*:

- Sarah Kliff, *These Towns Trusted a Doctor to Set Up Covid Testing. Sample Patient Fee: $1,944*, N.Y. TIMES, Nov. 10, 2020 (updated Nov. 24, 2021), https://www.nytimes.com/2020/11/10/upshot/covid-testing-doctor-fees.html.

- Inside Edition Staff, *Family Says Nearly $7,000 COVID-19 Test Bill Includes $480 Charge for Phone Call Telling Them Results*, INSIDE EDITION, Nov. 12, 2020, https://www.insideedition.com/family-says-nearly-7000-covid-19-test-bill-includes-480-charge-for-phone-call-telling-them-results.

- Thomas Breen, *"Profiteer" Set Up In City Amid Fraud Probe*, NEW HAVEN INDEPENDENT, June 18, 2021, https://www.newhavenindependent.org/article/1_patient_22_covid_tests_46764_billed.

---

[2]Advisory on COVID-19 Health Insurance- and Health Care-Related Fraud, FinCEN Advisory (FIN-2021-A001) (Feb. 2, 2021); available at https://www.fincen.gov/sites/default/files/advisory/2021-02-02/COVID-19%20Health%20Care%20508%20Final.pdf.

[3] FAQs About [FFCRA] and [CARES] Act Implementation Part 44 (February 26, 2021), Q. 6, https://www.cms.gov/files/document/faqs-part-44.pdf.

As one media outlet aptly put it, Plaintiffs are "pandemic 'profiteer[s].'"[4]

Despite all this, Plaintiffs endeavored to portray themselves as providing "the first line of defense against the pandemic." Third Amended Complaint ("TAC") (Doc. 92), ¶ 22. And they attacked Cigna for making "voluminous frivolous and bad faith medical records and audit requests … in a clear effort to overwhelm [Plaintiffs] and to delay or avoid its payment obligations." *Id.*, ¶ 60. However, as this litigation has demonstrated, and as this summary judgment motion will show, Plaintiffs' claims have evaporated when given even minimal scrutiny.

As but one example of the lack of merit, Plaintiffs initially claimed that Cigna was required to pay on some 13,000 individual claims for medical services provided to Cigna members on particular dates of service ("Itemized Claims"). However, Plaintiffs failed to comply with an order to produce their records, resulting in an order of preclusion pertaining to approximately 10,000 of these Itemized Claims.[5]

And Plaintiffs' abject failures to prove their claims are not limited to this action, because Courts in this District and elsewhere have dismissed multiple actions that Plaintiffs filed against other health plans and insurers.[6]

---

[4] *See* "Judge Dismisses 'Profiteer'-Yale Lawsuit," (New Haven Independent), Mar. 29, 2023, https://www.newhavenindependent.org/article/murphy_yale_dismissal.

[5] Even when Plaintiffs were able to produce medical records for a particular patient or itemized claim, they were inadequate and/or suspect. For example, the records did not document the services for which Plaintiffs billed Cigna, and they were largely "copied and pasted" from one record to another, and there was no basis to conclude that they were created contemporaneously with the services, as required. Those basic failures, originally documented by Cigna's SIU, gave rise to Cigna's counterclaims.

[6] *See, e.g.*, *Murphy Med. Assocs., LLC v. Yale Univ.*, No. 24-944,2024 WL 4656321 (2d Cir. Nov. 4, 2024) (affirming dismissal of action); *Murphy Med. Assocs., LLC v. EmblemHealth, Inc.*, No. 22-cv-59 (CSH), 2024 WL 4388305 (D. Conn. Oct. 3, 2024) (dismissing action); *Murphy Med. Assocs., LLC v. 1199SEIU Nat'l Benefit Fund*, No. 23-cv-6237 (DEH), 2024 WL 2978306 (S.D.N.Y. June 12, 2024) (dismissing action); *Murphy Med. Assocs., LLC v. United Med. Res., Inc.*, No. 22-cv-00083 (MPS), 2024 WL 1072731 (D. Conn. Mar. 12, 2024) (dismissing action in part); *Murphy Med. Assocs., LLC v. Centene Corp.*, No. 22-cv-504 (VLB), 2023 WL 2384143 (D. Conn. Mar. 6, 2023) (dismissing complaint); *Murphy Medical Associates, LLC v. MagnaCare LLC*, No.: 22-cv-00326 (RNC) (D. Conn. Nov. 30, 2023) (Doc. No. 59) (dismissing complaint).

3

II.    **SUMMARY OF GROUNDS FOR SUMMARY JUDGMENT**

Following rulings on several motions to dismiss the Complaint and the Amended Complaint (discussed in Section III, *infra*), there are three causes of action remaining in the TAC: (1) the First Cause of Action for Employee Retirement Income Security Act ("ERISA") benefits under 29 U.S.C. § 1132(a)(1)(B); (2) the Second Cause of Action for Connecticut Unfair Trade Practices Act ("CUTPA"); and (3) the Fourth Cause of Action for tortious interference with "beneficial or contractual relationships." The Court should grant summary judgment for Cigna on all of these claims.

Plaintiffs' ERISA claim (First Cause of Action) has many deficiencies:

*First*, the Court precluded Plaintiffs from introducing evidence regarding approximately 10,000 of the 13,000 Itemized Claims following Plaintiffs' willful failure to comply with an order compelling that production. (Doc. 118). Because Plaintiffs cannot prove that ERISA benefits are due on Itemized Claims that they cannot prove they performed, summary judgment dismissing those Itemized Claims is warranted.

*Second*, there is no dispute that Plaintiffs can have standing to assert an ERISA claim only if the Cigna member has assigned that claim to them in exchange for medical treatment they provided. Plaintiffs contend that they received assignments from many patients, but many of those purported assignments do not, in fact, convey the right to assert an ERISA benefits claim for the alleged services at issue. Moreover, those assignments only convey rights to two of the six Plaintiffs. Therefore, the Court should grant summary judgment dismissing the Itemized Claims for which Plaintiff does not have an effective assignment.

*Third*, even if Plaintiffs had standing, they failed to exhaust administrative remedies by administratively appealing the denials of Itemized Claims before filing suit. In particular, they have not produced evidence that they appealed any, much less all of the Itemized Claims at issue. Nor

4

have they produced evidence supporting their conclusory allegation that appeals would have been futile. Because exhaustion of administrative remedies is a prerequisite to an ERISA benefits claim, the Court should grant summary judgment dismissing every Itemized Claim for which Plaintiffs cannot introduce admissible evidence that they exhausted administrative remedies.

*Fourth*, Plaintiffs contend that Cigna is required to pay a "cash price" for each alleged Covid test, pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES") Act, Pub.L. 116-136, 134 Sta. 366. But the CARES Act placed an obligation on Plaintiffs to post on their website the "cash price" they were charging patients, and Plaintiffs have admitted that they were in violation of that obligation for most of the period at issue, and they cannot demonstrate that they were ever in compliance. As the Court previously observed, if no proper cash price is posted, "[t]hen probably you [get] zero, don't you?" (March 15, 2022 Tr. (Doc. 106) at 52). Moreover, Plaintiffs cannot seek to hold Cigna liable for an alleged violation of a statute that Plaintiffs themselves unquestionably violated. The Court should therefore grant summary judgment dismissing those Itemized Claims for which Plaintiffs did not publicly post a cash price compliant with the CARES Act.

Plaintiffs' CUTPA claim (Second Cause of Action) fails as a matter of law. The Court previously dismissed this claim to the extent it was based on a violation of Connecticut Unfair Insurance Practices Act ("CUIPA"), but left it standing to the extent it was based on a violation of the Connecticut Surprise Billing Law, the CARES Act, or the Families First Coronavirus Response Act, Pub.L. 116-127, 134 Stat. 201 ("FFCRA"). (Doc. 109). However, the Connecticut Supreme Court recently held that a CUTPA claim against an insurer could not be premised on a violation of the Connecticut Surprise Billing Law, and the decision also makes clear that a CUTPA claim cannot be based on violation of a federal statute either. *NEMS, PLLC v. Harvard Pilgrim Health*

5

*Care of Connecticut, Inc.*, No. 20914, 2024 WL 3892879 (Conn. Aug. 21, 2024). Therefore, the Court should grant summary judgment dismissing Plaintiffs' CUTPA claim.

Plaintiffs' tortious interference claim (Fourth Cause of Action) alleges that Cigna published defamatory statements about them, resulting in unspecified towns in which Plaintiffs had set up testing sites severing ties with them. Plaintiffs have no admissible evidence that Cigna made any defamatory statements about them. Moreover, the undisputed evidence establishes that various town severed ties with Plaintiffs promptly after new reports were published about their abusive billing practices. The Court should grant summary judgment on this claim.

