## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MURPHY MEDICAL ASSOCIATES, LLC,
DIAGNOSTIC AND MEDICAL
SPECIALISTS OF GREENWICH, LLC,
NORTH STAMFORD MEDICAL
ASSOCIATES, LLC, COASTAL
CONNECTICUT MEDICAL GROUP, LLC,
AND STEVEN A.R. MURPHY,
     *Plaintiffs*,

     v.

CIGNA HEALTH AND LIFE INSURANCE
COMPANY AND CONNECTICUT
GENERAL LIFE INSURANCE COMPANY,
     *Defendants*.

No. 3:20-cv-1675 (VAB)

### RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Murphy Medical Associates, LLC, Diagnostic and Medical Specialists of Greenwich, LLC,

North Stamford Medical Associates, LLC, Coastal Connecticut Medical Group, LLC,

(collectively, the "Murphy Practice") and Steven A.R. Murphy, M.D. (collectively, "Plaintiffs")

have brought suit against Cigna Health and Life Insurance Company and Connecticut General Life

Insurance Company (collectively, "Cigna" or "Defendants") to recover payment for COVID-19

testing and testing-related services that were allegedly denied reimbursement. *See* Third Am.

Compl., ECF No. 92 (Dec. 21, 2022) ("TAC"). Plaintiffs bring claims under the Employee

Retirement Income Security Act of 1974 ("ERISA"), the Connecticut Unfair Trade Practices Act

("CUTPA"), and for tortious interference with beneficial or contractual relationships.[1] *See id.*

---

[1] While the Plaintiffs also brought a claim for unjust enrichment, the Plaintiffs withdrew this claim after Defendants
filed a motion to dismiss. *See* Order, ECF No. 109 at 2 (May 12, 2023).

Defendants have countersued for various claims related to alleged overpayments that Plaintiffs allegedly collected. Answer to Third Am. Compl., ECF No. 116 (Jun. 9, 2023).

Defendants have moved for summary judgment on each of Plaintiffs' claims. Mot. for Summ. J., ECF No. 157 (Nov. 12, 2024); Mem. in Supp. of Mot. for Summ. J, ECF No. 157-13 (Nov. 12, 2024) ("Mot.").

For the following reasons, Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**.

Defendants' motion for summary judgment as to claims for which Plaintiffs have been precluded from introducing evidence is **GRANTED**.

Defendants' motion for summary judgment as to Plaintiffs' remaining ERISA claims is **DENIED** without prejudice to renewal as to Defendants' arguments regarding the failure to exhaust of administrative remedies.

Defendants' motion for summary judgment as to Plaintiffs' CUPTA and tortious interference claims is **GRANTED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The Court assumes familiarity with the factual and procedural history of this case, *see* Order granting in part and denying in part Motion to Dismiss Third Amended Complaint, ECF No. 109 (May 12, 2023) ("Order re MTD"), and focuses the following summary on the factual allegations most pertinent to this motion.

### A.  Factual Background

Plaintiffs are healthcare providers that operated COVID-19 testing sites. Plaintiffs' Response to Defendants' Statement of Material Facts, ECF No. 160-11 ¶ 2 ("Pl. SMF"); Defendants' Statement of Material Facts, ECF No. 157-1 ¶ 2 ("Def. SMF"). "Plaintiffs used a

BioFire Film Array System to test 'patients who were symptomatic or otherwise had a need for expedited results' for Covid and 20 other 'common respiratory pathogens.'" Pl. SMF ¶ 4; Def. SMF ¶ 4 (quoting TAC ¶¶ 32–36). Plaintiffs also "performed and billed Cigna for, various ancillary services such as blood testing for patients who tested positive for Covid; 'telemedicine preventative medicine counseling and education'; and 'telemedicine visits with patients to check on their conditions and determine whether further medical intervention was needed.'" Pl. SMF ¶ 4; Def. SMF ¶ 4.

Plaintiffs are "out-of-network or non-participating" providers, meaning that they "'do not have contracts' with Cigna." Pl. SMF ¶ 1; Def. SMF ¶ 1.

Some of the Cigna members that Plaintiffs treated executed assignments of benefits forms entitled "Patient Financial Responsibility Statement." Pl. SMF ¶ 22, 24; Def. SMF ¶ 22, 24. This form stated that the patient "assign[s] to DMSOG/NSMA [Diagnostic and Medical Specialists of Greenwich, LLC ("DMSOG") and North Stamford Medical Associates, LLC ("NSMA")] for application onto your bill for services, all of your rights and claims for the medical benefits to which you, or your dependents are entitled, under any federal or state healthcare plan … insurance policy, any managed care arrangement or other similar third-party payor arrangement that covers health care costs and for which payment may be available to cover the cost of the services provided to you." Pl. SMF ¶ 24; Def. SMF ¶ 24 (alterations in original).

Other patients signed an electronic registration acknowledgement, which stated, "I hereby assign to DMSOG/NSMA all money to which I am entitled for medical expenses related to the services performed from time to time by DMSOG/NSMA, but not to exceed my indebtedness to DMSOG/NSMA." Pl. SMF ¶ 25; Def. SMF ¶ 25.

In May 2020, Cigna's Special Investigations Unit ("SIU") investigated certain Plaintiffs,[2] and flagged[3] Murphy Medical Associates, LLC ("MMA") to request medical records to determine whether MMA was performing services being billed to Cigna.[4] Pl. SMF ¶ 8; Def. SMF ¶ 8.

The Plaintiffs "did not post a cash price for any COVID-19 related services on any of [their] internet websites before November 2020." Pl. SMF ¶ 31; Def. SMF ¶ 31 (alterations in original). "[I]f a patient sought to pay cash for a Covid test, the patient would be told that the cash price was $0." Pl. SMF ¶ 35; Def. SMF ¶ 35. On or about November 13, 2020, Plaintiffs' website advised patients that their insurance may be billed "up to $150" for COVID tests, and "up to $1,500" for BioFire panel tests. Pl. SMF ¶ 34; Def. SMF ¶ 34. The website also stated, "[t]here is no cost to patients for COVID-19 Testing or COVID Care." *Id.*

On February 1, 2021, Cigna included a new flag denying claims submitted under MMA's tax identification number as "Services Not Rendered As Billed." Pl. SMF ¶ 13; Def. SMF ¶ 13. This flag "did not impact claims submitted under the other Plaintiffs' tax identification numbers." Pl. SMF ¶ 14; Def. SMF ¶ 14.

On March 4, 2021, Cigna submitted a letter to Dr. Murphy and MMA summarizing its findings and claiming that MMA was routinely billing Cigna for services it could not document it had performed.[5] Pl. SMF ¶ 15–16; Def. SMF ¶ 15–16.