## III.    <u>RELEVANT PROCEDURAL HISTORY</u>

Plaintiffs commenced this action in November 2020, serving a complaint (Doc. 1) with six causes of action: (1) violation of the FFCRA and the CARES Act (together, "Covid Legislation"); (2) violation of the Affordable Care Act; (3) ERISA benefits; (4) ERISA equitable relief; (5) CUIPA/CUTPA; and (6) tortious interference.[7]

After Cigna sought a premotion conference for a motion to dismiss, Plaintiffs filed an Amended Complaint (Doc. 29) asserting eight causes of action: (1) violation of the Covid Legislation; (2) ERISA equitable reformation; (3) ERISA benefits; (4) ERISA equitable relief; (5) CUIPA/CUTPA; (6) unjust enrichment; (7) quantum meruit; and (8) tortious interference.

Cigna moved to dismiss the Amended Complaint (Doc. 30), and the Court granted the motion in substantial part, dismissing with prejudice Counts 1, 2, 4, 5, 6, and 7. Doc. 48; *Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*, No. 20-cv-1675(JBA), 2022 WL 743088 (D. Conn. Mar. 11, 2022), *on reconsideration*, 2022 WL 10560321 (D. Conn. Oct. 18, 2022). In

---

[7] Plaintiffs are Murphy Medical Associates, LLC ("MMA"); Diagnostic and Medical Specialists of Greenwich, LLC ("DMSOG"); North Stamford Medical Associates, LLC ("NSMA"); Coastal Connecticut Medical Group, LLC ("CCMG"); and Steven A.R. Murphy, MD ("Murphy").

particular, the Court held: (a) the Covid Legislation did not provide a private right of action for providers to seek payment for Covid tests;[8] (b) Plaintiffs did not have standing to seek equitable reformation of health plans under ERISA, and their ERISA equitable claim improperly sought relief that was available under an ERISA benefits claim and (c) ERISA preempted the state law claims for CUTPA, unjust enrichment and quantum meruit.

On a motion for reconsideration (Doc. 50), the Court granted Plaintiffs' leave to replead Counts 5 and 6 (CUIPA/CUTPA and unjust enrichment) to the extent that any of the Itemized Claims sought benefits under plans that ERISA did not govern. Doc. 71; *Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*, No. 20-cv-1675 (JBA), 2022 WL 10560321 (D. Conn. Oct. 18, 2022).

Plaintiffs filed their Second Amended Complaint (Doc. 75) asserting four causes of action: (1) ERISA benefits (29 U.S.C. § 1132(a)(1)(B)); (2) CUIPA/CUTPA; (3) unjust enrichment; and (4) tortious interference. Cigna filed a premotion conference request, seeking permission to file a motion to dismiss the claims for CUIPA/CUTPA and unjust enrichment (Doc. 78); following a conference, Plaintiffs filed the TAC (Doc. 92), which asserted the same four causes of action as the Second Amended Complaint.

Cigna moved to dismiss the CUIPA/CUTPA and unjust enrichment claims, which the Court granted in part and denied in part. Doc. 109; *Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*, No. 20-cv-1675 (JBA), 2023 WL 3434988 (D. Conn. May 12, 2023). Specifically, the Court held:

- Plaintiffs voluntarily withdrew their unjust enrichment claim (Doc. 109, at 2).

---

[8] The Second Circuit recently held the same. *Murphy Med. Assocs., LLC v. Yale Univ.*, No. 24-944, 2024 WL 4656321 (2d Cir. Nov. 4, 2024).

- To the extent Plaintiffs' CUTPA claim was based on a violation of CUIPA, it failed to state a claim, because Plaintiffs failed to plead facts demonstrating that Cigna's allegedly unfair insurance practices were part of a general business practice (*Id.*, at 3-6).

- To the extent Plaintiffs' CUTPA claim was based on a violation of the Covid Legislation and the Surprise Billing Law, Plaintiffs had adequately stated a claim, relying on *State v. Acordia, Inc.*, 310 Conn. 1, 37 (2013) and *NEMS PLLC v. Harvard Pilgrim Health Care of Conn. Inc.*, 615 F. Supp.3d 125 (D. Conn. 2022) (Doc. 109, at 6-11).[9]

As a result of the amendments and motion practice, there remain three claims in the action: (1) a claim under ERISA, 29 U.S.C. § 1132(a)(1)(B), seeking benefits payable under the governing plans for the Itemized Claims; (2) a claim for CUTPA based on alleged violations of the Surprise Billing Law and the Covid Legislation; and (3) a claim for tortious interference with business relations based on allegedly defamatory statements.

Prior to the filing of the Second Amended Complaint, Cigna moved for sanctions under Fed. R. Civ. P. 37 due to Plaintiffs' failure to comply with the Court's order compelling production. (Doc. 72). After extensive argument and supplemental briefing, the Court granted that motion. Doc. 118; *Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*, No. 20-cv-1675 (JBA), 2023 WL 5608444 (D. Conn. Aug. 30, 2023). The Court began its ruling on preclusion by noting that, in March 2022, it had ordered Plaintiffs to produce "a comprehensive record set for all of the patients on the list of itemized claims at issue," including medical records, patient assignment documents, "intake forms, authorizations, medical history, pretesting exams, lab test results, … doctors' orders … [and] any documents that relate to the decision to perform multiplex testing rather than just COVID testing[.]" (Doc. 118, at 5; quotation marks omitted). The Court held: "It is clear that Plaintiffs have repeatedly failed to comply with the March 2022

---

[9] As will be discussed further below, the Connecticut Supreme Court's recent decision in *NEMS, PLLC v. Harvard Pilgrim Health Care of Connecticut, Inc.*, No. 20914, 2024 WL 3892879 (Conn. Aug. 21, 2024), eliminates the interpretation of the *dictum* from *Acordia* on which this Court relied.

Court order[,]" and that they "have shown blatant and willful disregard for discovery deadlines in the Court's order." (*Id.*, at 7, 9). The Court then ruled:

> Given Plaintiffs' failure to comply with its discovery obligations, their failure to withdraw claims they promised to withdraw at the February [2023] hearing, and the uncontested declarations in the Begos Supplemental Declaration in the four months since it was submitted, the Court finds preclusion is warranted as to any evidence pertaining to the Itemized Claims and patients attached to the April 24th Begos Supplemental Declaration: the 10,619 Itemized Claims in Exhibit 1 [Doc. 108-1], the Itemized Claims pertaining to the 1,020 Patients in Exhibit 2 [Doc. 108-2], the 1,072 Itemized Claims in Exhibit 3 [Doc. 108-3], and the 376 Itemized Claims in Exhibit 4 [Doc. 108-4].

(Doc. 118, at 10). The Court also awarded attorneys' fees to Cigna (*Id.*, at 11), which the Court later determined to be in the amount of $154,700. (Doc. 153).

## IV.    STATEMENT OF FACTS

### A.    Background Facts and Admissions

Except where otherwise indicated, this section contains Plaintiffs' judicial admissions regarding the background of the dispute.

Plaintiffs are "out-of-network or non-participating" healthcare providers, which means that they "do not have contracts" with Cigna. TAC, ¶¶ 50, 78. Plaintiffs "operated drive and/or walk-through COVID-19 testing sites" in multiple locations in Connecticut and New York. *Id.*, ¶ 23. Plaintiffs allegedly "concluded that performing a COVID-19 test in a vacuum, without performing any other diagnostic testing, would fail to adhere to the requisite standard of care." *Id.*, ¶ 26. Rather, they assert, "patients who present with symptoms of COVID-19, or patients who have or potentially have exposure to COVID-19, need to be tested for COVID-19 as well as other respiratory viruses and infections that could possibly cause the same or similar symptoms as COVID-19, or could possibly co-exist with COVID-19." *Id.*

Plaintiffs acquired a BioFire Film Array System that allowed them to test for Covid and 20 other "common respiratory pathogens." *Id.*, ¶¶ 32-35. As a result, "patients who were

9

symptomatic or otherwise had a need for expedited results had their samples run through Bio-Fire[.]" *Id.*, ¶ 36. Testing for multiple pathogens at the same time is often referred to as "multiplex" testing. The claim detail Plaintiffs submitted with their initial Complaint shows that they billed Cigna up to $1,500 per multiplex test.

Plaintiffs also allegedly performed, and billed Cigna for, various ancillary services such as blood testing for patients who tested positive for Covid; "telemedicine preventative medicine counseling and education"; and "telemedicine visits with patients to check on their conditions and determine whether further medical intervention was needed." *Id.*, ¶¶ 38-40.

Plaintiffs commenced this action in November 2020. Doc. 1. At that time, Plaintiffs alleged that Cigna owed them $4.6 million for Covid testing related services provided to over 4,400 Cigna members. Doc. 1, ¶ 9. When Plaintiffs filed their Amended Complaint in March 2021, this amount had grown to "over $6 million." Doc. 29, ¶¶ 2, 64. That is the amount alleged to be owed in the TAC. TAC, ¶ 2.