---

[2] The parties dispute which Plaintiffs were subject to investigation. Defendants allege that MMA and Dr. Murphy were investigated. Def. SMF ¶ 5. Plaintiffs allege that, in addition to MMA and Dr. Murphy, DMSOG and "other Plaintiff entities" were also investigated. Pl. SMF ¶ 5.
[3] The parties dispute the scope and impact of the flag. Defendants allege that the flag "impacted only claims submitted under MMA's tax identification number" and "did not impact claims submitted under the other Plaintiffs' tax identification numbers," Def. SMF ¶ 9, but Plaintiffs allege that "[c]laims from all Plaintiffs were pended and or denied starting in or around May 2020." Pl. SMF ¶ 9. In addition, while Defendants contend that "[t]his flag did not cause MMA's claims to be denied . . . [r]ather, a claim would be 'pended,' and Cigna would issue a request to MMA to submit medical records supporting the claim" Def. SMF ¶ 10, Plaintiffs allege that "[c]laims from all Plaintiffs were pended and or denied starting in or around May 2020." Pl. SMF ¶ 10.
[4] The parties dispute whether MMA submitted records in response to the flag. Defendants allege that it did not submit any records, Def. SMF ¶ 11, and Plaintiffs allege that "[t]he parties agreed that Plaintiffs would submit medical records from a prove sample of ten claims, which Plaintiffs did in September 2020," Pl. SMF ¶ 11.
[5] Plaintiffs dispute Cigna's findings. Pl. SMF ¶ 15.

In April 2021, under a Court order, Plaintiffs submitted a spreadsheet detailing their alleged damages. Pl. SMF ¶ 17; Def. SMF ¶ 17.

On May 25, 2021 Cigna's SIU prepared a final report summarizing the investigation and findings. Pl. SMF ¶ 6; Def. SMF ¶ 6. The report concluded that MMA did not perform several services for which it billed Cigna.[6] Pl. SMF ¶ 7, 12; Def. SMF ¶ 7, 12.

Dr. Murphy contends that Cigna made a defamatory and malicious statements about him and the Murphy Practice to his patients and to another doctor, but Plaintiffs are unaware of any written or recorded defamatory and malicious statements made by Cigna about Plaintiffs. Pl. SMF ¶ 36–41; Def. SMF ¶ 36–41. Plaintiffs do not recall "[a]ny statement by anybody who was in charge of giving [him] permission to have testing done at any site who told [him] we're not doing business because of something Cigna said." Pl. SMF ¶ 42; Def. SMF ¶ 42.

### B. Procedural History

On November 6, 2020, Plaintiffs filed their initial Complaint. Compl., ECF No. 1.

On March 24, 2021, Plaintiffs filed an Amended Complaint. Am. Compl., ECF No. 29.

On March 11, 2022, the Court granted in part and denied in part the motion to dismiss the Amended Complaint. *See* Order, ECF No. 48; *see also* Order granting Mot. for Reconsideration and to Amend, ECF No. 71 (Oct. 18, 2022).

On October 28, 2022, the Plaintiffs submitted a Second Amended Complaint. Second Am. Compl., ECF No. 75.

On December 21, 2022, Plaintiffs filed a Third Amended Complaint, which is the operative pleading in this case. TAC.

---

[6] Plaintiffs dispute the report's conclusion. Pl. SMF ¶ 12.

On May 12, 2023, the Court granted in part and denied in part the motion to dismiss the Third Amended Complaint, and dismissed Plaintiffs' CUTPA claims based on the Connecticut Unfair Insurance Practices Act, but permitted their CUTPA claims under the Coronavirus Aid, Relief and Economic Security Act ("CARES Act"), the Families First Coronavirus Response Act ("FFCRA"), and the Connecticut Surprise Billing Law to proceed. Order re MTD.

On August 30, 2023, the Court granted the Defendants' motion for sanctions, and precluded the Plaintiffs from offering evidence in support of certain itemized claims. Order, ECF No. 118. As a result of this order, Plaintiffs may only introduce evidence to support 3,508 Itemized Claims.[7] Pl. SMF ¶ 21; Def. SMF ¶ 21.

On September 20, 2024, the Court denied the Plaintiffs' motion to reconsider the Order granting the motion for sanctions. Order, ECF No. 153.

On November 12, 2024, the Defendants filed their motion for summary judgment. Mot.

On December 17, 2024, the Plaintiffs submitted their opposition. Mem. in Supp. In Opp. to Mot. for Summ. J., ECF No. 160-12 ("Opp'n").

On January 9, 2025, the Defendants submitted their reply. Reply, ECF No. 161 ("Reply").

On July 2, 2025, the Court issued an Order directing Defendants to submit the relevant plan documents on which their motion for summary judgment rely. *See* Order ECF No. 162; Order, ECF No. 163.

On July 7, 2025, the Defendants filed a motion for a status conference and noted that "[t]his lawsuit concerns approximately 13,000 claims for medical services provided to approximately 2,600 individual Cigna members" and thus potentially 2,600 plan documents are at issue. Consent Mot. for Status Conf., ECF No. 164.

---

[7] Defendants allege that "Plaintiffs claim that they are owed $2,030,663 on [these] claims." Mot. at 22.

On July 15, 2025, the Court held a status conference to hear the parties' respective positions on the production of the documents. *See* Minute Entry, ECF No. 167.

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed

7

material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); and *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

When deciding a motion for summary judgment, a court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier v. Armstrong*, No. 3:99-cv-01559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007). In reviewing the record, a court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving party on the issue for which summary judgment is sought, then summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

## III.    DISCUSSION

Defendants have moved for summary judgment as to each of Plaintiffs' three remaining claims under ERISA, CUPTA, and for tortious interference with beneficial or contractual relationship.

The Court will address each claim in turn.

### A.  The ERISA Claims

Under Section 502 of ERISA, "a civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1)(B). A "participant" is "any employee . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan" and a "beneficiary" is "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(7)–( 8).

Defendants argue that the Court should grant summary judgment dismissing (1) the approximately 10,000 Itemized Claims for which Plaintiffs were precluded from introducing evidence, (2) any Itemized Claims for which Plaintiffs do not have a valid assignment, (3) all Itemized Claims for which Plaintiffs failed to demonstrate that they exhausted administrative remedies, and (4) all Itemized Claims for which Plaintiffs did not publicly post a cash price under the CARES Act. Mot. at 10–11.[8]

As to the first issue, because the Court has precluded Plaintiffs from offering evidence as to these claims, *see* Order, ECF No. 118 at 11 ("Plaintiffs are precluded from offering evidence in support of the 10,619 Itemized Claims in Exhibit 1, the Itemized Claims pertaining to the 1,020 Patients in Exhibit 2, the 1,072 Itemized Claims in Exhibit 3, and the 376 Itemized Claims in Exhibit 4 (in the Begos Suppl. Decl. [Doc. # 108])") and upheld this ruling upon reconsideration, *see* Order, ECF No. 153, summary judgment as to these claims is granted and any claims related to the precluded Itemized Claims are dismissed. *See Anderson*, 477 U.S. at 251 (noting that "summary judgment should be granted where the evidence is such that it 'would require a directed

---

[8] Where the internal pagination conflicts with the ECF-generated pagination, this Ruling and Order shall refer to the ECF-generated pagination.

verdict for the moving party[,]'" and "the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." (citations omitted)).