### B.    Cigna's SIU Investigation

During the early days of the pandemic, Cigna paid one Plaintiff, MMA in excess of $468,000 for medical services allegedly provided during the pandemic. Declaration of Stephanie Canto, ¶ 16. However, this changed shortly after Cigna's Special Investigations Unit ("SIU") opened an investigation in May 2020 into the practices of MMA and Murphy, based on various internal "referrals." *Id.*, ¶ 4, Ex. A. Specifically, data analytics identified MMA as billing "high level" evaluation and management ("E/M") codes at mobile sites, and also billing preventative screenings on the same date as the E/M services were allegedly performed. *Id.*, Ex. A., p. 3.[10]

---

[10] An example of an E/M code would be a standard doctor's office visit. There are five "levels" of E/M codes – CPT 99201-99205 (for new patients) and CPT 99211-99215 (for established patients) – with the complexity of the evaluation (and the reimbursement) increasing from 1 to 5.

The SIU investigator who conducted the investigation created a full and final report of her work, dated May 25, 2021, *id.*, Ex. A, which she testified contains an accurate summary of the investigation and findings, and was prepared by her in the ordinary course of her business for Cigna. Deposition of Katie Walker, dated April 29, 2024 ("Walker Tr."), pp. 145-146; *see also*, Canto Dec., ¶¶ 5-10.

Cigna's initial data analysis revealed that the CPT codes that MMA billed that had resulted in the highest payments were: CPT 87633 (multiplex respiratory test); CPT 99214 (high level E/M code for established patient); and CPT 99401 (preventative medicine counseling). Canto Dec., Ex. A, p. 3. Oddly, particularly because Plaintiffs were operating sites for Covid testing, the analysis showed that "[n]o COVID-19 related testing procedure codes were billed." *Id.* Rather, "[a] billing pattern was identified where CPT 87633 [multiplex test] was billed with COVID-19 related diagnosis codes[.] … The provider was also billing CPT 99214 [E/M] and 99401 [preventative medicine] on the same date of service as CPT 87633." *Id.* The analysis also found that MMA was "typically billing follow-up telemedicine visits … with CPT 99401." *Id.*

Cigna's investigator interviewed ten customers for whom MMA submitted bills and reported that "COVID-19 testing was performed at a drive-thru testing location. Customer responses indicated that preventative screenings did not occur. Customers who were billed for follow-up telemedicine appointments reported that those phone calls only consisted of a positive or negative COVID-19 test result and did not include anything else." *Id.*, p. 3. Cigna's investigator reported that the interviews "suggested misrepresentation of services" because the customers had sought only Covid testing, and were not aware that they were receiving, or that MMA was billing for, multiplex testing. *Id.* ("customers were receiving COVID-19 testing only and did not include respiratory panels which is what was billed for these customers (CPT 87633)"). The investigator

11

continued: "The interviews also suggested services not rendered as billed as customers did not receive the preventative medicine or high level E/M services that were billed." *Id.*

Cigna's investigator also sent Verification of Service letters to a random sample of 100 customers with dates of service after March 15, 2020. *Id.*, p. 3. Of the thirty-eight letters returned, "29 customer responses (76%) indicated that services were not rendered as billed." *Id.* Indeed, "five customers indicated that the services billed never happened and that they did not see Dr. Murphy or go for COVID-19 diagnostic or antibody testing." *Id.* One customer "reported 'fraud.'" *Id.*

Cigna's investigator also reported that Cigna had received a number of customer complaints about MMA. *Id.*, p. 4. Specifically, "[m]ultiple customers reported that the HCP [health care provider] billed E/M and preventative medicine codes for services that never occurred. One customer reported that the HCP billed for erroneous blood testing when only COVID-19 antibody testing was requested." *Id.* While investigating, Cigna received a subpoena from the United States Attorney's Office, seeking documents regarding Plaintiffs. *Id.*

In May 2020, as a result of the information developed as of that date, Cigna "flagged" MMA "to prospectively request medical records to determine whether or not services were being rendered as billed." *Id.*, p. 4. Cigna did not flag or pend claims submitted by the other Plaintiffs (DMSOG, NSMA, CCMG, or Murphy). Canto Dec., ¶ 12.

In July 2020, Plaintiffs' attorney contacted Cigna and they "agreed to provide a probe sample of 10 records for claims that were already processed and paid[.]" Canto Dec., Ex. A, p. 4. When the records were submitted in September 2020, they "were subject to clinical review by an SIU Nurse Coder. Issues identified from the clinical review included services not rendered as billed, incorrect coding, and insufficient documentation." *Id.*

Cigna's investigator also located claim data for one Cigna member for whom MMA "billed a total [of] $46,764.00 in COVID-19 related claims." *Id.*, p. 5. This included sixty Itemized Claims for services allegedly provided on forty-eight different dates between June 2020 and January 2021. *Id.* Cigna's investigator interviewed the customer, who "reported that they were receiving mandatory testing weekly at her place of employment in New Haven, CT. The customer reported that they only received COVID-19 diagnostic tests and denied evaluation and management services and preventative medicine counseling that was billed on the same dates as the diagnostic testing codes. When asked about telemedicine consults, the customer explained that they received brief, 15-second phone calls with their test results." *Id.*

As a result of its SIU investigation, Cigna concluded that MMA had failed to perform multiple types of services for which it had billed Cigna, including: Evaluation and Management Services (CPT 99202, 99212, 99213, 99213), Respiratory Panel Testing (CPT 87633), Preventative Medicine Counseling (CPT 99401), Laboratory Testing (multiple CPT codes), and Venipuncture (CPT 36410). *Id.* Cigna placed a new flag, effective February 1, 2021, to deny claims due to the conclusion that MMA was not performing the services for which it billed. *Id.*, p. 9; Canto Dec., ¶ 14.

Cigna detailed its findings and conclusions in a March 4, 2021 letter to Dr. Murphy and MMA. *Id.*, ¶ 16, Ex. B. The March 4, 2021 letter explained:

> Cigna issues payment in good faith and relies upon billed CPT®, HCPCS, and/or revenue codes expecting an accurate representation of the services rendered. In addition, the claim forms themselves mandate that a provider submit accurate and complete information, while the submitter also certifies the accuracy of the information being billed. The findings of Cigna's retrospective review revealed that Cigna has been billed inappropriately and that the documentation did not justify the claims paid. Based on the significant issues identified in this audit, as discussed above, a refund is required.
>
> The issues described above were identified in the records and customer interviews selected through the use of a probe sample. As previously noted, the sampling frame

13

included all claims paid between April 1, 2020 and May 12, 2020. Furthermore, the audit revealed that there was a consistent pattern of discrepant billing from March 2020 to February 2021 for all claims submitted to Cigna. Therefore, Cigna is requesting a refund for all claims paid between March 1, 2020 and February 4, 2021. In total, Cigna has calculated damages in the amount of $468,829.28 which must be refunded.

*Id.*

The letter also advised MMA that "a flag has been placed that will deny claims pursuant to the significant issues outlined above. Be advised that the flag will deny claims whether they are submitted to Cigna by you or by the patient directly." *Id.* The letter advised MMA to give notice to any patient who participated in a Cigna Plan that Plaintiffs' "services will not be covered or reimbursed by Cigna or any of its Plans." *Id.*[11]

### C.    Plaintiffs Have Been Precluded From Introducing Evidence For Most of Their Itemized Claims

In April 2021, pursuant to Court order, Plaintiffs produced a spreadsheet detailing their alleged damages ("2021 Damages Disclosure"). Declaration of Kenneth Foote-Smith, ¶6. The 2021 Damages Disclosure contained 12,970 itemized claims for approximately 2,600 Cigna members. *Id.* Plaintiffs contended that they charged Cigna a total of $6,316,059, that they were paid $692,496, and that Cigna allegedly owed $5,452,826. *Id.*

Following a motion to compel, the Court issued a March 2022 order directing Plaintiffs to produce "a comprehensive record set for all of the patients on the list of itemized claims at issue, including medical records and patient assignment documents, and whatever plaintiffs have with respect to intake forms, authorizations, medical history, pretesting exams, lab test results, etc., as well as doctors' orders." Doc. 118 at 5 (cleaned up). The order "also included any

---

[11] Neither of Cigna's SIU flags impacted the ability to administratively appeal denied claims. Whatever administrative appeal rights were granted by the terms of the member's plan remained available. Canto Dec., ¶ 15.

documents that relate to the decision to perform multiplex testing rather than just COVID testing[.]" *Id.*

Cigna filed its motion for discovery sanctions in October 2022, arguing that Plaintiffs had "not produced *any* medical records *at all* for *12,456* of their *12,970* itemized claims for which they seek payment." *Id.* (emphasis by the court). While the motion was pending, Plaintiffs belatedly produced approximately 100,000 pages of documents, which the Court directed Cigna to review, and to supplement its motion papers. Cigna did so.[12]

The Court concluded that Plaintiffs breached the order compelling production:

> It is clear that Plaintiffs have repeatedly failed to comply with the March 2022 Court order. The production of thousands of pages of documents by Plaintiffs as late as December 2022 was well beyond the Court's deadline. Moreover, Plaintiffs have not responded to Defendants' April 24th Supplemental Declaration which represents that even after Plaintiffs made their late production in December 2022, Plaintiffs have failed to produce medical records and assignments for thousands of patients and itemized claims.