The Court focuses the following analysis on the remaining 3,508 Itemized Claims. *See* Def. SMF ¶ 21; Pl. SMF ¶ 21.

### 1. The Validity of the Assignments

Healthcare providers are not considered beneficiaries under Section 502. *Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 257 (2d Cir. 2015) ("'Beneficiary,' as it is used in ERISA, does not without more encompass healthcare providers."). In this Circuit, however, "physicians [may] bring claims under § 502(a) based on a valid assignment from a patient." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 361 (2d Cir. 2016). The Second Circuit has recognized a "narrow exception [that] grants standing only to healthcare providers to whom a beneficiary has assigned his claim in exchange for health care benefits." *Id.* (citing *Simon v. Gen. Elec. Co.*, 263 F.3d 176, 178 (2d Cir. 2001). "[S]imply asserting that claims under [Section 502] have been assigned by the patients to [a healthcare provider] is insufficient by itself to give [the provider] a cause of action under the statute[,] [r]ather to obtain standing, the patients' assignment of the right to sue for benefits must be exchanged for healthcare benefits." *Id.* at 361–62.

"To proceed in the shoes of a beneficiary, the assignee must show that there is a valid assignment that comports with the terms of the benefits plan." *Pro. Orthopaedic Assocs., PA v. 1199SEIU Nat'l Benefit Fund*, 697 F. App'x 39, 40 (2d Cir. 2017). "[T]he validity of assignments for ERISA purposes is a question of federal common law[.]" *Merrick v. UnitedHealth Grp. Inc.*, 175 F. Supp. 3d 110, 117 (S.D.N.Y. 2016) (internal quotation omitted); *see also Devlin v. Empire Blue Cross and Blue Shield*, 274 F.3d 76, 85 n. 5 (2d Cir.2001) ("[I]n ERISA cases, state law does not control. Instead, general common law principles apply.").

While Defendants do not allege that the relevant plans contain anti-assignment provisions, and they do not dispute that Plaintiffs have produced two kinds of assignment agreements for the relevant claims, a "Patient Financial Responsibility Statement," and an electronic registration acknowledgement, Defendants nonetheless argue that these assignments are invalid for two reasons.

First, Plaintiffs argue that the electronic registration acknowledgement "assigns, at most, money to which a patient is 'entitled for medical expenses' provided that the money assigned does not exceed the patient's debt to Plaintiffs" and that because Plaintiffs represented to their patients that they would not seek payment from these patients, and no debt is owed, Plaintiff has "no standing to assert ERISA claims on behalf of those patients." Mot. at 23.

Second, Defendants argue that MMA, Coastal Connecticut Medical Group, LLC ("CCMG"), and Dr. Murphy's ERISA claims fail, as the only assignment agreements produced purport to assign rights only to DMSOG and NSMA.

In response, Plaintiffs argue that a valid assignment is not required for it to recover under the plan because the FFCRA and CARES Act require Defendants to reimburse providers, like Plaintiffs, directly for COVID-19 testing and related services. Opp'n at 9–11. Plaintiffs further argue that the language of the electronic registration acknowledgement, which assign "all money to which" the patient "is entitled" is legally sufficient to confer statutory standing under ERISA. Opp'n at 14–15. Finally, Plaintiffs argue that the assignments were valid because each assignment is to a named Murphy Practice entity, and because "all Murphy Practice entities are owned by the same individual, and operate interchangeably, that an entity other than the one named as assignee provided the services is immaterial." *Id.* at 7–8; *see also id.* at 12–13.

11

In reply, Defendants argue that the Second Circuit explicitly rejected Plaintiffs' argument that the CARES Act provides standing under ERISA. Reply at 6–7 (citing *Murphy Med. Assocs., LLC v. Yale Univ.*, 120 F.4th 1107, 1113 (2d Cir. 2024)). Defendants also argue that the electronic registration assigning the right to receive payment is insufficient to confer ERISA standing. *Id.* at 8–9. Finally, Defendants argue that Plaintiffs offer no legal support for their argument that the assignments to DMSOG and/or NSMA can be interpreted to be transferred to MMA, and have failed to provide any factual basis supporting an inference that DMSOG and/or NSMA re-assigned their interest to MMA before Plaintiffs brought suit. *Id.* at 7–8.

The Court disagrees.

As an initial matter, while the Plaintiffs argue that an assignment is not necessary because the FFCRA and CARES Act independently confer standing, the Plaintiffs cite no case law for this proposition, which runs contrary to the Second Circuit's longstanding recognition that the exception recognizing standing for healthcare providers to bring claims under Section 502 is "narrow," *see Am. Psychiatric Ass'n*, 821 F.3d at 361; *see also McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*, 857 F.3d 141, 146 (2d Cir. 2017) (quoting M*ontefiore Med. Ctr. v. Teamsters Loc*. 272, 642 F.3d 321, 329 (2d Cir. 2011)), and recent opinions declining to read these statutes as conferring an independent basis for standing, *see Murphy Med. Assocs.*, 120 F.4th at 1113 (noting that the Second Circuit has "made clear that providers cannot bring claims against ERISA health plans pursuant to this exception 'absent a *valid* assignment of a claim,'" and, where a plan included an anti-assignment provision, declining to find that the FFCRA and CARES Act provide a basis for standing) (emphasis in original). As a result, the Court "will not lightly infer congressional intent to override ERISA's standing requirements[,]" *Murphy Med. Assocs.,* 120 F.4th at 1113, and declines to find that the FFCRA and CARES Act give Plaintiffs standing to

bring claims under ERISA to recover payment for COVID-19 testing and related services. Thus, Plaintiffs must demonstrate valid assignments in order to bring their ERISA claims.