*Id.*

Turning to the remedy, the Court held that "it is apparent that Plaintiffs have shown blatant and willful disregard for the discovery deadlines in the Court's order." *Id.*, at 9. The Court then held that "preclusion is warranted as to any evidence pertaining to the Itemized Claims and patients attached to the April 24th Begos Supplemental Declaration: the 10,619 Itemized Claims in Exhibit 1, the Itemized Claims pertaining to the 1,020 Patients in Exhibit 2, the 1,072 Itemized Claims in Exhibit 3, and the 376 Itemized Claims in Exhibit 4." *Id.* The Court also awarded

---

[12] The Court itemized the supplemental submission: "Defendants attach as Exhibit 1 to the Begos Supplemental Declaration [Doc. 108-1] a list of the 10,619 Itemized Claims to be dismissed with prejudice. Second, Defendants seek the dismissal for claims from 1,020 patients on the 2021 Damages Analysis for whom Plaintiffs have not produced an assignment, which are attached as Exhibit 2 to the Begos Supplemental Declaration. [Doc. 108-2]. Third, Defendants seek dismissal of 1,072 Itemized Claims for which Plaintiffs have not produced any medical records, listed as Exhibit 3 to the Begos Supplemental Declaration. [Doc. 108-3]. Lastly, Defendants seek dismissal for 376 Itemized Claims, listed as Exhibit 4 to the Begos Supplemental Declaration, for which Plaintiffs have failed to produce documents showing they actually conducted COVID (or multiplex BioFire) testing for the patient at issue." Doc. 118, at p. 10.

15

Cigna's its attorneys' fees. *Id.*, at 10-11. Following review of Cigna's submission on fees, the Court awarded fees in the amount $154,700. Doc. 153.

As a result of the preclusion order, there are only 3,508 Itemized Claims that Plaintiffs are able to introduce evidence to support. Foote-Smith Dec., ¶7. Plaintiffs claim that they are owed $2,030,663 on those claims. *Id.* Thus, due solely to Plaintiffs' failure to produce Court-ordered records to support the treatment that they claim that they provided to Cigna members, the total of their Itemized Claims has been reduced by more than 60% from $5,452,826 to $2,030,663.

**D.      Plaintiffs Have Not Produced Evidence Essential to Their Claims**

**1.      *Many of Plaintiffs' "assignments" do not assign any ERISA rights.***

Plaintiffs alleged that "many" of the Cigna members they tested "executed assignments of benefits forms[,]" while "[o]ther patients registered electronically" and agreed only "that federal law requires their insurer to cover the entire cost of testing and related services, that the Murphy Practice would bill their insurer, and that the Murphy Practice would not, under any circumstances, seek payment from the patient." TAC, ¶¶ 79, 81. According to this allegation, the electronic form does not purport to assign anything, but merely contains an acknowledgment that Plaintiffs would not seek payment from the patient.

Plaintiffs have produced versions of these two documents either signed by, or allegedly acknowledged by, various Cigna members. Foote-Smith Dec., Exs. 1 and 2. The first, titled "Patient Financial Responsibility Statement," purports to "assign to DMSOG/NSMA for application onto your bill for services, all of your rights and claims for the medical benefits to which you, or your dependents are entitled, under any federal or state healthcare plan … insurance policy, any managed care arrangement or other similar third-party payor arrangement that covers health care

costs and for which payment may be available to cover the cost of the services provided to you."
Foote-Smith Dec., Ex. 1.

The second document, the electronic registration acknowledgment, is different, and states, in pertinent part: "I hereby assign to DMSOG/NSMA all money to which I am entitled for medical expenses related to the services performed from time to time by DMSOG/NSMA, *but not to exceed my indebtedness to DMSOG/NSMA*." Foote-Smith Dec., Ex. 2. This document assigns, at most, money to which a patient is "entitled for medical expenses" provided that the money assigned does not exceed the patient's debt to Plaintiffs. However, Plaintiffs have judicially admitted that they represented to their patients that Plaintiffs "would not, under any circumstances, seek payment from the patient[.]" TAC, ¶ 81. Therefore, it is undisputed that none of these patients have any debt to Plaintiffs. Exhibit 3 to the Declaration of Kenneth Foote-Smith contains a list of the patients at issue who allegedly only made this acknowledgement and did not assign claims. DMSOG and NSMA have no standing to assert ERISA claims on behalf of those patients.

Plaintiffs have not produced any assignment of any sort from any patient to MMA, CCMG, or Murphy. Foote-Smith Declaration, Exs. 1 and 2. Therefore, the ERISA claims asserted by those Plaintiffs should be dismissed.

### 2.    *Plaintiffs have not exhausted administrative remedies.*

Plaintiffs have not produced any documents indicating that they administratively appealed the adverse determinations on any of the Itemized Claims. Foote-Smith Declaration, ¶10. Plaintiffs have alleged that "appeal of these decisions would be futile" allegedly because "Cigna has reflexively denied thousands of claims for the exact same clearly reimbursable services[.]" TAC, ¶ 117. This is untrue and unsupported.

17

The undisputed evidence regarding Cigna's SIU investigation shows that in May 2020, Cigna "flagged" one Plaintiff, MMA, "to prospectively request medical records to determine whether or not services were being rendered as billed." Canto Dec., ¶ 12. Cigna did not flag or pend claims submitted by the other Plaintiffs (DMSOG, NSMA, CCMG, or Murphy). *Id.* Even with respect to MMA, this flag did not require denial of a claim. *Id.* Rather, the claim would be "pended," and Cigna would issue a request to MMA to submit medical records supporting the claim, which would then be reviewed and the claim determined. *Id.* If medical records were not submitted in a timely fashion, Cigna would deny the claim. *Id.* If and when the claim was denied, MMA still could appeal and submit medical records, and the records would be reviewed to ascertain if they supported coverage of the Itemized Claim. *Id.*, ¶ 13.

Neither MMA nor any of the other Plaintiffs submitted medical records for Cigna's review with respect to any of the Itemized Claims that were pended or denied as a result of the May 2020 flag. *Id.*, ¶ 13.

Cigna placed a new flag as of February 4, 2021 to deny MMA's claims. Canto Dec., ¶ 14. Because the Itemized Claims remaining at issue in this action have dates of service ending March 2021, that second flag would have impacted only a small number of the claims in this action. In any event, Plaintiffs still had full rights to administratively appeal those denials; had they done so and submitted documentation that the services were indeed performed as billed (and were otherwise covered), the claim would have been approved. *Id.*

### 3. *Plaintiffs did not post a "cash price" as required by the CARES Act.*

Plaintiffs have admitted that they "did not post a cash price for any COVID-19 related services on any of [their] internet websites before November 2020." Plaintiffs' June 24, 2024 Responses to Defendants' First Set of Requests for Admission, No. 3; Foote-Smith Declaration, Ex. 7. More specifically, Plaintiffs' attorney acknowledged in a February 22, 2023 letter that they

18

have no authenticated evidence establishing when, if ever, Plaintiffs did post a "cash price" on their website, because "the website hosting company that Murphy Medical used during the relevant period unfortunately did not maintain a web log reflecting and documenting historic changes to the website." February 22, 2023 letter from Plaintiffs' attorney, Foote-Smith Declaration, Ex. 6, p. 1.

Plaintiffs may contend that they posted a cash price in November 2020, but their evidence of that alleged posting is not admissible. Specifically, they produced unauthenticated documents from something called the "Wayback Machine," which they describe as an entity "over whom Murphy Medical has no control whatsoever." *Id.* They contend that these documents include a "November 13, 2020 snapshot of the Murphy Medical website" that they contend "contains a cash price for COVID-19 testing." *Id.*

Even if the "snapshot" from the "Wayback Machine" were considered admissible evidence of the Murphy Medical website as of November 13, 2020, the "snapshot" does not indicate a cash price (as discussed further in Point VI.4., *infra*). Rather, it states:

NO COST TO PATIENTS

For COVID tests we send to our lab partners, we may bill your insurance up to $150.

Because the BioFire panel tests for 21 respiratory pathogens, including SARS-COV-2, we may bill your insurance up to $1,500 for running this panel. ***You will not be billed for any of these costs regardless of which lab is used to process your test.***

EOB FROM MY INSURANCE COMPANY

We will bill your insurance company for our services. You may get a letter from your insurance company called Explanation of Benefits or EOB.