"While it is true that 'no particular mode, form, or phraseology is necessary to effect a valid assignment,' 'it is essential to an assignment of a right that the obligee manifest an intention to transfer the right to another person without further action or manifestation of intention by the obligee.'" *In re Int'l Eng'rs, Inc.*, 812 F.2d 78, 79–80 (2d Cir. 1987) (quoting 6A C.J.S. Assignments § 43b, at 655 (1975) and Restatement (Second) of Contracts § 324); *see also MC1 Healthcare, Inc. v. United Health Grp., Inc.*, No. 3:17-CV-01909 (KAD), 2019 WL 2015949, at *5 (D. Conn. May 7, 2019), *on reconsideration in part*, No. 3:17-CV-01909 (KAD), 2019 WL 3202965 (D. Conn. July 16, 2019) ("No words of art are required to constitute an assignment; any words that fairly indicate an intention to make the assignee owner of a claim are sufficient" (quoting 29 S. Williston, Contracts § 74:3 (4th Ed.)). "The requisite manifestation of a present intent to transfer the right may be accomplished in writing, orally or by conduct, but such manifestation must be sufficient to show a perfected transaction between the parties." *In re Int'l Eng'rs, Inc.*, 812 F.2d at 80 (citing *Miller v. Wells Fargo Bank International Corp.*, 540 F.2d 548, 557–58 (2d Cir. 1976)). The electronic registration acknowledgment states, in part:

> I am eligible for the insurance indicated on this form and I understand that payment is my responsibility regardless of insurance coverage. I hereby assign to DMSOG/NSMA all money to which I am entitled for medical expenses related to the services performed from time to time by DMSOG/NSMA, but not to exceed my indebtedness to DMSOG/NSMA. I authorize DMSOG/NSMA to release any medical information to my insurance carrier or third party payer to facilitate processing my insurance claims. . . . MEDICARE BENEFICIARIES: I request that payment of authorized Medicare benefits be made to DMSOG/NSMA. I authorize any holder of medical information about me to release to CMS and its agents any information needed to determine these benefits or the benefits payable for related services.

Ex. 2 to Foote-Smith Decl., ECF No. 157-7. The language of the assignment agreement thus can be interpreted to demonstrate an intent to assign any right to payment that the patient may have

under her insurance to DMSOG and NSMA. Courts in this District have found that similar assignments were sufficient to establish ERISA standing, *MC1 Healthcare, Inc.*, 2019 WL 2015949, at *5 ("Though not a model of clarity, based on the foregoing terms and provisions, the Court is persuaded that the average patient would have understood that by signing this form he was transferring to Mountainside the right to seek and collect any benefits due under the patient's plan for the services about to be performed by Mountainside."), and Defendants cite no controlling case law requiring a contrary result here.

Defendants likewise cite no authority to support their argument that because Plaintiffs represented in their Complaint that they told patients that Plaintiffs would not seek payment from the patients directly, they fail to establish a valid assignment of benefits to recover medical expenses from the patient's insurance providers. *See Am. Psychiatric Ass'n*, 821 F.3d at 361–62 ("[T]o obtain standing, the patients' assignment of the right to sue for benefits must be exchanged for healthcare benefits."). While Defendants argue that no amount is recoverable, as the assignment limits recovery to the patient's "indebtedness," Plaintiffs allege that their "representations that they would not, under any circumstances, seek payment from the patient . . . are nothing more than an accurate statement of law and government guidance prohibiting the billing of patients for COVID-19 testing and related services" as required under the FFCRA and the CARES Act. Opp'n at 15–16. Thus, "constru[ing] the evidence in the light most favorable to the non-moving party and draw[ing] all reasonable inferences in its favor," *Gary Friedrich Enters., LLC*, 716 F.3d at 312, as the Court must on a motion for summary judgment, Plaintiffs' representations that they would not seek payment from patients is not sufficient to establish that the patients owed no "debt" to Plaintiffs for their medical services that could be recovered through their insurance.

Finally, while Defendants argue that the assignment agreements confer standing only to DMSOG and NSMA, Plaintiffs have raised a genuine dispute of material fact as to the relationship between DMSOG and NSMA and the remaining Plaintiffs. Dr. Murphy alleges that he is "the sole owner of all Murphy Practice entities who are named plaintiffs in this lawsuit" and "was in process of transitioning the entire practice, and all individual practice entities, to Murphy Medical Associates during the relevant period." Decl. of Steven A.R. Murphy, ECF No. 160 at ¶ 34, 41 ("Murphy Aff."). He further states that "it was my intent that all rights or obligations due the individual practice entities such as Diagnostic and Medical Specialists of Greenwich and North Stamford Medical Associates – including assignments of benefits in their favor -- be assigned or re-assigned to Murphy Medical Associates." Murphy Aff. ¶ 41. In addition, Plaintiffs have produced documents that they allege to be Cigna SIU investigation reports stating that "[i]t appeared that Murphy Medical Associates was potentially the rebranded practice name for Diagnostic and Medical Specialists of Greenwich LLC," and describing DMSOG as  "Steven Murphy's other TIN." Ex. F. to Breitenbach Aff., ECF No. 160-10 at 3, 6.

As a result, drawing all factual inferences in favor of the Plaintiffs, *see Dufort*, 874 F.3d at 347 ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"), Plaintiffs have raised a genuine issue of material fact as to whether the Plaintiffs were, at the time of the assignments, essentially a single "healthcare provider," such that the assignment agreements intended to assign benefits to MMA. *See Simon*, 263 F.3d at 178 ("This narrow exception grants standing only to healthcare providers to whom a beneficiary has assigned his claim in exchange for health care."); *see also In re Int'l Eng'rs, Inc.*, 812 F.2d at 80 ("The requisite manifestation of

a present intent to transfer the right may be accomplished in writing, orally or by conduct, but such manifestation must be sufficient to show a perfected transaction between the parties.").

As a result, the Court declines to grant summary judgment dismissing Plaintiffs' ERISA claims based on the validity of the assignment agreements.

### 2. The Exhaustion of Administrative Remedies

The Second Circuit has long recognized that there is a "firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases." *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993) (quoting *Alfarone v. Bernie Wolff Const. Corp.*, 788 F.2d 76, 79 (2d Cir. 1986)), *cert. denied*, 479 U.S. 915 (1986); *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006) ("[T]he federal courts—including this Circuit—have recognized a firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases." (citation and internal quotation marks omitted)). The exhaustion requirement serves three primary purposes: to "(1) uphold Congress' desire that ERISA trustees be responsible for their actions, not the federal courts; (2) provide a sufficiently clear record of administrative action if litigation should ensue; and (3) assure that any judicial review of fiduciary action (or inaction) is made under the arbitrary and capricious standard, not *de novo*." *Kennedy*, 989 F.2d at 594. The requirement is an affirmative defense; the failure to exhaust is not jurisdictional. *See Paese*, 449 F.3d at 445 ("Indeed, the requirement is purely a judge-made concept that developed in the absence of statutory language demonstrating that Congress intended to make ERISA administrative exhaustion a jurisdictional requirement.").