This tells you that we have sent our bill to them. Even if the EOB says you owe a portion of the bill, you do not owe anything. ***There is no cost to patients for COVID-19 Testing or COVID Care.***

*Id.* (emphasis added).

19

Dr. Murphy testified that, if a patient sought to pay cash for a Covid test, the patient would be told that the cash price was $0:

> Q. And you were -- but you're saying here that the price to patients themselves is 0 dollars, correct?
>
> A. Yeah. I was not allowed legally to bill patients.
>
> Q. So if somebody -- in your view if somebody walked up to your test site and said I want to pay cash for my test, your answer is the price is 0.
>
> A. Based on compliance and my legal, and I recognize that that's my point. That's my stance, correct.

Murphy Deposition Tr., pp. 227-228 Foote-Smith Declaration, Ex. 4.

The unauthenticated website posting has other defects, discussed in Section VI.4., *infra*.

### 4.    *Plaintiffs have no evidence that Cigna published any defamatory statements*

Plaintiffs alleged that Cigna "made defamatory and malicious statements about the Murphy Practice and Dr. Murphy to its patients and others." TAC, ¶ 96. They alleged that "when patients and others ask Cigna about the status of reimbursement to the Murphy Practice, Cigna falsely informed them that the Murphy Practice is a fraudulent enterprise and it, together with Dr. Murphy are committing fraud in connection with its COVID-19-related testing services." *Id.*, ¶ 97. Plaintiffs alleged that Cigna interfered with Plaintiffs' relationships with "the sponsors of COVID-19 testing sites" by "making defamatory and malicious statements about Dr. Murphy and the Murphy Practice to their patients and others." *Id.*, ¶¶ 183, 185.

Plaintiffs have no admissible evidence that Cigna made any such statements. Plaintiffs have admitted that they have not produced (though they were ordered to do so) any written or recorded "'defamatory and malicious statements about Dr. Murphy and the Murphy Practice to their patients and others' made by Cigna, as alleged in paragraphs 96 and 185 of the TAC."

20

Plaintiffs' June 24, 2024 Responses to Defendants' First Set of Requests for Admission, Nos. 7, 8 and 9; Foote-Smith Declaration, Ex. 7.

Dr. Murphy was asked at his deposition what specific defamatory and malicious statements he claimed Cigna made about him or his practice, and he testified about double and/or triple hearsay; specifically, he said that a Dr. Mayas (non-party) told him that a Cigna representative allegedly said something to Dr. Mayas and to another doctor. Murphy Deposition Tr., pp. 149-150; Foote-Smith Declaration, Ex. 4. Asked whether, other than Dr. Mayas, "are there any non-patients that you contend Cigna made defamatory and malicious statements to about you?", Dr. Murphy answered "no." *Id.*, p. 152.

Asked about defamatory and malicious statements that Cigna allegedly made to patients, he provided hearsay testimony about what "several patients" allegedly told him Cigna had said to them. *Id.*

Even if Plaintiffs had admissible evidence of any defamatory and malicious statements published by Cigna, they have no evidence that any such statement interfered with Plaintiffs' relationships with any testing sites. Thus, he admitted that he had no recollection of "[a]ny statement by anybody who was in charge of giving [him] permission to have testing done at any site who told [him] we're not doing business because of something Cigna said." *Id.*, p. 154. Moreover, he acknowledged that he was "the subject of a lot of bad press" in 2020 and 2021, "including a lengthy article in The New York Times about what [he was] charging for COVID tests," and that "at least one site severed ties with [him] because of that" bad publicity. *Id.*[13] He specifically admitted the City of New Haven stopped allowing Plaintiffs to use its sites shortly after

---

[13] Sarah Kliff, *These Towns Trusted a Doctor to Set Up Covid Testing. Sample Patient Fee: $1,944*, N.Y. TIMES, Nov. 10, 2020 (updated Nov. 24, 2021), https://www.nytimes.com/2020/11/10/upshot/covid-testing-doctor-fees.html.

City officials internally circulated an email from a patient to a New Haven official complaining

that Plaintiffs "are milking the system in the City of New Haven." *Id.*, at pp. 176-79.

## V.    **APPLICABLE LEGAL STANDARD**

As this Court has previously explained, the standard applicable to a summary judgment

motion is as follows:

> A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.*, at 247–48 (emphasis in original).

> "[T]he substantive law will identify which facts are material." *Id.*, at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (*citing Anderson*, 477 U.S. at 248)).

> "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

> The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (first citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967) and then citing *First Nat'l Bank of Ariz. V. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.' "). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

*Navarro v. Town of Stratford*, No. 22-cv-01254 (VAB), 2024 WL 4008229, at *2-3 (D. Conn. Aug. 30, 2024).

## VI.    LEGAL ARGUMENT

### A.    Plaintiffs Cannot Succeed on Their ERISA Benefits Claim

The First Cause of Action seeks benefits payable, if at all, under ERISA-governed health plans, pursuant to 29 U.S.C. § 1132(a)(1)(B), which authorizes a claim "to recover benefits due to [a participant or beneficiary] under the terms of his plan[.]" Courts in this district routinely decide ERISA benefit claims through summary judgment motions. *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003). There are numerous reasons why Plaintiffs' ERISA benefits claim fails.

#### 1.    *The Court should grant summary judgment dismissing the Itemized Claims for which the Court has precluded Plaintiffs from introducing evidence.*

The evidentiary rules applicable to ERISA benefits claims are well-established. There is no dispute that the Court's review is presumptively limited to the Administrative Record. *Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*, 819 F.3d 42, 60 (2d Cir. 2016) ("[W]hen reviewing claim denials, whether under the arbitrary and capricious or de novo standards of review, district courts typically limit their review to the administrative record before the plan at the time it denied the claim."). Thus, Plaintiffs are required to support their claims that each of the Itemized Claims is a payable claim under the plan in which that patient participated.

The Court has precluded Plaintiffs from introducing any evidence pertaining to more than 11,000 Itemized Claims as a discovery sanction. Doc. 118. Plaintiffs thus cannot prove that they performed any covered health services at issue for those Claims; they cannot prove that the patients assigned ERISA claims to Plaintiffs; they cannot prove that a claim for payment was submitted to Cigna in a timely fashion; and they cannot prove that they exhausted administrative remedies. In short, the preclusion order prevents Plaintiffs from proving an ERISA benefits claim regarding these Itemized Claims.

The Court should therefore grant summary judgment dismissing the Itemized Claims that are subject to the order of preclusion.

### 2. Numerous defects in or limitations of Plaintiffs' alleged assignments prevent them from establishing ERISA standing.

ERISA does not bestow civil enforcement rights on healthcare providers such as Plaintiffs. 29 U.S.C. § 1132(a) expressly identifies who is eligible to seek ERISA's civil remedies, and only the parties so identified can sue for relief. *Franchise Tax Bd. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 27 (1983); *Simon v. Gen. Elec. Co.,* 263 F.3d 176, 178 (2d Cir. 2001) (per curiam). Thus, a section 1132(a)(1)(B) benefits claim can be brought *only* by a "participant or beneficiary" of an ERISA plan. Healthcare providers have no standing to bring a claim under section 1132(a)(1)(B) merely because they provided medical services to participants or beneficiaries. *Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 258 (2d Cir. 2015) (healthcare providers are not ERISA beneficiaries).

Courts have recognized a "narrow exception" extending standing to "healthcare providers to whom a beneficiary has assigned his claim in exchange for health care." *MC1 Healthcare, Inc. v. United Health Group, Inc.*, No. 17-cv-01909 (KAD), 2019 WL 2015949, at *3 (D. Conn. May 7, 2019) (quoting *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 329 (2d Cir. 2011));

24

*see also Simon*, 263 F.3d at 178.  As the Second Circuit recently held: "we have made clear that providers cannot bring claims against ERISA health plans pursuant to this exception absent a *valid* assignment of a claim, even if they have a direct stake in the outcome of the litigation." *Murphy Med. Assocs. LLC v. Yale University*, 2024 WL 4656321, at *4 (cleaned up; emphasis by the Court; quoting *McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*, 857 F.3d 141, 146 (2d Cir. 2017)).

The assignments on which Plaintiffs rely to assert their ERISA claims have numerous limitations or outright deficiencies that require summary judgment.

*First*, Plaintiffs have not produced any assignment of any sort purporting to assign ERISA claims (or anything else) to three of the five Plaintiffs – MMA, CCMG, and Murphy himself. To the contrary, the two forms of assignment that Plaintiffs have produced in this case purport to assign rights only to "DMSOG/NSMA." Foote-Smith Dec., Exs. 1 and 2.  Accordingly, MMA, DDMG and Murphy have not demonstrated standing to assert an ERISA claim as a matter of law, and claims for their services (*i.e.*, claims submitted under their tax identification numbers) should be dismissed.