Given the exhaustion requirement, a plaintiff must "pursue all administrative remedies provided by their plan pursuant to statute, which includes carrier review in the event benefits are denied." *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 511 (2d Cir.

2002); *see also Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 105 (2013) ("[P]articipants [are required to] exhaust internal review before bringing a claim for judicial review under § 502(a)(1)(B)" so "[a] participant's cause of action under ERISA accordingly does not accrue until the plan issues a final denial." (citations omitted)); *Kennedy*, 989 F.2d at 594 ("[E]xhaustion in the context of ERISA requires only those administrative appeals provided for in the relevant plan or policy.").

"The exhaustion requirement, however, is not absolute." *Kirkendall v. Halliburton, Inc.*, 707 F.3d 173, 179 (2d Cir. 2013), *cert. denied*, 571 U.S. 882 (2013). "Implicit in the exhaustion requirement is the condition that a plaintiff must have an administrative remedy to exhaust." *Id.* Thus, the Second Circuit has held that "plan participants will not be required to exhaust administrative remedies where they reasonably interpret the plan terms not to require exhaustion and do not exhaust their administrative remedies as a result." *Id.* at 181.

In addition, "where, claimants make a 'clear and positive showing' that pursuing available administrative remedies would be futile, the purposes behind the requirement of exhaustion are no longer served, and thus a court will release the claimant from the requirement." *Kennedy*, 989 F.2d at 594 (citations omitted). "A futility exception to an appeal requirement ordinarily depends on the proposition that appeals are so routinely and uniformly denied that it is simply a waste of time and money to pursue them." *Murphy Med. Assocs., LLC v. 1199SEIU Nat'l Benefit Fund*, No. 24-1880-CV, 2025 WL 763392, at *2 (2d Cir. Mar. 11, 2025) (summary order) (citing *Cottillion v. United Ref. Co.*, 781 F.3d 47, 55 (3d Cir. 2015)).

"The Second Circuit has discussed two instances where the plaintiffs failed to demonstrate futility." *Glynn v. Bankers Life & Cas. Co.*, 432 F. Supp. 2d 272, 283 (D. Conn. 2005). First, where the Plaintiffs presented "no evidence in the record that any ERISA plaintiff even *notified* [the

insurance carrier] of any disputed claim." *Id.* (citing *Kennedy*, 989 F.2d at 595) (emphasis in original). And second, where "the 'correspondence did not amount to an unambiguous application for benefits' and an official administrative denial of the plaintiff's claims was never issued." *Id.* (citing *Davenport v. Harry N. Abrams, Inc.*, 249 F.3d 130, 133 (2d Cir.2001)).

The Second Circuit has, however, "excused the failure to exhaust administrative remedies where the provider 'informed [the plaintiff] that he had exhausted any administrative remedies available,' and the recent denial of the plaintiff's benefits under a 'more lenient' standard suggested to 'any reasonable person' the futility of pursuing an administrative claim under a stricter standard." *Ruderman v. Liberty Mut. Grp., Inc.*, No. 21-817, 2022 WL 244086, at *2 (2d Cir. Jan. 27, 2022) (summary order) (citing *Paese*, 449 F.3d at 449 (alterations in original)).

Defendants argue that because "Plaintiffs have not produced documents demonstrating that they administratively appealed any of the denials[,]" they are entitled to summary judgment as to the ERISA claims. Mot. at 34. Defendants argue that "there is nothing in Cigna's communications during that period suggesting, much less making a clear and positive showing, that Cigna would not have reviewed Plaintiffs' medical records had Plaintiffs submitted them." *Id.* at 35.

In response, Plaintiffs assert that they were not required to exhaust administrative remedies because any administrative appeal would have been futile because Cigna sent letters to MMA and DMSG in the Spring of 2021 informing them that a flag was placed that will deny claims submitted by those entities. Opp'n at 19–20. Plaintiffs further argue that before the Spring of 2021, exhaustion would be futile because "[s]tarting around May 2020, Defendants responded to virtually every submitted claim with either denials stating 'Records do not match' or a request for extensive medical records and a notice that processing and payment of the claim would be pended

awaiting the records[,]" and "[t]he sheer number of these requests, coupled with the voluminous records requested, made it impossible for Plaintiffs to timely reply." *Id.* at 20.

In reply, Defendants argue that Plaintiffs fail to create a dispute of material fact, because they do not identify specific evidence showing a clear and positive showing of futility before bringing suit. Reply at 10. Defendants argue that the Spring 2021 audit cannot support a finding of futility because "that audit expressly concerned claims that Cigna had already paid," and thus "has no bearing on appealing the denied Itemized Claims for which Plaintiffs seek payment in this action." *Id.* at 10 (emphasis removed).

The Court disagrees, at least at this time.

Defendants have not provided the relevant plan documents or provisions of such plans concerning the administrative appeals process for the relevant claims in their initial briefs. As a result, the Court instructed that "[t]o the extent that Defendants seek to rely on arguments regarding the alleged failure to exhaust administrative remedies on summary judgment . . .  Defendants must clarify the administrative remedies available under the terms of the relevant plans." Order, ECF No. 163. Defendants informed the Court that "[t]his lawsuit concerns approximately 13,000 claims for medical services provided to approximately 2,600 individual Cigna members," Mot. for Status Conference, ECF No. 164 (Jul. 8, 2025), and, at the parties' request, the Court heard alternatives to submitting the plan documents, *see* Min. Entry, ECF No. 167 (Jul. 15, 2025).

Any proposal, however, which does not resolve any and all issues of fact as to the relevant administrative remedies to be exhausted for every claim in this case, likely does not satisfy the level of specificity required to meet their burden for this affirmative defense, particularly if there is inconsistency between and among the exhaustion procedures for the plans at issue.[9] *See Neufeld*

---

[9] To be clear, the Court is not and has not resolved whether any proposal contemplated by Defendants, even one discussed during the recent status conference, ECF No. 164, meets this standard.

*v. Cigna Health & Life Ins. Co.*, No. 3:17-CV-01693-WWE, 2018 WL 4158377, at *10 (D. Conn. Aug. 30, 2018) ("[F]ailure to exhaust ERISA administrative remedies under section 502(a)(1)(B) is an affirmative defense. Cigna has not demonstrated that is has established a reasonable claims and appeals procedure in compliance with DOL regulations relevant to Neufeld's overcharge claims." (citing *Paese*, 449 F.3d at 446 ("[F]ailure to exhaust ERISA administrative remedies is not jurisdictional, but is an affirmative defense") and *Negron v. Cigna Health & Life Ins.*, 300 F. Supp. 3d 341, 354 (D. Conn. 2018) ("In ruling on this motion to dismiss for failure to exhaust, the Court is mindful that defendant bears the burden of proof on this affirmative defense."))).