*Second*, the electronic registration form containing a purported "assignment" is not an assignment of any ERISA claim at all. Rather, it merely states, in pertinent part: "I hereby assign … ***all money to which I am entitled for medical expenses*** related to the services performed … ***but not to exceed my indebtedness*** to DMSOG/NSMA." Foote-Smith Dec., Ex. 2 (emphasis added).

A patient's assignment of "money to which I am entitled" cannot be construed as an assignment of the right to assert an ERISA claim. There is nothing in that form that would suggest that the patient knowingly assigned to "DMSOG/NSMA" all rights she has to assert an ERISA

25

claim in her own name. *See, e.g.*, *Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 256 (2d Cir. 2015) ("Not all ERISA assignments convey the same rights."). Indeed, this Court relied on this rule in dismissing Plaintiffs' claim for equitable ERISA relief under 29 U.S.C. 1132(a)(3) because the assignments that Plaintiffs pleaded "do not give Plaintiff standing to equitably reform its patients' ERISA plans." *Murphy Med. Assoc. v. Cigna*, 2022 WL 743088, at \*7.

Even if an assignment of money were considered an assignment of an ERISA claim, it is undisputed that whatever was conveyed by this form expressly did not exceed the patients' indebtedness to DMSOG/NSMA. As noted above, DMSOG and NMSA have judicially admitted that they represented to each of their patients that they "would not, under any circumstances, seek payment from the patient." TAC, ¶ 81. A Cigna member who has not incurred any liability for a health care service does not have a valid claim against her health plan for benefits. A patient who is not charged for a service has no injury to be remedied, and thus lacks standing to assert an ERISA benefits claim. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("the irreducible constitutional minimum of standing consists of three elements. … The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.") (quotation marks omitted).

A patient without an ERISA benefits claim against Cigna cannot create a valid ERISA benefits claim by executing an assignment: "it is blackletter law that assignments typically cover only those rights possessed by the assignors at the time of the assignments[.]" *Gallardo By & Through Vassallo v. Marstiller*, 596 U.S. 420, 434 (2022) (quotation marks and brackets omitted). This is because "[a]n assignee stands in the shoes of the assignor and ordinarily obtains only the rights possessed by the assignor at the time of the assignment, and no more." 6A C.J.S.

26

Assignments § 111) ("If the assignor suffered no damages, or is not owed anything under a contract, the assignee cannot recover anything.").

Therefore, the Court should grant summary judgment dismissing the ERISA claim to the extent: (i) it is asserted by MMA, CCMG, and Murphy; and (ii) it seeks to recover on Itemized Claims for patients who merely assigned "money to which I am entitled for medical expenses" because those assignments did not assign the right to assert an ERISA claim as a matter of law.

### 3. *Plaintiffs did not exhaust administrative remedies for any Itemized Claims.*

A plaintiff asserting an ERISA benefits claim must exhaust administrative remedies before filing suit. *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 105 (2013) ("A participant's cause of action under ERISA accordingly does not accrue until the plan issues a final denial."); *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006) ("the federal courts—including this Circuit—have recognized a firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases.") (quotation marks omitted).

Pursuing and completing an administrative appeal is a key component of exhausting administrative remedies. 29 U.S.C. § 1133 provides that a plan must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." The Second Circuit described the reasons for this requirement as follows:

> The primary purposes of the exhaustion requirement are to: (1) uphold Congress' desire that ERISA trustees be responsible for their actions, not the federal courts; (2) provide a sufficiently clear record of administrative action if litigation should ensue; and (3) assure that any judicial review of fiduciary action (or inaction) is made under the arbitrary and capricious standard, not de novo.

*Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993) (quotation marks omitted). In addition, "the requirement was intended to help reduce the number of frivolous

27

lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a non-adversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned." *Id.* (quotation marks omitted).

"A failure to exhaust administrative remedies provides grounds for dismissal or summary judgment in favor of the opposing party." *Zarringhalam v. United Food & Com. Workers Int'l Union Loc. 1500 Welfare Fund*, 906 F. Supp.2d 140, 152 (E.D.N.Y. 2012); *see also*, *Richard Mfg. Co. v. Richard*, 513 F. Supp.3d 261, 286 (D. Conn. 2021) (Summary judgment is warranted where "there is no genuine issue of fact as to whether [Plaintiffs] exhausted [their] administrative remedies"); *Quigley v. Citigroup Supplemental Plan for Shearson Transfers*, No. 09-cv-8944 (PGG), 2011 WL 1213218, at *7 (S.D.N.Y. Mar. 29, 2011) (citing cases).

Plaintiffs have not produced documents demonstrating that they administratively appealed any of the denials. Foote-Smith Dec., ¶10.

Presumably recognizing that they did not administratively appeal the Itemized Claims, Plaintiffs have contended that administrative appeals would have been futile. To survive summary judgment, Plaintiffs are required to introduce facts that suffice to make "a clear and positive showing that seeking review by the carrier would be futile[.]" *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 140 (2d Cir. 2000) (quotation marks omitted); *Kennedy*, 989 F.2d at 594 ("Where claimants make a 'clear and positive showing' that pursuing available administrative remedies would be futile, the purposes behind the requirement of exhaustion are no longer served, and thus a court will release the claimant from the requirement.").

Here, the evidence is undisputed that, prior to February 1, 2021, Cigna merely flagged the claims submitted by one of the Plaintiffs, MMA, resulting in a decision on those claims being "pended" along with a request to MMA to provide medical records supporting the claim. Cigna

did not flag or pend claims submitted by the other Plaintiffs (DMSOG, NSMA, CCMG, or Murphy). Therefore, those four Plaintiffs cannot rely on the SIU investigation as a basis to assert that it would have been futile for them to administratively appeal the denial of one of their claims.

As for MMA, there is nothing in Cigna's communications during that period suggesting, much less making a clear and positive showing, that Cigna would not have reviewed Plaintiffs' medical records had Plaintiffs submitted them. Canto Dec., ¶ 13 ("This flag was expressly intended to require MMA to submit medical records which would be reviewed by SIU resources. A determination would then be made, on a claim-by-claim basis, whether the claim was appropriately documented and payable."). Indeed, when Plaintiffs submitted medical records as part of Cigna's SIU investigation, Cigna reviewed them in detail. *Id.*, ¶ 7, and Ex. A, pp. 4-5.

Even after Cigna placed a flag in February 2021 to deny MMA's claims, it did not take away the right to administratively appeal the resulting denial – which rights, as noted, are baked into ERISA. Canto Dec., ¶ 15. MMA has not produced evidence establishing that an administrative appeal would have been futile.

Therefore, the Court should enter summary judgment dismissing Plaintiffs' ERISA claim for failure to exhaust administrative remedies.

### 4.    *Plaintiffs' own violation of the CARES Act precludes them from compelling Cigna to pay a "cash price" allegedly required by the CARES Act.*

Plaintiffs' ERISA claim is based on the allegation that the CARES Act requires Cigna to cover Plaintiffs' Covid testing services, and that Cigna is "required to pay 'out of network' providers their full cash price for the test[.]" TAC, ¶ 56.

Section 3202(a) of the CARES Act requires a group health plan or health insurance issuer that covers diagnostic Covid testing services to "reimburse the provider of the diagnostic testing as follows: … in an amount that equals the cash price for such service as listed by the provider

on a public internet website, or such plan or issuer may negotiate a rate with such provider for less than such cash price." Pub. L. No. 116-136 § 3202(a)–(b), 134 Stat. 281, 367 (2020).

"Cash price" is "the charge that applies to an individual who pays cash (or a cash equivalent) for a COVID-19 diagnostic test." 45 C.F.R. § 182.20. The agencies responsible for implementing the CARES Act have stated their "expectation that the 'cash price' established by the provider will be generally similar to, or lower than, rates negotiated with in-network plans and insurers." 85 Fed. Reg. 71152.

Section 3202(b)(1) of the CARES Act requires providers to "make public the cash price for such test on a public internet website of such provider[,]" and authorizes the Secretary of Health and Human Services to "impose a civil monetary penalty on any provider … that is not in compliance[.]" § 3202(b)(2).

Plaintiffs have now admitted that they did not list any cash price on any website prior to November 2020. Foote-Smith Dec. Ex. 6. Moreover, Plaintiffs do not have any admissible evidence that they posted a cash price on their website in or after November 2020. *Id.* And even if they did, the undisputed evidence demonstrates that the price they claim they posted at that time was not a cash price under the governing regulations, for three reasons:

- *First*, the charge Plaintiffs posted was not a "charge that applies to an individual who pays cash (or a cash equivalent) for a COVID-19 diagnostic test." 45 C.F.R. § 182.20. Rather, the only price they allegedly posted was a price that they would charge health plans for a test. Foote-Smith Dec. Ex. 6, pp. 2, 26-27.