As a result, because Defendants have not submitted record evidence establishing that an administrative appeals process was available under the relevant plans for the Itemized Claims, the Court does not consider their arguments regarding exhaustion of administrative remedies at this time. *See Kirkendall* 707 F.3d at 179 ("Implicit in the exhaustion requirement is the condition that a plaintiff must have an administrative remedy to exhaust."); *see Cotten v. Altice USA, Inc.*, No. 19-CV-01534 (RJD)(ST), 2020 WL 32433, at *3 (E.D.N.Y. Jan. 2, 2020) (on a motion to dismiss, declining to find failure to exhaust administrative remedies where Defendants failed to submit applicable plan, and noting that "before the applicable plan is identified, it is not possible to decide whether any term poses an insurmountable barrier to Plaintiffs' case"); *cf. Weyant v. Phia Grp. LLC*, 823 F. App'x 51, 53 (2d Cir. 2020) (summary order) (reversing district court's determination that plaintiff was required to exhaust administrative remedies where district court was provided with the relevant plan and "noted that the Plan did not contain explicit language providing guidance on how [Plaintiff] could have appealed her claim").

Accordingly, the Court denies summary judgment as to Plaintiffs' ERISA claims without prejudice to renewal. *See* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of

fact . . . as required by Rule 56(c), the court may: (1) give an opportunity to properly support or

address the fact; . . . or (4) issue any other appropriate order.")

### 3.  The Failure to Post a Cash Price

Section 3202 of the CARES Act sets forth the following requirements regarding the pricing

of COVID-19 diagnostic testing,

> (a) REIMBURSEMENT RATES.—A group health plan or a health insurance issuer providing coverage of items and services described in section 6001(a) of division F of the Families First Coronavirus Response Act (Public Law 116–127) with respect to an enrollee shall reimburse the provider of the diagnostic testing as follows:
>
>> (1) If the health plan or issuer has a negotiated rate with such provider in effect before the public health emergency declared under section 319 of the Public Health Service Act (42 U.S.C. 247d), such negotiated rate shall apply throughout the period of such declaration.
>>
>> (2) If the health plan or issuer does not have a negotiated rate with such provider, such plan or issuer shall reimburse the provider in an amount that equals the cash price for such service as listed by the provider on a public internet website, or such plan or issuer may negotiate a rate with such provider for less than such cash price.
>
> (b)  REQUIREMENT TO PUBLICIZE CASH PRICE FOR DIAGNOSTIC TESTING FOR COVID–19.—
>
>> (1) IN GENERAL.—During the emergency period declared under section 319 of the Public Health Service Act (42 U.S.C. 247d), each provider of a diagnostic test for COVID–19 shall make public the cash price for such test on a public internet website of such provider.
>>
>> (2) CIVIL MONETARY PENALTIES.—The Secretary of Health and Human Services may impose a civil monetary penalty on any provider of a diagnostic test for COVID–19 that is not in compliance with paragraph (1) and has not completed a corrective action plan to comply with the requirements of such paragraph, in an amount not to exceed $300 per day that the violation is ongoing.

Pub. L. No. 116-136, § 3202, 134 Stat. 281, 367 (2020).

Defendants argue that any claims brought under the CARES Act must be dismissed because Plaintiffs failed to post the "cash price" they were charging patients for most of the relevant period as required under the CARES Act, and because the cash price posted after November 2022 did not comply with the requirements under the CARES Act. Mot. at 24–26.

Plaintiffs do not dispute that they failed to post a cash price on their website until November 2020. Opp'n at 22. They argue, however, that this "does not foreclose Plaintiffs from recovering on their ERISA benefits claim." *Id.* Plaintiffs argue that the Departments of Labor, Health and Human Services, and the Treasury's FAQS about the FFCRA and CARES Act indicate that "section 3202(a) is silent with respect to the amount to be reimbursed for COVID-19 testing in circumstances where the provider has not made public the cash price for a test and the plan or issuer and the provider cannot agree upon a rate that the provider will accept as payment in full for the test" and "[i]f the method for determining reimbursement for out-of-network services (or services for which there is no negotiated rate) is governed by applicable state law, then state law continues to apply." *Id.* at 23 (quoting United States Departments of Labor, Health and Human Services, and the Treasury, *FAQS About Families First Coronavirus Response Act And Coronavirus Aid, Relief, And Economic Security Act Implementation Part 43* (Jun. 23, 2020)). Plaintiffs further argue that the Connecticut Surprise Billing Law supplies a price for out-of-network providers to reimburse emergency services. *Id.* at 24 (citing Conn. Gen. Stat. § 38a-477a(b)(3)(a))

In reply, Defendants argue that "[t]he CARES Act says nothing about a third option of resorting to state law to set a price" and state law does not apply, and even if it were to apply "Connecticut law prevents Plaintiffs from using the CARES Act to recover payment for services that they rendered (if they rendered them at all) in violation of the CARES Act." Reply at 11.

22

Defendants further argue that the Surprise Billing Law does not apply, as "[t]he law applies only to a patient with an 'emergency condition,'" and Plaintiffs failed to demonstrate that "mild Covid symptoms constituted an 'emergency condition' under the Surprise Billing Law." *Id.* at 12. Finally, Defendants argue that "even if the Surprise Billing Law did apply, Plaintiffs have not produced any evidence in this case that would allow them to prove a price for any of the Itemized Claims under that law." *Id.*

The Court disagrees, at least at in part.

As this Court stated previously in the context of Plaintiffs' CUTPA claims, "[w]hile Section 3202(b) of the CARES Act specifically contemplates certain penalties for failure to post a cash price, it does not relieve an insurer's obligations, and dismissal is not warranted on this basis." Order re MTD at 6. As Plaintiffs note, "there is nothing in the CARES Act that prohibits an out-of-network provider from obtaining direct reimbursement from health plans for providing COVID-19 testing or related services to their enrollees if the provider fails to properly post its cash price" and Section 3202(b)(2) of CARES Act provides an explicit remedy for the failure to post a cash price—the Secretary of Health and Human Services may impose a monetary penalty against providers who fail to post a cash price as required under Section 3202(b)(1). Opp'n at 17; *see also* Pub. L. No. 116-136, § 3202(b)(2) ("The Secretary of Health and Human Services may impose a civil monetary penalty on any provider of a diagnostic test for COVID–19 that is not in compliance with paragraph (1) and has not completed a corrective action plan to comply with the requirements of such paragraph, in an amount not to exceed $300 per day that the violation is ongoing.").