- *Second*, Plaintiffs failed to comply with the requirements for how a cash price was to be explained and what details it had to contain: "(1) A plain-language description of each COVID–19 diagnostic test that is offered by the provider; (2) The billing code used for each COVID–19 diagnostic test; (3) The provider's cash price for each such COVID–19 diagnostic test; and (4) Any additional information as may be necessary for the public to have certainty of the cash price that applies to each COVID–19 diagnostic test." 45 C.F.R. § 182.40 (c). As but one example, there is no evidence that Plaintiffs ever posted billing codes they used for the tests they were performing.

- *Third*, Plaintiffs cannot establish that the price they listed – $1,500 for a test – was "similar to, or lower than, rates negotiated with in-network plans and insurers." 85 Fed. Reg. 71152.

Because Plaintiffs violated their obligation under the CARES Act to post a cash price, they cannot establish that Cigna violated the CARES Act by not paying a cash price. Connecticut recognizes and enforces "the common-law maxims that no one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime. These maxims are dictated by public policy, and have their foundation in universal law administered in all civilized countries." *Greenwald v. Van Handel*, 311 Conn. 370, 376 (2014). This doctrine has specifically been applied to "preclude[] enforcement of contracts when plaintiffs had violated statutory requirements governing such contracts." *Id.*, citing *Solomon v. Gilmore*, 248 Conn. 769, 790–93 (1999). *Solomon* held that a mortgage issued by an unlicensed lender could not be enforced, even though the licensing statute did not so provide, and even though that might provide "a windfall" to the borrower. Where a plaintiff "has violated the law *in connection with the very transaction as to which he seeks legal redress*[,]" then "aid is denied despite the defendant's wrong. It is denied in order to maintain respect for law; in order to promote confidence in the administration of justice; in order to preserve the judicial process from contamination." *Greenwald*, 311 Conn. at 386 (emphasis by the Court).[14]

This rule perfectly encapsulates Plaintiffs' position here. Plaintiffs have violated the CARES Act in connection with each and every Itemized Claim by not publicly posting a cash

---

[14] This wrongful conduct rule is similar to the equitable doctrine of *in pari delicto*, which provides that, "in a case of equal or mutual fault, the position of the defending party is the better one. *Baena v. KPMG LLP*, 453 F.3d 1, 6 (1st Cir. 2006) (cleaned up; quoting Black's Law Dictionary at 791). Connecticut has long recognized that "if both parties are *in pari delicto* the law leaves them where it finds them." *Funk v. Gallivan*, 49 Conn. 124, 128 (Conn. 1881).

31

price. Respect for the law should compel the Court to reject Plaintiff's claim that Cigna violated a law that Plaintiffs themselves violated.

Finally, because Plaintiffs did not post a valid cash price, there is no relief that the Court can effectively provide, requiring judgment for Cigna. "[I]f the Court cannot grant any effectual relief to a prevailing party, it must dismiss the case, rather than issue an advisory opinion." *United States v. Corbin*, 620 F. Supp.2d 400, 406 (E.D.N.Y. 2009). The CARES Act specifies that, when there is no prior rate agreement between the parties, the rate is either the posted cash price or a freely negotiated rate. CARES Act, § 3202(a). Thus, the only obligation Plaintiffs can arguably seek to impose on Cigna is to compel it to enter into negotiations to ascertain if a rate can be agreed upon. There is no evidence that Plaintiffs sought such negotiations with Cigna prior to the litigation or that Cigna somehow violated ERISA in connection with any such negotiations. Even if there were evidence of a violation of an obligation to negotiate, the Court cannot issue an enforceable judgment under 29 U.S.C. § 1132(a)(1)(B) compelling the parties to negotiate a rate for the tests at issue. If the parties' negotiations did not lead to an agreement, what would be the standard to assign fault to one party or another for that outcome?

Therefore, the Court should enter summary judgment dismissing Plaintiff's ERISA claim to the extent it seeks to recover on Itemized Claims for Covid services rendered while Plaintiffs were not in compliance with the CARES Act.

**B.     Plaintiffs' Remaining CUTPA Claim Fails as a Matter of Law Under a 2024 Connecticut Supreme Court Decision**

In granting in part and denying in part Cigna's motion to dismiss the CUTPA claim pleaded in the TAC, the Court dismissed it to the extent it was premised on a violation of CUIPA, but declined to dismiss it to the extent that it was based on alleged violations of the CARES Act, the FFCRA, and the Connecticut Surprise Billing Law. Doc. 109; *Murphy Med.*

32

*Assocs., LLC v. Cigna Health & Life Ins. Co.*, 2023 WL 3434988. In so ruling, the Court ex-

pressly adopted the reasoning of a 2022 District of Connecticut decision that had declined to dis-

miss a non-CUIPA CUTPA claim premised on a violation of the Surprise Billing Law. This

Court explained:

> Defendants claim that Plaintiffs may not proceed on their non-CUIPA based CUTPA
> claims, which are based only on violations of the CARES Act, the FFCRA, and the
> Connecticut Surprise Billing Law. (Defs.' Mem., at 11.) Plaintiffs argue this is per-
> mitted because they are alleging a violation of a "statute regulating a specific type of
> insurance related conduct," *NEMS PLLC v. Harvard Pilgrim Health Care of Con-
> necticut Inc.*, 615 F. Supp. 3d 125, 138 (D. Conn. 2022); (see Pls.' Opp'n at 7).
>
> The Connecticut Supreme Court has held that "[b]ecause CUIPA provides the exclu-
> sive and comprehensive source of public policy with respect to general insurance
> practices ... unless an insurance related practice violates CUIPA *or, arguably, some
> other statute regulating a specific type of insurance related conduct*, it cannot be
> found to violate any public policy, and, therefore, it cannot be found to violate
> CUTPA." *State v. Acordia, Inc.*, 310 Conn. 1, 37 (2013) (emphasis added). In
> *NEMS*, District Judge Nagala concluded that some standalone CUTPA claims out-
> side of CUIPA could be maintained "where there is an alleged violation of a statute
> regulating a specific type of insurance related conduct." 615 F. Supp. 3d at 138.

*Murphy Med. Assocs., LLC*, 2023 WL 3434988, at *3–4 (emphasis by the Court).

> Based on this premise, the Court held:

> While a close issue, the Court agrees with the analysis in *NEMS* because the Con-
> necticut Supreme Court in *Acordia* expressly left open the possibility that CUTPA
> could provide relief based on the violation of "some other statute regulating a spe-
> cific type of insurance related conduct." *Acordia*, 310 Conn. at 37. As such, Plain-
> tiffs may bring certain standalone CUTPA claims based on alleged violations of stat-
> utes regulating a specific type of insurance related conduct.

*Id.*, at *4.

Thus, the Court found that Plaintiffs had adequately pleaded that the CARES Act, the

FFCRA, and the Surprise Billing Law were "some other statute[s] regulating a specific type of

insurance related conduct," and allowed the CUTPA claim to stand to that extent. *Id.*

In August 2024, the Connecticut Supreme Court, answering questions certified by Judge

Nagala in *NEMS*, held that a non-CUIPA CUTPA claim *could not* be premised on a violation of

33

the Surprise Billing Law. *NEMS, PLLC v. Harvard Pilgrim Health Care of Connecticut, Inc.*,

No. 20914,2024 WL 3892879, \*4 (Conn. Aug. 21, 2024) (the certified question as the Court "to

determine whether Connecticut law recognizes a cause of action under CUTPA for conduct that

violates the surprise billing law but is not identified as an unfair insurance practice under

CUIPA. We answer that question in the negative."). Therefore, the Court should dismiss Plain-

tiffs' CUTPA claim to the extent based on a violation of the Surprise Billing Law.

In reaching that determination, the Supreme Court found it necessary "to clarify our deci-

sion in *Acordia*[,]" *id.*, and that clarification precludes Plaintiffs from succeeding on their

CUTPA claim to the extent it is based on violation of *federal* statutes, because *NEMS* held that

the *Connecticut* legislature has occupied the field of unfair insurance practices, leaving no room

for Congress to add to the list.