Moreover, Plaintiffs have provided FAQs from relevant agencies indicating that the failure to post a cash price was not necessarily intended to bar a provider's recovery:

**Q11. How should plans and issuers determine a reimbursement rate for providers of COVID-19 testing if they do not have a negotiated rate with the provider and the**

**provider has not made available on a public internet website the cash price of a COVID-19 diagnostic test, as required by section 3202(b) of the CARES Act?**

The requirement imposed by section 3202(a) of the CARES Act to reimburse the provider an amount that equals the cash price of a COVID-19 test is contingent upon the provider making public the cash price for the test, as required by section 3202(b) of the CARES Act. If the provider has not complied with this requirement, and the plan or issuer does not have a negotiated rate with the provider, the plan or issuer may seek to negotiate a rate with the provider for the test. However, section 3202(a) is silent with respect to the amount to be reimbursed for COVID-19 testing in circumstances where the provider has not made public the cash price for a test and the plan or issuer and the provider cannot agree upon a rate that the provider will accept as payment in full for the test.

. . .

If the method for determining reimbursement for out-of-network services (or services for which there is no negotiated rate) is governed by applicable state law, then state law continues to apply as described in Q10 above.

Ex. B. to Breitenbach Aff., ECF No. 160-6 at 10.

As a result, dismissal of Plaintiffs' ERISA claims for failure to post a cash price is

improper.[10]

Of course, Plaintiffs' failure to include a cash price until November 2020 may limit their

ability to prove damages should Plaintiffs succeed in establishing Defendants' liability for their

ERISA claims. While Defendants argue that Plaintiffs have not submitted evidence that their

patients experienced "acute symptoms of sufficient severity, . . . such that a prudent layperson with

---

[10] Defendants cite to *Greenwald v. Van Handel*, 88 A.3d 467, 472 (Conn. 2014) for the proposition that under Connecticut law, "common-law maxims [dictate] that '[n]o one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime.'" In that case, however, the Connecticut Supreme Court determined that a plaintiff could not bring a tort claim against a clinical social worker for professional negligence after the social worker refused to treat plaintiff upon learning plaintiff viewed child pornography because "it would violate the public policy of our state to impose a duty on the defendant to protect the plaintiff from injuries arising from the legal consequences of the plaintiff's volitional criminal conduct, unlawful viewing and downloading of child pornography." *Greenwald*, 88 A.3d at 477. Thus, the rationale of that case is inapplicable here, where Plaintiffs' failure to post a cash price is subject only to a civil monetary penalty. Moreover, because Congress expressly delineated a remedy for the failure to post a cash price, and in the absence of evidence that it intended for the failure to post a cash price to bar recovery under the Act, it would be improper for the Court to impose an additional remedy. *See Grochowski v. Phoenix Const.*, 318 F.3d 80, 85 (2d Cir. 2003) ("It is an 'elemental canon' of statutory construction that where a statute expressly provides a remedy, 'courts must be especially reluctant to provide additional remedies.'" (citation omitted)).

an average knowledge of health and medicine, acting reasonably, would have believed that the absence of immediate medical attention would result in serious impairment to bodily functions or serious dysfunction of a bodily organ or part, or would place the person's health, . . ., in serious jeopardy," such that the Surprise Billing Law would apply and provide a price at trial, *see* Conn. Gen. Stat. § 38a-591a(14); *id.* § 38a-477aa(a)(1) ("'Emergency condition' has the same meaning as 'emergency medical condition', as provided in section 38a-591a."), the Court will not and cannot definitively resolve this issue now. *See Dufort v. City of New York*, 874 F.3d 338, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" (citation omitted)).

Accordingly, the Court declines to dismiss Plaintiffs' ERISA claims on this basis, at least at this stage.

### B.  The CUPTA Claims

A plaintiff may bring a private cause of action under the Connecticut Unfair Trade Practices Act, "CUTPA," to enforce alleged violations of the Connecticut Unfair Insurance Practices Act, "CUIPA." *Kim v. State Farm Fire & Cas. Co.*, No. 3:15-CV-879 (VLB), 2015 WL 6675532, at *5 (D. Conn. Oct. 30, 2015) (citing *Mead v. Burns*, 509 A.2d 11, 17–18 (Conn. 1986)).

In determining whether a practice violates CUTPA, the criteria set out in the Federal Trade Commission's so-called cigarette rule guides the inquiry:

> (1) '[W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness;
> (2) whether it is immoral, unethical, oppressive, or unscrupulous;
> (3) whether it causes substantial injury to consumers, [competitors or other businesspersons].'

*Zulick*, 949 A.2d at 1092 n.11 (quoting *Ventres v. Goodspeed Airport, LLC*, 881 A.2d 937, 969 (Conn. 2005)).

"CUIPA identifies and prohibits a number of 'unfair methods of competition and unfair and deceptive acts or practices in the business of insurance.'" *Kim*, 2015 WL 6675532, at *5 (citing Conn. Gen. Stat. § 38a-316.) "Among these are '[u]nfair claim settlement practices' such as 'not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.'" *Id.* (quoting Conn. Gen. Stat. § 38a-316(6)(F)). In *NEMS, PLLC v. Harvard Pilgrim Healthcare of CT., Inc.*, 325 A.3d 196 (Conn. 2024) ("*NEMS II*"), the Connecticut Supreme Court clarified that there are only two circumstances in which a CUPTA violation may be brought based on unfair insurance practices apart from those enumerated in Section 38a-815: (1) where there is a "clear statement of legislative intent" from the Connecticut legislature that "the violation of a different insurance related statute is actionable under CUTPA," or (2) a criminal statute for which "[t]here is reason to think that, although the legislature might deem such violations of the criminal law to be sufficiently egregious as to qualify as unfair trade practices, they are so fundamentally distinct from the types of practices prohibited throughout chapter 38a that the legislature could not reasonably be expected to have included them in § 38a-816." *See NEMS II* at 539–40; *see also* Conn. Gen. Stat. § 38a-315 ("No person shall engage in this state in any trade practice which is defined in section 38a-816 as, or determined pursuant to sections 38a-817 and 38a-818 to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance"). In *NEMS II*, the court concluded that neither rationale supports the conclusion that the Connecticut Surprise Billings law—the statute at issue in that case—is the kind of statute contemplated by earlier precedent. *Id* at 204–05.

Defendants argue that, after *NEMS II*, any claims premised on a violation of the Connecticut Surprise Billing law or federal statute are untenable, and Plaintiffs' CUPTA claims brought under the CARES Act or the FFCRA likewise must fail. Mot. at 42–43.

In response, Plaintiffs contend that *NEMS II* "only held that a CUTPA cause of action cannot be based on an alleged violation of the Connecticut Surprise Bill Law," and it "did not hold that a CUTPA cause of action cannot be based on violations of the CARES Act or FFCRA." Opp'n at 25.