The Court discussed *Acordia* at length, noting that the Connecticut legislature adopted

"two different ways in which a practice may be determined to be an unfair insurance practice in

violation of CUIPA:" by falling under one of the specific practices identified in C.G.S. § 38a-

816; or by the Insurance Commissioner determining that the practice is unfair after hearings. *Id.*

The Court explained: "Reviewing the statutory scheme and its legislative history, we found sev-

eral reasons to conclude in *Acordia* that the legislature intended those two paths to be the exclu-

sive means of identifying unfair insurance practices for purposes of CUTPA." *Id.*

Two of those reasons are particularly significant here. *First*, the Connecticut "legislature in-

tended to occupy the field of defining unfair insurance practices[.]" *Id. Second*, the legislature

"intended to set out specifically the types of actions that constitute unfair insurance practices in a

highly detailed manner," which "the legislature viewed accomplishing that task as essential to

the underlying purpose of CUIPA." *Id.* (cleaned up; citations omitted). The Court continued that

34

"the many subsequent amendments" to CUIPA "demonstrate an ongoing legislative effort to keep the list of prohibited practices as current as possible and provide further evidence of the legislature's intent to provide in CUIPA a comprehensive list of unfair insurance practices." *Id.*

*NEMS* then addressed the concluding *dictum* in *Acordia*: "Still, in summarizing our holding in *Acordia*, we left open the possibility—seemingly in tension with those conclusions—that a CUTPA claim might lie for insurance practices that, although not prohibited under CUIPA, violate some other statute." *Id. NEMS* confirmed that this "was *dictum* in *Acordia*, as no other statute was at issue." *Id.* And *NEMS* stated that the *dictum* was based on a treatise that was based, in turn, "on a 1992 Superior Court decision, a case that we suggested in *Acordia* might have been incorrectly decided." *Id.*

Turning to the certified question, *NEMS* stated: "In the present case, the plaintiff relies on the qualifying language in *Acordia*, construing it broadly to mean that, although CUIPA occupies the field as to general insurance practices, other statutes that prohibit specific types of unfair insurance related conduct can provide the basis of a CUTPA claim." *Id.*, at *5. The Court answered: "We are not persuaded." *Id.*

The Court continued: "Even if we assume for the sake of argument that violations of insurance related statutes other than CUIPA can give rise to a CUTPA claim, the meaning of the highlighted language in *Acordia* cannot be as broad as the plaintiff suggests." *Id.* The Court noted that Chapter 38a of the Connecticut General Statutes "encompasses more than one thousand individual statutes" and "prohibits numerous, *specific* insurance practices." *Id.* (emphasis by the Court). The Court continued: "If any practice prohibited in chapter 38a could qualify as an unfair insurance practice, as we explained in *Acordia*, there would be no reason for the

35

legislature to have singled out a small subset of those prohibited practices to receive that designation." *Id.*

Based on this reasoning, the Court substantially narrowed the potential reach of the *Acordia dictum*, holding that, while the Connecticut "legislature is always free to specify that practices other than those listed in [CUIPA]" violate CUTPA, "*we would expect a clear statement of legislative intent before concluding that the violation of a different insurance related statute is actionable under CUTPA.*" *Id.*, at *6 (emphasis added).[15]

The *NEMS* decision – and particularly the Court's explanation and narrowing of the *Acordia dictum* – compels the conclusion that a non-CUIPA CUTPA claim cannot be premised on violation of a *federal* statute, including the CARES Act or the FFCRA. First, *NEMS* twice emphasized that the *Connecticut legislature* intended, through CUIPA, to "occupy the field" of unfair insurance practices. *Id.*, at *4 and *5. Second, in examining the possible meaning of the phrase "some other statute regulating a specific type of insurance related conduct," *NEMS* considered only *Connecticut* statutes – Chapter 38a of the Connecticut General Statutes, and possibly certain state criminal statutes. Third, the Court expressly held that, if the *Connecticut legislature* chose to specify an unfair insurance practice outside of § 38a-816, the legislature would need to include "a clear statement of legislative intent" to that effect. *Id.*, at *6.

Everything in the Supreme Court's discussion of this issue compels the conclusion that only the Connecticut legislature and the Connecticut Insurance Commissioner have the power to designate an insurance practice as being unfair. There is nothing in the decision remotely suggesting that the Connecticut legislature intended to allow Congress to add to the acts that

---

[15] *NEMS* identified a second possible meaning that is irrelevant here, involving violations of hypothetical state criminal statutes. *Id.*

36

constitutes an unfair insurance practice in Connecticut.[16] Therefore, to the extent Plaintiffs'

CUTPA claim is premised on a violation of the CARES Act or the FFCRA, it fails as a matter of

law.

Finally, even if the Court were to conclude that a violation of the CARES Act or the FFCRA

could provide a basis for a non-CUIPA CUTPA claim, the Court should conclude that *Plaintiffs'*

claim is precluded by the wrongful conduct doctrine. *See* Point IV.A.4, *supra*. Specifically,

Plaintiffs, who have unquestionably violated their own obligations under the CARES Act, cannot

ask the Court to impose liability on Cigna as a result of Cigna's alleged violation of the same

statute. This is necessary "in order to maintain respect for law; in order to promote confidence in

the administration of justice; in order to preserve the judicial process from contamination."

*Greenwald*, 311 Conn. at 386.

Therefore, the Court should grant summary judgment dismissing Plaintiffs' CUTPA

claim.

### C.       Plaintiffs Have No Admissible Evidence of Tortious Interference

Tortious interference with contractual or business relations requires proof of: "(1) the ex-

istence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relation-

ship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious,

and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct." *Ap-*

*pleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 212-13 (2000) (citations omitted).

"[N]ot every act that disturbs a contract or business expectancy is actionable." *Robert S. Weiss &*

---

[16] Indeed, Congress has delegated to the states exclusive jurisdiction over the regulation of insurance: "No Act of Congress shall be construed to … supersede any law enacted by any State for the purpose of regulating the business of insurance[.]" 15 U.S.C.§ 1012(b). Congress thus has no authority to pass a law that supersedes the Connecticut Legislature's determination to occupy the field of unfair insurance practices in the state.

*Assoc., Inc. v. Wiederlight*, 208 Conn. 525, 535 (1988). Rather, "there must be evidence that the interference resulted from the defendant's commission of a tort." *Id.*

Plaintiffs allege that Cigna made "defamatory and malicious statements" "that were specifically designed to create a false and negative impression about [the Plaintiffs] among their patients and the community in general and to cause testing site sponsors to break their agreements or end their relationships with [Plaintiffs]." TAC,¶¶ 185-86. They allege that, as a result, "some municipalities and facilities have ended their relationship with [Plaintiffs]." Id., ¶187.

As discussed above, the only evidence that Plaintiffs have produced is double or triple hearsay; specifically, statements that Dr. Murphy claims were made to him by third parties about what a fourth party allegedly said to the third party. Such statements are inadmissible hearsay. Fed. R. Evid. 801(c), 802. Plaintiffs have not produced any admissible evidence that Cigna published any defamatory or malicious statements about Plaintiffs. Nor have they produced any admissible evidence that any tortious conduct by Cigna interfered with their contracts or business relationships with any testing site, or anyone else. To the contrary, Plaintiffs have admitted that, to the extent they were precluded from operating testing sites, which occurred after negative articles by *The New York Times*, among other news outlets.

Opposing summary judgment requires submission of *admissible* evidence to demonstrate the presence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(4). Therefore, the Court should grant summary judgment dismissing Plaintiffs' tortious interference claim.

## VII.    CONCLUSION

For all of the foregoing reasons, the Court should grant summary judgment dismissing Plaintiffs' claims, as follows:

1. On the First Cause of Action (for ERISA benefits):

   a. Dismissing the Itemized Claims for which the Court previously precluded Plaintiffs from introducing evidence as a discovery sanction.

   b. Dismissing all Itemized Claims for treatment by MMA, CCMG and Murphy for lack of standing because they have not produced any assignments.

   c. Dismissing all Itemized Claims for treatment by DMSOG and/or NSMA for lack of standing to the extent the only assignment produced is in the electronic registration that assigns only "money to which [the patient is] entitled."

   d. Dismissing all Itemized Claims for failure to exhaust administrative remedies.

   e. Dismissing all Itemized Claims for services alleged provided on dates on which Plaintiffs had not posted a "cash price," or had posted a purported "cash price" that did not comply with governing law.

2. On the Second Cause of Action, dismissing the CUTPA claim to the extent based on a violation of the Surprise Billing Law as barred by governing precedent, and to the extent based on a violation of the FFCRA and/or the CARES Act as not constituting unfair insurance practices.

3. On the Fourth Cause of Action, dismissing the tortious interference claim for lack of admissible evidence of tortious conduct or causation of damages.

4. For such other and further relief as the Court deems fair.

Respectfully submitted,

ROBINSON & COLE LLP

By:/s/ *Patrick W. Begos*
Patrick W. Begos (ct 19090)
Raymond J. Carta (ct 30088)
1055 Washington Boulevard
Stamford, CT 06901
Tel: (203) 462-7500
Email: pbegos@rc.com
Email: rcarta@rc.com
*Counsel for Defendants*

39

## CERTIFICATION

I hereby certify that on November 12, 2024, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

Dated: November 12, 2024

/s/ Patrick W. Begos
Patrick W. Begos