In reply, Defendants argue that "Plaintiffs do not claim that the Connecticut legislature issued any statement of legislative intent that a violation of the FFCRA or the CARES Act by a health plan is actionable under CUTPA," and in the absence of a clear statement from the Connecticut state legislature, a violation under the FFCRA or the CARES Act cannot support a CUPTA claim independent from CUIPA. Reply at 13.

The Court agrees.

Plaintiffs cite no authority for the proposition that after *NEMS II*, the CARES Act or the FFCRA satisfy either of the narrow circumstances permitted by the Connecticut Supreme Court. As a result, consistent with the Connecticut Supreme Court's statement "that the legislature intended [the] two paths [in § 38a-815] to be the exclusive means of identifying unfair insurance practices for purposes of CUTPA," *NEMS II*, 325 A.3d at 202, and recent cases after *NEMS II*, the Court declines to extend the reasoning of *NEMS II* to this novel circumstance, and concludes that the FFCRA and the CARES Act do not provide an independent basis for a CUPTA claim here where Plaintiffs have failed to establish a violation of CUIPA.[11] *See Zarabet v. ConnectiCare*, No.

---

[11] While Plaintiffs argue that given the emergency nature of these acts, "an expectation of clear legislative intent . . . is unreasonable given the circumstances," Opp'n at 26, this Court defers to the Connecticut Supreme Court's interpretations of its own opinions and of Connecticut statutes, and here the court in *NEMS II* set forth two pathways

HHD-CV24-6178622-S, 2025 WL 762609, at *6 (Conn. Super. Ct. Mar. 7, 2025) (granting motion to strike CUPTA claim against insurance company based on Mental Health Parity and Addiction Equity Act in light of *NEMS II*); *Guardian Flight LLC v. Aetna Life Ins. Co.*, No. 3:24-CV-00680-MPS, 2025 WL 1399145, at *14 (D. Conn. May 14, 2025) (without opining on the impact of *NEMS, II*, noting "Plaintiffs have since conceded that, in light of the Connecticut Supreme Court's decision in [*NEMS, II*], 'merely proving a violation of the [No Surprises Act] does not establish an independent violation of CUTPA'").

　　Accordingly, the Court grants summary judgment to the Defendants as to Plaintiffs' CUPTA claims.

### C.  The Tortious Interference Claim

　　Under Connecticut law, "[a] claim for intentional interference with contractual relations requires the plaintiff to establish: (1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was cause by the defendant's tortious conduct." *Rioux v. Barry*, 927 A.2d 304, 311–12  (Conn. 2007) (citations omitted). "[F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously." *Blake v. Levy*, 464 A.2d 52, 54 (Conn. 1983) (citation omitted). Moreover, "[t]o prove the interference was 'tortious,' the plaintiff must demonstrate 'malice on the part of the defendant, not in the sense of ill will, but intentional interference without justification.'" *Dichello*

---

that Plaintiffs fail to show apply to the FFCRA and the CARES Act. *See NEMS II* at 539–40. Regardless, given that the FFCRA and the CARES Act did not establish a private right of action, the Court is unpersuaded that policy reasons would support Plaintiffs' interpretation. *See* Order, ECF No. 48 at 9–10 (Mar. 11, 2022) (concluding "that neither § 6001 of the FFCRA nor § 3202 of the CARES Act contains a private right of action").

*Distributors, Inc. v. Anheuser-Busch, LLC*, 715 F. Supp. 3d 220, 269 (D. Conn. 2024) (quoting

*Daley v. Aetna Life & Cas. Co.*, 249 Conn. 766, 805, 734 A.2d 112 (1999)). "Whether a defendant's

interference is tortious is a question of fact for the jury." *Landmark Inv. Grp., LLC v. CALCO*

*Const. & Dev. Co.*, 124 A.3d 847, 860 (Conn. 2015).

Defendants argue that Plaintiffs fail to state a claim for tortious interference because they

"have no admissible evidence that Cigna made any defamatory statements about them" and

because "the undisputed evidence establishes that various town severed ties with Plaintiffs

promptly after new reports were published about their abusive billing practices." Mot. at 12.

Plaintiffs do not address this argument.

The Court agrees with Defendants.

"Hearsay is not sufficient to create a genuine issue of fact for summary judgment

purposes." *Antech Diagnostics, Inc. v. Veterinary Oncology & Hematology Ctr., LLC*, No. 3:16-

CV-481(AWT), 2019 WL 10351654, at *4 (D. Conn. Mar. 5, 2019) (citing *Johnson v.*

*Chesebrough-Pond's USA Co.*, 918 F. Supp. 543, 552 (D. Conn. 1996), *aff'd sub nom. Johnson v.*

*Chesebrough-Ponds, Inc.*, 104 F.3d 355 (2d Cir. 1996)). Here, Plaintiffs allege that Cigna

interfered with contractual relationship between Plaintiffs and patients who are Cigna members or

subscribers "by, among other things, making defamatory and malicious statements about Dr.

Murphy and the Murphy Practice to their patients and other." TAC  ¶ 185; *see also id.* ¶¶ 182–

186.  The Plaintiffs have, however, failed to produce written or recorded "defamatory and

malicious statements." *See* Pl. SMF  ¶ 36–38; Foote-Smith Decl., Ex. 7, ECF No. 157-12 at 6.

While Dr. Murphy alleges that certain doctors and patients were told defamatory

statements, Plaintiffs have not indicated that they intend to call any person who can offer direct

testimony regarding these alleged conversations with Cigna. *See* Pl. SMF ¶ 39 ("Dr. Murphy was

asked at his deposition what specific defamatory and malicious statements he claimed Cigna made about him or his practice, and he testified only about statements that a doctor made to him about statements allegedly made by others to that doctor."); *id.* ¶ 41 ("Asked about defamatory and malicious statements that Cigna allegedly made to patients, he provided hearsay testimony about what 'several patients' allegedly told him Cigna had said to them."); *see also* Foote-Smith Decl., Ex. 4, ECF No. 157-9 ("Dr. Murphy Deposition"). As a result, Plaintiffs' only evidence comes in the form of inadmissible hearsay. In the absence of any admissible allegedly defamatory statements Cigna made—let alone the content of such alleged statements—Plaintiffs fail to create a genuine dispute of material fact sufficient to overcome summary judgment.

Accordingly, the Court grants summary judgment as to the tortious interference claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**.

Defendants' motion for summary judgment as to claims for which Plaintiffs have been precluded from introducing evidence is **GRANTED**.

Defendants' motion for summary judgment as to Plaintiffs' remaining ERISA claims is **DENIED** without prejudice to renewal as to Defendants' arguments regarding the failure to exhaust of administrative remedies.

Defendants' motion for summary judgment as to Plaintiffs' CUPTA and tortious interference claims is **GRANTED**.

**SO ORDERED** at New Haven, Connecticut, this 18th day of July, 2025.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE